No. 26-___

# United States Court of Appeals
# for the Federal Circuit

## IN RE GOOGLE LLC

*Petitioner*

On Petition for a Writ of Mandamus to the United States Patent and Trademark Office, Patent Trial and Appeal Board, in Case Nos. IPR2025-00487 and IPR2025-00488

## APPENDIX

Nathan R. Speed
Elisabeth H. Hunt
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, MA  02210
Telephone: (617) 646-8000
Fax: (617) 646-8646

*Counsel for Petitioner*

# TABLE OF CONTENTS

**Materials from _Google LLC v. VirtaMove, Inc._, Case Nos. IPR2025-00487 and IPR2025-00488**

Paper 11 (Institution Decision)
  July 11, 2025...................................................................... Appx0001-Appx0004

Paper 12 (Petitioner's Request for Director Review, IPR2025-00487)
  August 7, 2025.................................................................... Appx0005-Appx0024

Paper 11 (Petitioner's Request for Director Review, IPR2025-00488)
  August 7, 2025.................................................................... Appx0025-Appx0044

Paper 14 (Order Denying Request for Director Review)
  October 1, 2025 .................................................................. Appx0045-Appx0047

Paper 2 (Petition for _Inter Partes_ Review, IPR2025-00487)
  January 31, 2025.................................................................. Appx0048-Appx0154

Paper 2 (Petition for _Inter Partes_ Review, IPR2025-00488)
  January 31, 2025.................................................................. Appx0155-Appx0277

Paper 8 (Patent Owner's Request Discretionary Denial, IPR2025-00487)
  May 12, 2025 ...................................................................... Appx0278-Appx0302

Paper 8 (Patent Owner's Request Discretionary Denial, IPR2025-00488)
  May 12, 2025 ...................................................................... Appx0303-Appx0327

Paper 9 (Petitioner's Opposition to Request Discretionary Denial, IPR2025-00487)
  June 10, 2025 ..................................................................... Appx0328-Appx0394

Paper 9 (Petitioner's Opposition to Request Discretionary Denial, IPR2025-00488)
  June 10, 2025 ..................................................................... Appx0395-Appx0463

**Other Materials**

DeFosse et al., "Data Undermines USPTO's 'Settled Expectations' Doctrine",
  Law360,
   August 29, 2025................................................................. Appx0464-Appx0468

Stewart, Interim Processes for PTAB Workload Management Memorandum
  March 26, 2025.................................................................... Appx0469-Appx0471

Interim Director Discretionary Process FAQs,
    https://www.uspto.gov/patents/ptab/interim-director-discretionary-process
    Retrieved October 29, 2025 ................................................. Appx0472-Appx0482

PTAB Standard Operating Procedure 2, Designation or De-Designation of
    Decisions as Precedential or Informative
    July 24, 2023 ...................................................................... Appx0483-Appx0490

PTAB Addendum to Standard Operating Procedure 2 (Rev. 11)
    August 12, 2025.................................................................. Appx0491-Appx0491

Squires, Director Institution of AIA Trial Proceedings Memorandum
    Ocotber 17, 2025 ............................................................... Appx0492-Appx0493

Testimony of John A. Squires
    June 6, 2007........................................................................ Appx0494-Appx0503

Questions for the Record, Nomination of John A. Squires
    May 28, 2025...................................................................... Appx0504-Appx0530

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE OFFICE OF THE UNDER SECRETARY OF COMMERCE
FOR INTELLECTUAL PROPERTY AND DIRECTOR OF THE
UNITED STATES PATENT AND TRADEMARK OFFICE

GOOGLE LLC,
Petitioner,

v.

VIRTAMOVE, CORP.,
Patent Owner.

IPR2025-00487 (Patent 7,519,814 B2)
IPR2025-00488 (Patent 7,519,814 B2)
IPR2025-00489 (Patent 7,784,058 B2)
IPR2025-00490 (Patent 7,784,058 B2)

Before KALYAN K. DESHPANDE,[1] *Acting Deputy Chief Administrative Patent Judge*.

DECISION
Denying Institution of *Inter Partes* Review

_____

[1] Coke Morgan Stewart, Acting Under Secretary of Commerce for Intellectual Property and Acting Director of the United States Patent and Trademark Office, is recused and took no part in this decision. The Acting Director has delegated her authority in a Notice of Delegation. *See* https://www.uspto.gov/sites/default/files/documents/deshpande-delegation-letter.pdf.

IPR2025-00487 (Patent 7,519,814 B2)
IPR2025-00488 (Patent 7,519,814 B2)
IPR2025-00489 (Patent 7,784,058 B2)
IPR2025-00490 (Patent 7,784,058 B2)

VirtaMove, Corp. ("Patent Owner") filed a request for discretionary denial of institution (Paper 8, "DD Req.") in the above-captioned cases, and Google LLC filed an opposition (Paper 9, "DD Opp.").[2]

After considering the parties' arguments and the record, and in view of all relevant considerations, discretionary denial of institution is appropriate in these proceedings. This determination is based on the totality of the evidence and arguments the parties have presented.

Some factors counsel against discretionary denial. For example, there is currently no trial date set for the parallel district court proceeding involving Petitioner and the challenged patents. DD Opp. 6–7.

Other factors, however, weigh in favor of discretionary denial. In particular, the challenged patents have been in force for more than 14 years, creating strong settled expectations, and Petitioner does not provide any persuasive reasoning why an *inter partes* review is an appropriate use of Board resources. *Dabico Airport Sols. Inc. v. AXA Power ApS*, IPR2025-00408, Paper 21 at 2–3 (Director June 18, 2025). In the absence of any such reasoning, the Office is disinclined to disturb Patent Owner's strong settled expectations.

Although certain arguments are highlighted above, the determination to exercise discretion to deny institution is based on a holistic assessment of all of the evidence and arguments presented. Accordingly, the Petitions are denied under 35 U.S.C. § 314(a).

In consideration of the foregoing, it is:

---

[2] Citations are to papers in IPR2025-00487. The parties filed similar papers in IPR2025-00488, IPR2025-00489, and IPR2025-00490.

IPR2025-00487 (Patent 7,519,814 B2)
IPR2025-00488 (Patent 7,519,814 B2)
IPR2025-00489 (Patent 7,784,058 B2)
IPR2025-00490 (Patent 7,784,058 B2)

ORDERED that Patent Owner's request for discretionary denial is *granted*; and

FURTHER ORDERED that the Petitions are *denied*.

IPR2025-00487 (Patent 7,519,814 B2)
IPR2025-00488 (Patent 7,519,814 B2)
IPR2025-00489 (Patent 7,784,058 B2)
IPR2025-00490 (Patent 7,784,058 B2)

FOR PETITIONER:

Elisabeth Hunt
Greg Nieberg
Anant Saraswat
WOLF, GREENFIELD & SACKS, P.C.
ehunt-ptab@wolfgreenfield.com
gnieberg-ptab@wolfgreenfield.com
asaraswat-ptab@wolfgreenfield.com

FOR PATENT OWNER:

Reza Mirzaie
Neil Rubin
James Milkey
Qi Tong
RUSS, AUGUST & KABAT
rmirzaie@raklaw.com
nrubin@raklaw.com
jmilkey@raklaw.com
ptong@raklaw.com

4

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

GOOGLE LLC,
Petitioner,

v.

VIRTAMOVE, CORP.,
Patent Owner.

_____

Case No. IPR2025-00487
Patent No. 7,519,814

**PETITIONER'S REQUEST FOR REHEARING OF DECISION
GRANTING PATENT OWNER'S REQUEST FOR DISCRETIONARY
DENIAL AND DENYING INSTITUTION OF *INTER PARTES* REVIEW**

# TABLE OF CONTENTS

I. INTRODUCTION ..................................................................................1

II. THE DIRECTOR'S RELIANCE ON VIRTAMOVE'S ALLEGED "SETTLED EXPECTATIONS" VIOLATES THE APA ...............................3

    A. The Director's Decision Violates the APA. ...............................................3

        1. The Director's "settled expectations" finding is not in accordance with the law. ........................................................3

        2. Separately, judicial estoppel precludes the Director from finding that VirtaMove had "settled expectations" that its patent would not be subject to IPR. ..............................................6

    B. The Director's Decision Exceeds Her Statutory Authority.......................10

III. THE DIRECTOR'S DECISION OVERLOOKS NUMEROUS REASONS GOOGLE PROVIDED DEMONSTRATING WHY THIS IPR IS AN APPROPRIATE USE OF THE OFFICE'S RESOURCES..........13

# TABLE OF AUTHORITIES

**CASES**

*Agarwal v. TopGolf Int'l, Inc.*,
813 F. App'x 476 (Fed. Cir. 2020)........................................................................5

*Apple Inc. v. Gesture Tech. Partners, LLC*,
127 F.4th 364 (Fed. Cir. 2025)...........................................................................12

*Celgene Corp. v. Peter*,
931 F.3d 1342 (Fed. Cir. 2019)............................................... 1, 4, 5, 8

*Cook v. Principi*,
318 F.3d 1334 (Fed. Cir. 2002) (en banc)...........................................................11

*Cuozzo Speed Techs., LLC v. Lee*,
579 U.S. 261 (2016) .................................................................. 5, 11

*Davis v. Wakelee*,
156 U.S. 680 (1895) ............................................................................................6

*Halo Electronics, Inc. v. Pulse Electronics*,
579 U.S. 93 (2016)............................................................................................10

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)............................................................................................13

*New Hampshire v. Maine*,
532 U.S. 742 (2001) ...........................................................................................7

*NHK Spring Co. Ltd. v. Intri-Plex Techs., Inc.*,
IPR2018-00752, Paper 8 (PTAB Sept. 12, 2018) ...............................................9

*Purdue Pharma L.P. v. Collegium Pharm., Inc.*,
86 F.4th 1338 (Fed. Cir. 2023)...........................................................................15

*Return Mail, Inc. v. U.S. Postal Service*,
587 U.S. 618 (2019) ...........................................................................................6

*Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.*,
948 F.3d 1342 (Fed. Cir. 2020)..........................................................................11

*SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*,
580 U.S. 328 (2017) ................................................................................12

*Shenzhen Tuozhu Tech. v. Stratasys, Inc*.,
IPR2025-00438, -00531, -00532, -00585, Paper 10 (Director July 17, 2025) ....15

*Thryv, Inc v. Click-To-Call Techs., LP*,
590 U.S. 45 (2020) ............................................................... 3, 14

*United States v. Paulson,*
144 S. Ct. 1029-30 (2024) .......................................................7

*United States v. Paulson*,
68 F.4th 528 (9th Cir. 2023) ...................................................7

**STATUTES**

35 U.S.C. §311(c) .........................................................................11

35 U.S.C. §311(c)(1) .....................................................................2

5 U.S.C. §706(2)(A) ............................................................. passim

5 U.S.C. §706(2)(C) ............................................................. 3, 10, 12

**OTHER AUTHORITIES**

H. R. Rep. No. 112-98, pt. 1- AMERICA INVENTS ACT (2011) ........................14

Interim Process for PTAB Workload Management (March 26, 2025) ....................7

iii

## I. INTRODUCTION

The Director[1] wrongly exercised her discretion to deny institution in this proceeding. While conceding that "[s]ome factors," including the lack of a trial date in the parallel litigation involving the challenged patent, counsel "against discretionary denial," the Director nonetheless found denial appropriate because (**a**) "the challenged patents have been in force for more than 14 years, creating strong settled expectations," and (**b**) "Petitioner does not provide any persuasive reasoning why an *inter partes* review is an appropriate use of Board resources." Paper 11 ("Decision") at 2. Both cited reasons are flawed and must be reconsidered.

The Director's first cited reason—the patentee's "settled expectations"—is "not in accordance with law" and cannot provide an APA-compliant basis for denying institution. 5 U.S.C. §706(2)(A). In *Celgene Corp. v. Peter*, 931 F.3d 1342 (Fed. Cir. 2019), the Federal Circuit—at the Patent Office's behest—explicitly rejected a patentee's contention that it had an expectation that its pre-AIA patents would not be subject to IPR, a proceeding that did not exist at the time its patents issued. As the Federal Circuit explained, "the ***expectation*** that patent owners have had for nearly four decades" is "that patents are open to PTO reconsideration and possible cancelation." *Id.* at 1361-62.[2] The *Celgene* patentee knew its patents were

---

[1] Acting Director Stewart delegated her authority to issue the Decision here.

[2] Unless otherwise indicated, all emphases herein are added.

subject to potential reconsideration by the Patent Office during the patents' term, and thus had no reasonable expectations to the contrary.

Just as the *Celgene* patentee—as a matter of law—lacked an expectation that its patent would not be subject to IPR, so too did VirtaMove. The Director's contrary finding is not in accordance with *Celgene*, and such an unlawful finding cannot be the basis for denying institution. 5 U.S.C. §706(2)(A). Notably, principles of judicial estoppel preclude the Patent Office from arguing otherwise, as it was the **Patent Office** that successfully convinced the Federal Circuit to find that the *Celgene* patentee lacked an expectation of immunity from IPR.

The Director's reliance on VirtaMove's alleged "settled expectations" also exceeds her authority under the AIA, which explicitly sets forth only *one* issue-date-based limit on when a patent can be challenged in an IPR: *i.e.*, an IPR cannot be filed within the first nine months after the patent was granted. 35 U.S.C. §311(c)(1). Congress plainly knew how to limit what patents are subject to IPR based on their issuance date, and Congress's decision to bar IPRs only during the first nine months of a patent's term means that Congress did not intend to impose any other term-based restrictions on IPRs. The Director's reliance on a patentee's (non-existent) "settled expectations" as a basis for denying institution effectively immunizes an entire generation of patents that Congress intended to be subject to IPR. The Director's decision thus improperly exceeds her statutory authority, and is arbitrary

2

and capricious. 5 U.S.C. §706(2)(A), (C).

Finally, the Director's second cited reason—that Google failed to provide "any persuasive reasoning" why IPR was an appropriate use of the Patent Office's resources—overlooks the many reasons that Google provided in its discretionary-denial briefing and petition. Google's briefing and its petition provided the Director and the Board with evidence-based reasons why reconsidering VirtaMove's unpatentable claims was an appropriate use of the Board's resources—indeed, Google's detailed showing that the claims are unpatentable is ***itself*** a persuasive reason for the Board to use its resources in this proceeding, as the very purpose of IPR is "to weed out bad patent claims efficiently." *Thryv, Inc v. Click-To-Call Techs., LP*, 590 U.S. 45, 54 (2020).

## II. THE DIRECTOR'S RELIANCE ON VIRTAMOVE'S ALLEGED "SETTLED EXPECTATIONS" VIOLATES THE APA

### A. The Director's Decision Violates the APA.

#### 1. The Director's "settled expectations" finding is not in accordance with the law.

The Director's finding that VirtaMove had "settled expectations" that its patent would not be subject to IPR because it has "been in force for more than 14 years" (Decision at 2) is irreconcilable with the Federal Circuit's *Celgene* decision. Because the Director's "settled expectations" finding is not in accordance with the law, the Decision denying institution must be reconsidered and should be reversed.

In *Celgene*, the patentee argued that the retroactive application of IPRs to two

of its patents was an unconstitutional taking because those patents had issued prior to the AIA's passage. 931 F.3d at 1349. Similar to VirtaMove's patent, the two *Celgene* patents issued, respectively, 14 and 15 years prior to being challenged in IPR. *Id.* at 1347, 1359 (discussing institution decisions in 2015, and identifying 2000 and 2001 issue dates for the patents). The *Celgene* patentee argued that subjecting its pre-AIA patents to post-AIA IPR proceedings "unfairly interferes with its reasonable investment-backed expectations without just compensation," and was thus an unconstitutional regulatory taking. *Id.* at 1358.

The Patent Office intervened in *Celgene* and argued that no regulatory taking had occurred because, *inter alia*, "patents have been subject to reconsideration and cancellation by the USPTO in administrative proceedings for nearly four decades, and Celgene's own patent[s were] issued subject to this administrative revocation authority." *Id.* at 1358 (quoting Intervenor's Br. at 42) (alterations original). The Federal Circuit ultimately agreed with the Patent Office.

Echoing the Patent Office's argument, the Federal Circuit explained that "for the last forty years, patents have been subject to reconsideration and possible cancellation by the PTO" and that the new IPR procedures "do not differ significantly enough from preexisting PTO mechanisms for reevaluating the validity of issued patents to constitute a Fifth Amendment taking." *Id.* at 1359. Given the similarities between IPRs and the reconsideration mechanisms that existed when its

patents issued, the *Celgene* patentee obtained the patents knowing full well that the Patent Office "possessed the authority to reexamine—and perhaps cancel—a patent claim it had previously allowed." *Id.* at 1359 (quoting *Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 267 (2016)).

The *Celgene* patentee's knowledge that its patents were granted subject to potential reconsideration (and cancelation) by the Patent Office defeated the patentee's claim of reasonable investment-backed expectations. As the Federal Circuit explained, "the **expectation** that patent owners have had for nearly four decades [is] that patents are open to PTO reconsideration and possible cancelation if it is determined, on the grounds specified in [35 U.S.C.] § 311(b), that the patents should not have issued in the first place." *Celgene*, 931 F.3d at 1361-62; *see also id.* at 1362-63 ("For forty years, patents owners have [] had the **expectation** that the PTO could reconsider the validity of issued patents…").[3]

The Director's finding that VirtaMove had "settled expectations" that its patent would not be subject to IPR because the patent issued over 14 years ago is impossible to reconcile with the Federal Circuit's *Celgene* decision. The Federal Circuit made clear that the only **expectation** patent owners have had for over forty years is that their patents are subject to potential reconsideration by the Patent Office,

---

[3] *See also Agarwal v. TopGolf Int'l, Inc.*, 813 F. App'x 476, 481 (Fed. Cir. 2020) (applying *Celgene* to patents filed before *inter partes* reexamination existed).

including via the vehicle of IPR challenges.[4]  That the *Celgene* patents had also issued 14 (and 15) years prior to being challenged highlights the inconsistency between the Director's "settled expectations" finding and the *Celgene* decision.

Under the APA, agency findings that are not in accordance with the law are unlawful and must be set aside.  5 U.S.C. §706(2)(A).  Because the Director's "settled expectations" finding is not in accordance with *Celgene*, it is unlawful.  The Director must reconsider the Decision and should refer the Petition to a merits panel.

**2.  Separately, judicial estoppel precludes the Director from finding that VirtaMove had "settled expectations" that its patent would not be subject to IPR.**

"Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position." *Davis v. Wakelee*, 156 U.S. 680, 689 (1895). In such scenarios, judicial estoppel operates to bar the previously-prevailing party from later advancing a contrary position.

---

[4] *Celgene* also made clear that patentees have known that their patents have "always been subject to challenge in district court."  931 F.3d at 1359; *see also Return Mail, Inc. v. U.S. Postal Service*, 587 U.S. 618, 622 (2019) ("After a patent issues, there are several avenues by which its validity can be revisited. The first is through a defense in an infringement action.").  Put simply, no matter the forum, patentees have no "settled expectations" against potential reconsideration or invalidation.

Judicial estoppel is warranted when (**1**) a party's later position is "clearly inconsistent" with its prior position, (**2**) the party successfully persuaded a court to accept its prior position, and (**3**) the party "would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001). All three factors are present here, and thus judicial estoppel provides a separate reason why the Director must reconsider her decision. *United States v. Paulson*, 68 F.4th 528, 547 & n.29 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 1029-30 (2024) ("[J]udicial estoppel may be applied to prevent the government from asserting inconsistent legal arguments.").

*First*, the Director's current position is that VirtaMove enjoys a settled expectation that its patent will not be subject to IPR because it issued over 14 years ago. Decision at 2; *see* Interim Process for PTAB Workload Management (March 26, 2025). That position is inconsistent with the position that the Director, on behalf of the Patent Office, advanced through the course of the *Celgene* case. In that earlier proceeding, the Office **repeatedly** advanced the position that the *Celgene* patentee lacked **any** expectation that its patents—which also had issued 14 and 15 years earlier—would not be subject to post-issuance reconsideration, including IPRs.

For example, in its Intervenor Brief in the *Celgene* case, the Patent Office argued that IPRs did not constitute a taking of a private property right because "patents have been subject to reconsideration and cancellation by the USPTO in

7

administrative proceedings for nearly four decades," thereby precluding patentees from having any reasonable expectation that their patents would not be subject to such proceedings, including IPRs. *Celgene*, No. 2018-1167, Brief for Intervenor, Doc. No. 43 at 42-43 (Fed. Cir. Aug. 30, 2018).

Likewise, in responding to Celgene's petition for rehearing, the Patent Office argued that no regulatory taking had occurred because "patent owners have long known that any unpatentable patent claims may be invalidated through judicial or administrative avenues." *Celgene*, No. 2018-1167, Intervenor's Response to Petition for Rehearing En Banc, Doc. No. 92 at 12 (Fed. Cir. Nov. 19, 2019). The Patent Office stated in no uncertain terms that: "There is also ***no reasonable expectation that a patent will be shielded from scrutiny***, or that invalid patents will be sheltered from procedural changes that bring their defects to light." *Id.* at 14.

And, in opposing Celgene's petition for a writ of certiorari from the Supreme Court, the Patent Office approvingly quoted the Federal Circuit's *Celgene* decision and argued that: "The differences between inter partes review and its reexamination predecessors did 'not disrupt the ***expectation*** that patent owners have had for nearly four decades' that the USPTO may cancel patent claims that the agency reconsiders and finds unpatentable." *Celgene*, No. 19-1074, Brief for Respondent in Opposition to Certiorari at 16 (Sup. Ct. May 2020) (quoting *Celgene*, 931 F.3d at 1361).

The Patent Office thus repeatedly took the position throughout the course of

8

the *Celgene* case that patentees have no reasonable expectation that their patents could be free from post-issuance reconsideration, including in the form of IPRs. Indeed, prior to the Director's recent "settled expectations" doctrine, the Patent Office's position had been that the ***only*** expectation that patentees have had for forty years is that their patents ***are subject*** to post-issuance reconsideration and cancellation. *See also NHK Spring Co. Ltd. v. Intri-Plex Techs., Inc.*, IPR2018-00752, Paper 8 at 19 (Sept. 12, 2018) (precedential) (rejecting patentee's contention that ten-year delay in challenging patent warranted discretionary denial).

***Second***, there can be no dispute that the Patent Office successfully persuaded the Federal Circuit that patentees should expect that their patents are subject to IPRs and thus patentees have no expectation that their patents could be immune from such challenges. As discussed *supra* II.A.1, that is the holding of *Celgene*. Advancing that same argument, the Patent Office also successfully persuaded the Federal Circuit to deny Celgene's rehearing petition and the Supreme Court to deny Celgene's petition for a writ of certiorari.

***Third***, allowing the Patent Office to reverse course and now declare that at least some patentees have settled expectations that their patents will not be subject to IPRs imposes an unfair detriment on Google. The detriment is clear: but for the Patent Office's abrupt change in position, the Director would have referred the IPR to a merits panel. VirtaMove's "settled expectations" was the ***only*** factor cited as

9

outweighing the other "factors" that the Director found counseled "***against***

discretionary denial." Decision at 2. Put simply, if the Director had not changed

positions, she would have had no reason to discretionarily deny Google's petition.

The three factors for judicial estoppel are met in this case. In *Celgene*, the

Patent Office explicitly took the position that the patentee had ***no*** expectation that

its patents—which, like VirtaMove's patent, had issued 14 or 15 years earlier—

would not be subject to IPR. The Director's decision in this proceeding is directly

contrary to that prior position, a position the Director successfully advanced before

the Federal Circuit and Supreme Court. Accordingly, the Director's decision must

be reconsidered because judicial estoppel bars the Director from finding that a patent

owner, like VirtaMove, has settled expectations that its patent will not be subject to

an IPR at some point in the patent's term.

**B.     The Director's Decision Exceeds Her Statutory Authority.**

The Director has some discretion to deny IPR petitions, but she cannot

exercise that discretion in a manner that exceeds her statutory authority. 5 U.S.C.

§706(2)(C); *Halo Electronics, Inc. v. Pulse Electronics*, 579 U.S. 93, 103 (2016)

("In a system of laws discretion is rarely without limits, even when the statute does

not specify any limits upon the [tribunal's] discretion.") (cleaned up). By treating

the age of VirtaMove's patent as dispositive in this proceeding, the Director created

a *de facto* deadline requiring that IPRs must be filed within some ill-defined period

of time early in a patent's term.  This Director-crafted deadline is inconsistent with the AIA, and the Director therefore exceeded her statutory authority by relying exclusively on that deadline to discretionarily deny Google's meritorious petition.

The AIA explicitly sets the IPR filing "deadline" as ***any time after*** the later of either "the date that is 9 months after the grant of a patent" or the date of termination of any instituted post-grant review of that patent.  35 U.S.C. §311(c).  Congress knew how to impose an issue-date-based deadline affecting when an IPR must be filed, and the ***only*** such deadline that Congress elected to impose is one that limits IPRs to patents that have been issued for at least nine months.  Congress's decision to impose one issue-date-based deadline means that other issue-date-based deadlines—like the Director's "settled expectations" deadline—were not intended.  *See Cook v. Principi*, 318 F.3d 1334, 1339 (Fed. Cir. 2002) (en banc) (superseded by statute) (applying the canon of *expressio unius est exclusio alterius* to conclude that, in listing two statutory exceptions, Congress did not intend to allow other exceptions).

Consistent with the statute's plain text, Justices Alito and Sotomayor have interpreted the AIA to permit "anyone [to] file a petition challenging the patentability of an issued patent claim ***at almost any time***."  *Cuozzo*, 579 U.S. at 287-88 (citing 35 U.S.C. §311(a), (c)) (Alito and Sotomayor concurring in part and dissenting in part).  As has the Federal Circuit.  *Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.*, 948 F.3d 1342, 1346 (Fed. Cir. 2020) (citing 35 U.S.C. §311(c),

§315(b), and explaining that "[IPRs] can be requested ***at any time*** during a patent's enforceability period, with certain restrictions."). As the Justices and the Federal Circuit recognized, 35 U.S.C. §311(c) provides the only issue-date-based restriction on when a patent may be challenged via IPR, and that provision limits how ***early*** in its term a patent can be challenged, but does not limit how ***late*** in its term a patent can be challenged. Indeed, the Federal Circuit recently confirmed that even expired patents can be challenged via IPR. *Apple Inc. v. Gesture Tech. Partners, LLC*, 127 F.4th 364, 368-70 (Fed. Cir. 2025).

Analogously, in *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, the Supreme Court rejected as a matter of law any attempt to limit actions based on timing where Congress has been express about the time frame in which such actions are to take place. 580 U.S. 328, 346 (2017) ("Laches cannot be interposed as a defense against damages where the infringement occurred within the period prescribed by § 286."). The same result should apply to the Director's implication of petitioner "laches" here.

The Director's imposition in this proceeding of a new issue-date-based deadline for filing an IPR exceeds her statutory authority under the AIA. By exceeding her statutory authority, the Director violated the APA and her decision must be reconsidered (and should be reversed). 5 U.S.C. §706(2)(C).

For similar reasons, the Director's reliance on the age of VirtaMove's patent

to deny institution must also be reconsidered because such reliance is arbitrary and capricious. 5 U.S.C. §706(2)(A). Agency action is arbitrary and capricious when "the agency has relied on factors which Congress has not intended it to consider." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Here, the Director acted in an arbitrary and capricious manner when she took into consideration the age of VirtaMove's patent despite Congress intending that any patent that has been issued for at least nine months is subject to IPR *at any point in time*. The Decision should be reconsidered for this reason too.

## III. THE DIRECTOR'S DECISION OVERLOOKS NUMEROUS REASONS GOOGLE PROVIDED DEMONSTRATING WHY THIS IPR IS AN APPROPRIATE USE OF THE OFFICE'S RESOURCES

The Decision says, "Petitioner does not provide any persuasive reasoning why an *inter partes* review is an appropriate use of Board resources." Decision at 2. But that statement is only plausibly accurate if the Director mistakenly *overlooked* the numerous reasons that Google provided. The Director should take those numerous reasons into consideration, and reconsider her decision denying institution.

The Petition itself provides a compelling reason why this IPR would be an appropriate use of Board resources, as the Petition spells out in detail why the challenged claims are unpatentable. For at least four claims, VirtaMove seemingly agreed when it disclaimed those claims in view of the Petition's showing. Paper 10 at 1. For the remaining challenged claims, VirtaMove offered only a meek defense

13

premised on an alleged missing limitation in the primary reference. *Id.* at 2-7. But VirtaMove's argument wholly ignores that the Petition advanced an ***obviousness*** theory, and explained why the limitation would have been obvious to combine.

"By providing for *inter partes* review, Congress, concerned about overpatenting and its diminishment of competition, sought to weed out bad patent claims efficiently." *Thryv*, 590 U.S. at 54. Congress thus intended for the Office to use the Board's resources to reconsider patents of dubious validity, and the Petition demonstrates that the '814 patent is such a patent. Instituting IPR is not only an appropriate use of the Board's resources, it is Congress's ***intended*** use of those resources. H. R. Rep. No. 112-98, pt. 1, p. 40 (2011) ("The legislation is designed to establish a more efficient and streamlined patent system that will improve patent quality and limit unnecessary and counterproductive litigation costs.").

Beyond being what Congress intended the Board to do with its resources, instituting IPR in this proceeding is an appropriate use of those resources for several other reasons that Google identified in its briefing. For example, Google highlighted the fact that its Petition challenges at least 26 unpatentable claims that would not be addressed in the pending district court litigation given VirtaMove's litigation tactics. Paper 9 at 16. Evaluating the merits of these 26 claims—an evaluation that the district court will not do—is thus an appropriate (and Congressionally intended) use of the Board's resources so as to avoid future costly litigation. *Purdue Pharma L.P.*

14

*v. Collegium Pharm., Inc.*, 86 F.4th 1338, 1344 (Fed. Cir. 2023) ("the purpose of the AIA" is "to create a more efficient alternative to district court litigation").

Google also highlighted the fact that VirtaMove never asserted the '814 patent before 2024, and never alleged that Google knew of the patent prior to being sued in 2024 (Paper 9 at 45-47), a fact that cuts against VirtaMove's alleged "settled expectations," if such expectations were a lawful consideration (they are not). *Shenzhen Tuozhu Tech. v. Stratasys, Inc.*, IPR2025-00438, -00531, -00532, -00585, Paper 10 (Director July 17, 2025). Further, Google explained that VirtaMove having asserted the '814 patent against six companies provides "compelling reasons" for the Board to more efficiently assess unpatentability in one forum, and "substantial negative economic consequences" if the Board does not. Paper 9 at 47-48.

Google further discussed the "efficiencies that would be gained by instituting IPR" because two other companies VirtaMove sued (Microsoft and Oracle) sought to join Google's petition rather than file their own. Paper 9 at 20. Google's Petition provided the Board an opportunity to address three different companies' challenges to VirtaMove's claims in a single proceeding, thus conserving both the Board's resources and those of the district courts. That Google provided a *Sotera* stipulation—which the Decision does not even mention—further highlights the efficiencies that would be gained by the Board instituting review. *Id.* at 17-18.

/Elisabeth Hunt/ August 7, 2025
Elisabeth Hunt, Reg. No. 67,336

15

## CERTIFICATE OF SERVICE UNDER 37 C.F.R. §42.6(E)(4)

I certify that on August 7, 2025, a copy of the foregoing document, including any exhibits or appendices filed therewith, is being served via electronic mail, as previously consented to by Patent Owner, upon the following:

| | |
|---|---|
| Reza Mirzaie | rmirzaie@raklaw.com |
| | rak_almondnet@raklaw.com |
| Marc A. Fenster | mfenster@raklaw.com |
| Neil Rubin | nrubin@raklaw.com |
| James A. Milkey | jmilkey@raklaw.com |
| Qi (Peter) Tong | ptong@raklaw.com |
| | rak_virtamove@raklaw.com |

Date: August 7, 2025

/Dara Del Rosario/
Dara Del Rosario
Paralegal
WOLF, GREENFIELD & SACKS, P.C.

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

GOOGLE LLC,
Petitioner,

v.

VIRTAMOVE, CORP.,
Patent Owner.

————————————

Case No. IPR2025-00488
Patent No. 7,519,814

**PETITIONER'S REQUEST FOR REHEARING OF DECISION
GRANTING PATENT OWNER'S REQUEST FOR DISCRETIONARY
DENIAL AND DENYING INSTITUTION OF *INTER PARTES* REVIEW**

# **TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................................1

II.   THE DIRECTOR'S RELIANCE ON VIRTAMOVE'S ALLEGED "SETTLED EXPECTATIONS" VIOLATES THE APA ................................3

    A.  The Director's Decision Violates the APA. ...............................3

       1.  The Director's "settled expectations" finding is not in accordance with the law. ..................................................3

       2.  Separately, judicial estoppel precludes the Director from finding that VirtaMove had "settled expectations" that its patent would not be subject to IPR. ................................6

    B.  The Director's Decision Exceeds Her Statutory Authority.......................10

III.  THE DIRECTOR'S DECISION OVERLOOKS NUMEROUS REASONS GOOGLE PROVIDED DEMONSTRATING WHY THIS IPR IS AN APPROPRIATE USE OF THE OFFICE'S RESOURCES..........13

# TABLE OF AUTHORITIES

**CASES**

*Agarwal v. TopGolf Int'l, Inc.*,
  813 F. App'x 476 (Fed. Cir. 2020) ...................................................................5

*Apple Inc. v. Gesture Tech. Partners, LLC*,
  127 F.4th 364 (Fed. Cir. 2025) ......................................................................12

*Celgene Corp. v. Peter*,
  931 F.3d 1342 (Fed. Cir. 2019) ..................................................... 1, 4, 5, 8

*Cook v. Principi*,
  318 F.3d 1334 (Fed. Cir. 2002) (en banc) ...................................................11

*Cuozzo Speed Techs., LLC v. Lee*,
  579 U.S. 261 (2016) ...................................................................... 5, 11

*Davis v. Wakelee*,
  156 U.S. 680 (1895) ......................................................................................6

*Halo Electronics, Inc. v. Pulse Electronics*,
  579 U.S. 93 (2016) ......................................................................................10

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ......................................................................................13

*New Hampshire v. Maine*,
  532 U.S. 742 (2001) ......................................................................................7

*NHK Spring Co. Ltd. v. Intri-Plex Techs., Inc.*,
  IPR2018-00752, Paper 8 (PTAB Sept. 12, 2018) .......................................9

*Purdue Pharma L.P. v. Collegium Pharm., Inc.*,
  86 F.4th 1338 (Fed. Cir. 2023) ....................................................................14

*Return Mail, Inc. v. U.S. Postal Service*,
  587 U.S. 618 (2019) ......................................................................................6

*Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.*,
  948 F.3d 1342 (Fed. Cir. 2020) ...................................................................12

*SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*,
   580 U.S. 328 (2017) ...............................................................................12

*Shenzhen Tuozhu Tech. v. Stratasys, Inc.*,
   IPR2025-00438, -00531, -00532, -00585, Paper 10 (Director July 17, 2025) ....15

*Thryv, Inc v. Click-To-Call Techs., LP*,
   590 U.S. 45 (2020) ............................................................................... 3, 14

*United States v. Paulson,*
   144 S. Ct. 1029-30 (2024) ......................................................................7

*United States v. Paulson*,
   68 F.4th 528 (9th Cir. 2023).....................................................................7

**STATUTES**

35 U.S.C. §311(c) ....................................................................................11

35 U.S.C. §311(c)(1).................................................................................2

5 U.S.C. §706(2)(A)......................................................................... passim

5 U.S.C. §706(2)(C)......................................................................... 3, 10, 12

**OTHER AUTHORITIES**

H. R. Rep. No. 112-98, pt. 1- AMERICA INVENTS ACT (2011) ........................14

Interim Process for PTAB Workload Management (March 26, 2025) ....................7

## I.  INTRODUCTION

The Director[1] wrongly exercised her discretion to deny institution in this proceeding.  While conceding that "[s]ome factors," including the lack of a trial date in the parallel litigation involving the challenged patent, counsel "against discretionary denial," the Director nonetheless found denial appropriate because (**a**) "the challenged patents have been in force for more than 14 years, creating strong settled expectations," and (**b**) "Petitioner does not provide any persuasive reasoning why an *inter partes* review is an appropriate use of Board resources."  Paper 10 ("Decision") at 2.  Both cited reasons are flawed and must be reconsidered.

The Director's first cited reason—the patentee's "settled expectations"—is "not in accordance with law" and cannot provide an APA-compliant basis for denying institution. 5 U.S.C. §706(2)(A).  In *Celgene Corp. v. Peter*, 931 F.3d 1342 (Fed. Cir. 2019), the Federal Circuit—at the Patent Office's behest—explicitly rejected a patentee's contention that it had an expectation that its pre-AIA patents would not be subject to IPR, a proceeding that did not exist at the time its patents issued.  As the Federal Circuit explained, "the ***expectation*** that patent owners have had for nearly four decades" is "that patents are open to PTO reconsideration and possible cancelation."  *Id.* at 1361-62.[2]  The *Celgene* patentee knew its patents were

---

[1]Acting Director Stewart delegated her authority to issue the Decision here.

[2] Unless otherwise indicated, all emphases herein are added.

subject to potential reconsideration by the Patent Office during the patents' term, and thus had no reasonable expectations to the contrary.

Just as the *Celgene* patentee—as a matter of law—lacked an expectation that its patent would not be subject to IPR, so too did VirtaMove. The Director's contrary finding is not in accordance with *Celgene*, and such an unlawful finding cannot be the basis for denying institution. 5 U.S.C. §706(2)(A). Notably, principles of judicial estoppel preclude the Patent Office from arguing otherwise, as it was the **Patent Office** that successfully convinced the Federal Circuit to find that the *Celgene* patentee lacked an expectation of immunity from IPR.

The Director's reliance on VirtaMove's alleged "settled expectations" also exceeds her authority under the AIA, which explicitly sets forth only **one** issue-date-based limit on when a patent can be challenged in an IPR: *i.e.*, an IPR cannot be filed within the first nine months after the patent was granted. 35 U.S.C. §311(c)(1). Congress plainly knew how to limit what patents are subject to IPR based on their issuance date, and Congress's decision to bar IPRs only during the first nine months of a patent's term means that Congress did not intend to impose any other term-based restrictions on IPRs. The Director's reliance on a patentee's (non-existent) "settled expectations" as a basis for denying institution effectively immunizes an entire generation of patents that Congress intended to be subject to IPR. The

2

Director's decision thus improperly exceeds her statutory authority, and is arbitrary and capricious. 5 U.S.C. §706(2)(A), (C).

Finally, the Director's second cited reason—that Google failed to provide "any persuasive reasoning" why IPR was an appropriate use of the Patent Office's resources—overlooks the many reasons that Google provided in its discretionary-denial briefing and petition. Google's briefing and its petition provided the Director and the Board with evidence-based reasons why reconsidering VirtaMove's unpatentable claims was an appropriate use of the Board's resources—indeed, Google's detailed showing that the claims are unpatentable is ***itself*** a persuasive reason for the Board to use its resources in this proceeding, as the very purpose of IPR is "to weed out bad patent claims efficiently." *Thryv, Inc v. Click-To-Call Techs., LP*, 590 U.S. 45, 54 (2020).

## II.  THE DIRECTOR'S RELIANCE ON VIRTAMOVE'S ALLEGED "SETTLED EXPECTATIONS" VIOLATES THE APA

### A.  The Director's Decision Violates the APA.

#### 1.  The Director's "settled expectations" finding is not in accordance with the law.

The Director's finding that VirtaMove had "settled expectations" that its patent would not be subject to IPR because it has "been in force for more than 14 years" (Decision at 2) is irreconcilable with the Federal Circuit's *Celgene* decision. Because the Director's "settled expectations" finding is not in accordance with the law, the Decision denying institution must be reconsidered and should be reversed.

3

In *Celgene*, the patentee argued that the retroactive application of IPRs to two of its patents was an unconstitutional taking because those patents had issued prior to the AIA's passage. 931 F.3d at 1349. Similar to VirtaMove's patent, the two *Celgene* patents issued, respectively, 14 and 15 years prior to being challenged in IPR. *Id.* at 1347, 1359 (discussing institution decisions in 2015, and identifying 2000 and 2001 issue dates for the patents). The *Celgene* patentee argued that subjecting its pre-AIA patents to post-AIA IPR proceedings "unfairly interferes with its reasonable investment-backed expectations without just compensation," and was thus an unconstitutional regulatory taking. *Id.* at 1358.

The Patent Office intervened in *Celgene* and argued that no regulatory taking had occurred because, *inter alia*, "patents have been subject to reconsideration and cancellation by the USPTO in administrative proceedings for nearly four decades, and Celgene's own patent[s were] issued subject to this administrative revocation authority." *Id.* at 1358 (quoting Intervenor's Br. at 42) (alterations original). The Federal Circuit ultimately agreed with the Patent Office.

Echoing the Patent Office's argument, the Federal Circuit explained that "for the last forty years, patents have been subject to reconsideration and possible cancellation by the PTO" and that the new IPR procedures "do not differ significantly enough from preexisting PTO mechanisms for reevaluating the validity of issued patents to constitute a Fifth Amendment taking." *Id.* at 1359. Given the

4

similarities between IPRs and the reconsideration mechanisms that existed when its patents issued, the *Celgene* patentee obtained the patents knowing full well that the Patent Office "possessed the authority to reexamine—and perhaps cancel—a patent claim it had previously allowed." *Id.* at 1359 (quoting *Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 267 (2016)).

The *Celgene* patentee's knowledge that its patents were granted subject to potential reconsideration (and cancelation) by the Patent Office defeated the patentee's claim of reasonable investment-backed expectations. As the Federal Circuit explained, "the *expectation* that patent owners have had for nearly four decades [is] that patents are open to PTO reconsideration and possible cancelation if it is determined, on the grounds specified in [35 U.S.C.] § 311(b), that the patents should not have issued in the first place." *Celgene*, 931 F.3d at 1361-62; *see also id.* at 1362-63 ("For forty years, patents owners have [] had the *expectation* that the PTO could reconsider the validity of issued patents…").[3]

The Director's finding that VirtaMove had "settled expectations" that its patent would not be subject to IPR because the patent issued over 14 years ago is impossible to reconcile with the Federal Circuit's *Celgene* decision. The Federal Circuit made clear that the only *expectation* patent owners have had for over forty

---

[3] *See also Agarwal v. TopGolf Int'l, Inc.*, 813 F. App'x 476, 481 (Fed. Cir. 2020) (applying *Celgene* to patents filed before *inter partes* reexamination existed).

years is that their patents are subject to potential reconsideration by the Patent Office, including via the vehicle of IPR challenges.[4]  That the *Celgene* patents had also issued 14 (and 15) years prior to being challenged highlights the inconsistency between the Director's "settled expectations" finding and the *Celgene* decision.

Under the APA, agency findings that are not in accordance with the law are unlawful and must be set aside.  5 U.S.C. §706(2)(A).  Because the Director's "settled expectations" finding is not in accordance with *Celgene*, it is unlawful.  The Director must reconsider the Decision and should refer the Petition to a merits panel.

> **2.**  **Separately, judicial estoppel precludes the Director from finding that VirtaMove had "settled expectations" that its patent would not be subject to IPR.**

"Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position." *Davis v. Wakelee*, 156 U.S. 680, 689 (1895).

---

[4] *Celgene* also made clear that patentees have known that their patents have "always been subject to challenge in district court."  931 F.3d at 1359; *see also Return Mail, Inc. v. U.S. Postal Service*, 587 U.S. 618, 622 (2019) ("After a patent issues, there are several avenues by which its validity can be revisited. The first is through a defense in an infringement action.").  Put simply, no matter the forum, patentees have no "settled expectations" against potential reconsideration or invalidation.

In such scenarios, judicial estoppel operates to bar the previously-prevailing party from later advancing a contrary position.

Judicial estoppel is warranted when (**1**) a party's later position is "clearly inconsistent" with its prior position, (**2**) the party successfully persuaded a court to accept its prior position, and (**3**) the party "would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001). All three factors are present here, and thus judicial estoppel provides a separate reason why the Director must reconsider her decision. *United States v. Paulson*, 68 F.4th 528, 547 & n.29 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 1029-30 (2024) ("[J]udicial estoppel may be applied to prevent the government from asserting inconsistent legal arguments.").

*First*, the Director's current position is that VirtaMove enjoys a settled expectation that its patent will not be subject to IPR because it issued over 14 years ago. Decision at 2; *see* Interim Process for PTAB Workload Management (March 26, 2025). That position is inconsistent with the position that the Director, on behalf of the Patent Office, advanced through the course of the *Celgene* case. In that earlier proceeding, the Office *repeatedly* advanced the position that the *Celgene* patentee lacked *any* expectation that its patents—which also had issued 14 and 15 years earlier—would not be subject to post-issuance reconsideration, including IPRs.

7

For example, in its Intervenor Brief in the *Celgene* case, the Patent Office argued that IPRs did not constitute a taking of a private property right because "patents have been subject to reconsideration and cancellation by the USPTO in administrative proceedings for nearly four decades," thereby precluding patentees from having any reasonable expectation that their patents would not be subject to such proceedings, including IPRs. *Celgene*, No. 2018-1167, Brief for Intervenor, Doc. No. 43 at 42-43 (Fed. Cir. Aug. 30, 2018).

Likewise, in responding to Celgene's petition for rehearing, the Patent Office argued that no regulatory taking had occurred because "patent owners have long known that any unpatentable patent claims may be invalidated through judicial or administrative avenues." *Celgene*, No. 2018-1167, Intervenor's Response to Petition for Rehearing En Banc, Doc. No. 92 at 12 (Fed. Cir. Nov. 19, 2019). The Patent Office stated in no uncertain terms that: "There is also ***no reasonable expectation that a patent will be shielded from scrutiny***, or that invalid patents will be sheltered from procedural changes that bring their defects to light." *Id.* at 14.

And, in opposing Celgene's petition for a writ of certiorari from the Supreme Court, the Patent Office approvingly quoted the Federal Circuit's *Celgene* decision and argued that: "The differences between inter partes review and its reexamination predecessors did 'not disrupt the ***expectation*** that patent owners have had for nearly four decades' that the USPTO may cancel patent claims that the agency reconsiders

8

and finds unpatentable." *Celgene*, No. 19-1074, Brief for Respondent in Opposition to Certiorari at 16 (Sup. Ct. May 2020) (quoting *Celgene*, 931 F.3d at 1361).

The Patent Office thus repeatedly took the position throughout the course of the *Celgene* case that patentees have no reasonable expectation that their patents could be free from post-issuance reconsideration, including in the form of IPRs. Indeed, prior to the Director's recent "settled expectations" doctrine, the Patent Office's position had been that the *only* expectation that patentees have had for forty years is that their patents *are subject* to post-issuance reconsideration and cancellation. *See also NHK Spring Co. Ltd. v. Intri-Plex Techs., Inc.*, IPR2018-00752, Paper 8 at 19 (Sept. 12, 2018) (precedential) (rejecting patentee's contention that ten-year delay in challenging patent warranted discretionary denial).

*Second*, there can be no dispute that the Patent Office successfully persuaded the Federal Circuit that patentees should expect that their patents are subject to IPRs and thus patentees have no expectation that their patents could be immune from such challenges. As discussed *supra* II.A.1, that is the holding of *Celgene*. Advancing that same argument, the Patent Office also successfully persuaded the Federal Circuit to deny Celgene's rehearing petition and the Supreme Court to deny Celgene's petition for a writ of certiorari.

*Third*, allowing the Patent Office to reverse course and now declare that at least some patentees have settled expectations that their patents will not be subject

to IPRs imposes an unfair detriment on Google.  The detriment is clear: but for the Patent Office's abrupt change in position, the Director would not have denied the IPR as she did.  VirtaMove's "settled expectations" was the ***only*** factor cited as outweighing the other "factors" that the Director found counseled "***against*** discretionary denial."  Decision at 2.  If the Director had not changed positions, her only cited reason to discretionarily deny Google's petition would not have existed.

The three factors for judicial estoppel are met in this case.  In *Celgene*, the Patent Office explicitly took the position that the patentee had ***no*** expectation that its patents—which, like VirtaMove's patent, had issued 14 or 15 years earlier— would not be subject to IPR.  The Director's decision in this proceeding is directly contrary to that prior position, a position the Director successfully advanced before the Federal Circuit and Supreme Court.  Accordingly, the Director's decision must be reconsidered because judicial estoppel bars the Director from finding that a patent owner, like VirtaMove, has settled expectations that its patent will not be subject to an IPR at some point in the patent's term.

**B.    The Director's Decision Exceeds Her Statutory Authority.**

The Director has some discretion to deny IPR petitions, but she cannot exercise that discretion in a manner that exceeds her statutory authority.  5 U.S.C. §706(2)(C); *Halo Electronics, Inc. v. Pulse Electronics*, 579 U.S. 93, 103 (2016) ("In a system of laws discretion is rarely without limits, even when the statute does

not specify any limits upon the [tribunal's] discretion.") (cleaned up).  By treating the age of VirtaMove's patent as dispositive in this proceeding, the Director created a *de facto* deadline requiring that IPRs must be filed within some ill-defined period of time early in a patent's term.  This Director-crafted deadline is inconsistent with the AIA, and the Director therefore exceeded her statutory authority by relying exclusively on that deadline to discretionarily deny Google's meritorious petition.

The AIA explicitly sets the IPR filing "deadline" as ***any time after*** the later of either "the date that is 9 months after the grant of a patent" or the date of termination of any instituted post-grant review of that patent.  35 U.S.C. §311(c). Congress knew how to impose an issue-date-based deadline affecting when an IPR must be filed, and the ***only*** such deadline that Congress elected to impose is one that limits IPRs to patents that have been issued for at least nine months.  Congress's decision to impose one issue-date-based deadline means that other issue-date-based deadlines—like the Director's "settled expectations" deadline—were not intended.  *See Cook v. Principi*, 318 F.3d 1334, 1339 (Fed. Cir. 2002) (en banc) (superseded by statute) (applying the canon of *expressio unius est exclusio alterius* to conclude that, in listing two statutory exceptions, Congress did not intend to allow other exceptions).

Consistent with the statute's plain text, Justices Alito and Sotomayor have interpreted the AIA to permit "anyone [to] file a petition challenging the patentability of an issued patent claim ***at almost any time***."  *Cuozzo*, 579 U.S. at

287-88 (citing 35 U.S.C. §311(a), (c)) (Alito and Sotomayor concurring in part and dissenting in part). As has the Federal Circuit. *Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.*, 948 F.3d 1342, 1346 (Fed. Cir. 2020) (citing 35 U.S.C. §311(c), §315(b), and explaining that "[IPRs] can be requested ***at any time*** during a patent's enforceability period, with certain restrictions."). As the Justices and the Federal Circuit recognized, 35 U.S.C. §311(c) provides the only issue-date-based restriction on when a patent may be challenged via IPR, and that provision limits how ***early*** in its term a patent can be challenged, but does not limit how ***late*** in its term a patent can be challenged. Indeed, the Federal Circuit recently confirmed that even expired patents can be challenged via IPR. *Apple Inc. v. Gesture Tech. Partners, LLC*, 127 F.4th 364, 368-70 (Fed. Cir. 2025).

Analogously, in *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, the Supreme Court rejected as a matter of law any attempt to limit actions based on timing where Congress has been express about the time frame in which such actions are to take place. 580 U.S. 328, 346 (2017) ("Laches cannot be interposed as a defense against damages where the infringement occurred within the period prescribed by § 286."). The same result should apply to the Director's implication of petitioner "laches" here.

The Director's imposition in this proceeding of a new issue-date-based deadline for filing an IPR exceeds her statutory authority under the AIA. By

exceeding her statutory authority, the Director violated the APA and her decision must be reconsidered (and should be reversed). 5 U.S.C. §706(2)(C).

For similar reasons, the Director's reliance on the age of VirtaMove's patent to deny institution must also be reconsidered because such reliance is arbitrary and capricious. 5 U.S.C. §706(2)(A). Agency action is arbitrary and capricious when "the agency has relied on factors which Congress has not intended it to consider." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983). Here, the Director acted in an arbitrary and capricious manner when she took into consideration the age of VirtaMove's patent despite Congress intending that any patent that has been issued for at least nine months is subject to IPR *at any point in time*. The Decision should be reconsidered for this reason too.

## III. THE DIRECTOR'S DECISION OVERLOOKS NUMEROUS REASONS GOOGLE PROVIDED DEMONSTRATING WHY THIS IPR IS AN APPROPRIATE USE OF THE OFFICE'S RESOURCES

The Decision says, "Petitioner does not provide any persuasive reasoning why an *inter partes* review is an appropriate use of Board resources." Decision at 2. But that statement is only plausibly accurate if the Director mistakenly *overlooked* the numerous reasons that Google provided. The Director should take those numerous reasons into consideration, and reconsider her decision denying institution.

The Petition itself provides a compelling reason why this IPR would be an appropriate use of Board resources, as the Petition spells out in detail why the

13

challenged claims are unpatentable. VirtaMove did not file any preliminary response, leaving the Petition's merits unrebutted.

"By providing for *inter partes* review, Congress, concerned about overpatenting and its diminishment of competition, sought to weed out bad patent claims efficiently." *Thryv*, 590 U.S. at 54. Congress thus intended for the Office to use the Board's resources to reconsider patents of dubious validity, and the Petition demonstrates that the '814 patent is such a patent. Instituting IPR is not only an appropriate use of the Board's resources, it is Congress's **intended** use of those resources. H. R. Rep. No. 112-98, pt. 1, p. 40 (2011) ("The legislation is designed to establish a more efficient and streamlined patent system that will improve patent quality and limit unnecessary and counterproductive litigation costs.").

Beyond being what Congress intended the Board to do with its resources, instituting IPR in this proceeding is an appropriate use of those resources for several other reasons that Google identified in its briefing. For example, Google highlighted the fact that its Petition challenges at least 26 unpatentable claims that would not be addressed in the pending district court litigation given VirtaMove's litigation tactics. Paper 9 at 16-17. Evaluating the merits of these 26 claims—an evaluation that the district court will not do—is thus an appropriate (and Congressionally intended) use of the Board's resources so as to avoid future costly litigation. *Purdue Pharma L.P.*

14

*v. Collegium Pharm., Inc*., 86 F.4th 1338, 1344 (Fed. Cir. 2023) ("the purpose of the AIA" is "to create a more efficient alternative to district court litigation").

Google also highlighted the fact that VirtaMove never asserted the '814 patent before 2024, and never alleged that Google knew of the patent prior to being sued in 2024 (Paper 9 at 47-49), a fact that cuts against VirtaMove's alleged "settled expectations," if such expectations were a lawful consideration (they are not). *Shenzhen Tuozhu Tech. v. Stratasys, Inc*., IPR2025-00438, -00531, -00532, -00585, Paper 10 (Director July 17, 2025). Further, Google explained that VirtaMove having asserted the '814 patent against six companies provides "compelling reasons" for the Board to more efficiently assess unpatentability in one forum, and "substantial negative economic consequences" if the Board does not. Paper 9 at 49-50.

Google further discussed the "efficiencies that would be gained by instituting IPR" because two other companies VirtaMove sued (Microsoft and Oracle) sought to join Google's petition rather than file their own. Paper 9 at 21. Google's Petition provided the Board an opportunity to address three different companies' challenges to VirtaMove's claims in a single proceeding, thus conserving both the Board's resources and those of the district courts. That Google provided a *Sotera* stipulation—which the Decision does not even mention—further highlights the efficiencies that would be gained by the Board instituting review. *Id.* at 18-19.

/Elisabeth Hunt/ August 7, 2025
Elisabeth Hunt, Reg. No. 67,336

## CERTIFICATE OF SERVICE UNDER 37 C.F.R. §42.6(E)(4)

I certify that on August 7, 2025, a copy of the foregoing document, including any exhibits or appendices filed therewith, is being served via electronic mail, as previously consented to by Patent Owner, upon the following:

| | |
|---|---|
| Reza Mirzaie | rmirzaie@raklaw.com |
| | rak_almondnet@raklaw.com |
| Marc A. Fenster | mfenster@raklaw.com |
| Neil Rubin | nrubin@raklaw.com |
| James A. Milkey | jmilkey@raklaw.com |
| Qi (Peter) Tong | ptong@raklaw.com |
| | rak_virtamove@raklaw.com |

Date: August 7, 2025

/Dara Del Rosario/
Dara Del Rosario
Paralegal
WOLF, GREENFIELD & SACKS, P.C.

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE OFFICE OF THE UNDER SECRETARY OF COMMERCE
FOR INTELLECTUAL PROPERTY AND DIRECTOR OF THE UNITED
STATES PATENT AND TRADEMARK OFFICE

---

GOOGLE LLC,
Petitioner,

v.

VIRTAMOVE, CORP.,
Patent Owner.

---

IPR2025-00487 (Patent 7,519,814 B2)
IPR2025-00488 (Patent 7,519,814 B2)
IPR2025-00489 (Patent 7,784,058 B2)
IPR2025-00490 (Patent 7,784,058 B2)[1]

---

Before JOHN A. SQUIRES, *Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office.*

ORDER

---

[1] This order applies to each of the above-listed proceedings.

IPR2025-00487 (Patent 7,519,814 B2)
IPR2025-00488 (Patent 7,519,814 B2)
IPR2025-00489 (Patent 7,784,058 B2)
IPR2025-00490 (Patent 7,784,058 B2)

The Office received a request for Director Review of the Decision denying institution in each of the above-captioned cases and an authorized response to each request. *See* Papers 12, 13.[2]

Having reviewed the requests and responses, it is:

ORDERED that the requests for Director Review are denied.

---

[2] Citations are to the record in IPR2025-00487. The parties filed similar papers in IPR2025-00488, IPR2025-00489, and IPR2025-00490.

2

IPR2025-00487 (Patent 7,519,814 B2)
IPR2025-00488 (Patent 7,519,814 B2)
IPR2025-00489 (Patent 7,784,058 B2)
IPR2025-00490 (Patent 7,784,058 B2)

For PETITIONER:

Elisabeth Hunt
Greg Nieberg
Anant Saraswat
WOLF, GREENFIELD & SACKS, P.C.
ehunt-ptab@wolfgreenfield.com
gnieberg-ptab@wolfgreenfield.com
asaraswat-ptab@wolfgreenfield.com

For PATENT OWNER:

Reza Mirzaie
Neil Rubin
James Milkey
Qi Tong
RUSS, AUGUST & KABAT
rmirzaie@raklaw.com
nrubin@raklaw.com
jmilkey@raklaw.com
ptong@raklaw.com

3

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

GOOGLE LLC,
Petitioner,

v.

VIRTAMOVE, CORP.,
Patent Owner.

_____

Case No. IPR2025-00487
Patent No. 7,519,814

_____

**PETITION FOR INTER PARTES REVIEW
UNDER 35 U.S.C. §§ 311-319 AND 37 C.F.R. § 42.1 et seq**

# TABLE OF CONTENTS

MANDATORY NOTICES ................................................................ xvi

    A.  Real Party-In-Interest ................................................. xvi

    B.  Related Matters ......................................................... xvi

        1.  United States Patent & Trademark Office ........................ xvi

        2.  USPTO Patent Trial and Appeal Board ........................... xvii

        3.  U.S. District Court for the Eastern District of Texas ........ xvii

        4.  U.S. District Court for the Western District of Texas ....... xvii

        5.  U.S. District Court for the Northern District of California ........... xviii

    C.  Counsel and Service Information - § 42.8(b)(3) and (4) ...................... xviii

I.    STANDING ....................................................................... 1

II.    GROUNDS ...................................................................... 1

III.    THE '814 PATENT ......................................................... 1

    A.  Specification ............................................................. 1

    B.  Person of Ordinary Skill in the Art ("POSA") ........................ 3

    C.  Prosecution History .................................................... 4

    D.  Challenged Claims ..................................................... 4

IV.    CLAIM INTERPRETATION ............................................. 4

V.    GROUND 1: Claims 1-4, 7-11, 14, AND 16-30 ARE
UNPATENTABLE OVER Blaser-Calder ...................................... 5

    A.  Blaser (EX1005) ....................................................... 5

    B.  Calder (EX1006) ...................................................... 7

    C.  Blaser-Calder Combination .......................................... 9

    D.  Mapping to Challenged Claims ...................................... 14

        1.  Claim 1 .............................................................. 14

            a.  [1PREA] ....................................................... 14

               i.  "1. In a system having a plurality of servers with
operating systems that differ" ................................ 14

               ii.  "operating in disparate computing environments" ............. 15

iii. "wherein each server includes a processor and an operating system" ...............................................16

iv. "[OS] including a kernel [and] a set of associated local system files compatible with the processor" ............17

b. [1PREB] ................................................................20

    i. "a method of providing at least some of the servers in the system with secure, executable, applications" ..............20

    ii. "[applications] related to a service" ...................................21

    iii. "wherein the applications are executed in a secure environment" ...............................................22

    iv. "wherein the applications each include an object executable by at least some of the different operating systems for performing a task related to the service" .........23

c. [1A] ................................................................25

    i. "storing in memory accessible to at least some of the servers a plurality of secure containers of application software" ................................................................25

        (1) Blaser-Calder's layers (containers) are "stor[ed] in memory accessible to…the servers" ......................25

        (2) Blaser-Calder's layers are "containers" .....................27

        (3) Blaser-Calder's layers are "secure containers of application software" ................................................................29

    ii. "each container comprising one or more of the executable applications" ...................................32

    iii. "and a set of associated system files required to execute the one or more applications" ...............................34

    iv. "for use with a local kernel residing permanently on one of the servers" ...........................................35

d. [1B] "wherein the set of associated system files are compatible with a local kernel of at least some of the plurality of different operating systems," ...................................36

e. [1C] "the containers of application software excluding a kernel," ...................................................................37

– ii –

f. [1D] "wherein some or all of the associated system files within a container stored in memory are utilized in place of the associated local system files that remain resident on the server," ...............................................................39

g. [1E] "wherein said associated system files utilized in place of the associated local system files are copies or modified copies of the associated local system files that remain resident on the server,"...............................................................40

h. [1F] "and wherein the application software cannot be shared between the plurality of secure containers of application software," ...............................................................41

i. [1G] "and wherein each of the containers has a unique root file system that is different from an operating system's root file system." ...............................................................43

2. Claim 2: "[C]laim 1, wherein each container has an execution file associated therewith for starting the one or more applications."...............................................................46

3. Claim 3: "[C]laim 2['s]…execution file includes instructions related to an order in which executable applications within will be executed." ...............................................................47

4. Claim 4: "[C]laim 1…pre-identifying applications and system files required for association with the one or more containers prior to said storing step" [1A]...............................................................48

5. Claim 7: "[C]laim 2…modifying at least some of the system files to define container specific mount points associated with the container." ...............................................................49

6. Claim 8: "[C]laim 1['s]…applications and associated system files are retrieved from a computer system having a plurality of secure containers."...............................................................50

7. Claim 9: "[C]laim 2, wherein server information related to hardware resource usage including at least one of CPU memory, network bandwidth, and disk allocation is associated with at least some of the containers prior to the applications within the containers being executed." ...............................................................51

8. Claim 10: "[C]laim 2, wherein in operation when an application residing within a container is executed, said application has no

access to system files or applications in other containers or to system files within the operating system during execution thereof."......................................................................................52

9.  Claim 11: "[C]laim 2['s]…containers include files stored in network file storage, and parameters forming descriptors of containers stored in a separate location."..........................................54

10. Claim 14 ...............................................................................54

  a.  [14PRE] "[C]laim 1…creating containers prior to said step of storing containers in memory" ..............................................54

  b.  [14A] "wherein containers are created by: a) running an instance of a service on a server;"...............................................55

  c.  [14B] "b) determining which files are being used; and," ..........56

  d.  [14C] "c) copying applications and associated system files to memory without overwriting the associated system files so as to provide a second instance of the applications and associated system files." ...........................................................56

11. Claim 16 ...............................................................................57

  a.  [16A] "[C]laim 1…creating containers prior to said step of storing containers in memory,"..................................................57

  b.  [16B] "wherein a step of creating containers includes using a skeleton set of system files as a container starting point and installing applications into that set of files." .............57

12. Claim 17 ...............................................................................58

  a.  [17A] "[C]laim 1…installing a service on a target server selected from one of the plurality of servers,"..........................58

  b.  [17B]: "…using a graphical user interface [GUI], associating a unique icon representing a service with an unique icon representing a server for hosting applications related to the service and for executing the service, so as to cause the applications to be distributed to, and installed on the target server." .....................................................................59

13. Claim 18: Claim 17's "target server and" GUI "are at remote locations."...........................................................................60

– iv –

14. Claim 19: Claim 18's GUI "is installed on a computing platform, and wherein the computing platform is a different computing platform than the target server." .......................................60

15. Claim 20: "Claim 19," where [17B]'s "associating" step "includes…relatively moving the unique icon representing the service to the unique icon representing a server." .............................61

16. Claim 21: "[C]laim 20…starting a distributed software application." ......................................................................................61

17. Claim 22: "[C]laims 20…updating a console on the selected target server with information indicating that the service is resident on the selected target server.".................................................62

18. Claim 23: "[C]laim 17…testing to determine if the selected target server is a valid computing platform, prior to causing the applications to be distributed to, and installed on the target server.".............................................................................................62

19. Claim 24: "[C]laim 17…creating a user account for the service."...............................................................................................62

20. Claim 25: "[C]laim 17…installing files specific to the selected application on the selected server."......................................................63

21. Claim 26: "[C]laim 17…setting file access permissions to allow a user to access the one of the applications to be distributed."...........63

22. Claim 27 ...................................................................................63

    a.   [27A] "[C]laim 1…de-installing a service from a server, comprising:".................................................................................63

    b.   [27B] "displaying the icon representing the service; [and] displaying the icon representing the server on which the service is installed; and" ...........................................................64

    c.   [27C] "utilizing the icon representing the service and the icon representing the server to initiating the de-installation of the selected service from the server on which it was installed." ....................................................................................64

23. Claim 28: "[C]laim 27…separating icon representing the service from the icon representing the server.".................................64

24. Claim 29: "[C]laim 27…testing whether the selected server is a valid computing platform for de-installation of the service."............65

Appx0053

25. Claim 30: "[C]laim 27…copying data file changes specific to the service back to a storage medium from which the data file changes originated prior to installation." ...........................65

VI. GROUND 2: Claims 5-6, 12-13, 15, AND 31-34 Are Unpatatentbale OVER Blaser-Calder-Schmidt.................................................................66

    A. Schmidt-449 (EX1007) ................................................................66

    B. Blaser-Calder-Schmidt .................................................................67

    C. Mapping to Challenged Claims.....................................................68

        1. Claim 5: "[C]laim 2…modifying at least some of the associated system files in plural containers to provide an association with a container specific identity assigned to a particular container." ..........68

        2. Claim 6: "[C]laim 2…assigning a unique associated identity to each of a plurality of the containers, wherein the identity includes at least one of IP address, host name, and MAC address." ...................................................................................69

        3. Claim 12 .................................................................................75

        4. Claim 13 .................................................................................75

        5. Claim 15 .................................................................................71

            a. [15A] "[C]laim 14…assigning an identity to the containers including at least one of a unique IP address, a unique Mac address and an estimated resource allocation;" ..........................71

            b. [15B] "installing the container on a server; and," ......................71

            c. [15C] "testing the applications and files within the container." ...........................................................................71

        6. Claim 31 .................................................................................72

            a. Previously Addressed Limitations .............................................72

            b. [31I] "a run time module for monitoring system calls from applications associated with one or more containers and for providing control of the one or more applications." ............73

        7. Claim 32 .................................................................................78

        8. Claim 33: "[C]laim 32['s]…run time module includes an intercepting module associated with the…containers for intercepting system calls from any of the…containers and for

providing values alternate to values the kernel would have assigned in response to the system calls, so that the containers can run independently of one another without contention, in a secure manner, the values corresponding to at least one of" [31C]'s unique identifiers.................................................74

9. Claim 34 ........................................................75

   a. [34A]: "[C]laim 31['s]…run time module performs: monitoring resource usage of applications executing;"..............75

   b. [34B]: "intercepting system calls to kernel mode, made by the at least one respective application within a container, from user mode to kernel mode;" ................................75

   c. [34C]: "comparing the monitored resource usage…with the resource limits; and, forwarding the system calls to a kernel on the basis of the comparison…."..................................76

VII. DISCRETIONARY DENIAL IS UNWARRANTED ...................................76

  A. §314(a).........................................................76

   1. Stay Potential..............................................77

   2. Trial Timing ...............................................77

   3. Litigation Investment .......................................77

   4. Issue Overlap...............................................77

   5. Litigation Defendants.......................................78

   6. Other Circumstances ........................................78

  B. §325(d).........................................................78

VIII. CONCLUSION..................................................78

IX. APPENDIX: CLAIM LISTING.......................................80

# TABLE OF AUTHORITIES

**CASES**

*Apple Inc. v. Fintiv, Inc.*,
IPR2020-00019, Paper 11 (Mar. 20, 2020) ........................................................76

*BMW of North America, LLC v. Michigan Motor Techs., LLC*,
IPR2023-01224, Paper 15 (Feb. 15, 2024) .........................................................77

*Google LLC v. Security First Innovations, LLC*,
IPR2024-00215, Paper 15 (May 23, 2024) ...........................................................5

*Markforged Inc. v. Continuous Composites Inc.*,
IPR2022-00679, Paper 7 (Oct. 25, 2022) ..................................................... 77, 78

*PLR Worldwide Sales Ltd. v. Flip Phone Games, Inc.*,
IPR2024-00209, Paper 9 (May 10, 2024) ..................................................... 15, 44

*Protect Animals With Satellites LLC v. OnPoint Sys., LLC*,
IPR2021-01483, Paper 11 (Mar. 4, 2022) ..........................................................77

*Sand Revolution II, LLC v. Cont'l Intermodal Group–Trucking*,
IPR2019-01393, Paper 24 (June 16, 2020) ........................................................77

**REGULATIONS**

37 C.F.R. §42.100(b) ..................................................................................................4

37 C.F.R. §42.104(a) .................................................................................................1

37 C.F.R. 42.104(b)(3) .............................................................................................5

**STATUTES**

35 U.S.C. §102(b) ......................................................................................................1

35 U.S.C. §102(e) ......................................................................................................1

35 U.S.C. §103 ...........................................................................................................1

35 U.S.C. §282(b) ......................................................................................................4

35 U.S.C. §314(a) ....................................................................................................76

35 U.S.C. §325(d) ................................................................................78

**OTHER AUTHORITIES**

Director's Interim Procedure for Discretionary Denials (June 21, 2022) ........ 76, 78

Appx0057

## APPENDIX LISTING OF EXHIBITS

| Exhibit | Description |
|---|---|
| 1001 | U.S. Patent No. 7,519,814 ("'814 patent") |
| 1002 | Prosecution History of U.S. Patent No. 7,519,814 |
| 1003 | Declaration of Samrat Bhattacharjee, Ph.D. ("Bhattacharjee") |
| 1004 | Curriculum Vitae of Samrat Bhattacharjee, Ph.D. |
| 1005 | U.S. Patent No. 7,117,495 ("Blaser") |
| 1006 | U.S. Patent Application Publication No. 20020066022 ("Calder") |
| 1007 | U.S. Patent No. 6,931,449 ("Schmidt-449") |
| 1008 | U.S. Patent Application Publication No. 20020095479 ("Schmidt-479") |
| 1009 | U.S. Patent Application Publication No. 20020133529 ("Schmidt-529") |
| 1010 | U.S. Patent Application Publication No. 20020124072 ("Tormasov") |
| 1011 | U.S. Patent Application Publication No. 20010009425 |
| 1012 | U.S. Patent Application Publication No. 20010018708 |
| 1013 | U.S. Patent Application Publication No. 20010047472 |
| 1014 | U.S. Patent Application Publication No. 20010056572 |
| 1015 | U.S. Patent Application Publication No. 20010029605 |
| 1016 | U.S. Patent Application Publication No. 20020023158 |
| 1017 | U.S. Patent Application Publication No. 20020052727 |
| 1018 | U.S. Patent Application Publication No. 20020143795 |
| 1019 | U.S. Patent Application Publication No. 20020156612 |
| 1020 | U.S. Patent Application Publication No. 20020156877 |
| 1021 | U.S. Patent Application Publication No. 20020174215 |
| 1022 | U.S. Patent Application Publication No. 20020188718 |
| 1023 | U.S. Patent Application Publication No. 20020194394 |
| 1024 | U.S. Patent Application Publication No. 20020194488 |
| 1025 | U.S. Patent Application Publication No. 20030009408 |
| 1026 | U.S. Patent Application Publication No. 20030014381 |
| 1027 | U.S. Patent Application Publication No. 20030014466 |
| 1028 | U.S. Patent Application Publication No. 20030018717 |
| 1029 | U.S. Patent Application Publication No. 20030023839 |
| 1030 | U.S. Patent Application Publication No. 20030041173 |
| 1031 | U.S. Patent Application Publication No. 20030093688 |
| 1032 | U.S. Patent Application Publication No. 20030097464 |
| 1033 | U.S. Patent No. 6,467,052 |
| 1034 | U.S. Patent Application Publication No. 20030140179 |
| 1035 | U.S. Patent Application Publication No. 20030154221 |
| 1036 | U.S. Patent No. 7,159,184 |

| Exhibit | Description |
|---|---|
| 1037 | U.S. Patent No. 7,103,745 |
| 1038 | U.S. Patent No. 6,263,440 |
| 1039 | U.S. Patent Application Publication No. 20040190534 |
| 1040 | U.S. Patent No. 7,356,771 |
| 1041 | U.S. Patent No. 5,903,753 |
| 1042 | U.S. Patent No. 4,685,125 |
| 1043 | U.S. Patent No. 5,406,644 |
| 1044 | U.S. Patent No. 5,421,009 |
| 1045 | U.S. Patent No. 5,568,630 |
| 1046 | U.S. Patent No. 5,640,562 |
| 1047 | U.S. Patent No. 5,657,221 |
| 1048 | U.S. Patent No. 5,675,831 |
| 1049 | U.S. Patent No. 5,742,829 |
| 1050 | U.S. Patent No. 4,742,450 |
| 1051 | U.S. Patent No. 5,761,669 |
| 1052 | U.S. Patent No. 5,784,555 |
| 1053 | U.S. Patent No. 5,835,765 |
| 1054 | U.S. Patent No. 6,044,465 |
| 1055 | U.S. Patent No. 6,122,744 |
| 1056 | U.S. Patent No. 6,195,650 |
| 1057 | U.S. Patent No. 6,321,323 |
| 1058 | U.S. Patent No. 6,363,409 |
| 1059 | U.S. Patent No. 6,453,470 |
| 1060 | U.S. Patent No. 6,567,767 |
| 1061 | U.S. Patent No. 6,732,359 |
| 1062 | U.S. Patent No. 6,874,148 |
| 1063 | U.S. Patent No. 6,985,937 |
| 1064 | U.S. Patent No. 7,140,015 |
| 1065 | U.S. Patent No. 7,185,192 |
| 1066 | U.S. Patent No. 7,454,440 |
| 1067 | U.S. Patent No. 8,209,680 |
| 1068 | U.S. Patent No. 5,926,636 |
| 1069 | U.S. Patent No. 5,218,530 |
| 1070 | U.S. Patent No. 6,134,593 |
| 1071 | U.S. Patent No. 6,918,038 |
| 1072 | U.S. Patent Application Publication No. 20040034623 |
| 1073 | U.S. Patent No. 7,461,148 |
| 1074 | U.S. Patent No. 7,136,800 |

| Exhibit | Description |
|---|---|
| 1075 | PCT Application Publication No. WO2002056156 |
| 1076 | Kamp et al., "Jails: Confining the omnipotent root," Proceedings of the 2nd International SANE Conference (Vol. 43, p. 116) (2000) |
| 1077 | Prevelakis et al., "Sandboxing Applications," USENIX Annual Technical Conference, FREENIX Track (pp. 119-126) (2001) |
| 1078 | Plaintiff VirtaMove Corp.'s Supplemental Preliminary Disclosure of Asserted Claims and Infringement Contentions, in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (Sept. 06, 2024) |
| 1079 | Chart re: '814 Patent accompanying Plaintiff VirtaMove Corp.'s Supplemental Preliminary Disclosure of Asserted Claims and Infringement Contentions, in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (Sept. 6, 2024) |
| 1080 | First Amended Complaint for Patent Infringement Against Google LLC in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (May 21, 2024) |
| 1081 | Scheduling Order in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (June 17, 2024) (ECF 34) |
| 1082 | Federal Court Management Statistics–Profiles, U.S. District Courts–Combined Civil and Criminal (September 2024) |
| 1083 | U.S. Patent Application Publication No. 20020095500 ("Schmidt-500") |
| 1084 | U.S. Patent Application Publication No. 20050169073 |
| 1085 | U.S. Provisional Application No. 60/533,388 |
| 1086 | U.S. Patent No. 5,412,808 |
| 1087 | Order Granting Defendant Google LLC's Motion to Transfer Venue to the Northern District of California in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (Jan. 22, 2025) |
| 1088 | Microsoft's Computer Dictionary (5th ed. 2002) (excerpt) |
| 1089 | U.S. Patent No. 6,381,742 |
| 1090 | U.S. Patent Application Publication No. 20030035430 |
| 1091 | U.S. Patent No. 6,477,624 |
| 1092 | U.S. Patent No. 5,931,947 |
| 1093 | U.S. Patent No. 6,148,335 |
| 1094 | U.S. Patent No. 6,944,790 |
| 1095 | U.S. Patent No. 6,014,135 |
| 1096 | U.S. Patent No. 6,282,660 |
| 1097 | U.S. Patent Application Publication No. 20040153709 |
| 1098 | U.S. Patent Application Publication No. 20050050389 |
| 1099 | U.S. Patent Application Publication No. 20040225952 |

| Exhibit | Description |
|---|---|
| 1100 | Google LLC's Proposed Claim Terms for Construction in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (Oct. 1, 2024) |
| 1101 | Plaintiff's Disclosure of Proposed Claim Constructions in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (Oct. 1, 2024) |
| 1102 | Google LLC's Opening Claim Construction Brief in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (Oct. 24, 2024) |
| 1103 | Plaintiff's Responsive Claim Construction Brief in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (Nov. 12, 2024) |
| 1104 | Google LLC's Reply Claim Construction Brief in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (Nov. 26, 2024) |
| 1105 | Plaintiff's Sur-Reply Claim Construction Brief in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (Dec. 13, 2024) |
| 1106 | Joint Claim Construction Statement in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (Dec. 18, 2024) |
| 1107 | U.S. Provisional Application No. 60/502,619 |
| 1108 | U.S. Patent Application Publication No. 20050188268 |
| 1109 | U.S. Patent Application Publication No. 20020140743 |
| 1110 | U.S. Patent Application Publication No. 20020143906 ("Tormasov-906") |
| 1111 | U.S. Patent No. 7,076,633 ("Tormasov-633") |
| 1112 | U.S. Patent Application Publication No. 20060089950 ("Tormasov-950") |
| 1113 | U.S. Patent No. 7,222,132 ("Tormasov-132") |
| 1114 | U.S. Patent Application Publication No. 20020147815 ("Tormasov-815") |
| 1115 | U.S. Patent No. 7,209,973 ("Tormasov-973") |
| 1116 | U.S. Patent Application Publication No. 20020138629 ("Schmidt-629") |
| 1117 | U.S. Patent No. 6,944,860 ("Schmidt-860") |
| 1118 | U.S. Patent Application Publication No. 20020174265 ("Schmidt-265") |
| 1119 | U.S. Patent Application Publication No. 20020116659 ("Tormasov-659") |
| 1120 | Bach, Maurice. 1987. Design of the Unix Operating System by Marice J Bach, 1 edition (Feb. 27, 1987) Prentice Hall; ISBN: 0132017997. |
| 1121 | Crowley, Charles. 1997. Operating Systems: a design-oriented approach. Irwin. 1997. ISBN 0-256-15151-2. |

| Exhibit | Description |
|---|---|
| 1122 | Eckel, George and Chris Hare. 1995. Building a Linux Internet Server, Chris Hare", G. Eckel, New Riders Publishing; ISBN: 1562055259. |
| 1123 | RESERVED |
| 1124 | RESERVED |
| 1125 | RESERVED |
| 1126 | RESERVED |
| 1127 | U.S. Patent No. 6,854,009 |
| 1128 | U.S. Patent No. 7,080,356 |
| 1129 | U.S. Patent No. 5,870,539 |
| 1130 | U.S. Patent No. 6,883,028 |
| 1131 | U.S. Patent No. 7,209,959 |
| 1132 | U.S. Patent Application Publication No. 20020065835 |
| 1133 | The Wayback Machine archive of USENIX Association – Home Page (2001-11-14) |
| 1134 | The Wayback Machine archive of USENIX – Publications – Proceedings (2001-11-15) |
| 1135 | The Wayback Machine archive of USENIX – 2001 USENIX Annual Technical Conference (2001-11-11) |
| 1136 | The Wayback Machine archive of USENIX – 2001 USENIX Annual Technical Conference (2001-11-11) |
| 1137 | The Wayback Machine archive of 2001 FREENIX Track Technical Program – Abstract (2002-01-12) |
| 1138 | The Wayback Machine archive of "Sandboxing Applications" (2003-03-29) |
| 1139 | The Wayback Machine archive of "Sandboxing Applications" (2004-01-19) |
| 1140 | The Wayback Machine archive of PDF of "Sandboxing Applications" (2004-01-19) |
| 1141 | The Wayback Machine archive of NLUUG: UNIX User Group – The Netherlands (2001-07-22) |
| 1142 | The Wayback Machine archive of NLUUG: Previous Events (2001-08-03) |
| 1143 | The Wayback Machine archive of Second International SANE Conference (2001-08-12) |
| 1144 | The Wayback Machine archive of Second International SANE Conference (2001-06-20) |
| 1145 | The Wayback Machine archive of "Jails: Confining the omnipotent root." (2000-09-02) |

| Exhibit | Description |
|---|---|
| 1146 | The Wayback Machine archive of Linux Journal (1999-05-08) |

**MANDATORY NOTICES**

**A.     Real Party-In-Interest**

Petitioner Google LLC is the Real Party-in-Interest.[1]

**B.     Related Matters**

**1.     United States Patent & Trademark Office**

The application from which U.S. Patent No. 7,519,814 issued claims priority to two provisional applications: No. 60/502,619, filed September 15, 2003 and No. 60/512,103, filed October 20, 2003.

The following U.S. patent applications claim the benefit of priority to U.S. Patent 7,519,814:

(i) U.S. Patent Application 11/432,843 (U.S. Patent No. 7,757,291), filed May 12, 2006;

(ii) U.S. Patent Application 11/380,285 (U.S. Patent No. 7,774,762), filed April 26, 2006;

(iii) U.S. Patent Application 12/075,842 filed March 13, 2008.

---

[1] Google LLC is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc.  XXVI Holdings Inc. and Alphabet Inc. are not real parties-in-interest to this proceeding.

### 2. USPTO Patent Trial and Appeal Board

Concurrently with the present petition, Petitioner is filing IPR2025-00488, also challenging U.S. Patent No. 7,519,814.

Petitioner is also filing IPR2025-00489 and IPR2025-00490 challenging U.S. Patent No. 7,784,058, which is also asserted in *VirtaMove, Corp. v. Google LLC*, Case No. 7:24-cv-00033, listed below.

### 3. U.S. District Court for the Eastern District of Texas

(i) *VirtaMove, Corp. v. Hewlett Packard Enterprise Company*, Case No. 2:24-cv-00093;

(ii) *VirtaMove, Corp. v. International Business Machines Corporation*, Case No. 2:24-cv-00064.

### 4. U.S. District Court for the Western District of Texas

(i) *VirtaMove, Corp. v. Google LLC*, Case No. 7:24-cv-00033 (pending transfer to Northern District of California per Order dated January 22, 2025, *see* EX1087);

(ii) *VirtaMove, Corp. v. Amazon.com, Inc. et al*, Case No. 7:24-cv-00030 (pending transfer to Northern District of California per Order dated January 22, 2025, *see* Docket Entry No. 87);

(iii) *VirtaMove, Corp. v. Microsoft Corp.*, Case No. 7:24-cv-00338; and

(iv) *VirtaMove, Corp. v. Oracle Corp.*, Case No. 7:24-cv-00339.

**5. U.S. District Court for the Northern District of California**

(i) *Red Hat, Inc. v. VirtaMove, Corp.*, Case No. 5:24-cv-04740.

**C.    Counsel and Service Information - § 42.8(b)(3) and (4)**

| | |
|---|---|
| Lead Counsel | Elisabeth H. Hunt, Reg. No. 67,336 |
| Backup Counsel | Gregory S. Nieberg, Reg. No. 57,063<br>Anant K. Saraswat, Reg. No. 76,050 |
| Service Information | E-mail:    EHunt-PTAB@wolfgreenfield.com<br>GNieberg-PTAB@wolfgreenfield.com<br>ASaraswat-PTAB@wolfgreenfield.com<br><br>Post and hand delivery:   Wolf, Greenfield & Sacks, P.C.<br>600 Atlantic Avenue<br>Boston, MA  02210-2206<br><br>Telephone: 617-646-8000        Facsimile: 617-646-8646 |

A power of attorney is submitted with the Petition.  Counsel for Petitioner consents to service of all documents via electronic mail.

Petitioner requests *inter partes* review and cancellation of claims 1-34 of the '814 patent (EX1001).

## I.     STANDING

Petitioner certifies that the '814 patent is available for *inter partes* review and that Petitioner is not barred or estopped from requesting *inter partes* review of the challenged claims.  37 C.F.R. §42.104(a).

## II.     GROUNDS

| Ground Number and Reference(s) | Claims | Basis |
|---|---|---|
| 1  Blaser-Calder | 1-4, 7-11, 14, 16-30 | §103 |
| 2  Blaser-Calder-Schmidt | 5-6, 12-13, 15, 31-34 | §103 |

Each reference above is prior art under (at least) pre-AIA §102(e) to the '814 patent's earliest alleged priority date; Calder is also prior art under §102(b).

These references were not of record during prosecution of the '814 patent. EX1003 ("Bhattacharjee"), [0029]-[0031], [0001]-[0014].

## III.     THE '814 PATENT

### A.     Specification

Computer Operating Systems ("OSs") typically provide system files (like configuration files and libraries) used by applications.  EX1001, 2:52-3:19. Configuration files identify, e.g., the computer's IP address, available font(s), etc. Libraries provide pre-existing code for common functions (e.g., opening files). Problems can arise, however, when one application hogs shared computing

– 1 –

"resources" (e.g., the processor or "network port numbers") or updates a library shared by multiple applications in a way that makes it incompatible with another application. EX1001, 1:31-36. Bhattacharjee, [0032]-[0033].

The patent says one known solution to these issues was to "separate[]" applications by installing them on "individual computer system[s]" (EX1001, 1:27-30), but that can quickly become costly. An alternative prior-art solution is "Virtual Machine [VM] technology," where one computer can run multiple VMs, each simulating a different machine with its own hardware, OS, etc. EX1001, 1:51-61. The patent alleges, however, that VMs "impose[] significant performance overhead" from executing multiple full OSs. EX1001, 1:62-65. The patent says another known technique "separat[ed]…application[s] from the underlying operating system" but allegedly did "not isolate applications into distinct environments." EX1001, 2:4-12. Bhattacharjee, [0034].

Figure 2 (color added below) illustrates the patent's alleged invention: having "a single server" executing sets of "[a]pplications" (blue and green) that "are segregated" into respective "secure containers" 20a-20b, each container having respective system files (light blue and light green). EX1001, 7:4-15, 9:53-57.



**Figure 2**

Containers share the computer's hardware (grey) and OS kernel (red) (which controls access to the computer's resources). EX1001, FIG. 2, 1:56-61. Each container can also have its own unique identifier (e.g., IP address). EX1001, 3:55-57. Bhattacharjee, [0035].

### B. Person of Ordinary Skill in the Art ("POSA")

A POSA as of the '814 patent's earliest claimed priority date would have had at least a bachelor's degree in computer science, computer engineering, or a related field, with three years of academic and/or industry experience in the area of "management and deployment of server applications." EX1001, 1:15-16. More education may substitute for less experience. Bhattacharjee, [0036]-[0038].

### C. Prosecution History

The original application's claims were found anticipated by EX1089. EX1002, 238-271.  The applicants responded by adding Limitations [**1E**]-[**1G**] and the word "remain" to Limitation [**1D**].  EX1002, 287-288, 291; *see infra* §IX (Claim Listing).  The Examiner subsequently allowed the claims, stating that the prior art of record failed to disclose application software "not being shareable between" secure containers, and "unique root file systems different from an operating system's root file system."  EX1002, 341-344.  Bhattacharjee, [0039].

### D. Challenged Claims

The '814 patent's two independent claims (1, 31) each recite a system having secure containers of applications comprising associated system files for executing applications.  The containers do not include an OS kernel, but instead use a server's underlying OS's kernel.

The dependent claims recite additional, routine prior-art functionality. Bhattacharjee, [0040]-[0042].

## IV. CLAIM INTERPRETATION

Claim terms are construed herein using the standard used in civil actions under 35 U.S.C. §282(b), in accordance with the ordinary and customary meaning as understood by POSAs and the patent's prosecution history.  37 C.F.R. §42.100(b).  In the concurrent district-court proceeding, Petitioner "Google" and Patent Owner "VirtaMove" have briefed competing constructions of various claim

terms. EX1100-EX1101. As discussed further within the Grounds, this Petition presents alternative mappings of the prior art under both parties' proposed constructions of disputed terms, thus demonstrating unpatentability regardless of which proposed construction is correct. *Google LLC v. Security First Innovations, LLC*, IPR2024-00215, Paper 15, 6 (May 23, 2024) (finding this approach "complies with" Rule 42.104(b)(3)). Bhattacharjee, [0045]-[0061].

## V. GROUND 1: CLAIMS 1-4, 7-11, 14, AND 16-30 ARE UNPATENTABLE OVER BLASER-CALDER

### A. Blaser (EX1005)

Like the '814 patent (*supra* §III.A), Blaser concerns reducing "application conflicts" that may arise on a computer from conflicting "shared libraries and system configuration" (e.g., applications requiring "different versions" of a single shared library). Blaser, 1:14-31. Figure 4 (annotated below) illustrates Blaser's software-based solution (4:51-59): layers of "application files and directories [that] are shadowed or overlaid over the regular operating system file system" (5:20-26). Bhattacharjee, [0062]-[0063].



Fig. 4

As illustrated above, Blaser's computing device (e.g., a "server[]") (3:16-27) has a "processor" (gray) and "storage devices" (brown) (4:51-59) that store a "base operating system" (red) and several "layers" – e.g., Layer 1 (blue) and Layer 2 (green) – each "having [respective] applications." Each layer also contains software "libraries" and configuration files (i.e., system files). Blaser, 3:42-58, 4:7-27, 5:18-32, 6:62-7:23. The shared Base OS (red) "forms a platform with which applications can be run." Blaser, 4:7-27. Bhattacharjee, [0064]-[0065] (citing EX1046, 1:25-26; EX1103, 12).

Each layer is "managed as a unit for the purposes of exporting[ and] importing." Blaser, 3:59-4:6. Thus, "vendors can provide 'pre-installed' applications as layers on" storage "media" and applications can be transferred

"between similar computing systems" "by moving the layer containing the application." Blaser, 6:62-7:23. Different layers "may use conflicting configuration or library files" because layers "provide a barrier between applications." Blaser, 3:42-58. Thus, "[a] layer [] provides a convenient container to limit access to an application." Blaser, 6:62-7:23. Bhattacharjee, [0066]-[0067].

## B. Calder (EX1006)

Calder teaches techniques for modifying "an application package to be executed safely, securely, and transparently on a remote machine." Calder, [0073]. Conventional "packages" for installing applications typically include application binaries ("also called application program[s]," e.g., executable software files for starting and running the application) and system files (e.g., libraries and configuration files) for the application to use. Calder, [0076], [0082]; EX1014, [0026]-[0028] ("Typically, one software **package** includes all the files…required for a local setup procedure [for]…the application…including the Dynamic Link **Libraries** (DLL)" and "**executable** file[s]"); Blaser, 1:14-19. Some conventional libraries include functionality for making "system calls," which request services/functionality provided by the OS's kernel (e.g., opening a file). EX1120, 19-20. Because different OSs may "provide different mechanisms for implementing system calls," an application package designed for one OS (its

"native" OS) might not work with another (non-native) OS.  EX1097, [0082]. Bhattacharjee, [0068]-[0071].

To overcome that potential restriction, Calder teaches modifying an "application package" by adding "system libraries…that translate" "system calls" native to one OS (e.g., "Windows 2000") to work with a different OS (e.g., "Linux").  Calder, [0101].  Bhattacharjee, [0072].

Calder's Figure 2 (color added below) shows a software-implemented "preprocessing module" (orange) processing an application package's original files (pink) to create modified files (blue) (e.g., modified libraries and configuration files) that "allow for the application [] to execute and communicate on any non-native platforms" (i.e., to execute on OSs that are not the application's "native," originally intended, OS).  Calder, [0101].  Bhattacharjee, [0073]-[0074]; EX1054, 4:37-41 ("'non-native' server…run[s] a" "different" "operating system").

Appx0074



## C.     Blaser-Calder Combination

POSAs had reason to install Blaser's layers in a system having multiple servers running different OSs, with each layer being executable on more than one different OS, based on Calder's teachings to make applications executable on both native and non-native OSs.  Bhattacharjee, [0075].

Blaser's "layering system" provides for "transfer of applications between similar computing systems."  Blaser 6:62-7:23; 8:48-9:4 ("a layer [can] be moved from one Windows system to another"); *supra* §V.A.  Blaser's "computing systems" include "servers" (Blaser, 3:16-27) and Blaser's layers are compatible with various "Windows operating system[s]" ("Windows 95, 98, NT, 2000, and

– 9 –

XP" (Blaser, 13:43-57)) and "operating systems other than Windows" (Blaser, 3:28-36).  Bhattacharjee, [0076]-[0082].

Blaser says "multiple versions of a software product are [often] installed" in a network because "an older version…supports a function desired but not supported in a newer version" or because a "software product tester[]" wants to "verify" "multiple development versions."  Blaser, 13:29-41.  POSAs understood that different "versions" of software typically included versions of the same application designed for different OSs.  Bhattacharjee, [0083].

Blaser also discusses an example system in "a company ha[ving] 500 computers" using different "layers defined for different types of users."  Blaser, 13:1-15.  For example, a "secretarial layer contains…secretarial applications" (e.g., "word processing") and an "engineering layer contains…engineering related applications" (e.g., "CAD tools").  Blaser, 13:1-15.  POSA knew that such large corporate systems often had "computers spread across a wide geographical area that are networked together," with groups of users "interconnected" to "**one or more server computers**" that "run[] **different network operating systems**."  EX1049, 1:12-14, 1:41-52.  Bhattacharjee, [0084]-[0085].

POSAs also knew it was "important…that an application be usable with several **different operating systems**."  EX1058, 1:14-21.  Bhattacharjee, [0086] (citing also EX1057, 1:10-14 ("[s]oftware developers often strive to tailor or 'port'

– 10 –

their applications to a variety of computing platforms" (e.g., "variable[]…

operating system[s]")); EX1014, [0029]-[0030]).

For example, "in a distributed system of a large corporation having many

end users, there are usually a number of **computers with different operating**

**systems**" running the applications. EX1049, 1:41-58. POSAs knew that typically,

in those large systems, application "software…[is] centrally hosted by a Server and

used by a number of Clients." EX1020, [0004]-[0005]; Bhattacharjee, [0087]

(citing also EX1051, 2:35-37).

And in those "larger networks, it is common…for the servers to be running

**different network operating systems**." EX1051, 2:35-37; Bhattacharjee, [0088]-

[0098] (citing also EX1054, 1:14-35, 4:48-50; EX1066, 1:17-37; EX1068, 1:19-27;

EX1071, 2:4-14; EX1016, [0002]; EX1053, 1:36-41; EX1049, 1:53-58; EX1012,

[0002]-[0005]; EX1093, 1:66-2:25; EX1127, 4:39-65; EX1109, [0002]-[0003]).

Thus, Blaser discloses or at minimum motivates using Blaser's layers in a

system having multiple servers running different OSs (e.g., in a large

organization's network), with each layer executable on at least some of those

different OSs, and POSAs had independent reason based on their background

knowledge to implement Blaser's layers that way. Bhattacharjee, [0098].

During prosecution, the '814 patent's applicants stated that different

versions of OSs in the same OS-family (i.e., OSs with the same tradename, like

– 11 –

Unix-based OSs "Solaris 8" and "Solaris 10") are OSs that differ. EX1002, 300-301. POSAs knew that applications native to one OS (e.g., Windows 95) were often compatible with other OSs in the same family (e.g., Windows 98). Bhattacharjee, [0077]-[0082] (citing EX1017, [0019]-[0021]; EX1128, 1:51-57, 3:7-30; EX1050, 2:55-38). Thus, POSAs reasonably expected each Blaser layer to be successfully executable on (at least) different OSs in the same OS family. Bhattacharjee, [0082].

As discussed above (§V.B), Calder teaches how to modify an "application package" (e.g., its libraries and configuration files) so "the application" can "execute and communicate on any non-native platforms," such as allowing Windows-native applications to work with a Unix-based OS. Calder, [0101]. As discussed above, Blaser's layers include similar system files for installing applications on OSs similar to the conventional OSs Calder discusses. Thus, POSAs would have been motivated and reasonably expected success to apply Calder's teachings to make any suitable application package (including Blaser's application layers) executable on multiple, different OSs (including different OS-families), which POSAs had reason to do, as discussed above. Bhattacharjee, [0099].

In this Blaser-Calder combination, the system comprises multiple servers, at least some running different OSs (including in different OS families), and each

application layer used in the system comprises, *inter alia*, (1) the files that Blaser includes in layers (*supra* §V.B; e.g., application(s) and system files required to execute the application(s) on, at least, the application's native OS), and (2) modified system-file copies (e.g., modified libraries and configuration files) to allow the layer (and its application(s)) to also execute on non-native OSs/OS-families, based on Calder's teachings (*supra* §V.B). For example, a native Windows 2000 layer would have "system libraries added" to execute software that "translate[s] Windows 2000 system calls to Linux system calls." Calder, [0101]. Bhattacharjee, [0100]-[0102].

POSAs would have reasonably expected success in the combination. As discussed above, Blaser expressly discloses using application layers in large corporate networks (13:1-15), for servers running Windows- and non-Windows-based OSs (3:28-41). Calder's techniques similarly allow one application package to be executable on multiple OSs. Calder, [0101]. Thus, it would have required only ordinary programming skill, based on Calder's teachings, to make a Blaser layer executable on multiple servers running different OSs. Bhattacharjee, [0103]-[0106].

**D.     Mapping to Challenged Claims**

**1.     Claim 1**

Claim 1's preamble, which the parties agree is limiting (EX1106, 6), is addressed below in two parts: [**1PREA**]'s "system" and [**1PREB**]'s "method."

**a.     [1PREA]**

**i.   "1. In a system having a plurality of servers with operating systems that differ"**

Blaser's "layering system" provides for "transfer of applications between similar computing systems [plural]" *in a system* (e.g., corporate network).  Blaser 6:62-7:23, 8:48-9:4.  As discussed above (§V.A), Blaser's "computing systems" include "**servers**" (3:16-27) *with OSs that differ* (e.g., different versions of "**Windows**" (13:43-57) and "operating systems **other than Windows**" (3:28-36)). Blaser's Figure 4 shows **physical** hardware-based servers, thus meeting the parties' joint construction of "*servers*" as "physical servers."  EX1106, 6; *compare* EX1001, FIG. 2.  Thus, Blaser uses conventional OSs, including an example OS in the '814 patent (e.g., Windows).  *See* EX1001, 7:34-38.  Bhattacharjee, [0107]-[0113].

EX1088's definition of "*operating system*" – which is Google's construction (EX1106, 4) – is "software that controls the allocation and usage of hardware resources such as memory, central processing unit (CPU) time, disk space, and

peripheral devices" – and identifies "Windows 98, Windows NT…" as examples. EX1088, 378.

Thus, conventional prior art OSs that Blaser uses meet Google's construction and VirtaMove's "ordinary meaning" construction of "*operating system*" (EX1106, 4) and Blaser's *system has a plurality of servers with operating systems that differ*. Bhattacharjee, [0114]-[0120] (citing EX1121, 2-4).

Moreover, as discussed above (§V.C), Blaser-Calder's *system* also *has a plurality of servers with operating systems that differ* by OS family (e.g., Windows- and Unix-based servers). Bhattacharjee, [0121] (citing Calder, [0083]).

### ii. "operating in disparate computing environments"

VirtaMove construes "*disparate computing environments*" as "[e]nvironments run by standalone or unrelated computers," based on the "definition[]" in the specification. EX1103, 8; EX1001, 2:16-19. While Google explains that it is unclear what "unrelated" means (EX1102, 5-7), Blaser-Calder's servers are (at least) "stand-alone" computers as discussed below, so the Board should find Blaser-Calder meets [**1PREA**] even if indefinite. *PLR Worldwide Sales Ltd. v. Flip Phone Games, Inc.*, IPR2024-00209, Paper 9, 39 (May 10, 2024) ("even if full scope of" term "is indefinite because the specification does not provide a sufficient boundary…that does not prevent us from making a determination that a teaching is well within that boundary").

Blaser-Calder's servers (*supra* §V.D.1.a.i) are stand-alone computers (at least) because they are separate computer machines. Blaser-Calder's servers also operate independently of each other, which is what VirtaMove says makes accused computers "standalone." EX1103, 9. Bhattacharjee, [0122]-[0125] (citing Blaser, FIG. 4, 4:40-59).

Additionally, during prosecution, the Examiner found that [**1PREA**] was met by a "network environment" (EX1002, 239-240) having a server and client (EX1089, FIG. 2, 6:28-35). VirtaMove did not disagree. EX1002, 286-333. Bhattacharjee, [0126]-[0127]. Blaser-Calder's system likewise has servers and client computers in a network environment. *See supra* §V.C.

### iii. "wherein each server includes a processor and an operating system"

Blaser's Figure 4 (highlighted below) shows that each "computing device" – a *server* in Blaser-Calder – "includes a ***processor*** [gray]" and "a base ***operating system*** [red]." Blaser, 4:51-59. *See also* Calder, [0083] (computer's "standard architecture" has an "operating system"); *supra* §V.D.1.a (demonstrating that Blaser-Calder's OSs meet each party's construction of "*operating system*").

Blaser uses "a conventional" computer "having a CPU." Blaser, 3:15-27. POSAs understood the processor/CPU for a conventional computer is a physical device and thus meets the parties' joint construction of "*processor*" as "physical computer processor." EX1106, 6. Blaser says its CPU may "have peripheral

– 16 –

**devices** attached" to it (Blaser, 4:50-59), reinforcing that it is a physical processor. Bhattacharjee, [0128]-[0130].



### iv. "[OS] including a kernel [and]² a set of associated local system files compatible with the processor"

The conventional prior-art OSs that Blaser supports – Windows-based (13:43-57) and "other than Windows" (3:28-36) – include *system files* and a conventional local *kernel*. Bhattacharjee, [0137]-[0147] (citing EX1029, [0027] (the "minimum…**OS components include[] a kernel**…**and system files**"); EX1023, [0023] (Windows has "***system files* which form the *kernel* part** of the ***operating system***"), [0027]; EX1011, [0032]; EX1067, 9:12-20; EX1064, 1:53-62;

---

² The parties agree "and" should be inserted. EX1106, 6.

EX1062, 3:37-40; EX1094, 3:34-63; EX1046, 1:25-26 (the "**_kernel_**" is the core of the operating system"); EX1103, 12 (VirtaMove arguing an OS "by definition, includes a **_kernel_**")).

EX1088's definition of "*kernel*" – which is Google's construction (EX1106, 4) is "[t]he core of an operating system—the portion of the system that manages memory, files, and peripheral devices; maintains the time and date; launches applications; and allocates system resources." EX1088, 300. Thus, Blaser-Calder's conventional OS *kernels* meet Google's construction and VirtaMove's "ordinary meaning" construction. EX1106, 4. Bhattacharjee, [0136]-[0148].

The '814 patent defines "**_system files_**" as "files provided within an operating system and which are available to applications as shared libraries and configuration files." EX1001, 2:52-54, 2:55-3:19. Thus, the patent relies on conventional *system files* typically provided with conventional prior-art OSs, like libraries and configuration files. EX1001, 2:52-3:19. Bhattacharjee, [0131].

In Blaser, a layer is "overlaid over the regular operating system file system" that exists in the server's Base OS. Blaser, 5:18-32. That "regular **_operating system file_** system" includes the files that are provided with Blaser's Base *OS*, which include the same conventional system files the '814 patent identifies as examples: "**[s]hared libraries** (such as DLLs)" **and** "system accessible **configuration** (such as registry entries)." Blaser, 5:18-32, 3:42-58 ("an

– 18 –

application layer" includes "**application configuration stored to operating system files**"). Blaser's Figure 4 (highlighted below) shows applications 410 executable outside of layers. Bhattacharjee, [0132]-[0133] (citing EX1108, [0003]).



Those applications use *local system files* that are separate from the system files inside layers. Bhattacharjee, [0134]; *see* EX1001, 7:12-15 ("applications executing within a secure container can co-exist with applications that are not associated with a container, but which are associated with the underlying operating system"). Thus, Blaser's server's Base OS has and uses *local system files*. Bhattacharjee, [0135].

POASs understood that Blaser's Base OS's *kernel* and *set of associated local system files* are *compatible with the* server's *processor* because they are used by the processor, which would not occur if they were incompatible.  Bhattacharjee, [0136], [0149]-[0151] (citing EX1067, 35:48-54 ("the active **kernel must be compatible with the computer's *processor***"); EX1045, 16:60-62 ("***kernel*** programs tend not to be compatible from ***processor*** to ***processor***"); EX1043, 1:17-20 ("computer programs written for" a ***processor*** "are **frequently unsuitable for use with** computers based on **a different *processor***")).

### b. [1PREB]

#### i. "a method of providing at least some of the servers in the system with secure, executable, applications"

Blaser's method "***provide[s]*** an installation for an ***application***" that is "installed to the destination system" (Blaser-Calder's *servers*), "but isolated in a layer."  Blaser, 10:25-42; *see also* Calder, [0076] ("application package" includes "an application binary (also called application program)").  Applications in Blaser's layers are "***Secure Applications***" (at least) because "[a]pplications can be **protected** from unauthorized access."  Blaser, 11:20-38.  For example, an application that is "isolated in a layer" "is **protected** from [*secured* against] corruption from other applications or meddling."  Blaser, 10:25-42.  Bhattacharjee, [0152]-[0153].

Blaser says an "application 200 is **running** [i.e., *executing*] on a layered computing system." Blaser, 4:27-50, col. 20, page 17 ("FSLActivate" function identifies "*[a]pplications* in the layer that are specified **to be run** on system startup…are started."); Calder, [0073], [0082]. Bhattacharjee, [0154].

Thus, Blaser-Calder's method *provides at least some of the servers in the system with secure, executable, applications*. Bhattacharjee, [0155]-[0156].

### ii. "[applications] related to a service"

The '814 patent says conventional website-related "applications such as Apache, MySql and PHP" can "support[] a single *service*, such as a web based human resource or customer management type of *service*." EX1001, 4:26-31. The patent identifies additional conventional "*services*" like "CRM (Customer Relation Management) tools, Accounting, and Inventory." EX1001, 7:18-21. Bhattacharjee, [0157]-[0158].

Blaser discloses application "layers defined for different types of users, for example, secretaries, engineers and accountants." Blaser, 13:1-15. "The secretarial layer contains…secretarial applications" and "[t]he accounting layer includes accounting software." *Id.* Each layer provides a conventional *service* because each layer comprises one or more applications (e.g., secretarial applications), and POSAs understood that those applications that are for different types of users are specialized, software-based functionality provided by Blaser-

Calder's network servers, meeting Google's construction of "*service*" (EX1106, 4), and VirtaMove's "ordinary meaning" construction (*id.*).  Further, Blaser's layer services (e.g., accounting) are like the patent's example services discussed above.  Thus, each layer's applications are *related to a service* (e.g., accounting service).  Bhattacharjee, [0159]-[0162].

### iii. "wherein the applications are executed in a secure environment"

Blaser's layers provide *secure environments* for *executing* "**Secure Applications**" because the applications in layers are "**protected** from unauthorized access."  Blaser, 11:20-38, 13:25-28 ("layers…represent different **environments** on a system").  Layers "**protect** application files from viewing and copying" because "[a]ny [executing] application of the computing system desiring to open files within the layer" must supply "an authentication key or token."  Blaser, 11:21-38.  Layers are further secured by "be[ing] **encrypted**" (Blaser, 11:31-34) and "authenticat[ing] a user before enabling a layer" (Blaser, 11:59-62).  Bhattacharjee, [0163].

Based on Calder, POSAs would have been additionally motivated and reasonably expected success to "intercept[]" "system calls made by the *application*" packages installed to Blaser-Calder's layers to restrict "access [to] approved files," thereby protecting the servers and "the contents of the *application* package."  Calder, [0087], [0006] ("**protect[ing] the contents of the project** from

– 22 –

improper tampering" and "**protect the non-secure machine** from improper tampering by the project"), [0073] ("application package" is "**executed safely, securely,** and transparently on a remote machine"), [0100] (using "security information" to "**protect[] both the client computer** [], **as well as the contents of the application**").  Bhattacharjee, [0164]-[0167].

For either reason, Blaser-Calder's *applications are executed in a secure environment*.  Bhattacharjee, [0168]-[0169].  *See also infra* §V.D.1.c.i.(3) (demonstrating that layers are *secure containers*).

### iv. "wherein the applications each include an object executable by at least some of the different operating systems for performing a task related to the service"

The '814 patent says "**[a]n icon is an *object*** supported by a GUI [graphical user interface]" that "**associates an image with an *object*** that can be operated on through a GUI."  EX1001, 14:21-23.  For example, "the GUI support[s] the ability to **select an *object*, move it and initiate an operation**," e.g., "copy[ing] and transfer[ring] of files," "when the **object** is placed on a specific destination."  EX1001, 14:4-8.  Example "*tasks*" that use icon objects include "[i]nstall[ing] application specific files" and "[s]tarting a first application."  EX1001, 15:35-56.  Thus, the patent discloses conventional uses of application icons (e.g., clicking an icon object to activate an application's executable object).  Bhattacharjee, [0170]-[0175] (citing EX1047, 1:21-67, 1:43-51; EX1059, 1:34-38).

Blaser-Calder uses two or more conventional prior-art GUI-based OSs (e.g., Windows-based OSs and Linux-based OSs), whose *applications each include an object* (e.g., icons and application files and executables) *executable* by the *different OSs* in the system, thus meeting Google's construction (EX1106, 4) and VirtaMove's "ordinary meaning" construction (*id.*) of "*at least some of the different*" OSs. Blaser, 3:28-36, 13:25-28 ("layers that represent different environments" include their own "icons" for executing applications). Bhattacharjee, [0176]-[0179] (citing EX1121, 43).

For example, when "layer A contain[s] **B.EXE**" (an executable file) and "**B.EXE** executes, it results in process C running." Blaser, 15:6-36. In GUI-based OSs, an .EXE file is an executable object that is conventionally started via its corresponding icon. Bhattacharjee, [0180]-[0182] (citing EX1047, 1:39-45 (GUI's "[e]xecution of an application program is initiated by selecting its corresponding icon"); EX1059, 1:34-39; EX1095, 8:4-13; EX1096, 4:7-10). Thus, the icon included and associated with, for example, a word-processing application is for *performing a task related to the* secretarial *service* in a layer. Blaser, 13:1-15. Bhattacharjee, [0180]-[0183].

Moreover, the "process [] running" in response to executing an application's object(s) (Blaser, 15:27-36) is itself a *task related to the service* because "[a] 'task' is also a process" that "the operating system creates" "[w]henever a program is

executed" (EX1030, [0002]).  Bhattacharjee, [0184]-[0189] (citing also EX1042, 1:5-20; EX1061, 1:13-16; EX1064, 2:12-23; EX1052, 4:28-31).

In Blaser-Calder (*supra* §V.C), each layer is configured with system files (e.g., libraries and configuration files, *see* Blaser, 5:18-32, Calder, [0082]) that allow the application's object(s) discussed above "to execute and communicate on **any non-native [or native] platforms**" (including different OSs) (Calder, [0101]). Bhattacharjee, [0190]-[0192].

Thus, Blaser-Calder meets [**1PREB**].  Bhattacharjee, [0193]-[0194].

    c.    **[1A]**

        i.  **"storing in memory accessible to at least some of the servers a plurality of secure containers of application software"**

          **(1)    Blaser-Calder's layers (containers) are "stor[ed] in memory accessible to…the servers"[3]**

Blaser's Figure 4 (color added below) shows layers 1-N (blue) *stored* on the *memory* of storage 402 (red) which is *accessible to* the Blaser-Calder *server* containing processor 400.  Blaser, 4:51-59 ("layers 404a-n are also contained on storage 402"), 3:16-27, 3:59-4:6, 6:62-7:23 (layers can be "stored on separate disk partitions or remote file systems"), 7:36-47 ("each layer spanning one or more

---

[3] *See infra* §V.D.1.c.i.(2) (VCE-capsules are *containers*), §V.D.1.c.i.(3) (VCE-capsules are *secure containers of application software*).

fixed disks" of storage). This meets VirtaMove's construction, which only requires the claimed *memory* to be *accessible to* one *server*. EX1103, 12; EX1106, 4; Bhattacharjee, [0195]-[0199].



Google's construction of "*memory accessible to at least some of the servers*" is "memory that at least two or more of the servers can read from or write to." EX1106, 4. Blaser-Calder meets that construction because Blaser's layers "may be **stored** [written] to a network server and retrieved [read from] and **stored** as required to any computer of a computer farm" (e.g., a collection of Blaser-Calder servers). Blaser, 12:36-44. Thus, layers (*containers*) are *stored on memory accessible to* at least two *servers* (i.e., the network storage device(s)' memory which is also accessible to the servers that retrieve layers from it). Bhattacharjee,

[0200]-[0202].  *See infra* §V.D.1.c.i.(3) (demonstrating that layers are *secure containers of application software*).

### (2)     Blaser-Calder's layers are "containers"

Blaser's layer "provides a convenient ***container*** to limit access to an application."  Blaser, 6:62-7:23, 9:18-34 ("captured data is held separate from the regular OS…in a data file, hard disk partition, or some other ***container***").  Bhattacharjee, [0203]-[0204].

The parties' joint construction of "*container*" (EX1106, 6) is addressed in two parts ([**1**]-[**2**]) below.

> [**1**]: *"An aggregate of files required to successfully execute a set of software applications on a computing platform."*  EX1106, 6.

In Blaser, each layer includes *a set of software applications* (e.g., accounting applications) and "the persistent ***files*** and configuration ***required to*** **operate [i.e., execute] an** *application*" in the layer.  Blaser, 7:36-47, 4:28-50 ("***application*** 200 is **running** [*executing*] on a layered computing system").  As discussed above (§V.C), each Blaser-Calder layer includes modified "application binar[ies]," "libraries," and "configuration ***files***" that are *required to successfully execute a set of software applications* in the layer *on a computing platform*, even platforms using OSs non-native to the applications.  Calder, [0082], [0102].  Bhattacharjee, [0205]-[0209].

> **[2]**: *"Each container for use on a server is mutually exclusive of the other containers, such that read/write files within a container cannot be shared with other containers."* EX1106, 6.

Blaser "**isolat[es]** application files and configuration in a layer" "**to provide a barrier between applications** which may use conflicting configuration or library files." Blaser, 3:42-58. Applications are "stored individually in layers" so "**interactions** between application files **may no longer occur**." Blaser, 6:62-7:23. Each layer has its own "**read-writable portion**" that can be "**protected from access by other users**." Blaser, 7:48-58. Moreover, "layers may be provided **accessible only to an individual user**," where "a writable layer is provided for each user, **providing data protection and isolation between users**." Blaser, 7:59-67. Thus, read/write files associated with[4] one user's layer cannot be shared with another user's layer.[5] Another mechanism by which Blaser prevents *read/write files within a* layer (*container*) from *being shared with other* layers

---

[4] The parties agree that "within a container" in the joint construction of "*container*" means "associated with a container." EX1106, 6; EX1001, 2:29-34.

[5] For the same reason, data within each application set within a layer are insulated from effects of other application sets, which meets each party's construction of *secure containers of application software.* *See infra* §V.D.1.c.1.(3).

(*containers*) is by providing each layer its own root file system, as discussed below (§V.D.1.g).  Blaser, 29:11-28.  Bhattacharjee, [0210].

POSAs also had motivation and reasonably expected success to prevent layers from sharing read/write files to prevent applications in other layers from corrupting those files based on Calder, which discloses "**protecting the contents of the application package 115 from user access**" ([0087]) to beneficially prevent "improper[] modifying or accessing data" ([0088]).  Conventional techniques – like chroot (change-root) – existed for that reason, and thus required only ordinary skill to implement in Blaser-Calder.  Bhattacharjee, [0211]-[0216] (citing EX1027, [0042]; EX1035, [0002]-[0003]; EX1072, [0049]-[0053]); Bhattacharjee, [0217]-[0236].

### (3) Blaser-Calder's layers are "secure containers of application software"

Google's construction of "*secure containers of application software*" – which quotes the '814 patent (EX1001, 2:43-48) – is "environments where each application set appears to have individual control of some critical system resources and/or where data within each application set is insulated from effects of other application sets."  EX1106, 5.  VirtaMove's construction replaces "environments" with "containers."  *Id.*

An "application set" includes "a set of one or more software applications that support a specific service."  EX1001, 7:39-41.

As discussed above (§V.A), Blaser layers provide *environments* for, e.g., a "secretarial layer contain[ing]…secretarial applications," which are an application set that supports the secretarial service. Blaser, 13:1-15, 13:25-28 ("layers...represent different ***environments***"). Bhattacharjee, [0237]-[0240].

As discussed above (§V.D.1.c.i.(2), "container"-construction part [**2**]), each layer (and the application set it includes) is an *environment* insulated from effects of application sets in other layers because applications are "**isolated** in a layer" and "**protected from corruption** from other applications or meddling." Blaser, 10:25-42. "[A]pplication layers…**are isolated** from other applications" to "provide **a barrier** between applications." Blaser, 3:42-58. When "applications are stored individually in layers, interactions between application files may no longer occur." Blaser, 6:62-7:23. Blaser's layering technique thus provides "***Secure Applications***" because "[a]pplications can be **protected** from unauthorized access through the…layered system." Blaser, 11:20-38. As discussed above (§V.D.1.b.iii), Blaser-Calder's applications are also modified based on Calder to prevent corruption from other applications. Calder, [0079], [0087], [0100]. Bhattacharjee, [0241].

Thus, application sets in Blaser-Calder's layers are in environments that are insulated from effects of other application sets, which is one way Blaser-Calder

meets each party's construction of "*secure containers…*." EX1106, 5. Bhattacharjee, [0242].

Furthermore, exemplary "resource[s]" in the '814 patent "include[] CPU time, memory, file activity and network bandwidth." EX1001, 10:15-17. Blaser says because changes made by a layer's applications are only "recorded to a layer and not to the underlying file systems and OS resources" users can "**use the computer in an unrestricted fashion**." Blaser, 12:8-20. Because layers are unrestricted, their application sets appear to have control of some critical system resources (like the memory and hard disk), but do not actually control them, because when a layer is deleted, any changes recorded within the layer are "wiped" and the computer is restored to the state it was in before the layer was installed. Blaser, 12:8-20. Similarly, as discussed below (§V.D.1.i), layers cannot access the server's root directory, reinforcing that layers lack actual control of that critical system resource. Blaser, 29:11-28; Calder, [0138], [0241]. Bhattacharjee, [0243]-[0246] (citing EX1072, [0049]-[0053]).

Blaser's layers also "intercept **key file system and registry calls** and manipulate the results **to create the appearance** that virtual files and registry settings contained in the layer definitions exist in the real file system and real registry." Blaser, 14:60-15:3. The key file system and registry calls – which a layer *appears* to have control of – are and/or manage critical system resources.

Bhattacharjee, [0247]-[0248] (citing EX1026, [0004] ("non-file system resources" include the "registry")).

Additionally, based on Calder, application "resource requests [are] virtualized" in Blaser-Calder (§V.C) and appear to "control[] resources," including "memory usage," "network bandwidth," "and disk usage." Calder, [0126], [0130] (explaining that the resources actually used are "transparen[t]" to and "hidden from the application").

Thus, Blaser-Calder layer application sets appear to have individual control of some critical system resources, which is another way Blaser-Calder meets each party's construction of "*secure containers of application software.*" EX1106, 5. Bhattacharjee, [0249]-[0251].

### ii. "each container comprising one or more of the executable applications"

As discussed below, Blaser's layers "*each* hav[e] *applications*" (4:51-59) that are "running" (i.e., *executable*) in the layer (4:27-29). Blaser, 5:18-32, 13:1-15 ("layer…contains…*applications*"), 15:6-36 (when an application in a layer "*executes*, it results in [a] process [] running"). As illustrated in Blaser's Figure 4 (annotated below), "*application[s]* [406a-406n are] stored in a layer." Blaser, 5:18-32.



Each layer stores the associated "files and directory structure of the application's installation," including *system files* like "[s]hared **libraries** (such as DLLs), [**and**] system accessible **configuration** (such as registry entries)." Blaser, 5:18-32. Thus, each Blaser-Calder layer comprises *application programs* and *associated system files* (e.g., libraries **and** configuration files) *for use in executing* the applications. Bhattacharjee, [0252]-[0255].

As discussed above (§V.C), based on Calder, each Blaser-Calder layer comprises *associated system files for use in executing* the applications on both native and non-native OSs. *See* Calder, [0082]-[0083], [0101]. Bhattacharjee, [0256]-[0257].

### iii. "and a set of associated system files required to execute the one or more applications"

The '814 patent defines "*system files*" as "files provided within an operating system and which are available to applications as shared libraries and configuration files." EX1001, 2:52-54. Thus, the patent recognizes (as POSAs knew) that conventional prior-art OSs typically provided *system files*. Bhattacharjee, [0258].

In Blaser, each "layer may be defined to be a set of file system and registry changes" (4:60-5:2), which includes "the *files* and directory structure of the application's installation" (5:19-32). These "*files* and directories" are "shadowed or overlaid over the regular operating system file system." Blaser, 5:19-32. Files copied into layers include "**shared libraries** (DLLs)" (Blaser, 6:62-7:23), "persistent *files* **and configuration** *required to* **operate** *an application*" (Blaser, 7:36-47), and copies of "registry changes" (Blaser, 4:60-5:2), which meet the '814 patent's definition of "*system files*." *See* EX1001, 2:55-3:19 (exemplary system files include libraries and configuration files); Blaser, 9:18-34 (layers "capture" "all of the application[']s shared DLLs, registry entries, and .ini files"), 10:50-59 ("software installation of an application layer" is recorded to the layer's "readable-only portion" so the user cannot "damage the application installation"). Bhattacharjee, [0259]-[0260].

As discussed above (§V.C), based on Calder, Blaser-Calder's layers also include modified *system files* (e.g., modified libraries and configuration files) that

– 34 –

are *required to execute the applications* on non-native OSs.  Calder, [0077],

[0082], [0094], [0101].  For example, "**system** libraries are added…that translate

Windows 2000 system calls to Linux system calls."  Calder, [0101].

Bhattacharjee, [0261]-[0262] (citing EX1061, 1:13-16, 2:53-58 ("Typically, when"

an OS "instantiate[s] an application," the OS will "locate[]" "and then process[]" a

"configuration file[] for the application")).

#### iv. "for use with a local kernel residing permanently on one of the servers"

In Blaser, the "base operating system [] forms a platform with which

applications can be run" in layers.  Blaser, 4:7-27, FIGs. 1-4.  When applications

request access to the Base OS, "the layering system software" "determine[s]"

whether the accesses should be permitted to continue to the base operating system

[], or should be redirected" within the layer.  Blaser, 4:7-27.  As discussed above

(§V.D.1.a.iv), the conventional OSs *resident on* Blaser-Calder's *servers* (e.g.,

Windows-based, Unix-based, etc.) each have a *local kernel* that is exclusively *used*

to obtain resources/services provided by the kernel that are needed to execute

applications (*e.g.*, open files, use the underlying hardware).  *See* Calder, [0150]

(POSAs knew applications can "execute an interrupt call on the [computer's]

operating system kernel").  Bhattacharjee, [0263]-[0265] (citing EX1097, [0051]).

POSAs understood *local kernel residing* in the server's memory (Blaser,

4:51-59, FIG. 4) is not (or conventionally would not be) lost when power is

– 35 –

removed from the server, and thus is stored in non-volatile memory, which meets

Google's construction of a "*local kernel…*" (EX1106, 4) and VirtaMove's

"ordinary meaning" construction (*id.*).  Bhattacharjee, [0266]-[0269] (citing

EX1091, 1:23-38).

> **d.  [1B] "wherein the set of associated system files are compatible with a local kernel of at least some of the plurality of different operating systems,"**

As discussed above (§§V.D.1.c.iii-iv), each Blaser-Calder layer (container)

comprises a *set of associated system files* that are *for use with* the server's *local*

*kernel*.  Blaser, 4:60-5:2; Calder, [0077], [0082], [0094], [0101] (preparing

modified *system files* so an application can run on "any non-native" OS).  Because

each server's Base OS and its *local kernel* provide the "platform" for layers

(Blaser, 4:7-27, FIG. 1), each layer's *associated system files are compatible with*

*the local kernel of* the Base OS, which would not occur if they were incompatible.

Bhattacharjee, [0270]-[0272] (citing EX1086, 2:53-55 ("the *operating system* is

commonly called the system *kernel* [], or just the *kernel*"); EX1064, 1:53-62 (a

"traditional operating system" has a "kernel")).  Bhattacharjee, [0270]-[0272]

As discussed above (§V.D.1.a.i), each Blaser-Calder layer is compatible

with at least two different OSs; thus, *the set of associated system files* in each layer

is compatible with *the plurality of different* OSs (and their *local kernels*) under

each party's construction of "*at least some…*," which would not occur if they were incompatible.  EX1106, 4.  Bhattacharjee, [0273]-[0275].

> e.  **[1C] "the containers of application software excluding a kernel,"**

Each layer has "***applications***" and contains "a set of file system and registry changes" for use in executing the applications.  Blaser, 4:51-63, 13:1-15 ("layer…contains…***applications***").  As Blaser's Figure 4 (colored below) shows, layers and their ***application software*** (red) are outside of and "overlaid on top of an operating system" (the Base OS and its ***kernel***) (blue).  Blaser, 2:50-58.  The "base operating system [] forms a platform with which ***applications*** can be run and files can be accessed in file systems."  Blaser, 4:7-27.



When a layer is initially "captured" (i.e., created for future use), "changes made by the installation procedure **do not affect the base system**" because "captured data is **held separate from the regular OS**." Blaser, 9:5-34. After a layer is subsequently installed on another computer, changes are recorded to the installed layer but "**not to the** underlying file systems and **OS** resources." Blaser, 12:8-20. Bhattacharjee, [0276]-[0278].

Thus, layers *exclude* and cannot affect the Base OS's kernel. Bhattacharjee, [0279], [0222]-[0227] (citing EX1024, [0005]-[0006]).

Moreover, "each layer is a separate and individual entity within **the** host OS" (Blaser, 5:18-32), reinforcing that each computing device with layers has a single OS whose kernel is shared by all layers on the device. Bhattacharjee, [0280]-[0281].

Furthermore, based on Calder's teachings, a Blaser-Calder layer (§V.C) include "system libraries [that] are added…that translate Windows 2000 system calls to Linux system calls." Calder, [0101]. "[W]hen a program runs under the Windows operating system," for example, "it accesses the operating system via the Windows API," with "[o]nly the WIN32 API calls [] allowed to access the operating system." Calder, [0096]. POSAs knew that the WIN32 API is how applications access a 32-bit Windows kernel. Bhattacharjee, [0282] (citing EX1048, 6:7-8 ("Win32 *kernel*")). Because layers access the OS kernel via an

API, that reinforces to POSAs that the layers themselves *exclude* the *kernel*. Bhattacharjee, [0282]-[0283].

> **f.** **[1D] "wherein some or all of the associated system files within a container stored in memory are utilized in place of the associated local system files that remain resident on the server,"**

As discussed above (§V.D.1.a.iv), the *associated system files within* each Blaser-Calder layer (*container*) are *stored in memory* and include "captures" of "all of the applications shared DLLs, registry entries, and .ini files" that are needed to execute the layer's application(s). Blaser, 9:18-34. The "[a]pplication files that would be placed on file systems managed by the OS are also redirected into the layer." Blaser, 9:18-34. "All of the captured data is held [i.e., *stored*] separate from the regular OS either locally or remotely in a data file, hard disk partition, or some other container." Blaser, 9:18-34. Bhattacharjee, [0284]-[0285].

Similarly, based on Calder (*supra* §V.C), Blaser-Calder's layers include modified *system files* – e.g., "libraries" and "configuration files" (Calder, [0082]) – that *are utilized* to allow the layer's application(s) to execute on both native and non-native OSs. Bhattacharjee, [0286].

As discussed above (§V.D.1.iv), the Base OS *that remains resident on* a Blaser-Calder *server* comprises *associated local system files* that are used, e.g., to execute applications that are not in layers. Blaser, FIG. 4, 3:42-58, 4:51-59. But as discussed above (§V.D.1.c.iii), the *associated system files within* a layer are

– 39 –

*utilized in place of* those *local system files* when executing an application in a layer.  Bhattacharjee, [0287]-[0288].

Thus, *system files within* Blaser-Calder layers (containers) *are utilized in place of the associated local system files that remain resident on the server*.

> g.   [1E] "wherein said associated system files utilized in place of the associated local system files are copies or modified copies of the associated local system files that remain resident on the server,"

Blaser's "layers may be stacked on top of each other, with **the real file system at the bottom of the stack.**"  Blaser, 8:6-18.  The real file system at the bottom is the Base OS's file system, which includes its *associated local system files that remain resident on the server*.  *Supra* §V.D.1.f.  "[F]iles of the same name and location" can "exist in multiple layers, or in the base file system," and "rules can be provided whereby the layered system can determine which file to present to an application."  Blaser, 8:6-18.  POSAs understood that means a layer's *system files are utilized in place of system files that remain resident on the server* in its base OS (e.g., when a layer and the "real file system at the bottom of the stack" have *system files* with the same name and location, the layer's *system files* are utilized).  Bhattacharjee, [0289].

A layer's *system files* are created "through a 'capture' operation" that "intercept[s] operations" involving "files and configuration such as a registry," such that "changes made by the installation procedure **do not affect the base**

**system** but are rather recorded to the new layer." Blaser, 9:5-17. "[A]ll operations by any application to create, *modify* or delete files are entered into [the] layer," so "all of the applications shared DLLs, registry entries, and .ini files that would be directed to the Windows [local] system directories **become trapped in the capture layer**." Blaser, 9:18-34. Blaser also uses a "file system *copy*" to create layers (Blaser, 9:64-67), which copies the system files in the file system used to create a layer. Bhattacharjee, [0290]-[0292]. Thus, the *system files* in a Blaser-Calder layer are *copies or modified copies of the associated local system files*.

Moreover, based on Calder's teachings (*supra* §V.C), Blaser-Calder's layers include "*modified*" *system files* ("*modified* libraries [and], *modified* configuration files," [0082]) that are based on "*cop[ying]*" specific information **from the existing system registry**" ([0121]).

Thus, with Blaser-Calder's layers, the *associated system files utilized in place of the associated local system files are copies or modified copies of the associated local system files that remain resident on the server*. Bhattacharjee, [0293]-[0295].

> h. **[1F] "and wherein the application software cannot be shared between the plurality of secure containers of application software,"**

Blaser-Calder's "application layers" (*containers*) "**are isolated from other applications** on a computer" by "provid[ing] **a barrier between applications**

which may use **conflicting** configuration or library files." Blaser, 3:42-58.

Blaser's teachings that layers can have conflicting *system files* (like configuration and library files) and that deleting a layer does not disturb other layers (Blaser, 3:42-58) reinforce that each layer's application(s) are not shared. "[E]ach layer is **a separate and <u>individual</u> entity** within the host OS" (Blaser, 5:18-32) and applications in layers are "**protected from corruption** from other *applications* or meddling" (Blaser, 10:25-42). For example, for "*applications*…stored individually in layers, **interactions between *application* files may no longer occur** due to conflicting shared libraries (DLLs), as each *application* 'sees' only it's [sic] own installed libraries first, followed by libraries in the base operating system." Blaser, 6:62-7:23. "**A second *application* installed to the computer…cannot view the *application* layer files** because it does not possess the correct authentication key." Blaser, 11:39-58. Bhattacharjee, [0296]-[0297].

Moreover, as discussed further below (§V.D.1.i), each layer has its own, unique root directory to which applications are installed, which further teaches or at least renders obvious that applications cannot be shared across layers. For example, POSAs knew chroot was commonly used to create a "sandbox" environment where applications have "access only to the constrained environment and **cannot corrupt software applications outside it**, i.e. beyond the sandbox boundary." EX1075, 2:9-15; Bhattacharjee, [0298].

Thus, Blaser-Calder's *application software* within a layer (*container*) *cannot be shared between the plurality of secure containers of application software.* Bhattacharjee, [0299].

> i. **[1G] "and wherein each of the containers has a unique root file system that is different from an operating system's root file system."**

In Blaser, each layer's file system is "overlaid on the normal file system." Blaser, 29:11-28.  An "fslrdr directory" is created, and "[u]nder the fslrdr directory[,] **directories that correspond to *each* layer** are maintained."  Blaser, 29:11-28.  For example, if layer "TEST" has "the directory 'C:\fslrdr\TEST\c\XYZCorp,'" the layer's application(s) do not know that "XYZCorp" is a subfolder of "fslrdr\TEST\c" because "the directory 'c:\XYZCorp' **appears** on the C: drive to all applications running under that layer."  Blaser, 29:11-28.  Bhattacharjee, [0300] (citing Calder, [0241] ("root directory C:")).

Thus, based on Blaser, each layer *has a unique root file system* (e.g., "C:\fslrdr\TEST") *that is different from* the server's *operating system's root file system* – the *root file system* under "c:\," meeting VirtaMove's interpretation of [**1G**].  *See* EX1103, 8 ("Realistically if a container on a particular server does not share a root file system with the OS *on that server*, it will not share a root file

– 43 –

system with *any* operating system (in the entire world).") (emphasis original); Bhattacharjee, [0301].

Google explained in district court that [**1G**] is indefinite because it recites "*different from **an** operating system*" without indicating **which** OS the *container*'s *root file system* must be "*different from*." EX1102, 14. The Board need not resolve that dispute (*see PLR*, IPR2024-00209, Paper 9, 39), because it would have been obvious to POSAs that some modifications users may make to their own layer's *unique root file system* would make it *different from* the *root file system* of **every** OS in the world, which would meet [**1G**] regardless of the uncertain boundaries of what OS (or set of OSs) the claim is referring to. For example, Blaser discloses that users may make "**changes**…to that user's layers" (12:27-31) and can "**install[]**" applications (12:31-34), which POSAs understood can change the layer's *file system* to be different from every OS's root file system in the world. Bhattacharjee, [0302]-[0304].

Additionally, POSAs understood the *unique root file system* assigned to each Blaser layer provides a chroot (changed root) file system, which meets [**1G**] under VirtaMove's apparent claim scope in the district-court litigation, which alleges that a *container* assigned to a "**chroot**" file system meets [**1G**]. EX1079, 40-51 (emphasis original). Bhattacharjee, [0305]-[0306].

POSAs were also motivated to chroot each layer based on Calder. Calder's Figure 46 (below left) shows a "traditional system layout"; Figure 47 (below right) shows a "virtualized system layout":

 

In the traditional layout, applications can "access…the ***root*** directory C:" and its "three folders": "APP WORKSPACE," "SYSTEM FILES," and "TMP." Calder, [0241]. In Calder's "virtualized system layout," each application's "sandbox directory" has "a **virtual *root* directory**." Calder, [0241]. When a Calder-modified application "request[s]" "to access[] the subdirectory 'C:\TMP,'" it is "transparently" redirected to "the sandbox directory C:\SANDBOX_LAYER\AP[P]_WORKSPACE\C1\TMP" under the *unique root directory* "C:\SANDBOX_LAYER_AP[P]_WORKSPACE." Calder, [0241]. POSAs had motivation to sandbox Blaser-Calder's layers in the same way Calder sandboxes applications with a changed *root*, to support "safely" and "securely" "execut[ing]" applications "on a remote machine." Calder, [0073]. Bhattacharjee, [0307]-[0312].

– 45 –

### 2. Claim 2: "[C]laim 1, wherein each container has an execution file associated therewith for starting the one or more applications."

As discussed above (§V.D.1.b.iv), each Blaser-Calder layer has "icons," where each icon is or is *associated with* an "*execution file…for starting the one or more applications*" (e.g., an application's .EXE file). Blaser, 13:25-28, 15:6-36. Bhattacharjee, [0313]-[0315] (citing EX1047, 1:21-67; EX1059, 1:36-38; EX1070, 4:50-56), [0170]-[0193]. The .EXE files (*execution files*) are for **applications** like "word processors." Blaser, 3:42-58. *See also* Calder, [0077] ("prepares a software package for **execution** on…computers"). Bhattacharjee, [0315]-[0316] (citing EX1069, 11:35-39).

Additionally, Blaser's "FSLLIB32.DLL runtime library" "provides an API [application program interface] that may be used by other **applications** to manage the layered system," "includ[ing] functions to" "**activate** and deactivate layers" and "**enable** and disable layers." Blaser, 20:19-36. The function "FSLActivate (PTCHAR fslName)" "[v]alidates the fslName against defined layers" – i.e., the defined layers being the layers available in the system – and "[c]ommunicates with FSLX driver…to **activate** the layer[/layer group]" identified by "fslNAME." *See* Blaser, col. 20 (table's first function); *see also* ("FSLAddLayerToGroup (PTCHAR fslName, PTCHAR, groupName": "Verifies that both the specified layer [fslName] and group [groupName] are defined."). The variable "fslName"

– 46 –

identifies "[a]pplications in the layer that are specified to be run on system startup…[, which] are **started**." *See* Blaser, col. 20 (table's first listed function). Thus, FSLActivate is an *execution file* that *starts* a layer/group of layers, which further causes *execution* of *execution file(s)* in the layer for starting startup *application(s)* within the identified layer(s), as claimed. Bhattacharjee, [0317]-[0318].

VirtaMove alleges claim 2 is met by an "image configuration" that "includes information such as application arguments, environments, etc." EX1079, 51-55. Blaser similarly discloses a "layer definition" that "include[s] layer properties and settings" (Blaser, 4:60-5:2), which POSAs understood would be interpreted by an *execution file associated* with the layer *for starting applications*. Bhattacharjee, [0319]-[0322] (citing EX1084, [0145]-[0153]).

Blaser-Calder's layers meet claim 2 in any of the above ways. Bhattacharjee, [0323].

3.    **Claim 3: "[C]laim 2['s]…execution file includes instructions related to an order in which executable applications within will be executed."**

As discussed above (§V.D.2), Blaser's function "FSLActivate" (an *execution file*) "activate[s] the layer" identified to FSLActivate and "[a]pplications in the layer that are specified to be run on **system startup** (in **win.ini**, **registry**, **startup folder**, etc.) are started." Blaser, col. 20 (table's first function).

Those various files for "startup" each *include* (or obviously would include) *instructions related to an order in which executable applications will be executed.* Bhattacharjee, [0324]-[0330] (citing EX1041, 2:8-17; EX1027, [0070]-[0073]; EX1013, [0003]; EX1021, [0020]).

4.      **Claim 4: "[C]laim 1…pre-identifying applications and system files required for association with the one or more containers prior to said storing step" [1A].**

Blaser's "bundling of an application and user files into a layer **provides a package** that may be…transported conveniently" to "provide 'pre-installed' applications as layers on CD-ROM or other media." Blaser, 6:62-7:23. Calder's teachings reinforce that Blaser-Calder's layers contain *pre-identified* applications and associated system files ([0082]) for transmission to and installation on computers ([0073]). Bhattacharjee, [0331].

Because applications and files within (i.e., *associated with*) a layer are stored in a transportable package that exists **before** installing the layer and its applications on a particular computer, the *applications and system files required for association with the one or more containers* are *pre-identified prior to* [**1A**]'s *storing step* (*supra* §V.D.1.c). Bhattacharjee, [0332]-[0336] (citing EX1084, [0145]-[0150]).

**5. Claim 7: "[C]laim 2…modifying at least some of the system files to define container specific mount points associated with the container."**

The '814 patent mentions "*mount points*" without explanation. EX1001, 11:17-18. POSAs knew "[a] *mount point* simply allows a drive volume to be *mounted* at some *point* within an existing directory tree structure." EX1056, 2:37-52; Bhattacharjee, [0337] (citing also EX1018, [0044]).

Blaser discloses a "layer becom[ing] *mounted* (or enabled)" by being "shadowed or overlaid over the regular operating system file system." Blaser, 5:18-32. "[A]n fslrdr directory at the root of the volume" (the host's root) "contains file system information for each of the defined layers." Blaser, 29:11-28. As discussed above (§V.D.1.i), the example layer "TEST" has the *specific mount point* "C:\fslrdr\TEST\" (Blaser, 29:11-28), which is identified in a *modified system file* – e.g., the registry (configuration) "key called fslrdr," which keeps "all registry information contained in each layer." Blaser, 14:43-59. *See also* Calder, FIG. 47, [0135] (mounting applications to a "sandbox directory" with mount point "C:\SANDBOX_LAYER\AP[P]_WORKSPACE\"). Bhattacharjee, [0338]-[0341].

Thus, Blaser-Calder meets claim 7.

**6.** **Claim 8: "[C]laim 1['s]…applications and associated system files are retrieved from a computer system having a plurality of secure containers."**

Each "layer may be **stored to a network server [*a computer system*] and retrieved and stored** as required to any computer." Blaser, 12:36-44. Thus, layers (and the *application(s) and associated system files* stored therein) *are retrieved from a computer system* (network server) *having a plurality of* layers (*secure containers*). Bhattacharjee, [0342]-[0343].

Calder similarly discloses "at least **one *server* that transmits application packages to the member computers**." Calder, [0075]. That would have also motivated (and provided reasonable expectation of success in) having Blaser-Calder's servers *retrieve* layers *from a computing system* (a server) *having a plurality of secure containers*. Bhattacharjee, [0344]-[0349] (citing EX1084, [0162]-[0166]; EX1014, [0005]-[0006], [0015]; EX1015, [0004]).

Blaser-Calder also meets claim 8 because Blaser's Figure 4 shows a *computer system* storing layers 1-N. Blaser, 4:51-59. Accessed layers are thus *retrieved from* that *computer system having a plurality of secure containers*. Bhattacharjee, [0350].

**7. Claim 9: "[C]laim 2, wherein server information related to hardware resource usage including at least one of CPU memory, network bandwidth, and disk allocation is associated with at least some of the containers prior to the applications within the containers being executed."**

Calder teaches to modify an application package to manage its use of computer resources, like "***memory usage***," "***network bandwidth used***," and "***disk usage***." Calder, [0125]-[0126]. The "grant[ed] allocation" of resources is "predicated" (i.e., pre-assigned) using "heuristics" (e.g., "amount of virtual memory currently being consumed"). Calder, [0126].

Thus, Calder teaches allocating to applications *hardware resource usage including at least one of CPU memory, network bandwidth, and disk allocation*" that "*is associated with at least some of the containers prior to the applications within the containers being executed*. Bhattacharjee, [0351]-[0352].

POSAs had motivation to apply resource-allocation techniques, like Calder's, to Blaser-Calder's layers and allocate resources "*prior to the applications within the containers being executed*" because layers are isolated from each other and thus unaware of competition for hardware resources, so POSAs would want to ensure layers had sufficient resources to execute their applications by allocating resources before executing applications. *See* Blaser, 3:42-58. Bhattacharjee, [0353]-[0361] (citing EX1132, [0009]-[0011]; EX1036, 1:16-26; EX1063, 1:52-

2:62; EX1027, [0176]; EX1037, 6:29-38; EX1073, 1:48-54; EX1074, 3:66-4:22; EX1076, 13; EX1083, [0035]-[0040]; EX1094, 2:5-21).

POSAs would have reasonably expected success because, as the cited corroboration demonstrates, pre-allocating resources to applications/processes was conventional by the early-2000s. Bhattacharjee, [0362]-[0363].

> **8. Claim 10: "[C]laim 2, wherein in operation when an application residing within a container is executed, said application has no access to system files or applications in other containers or to system files within the operating system during execution thereof."**

Applications in layers "are **isolated from other *applications*** on a computer" "to **provide a barrier between *applications*** which may use conflicting configuration or library files." Blaser, 3:42-58. "[E]ach layer is a separate and individual entity within the host OS." Blaser, 5:18-32. Additionally, "layers may be provided **accessible only to** an individual user," which "provid[es] data protection and isolation between users" (Blaser, 7:59-67) and thus isolates the system files and applications in another user's layer. Thus, an application "isolated in a layer" "is **protected** from corruption **from other applications** or meddling." Blaser, 10:25-42, 5:3-17 (layers "prevent[] accidental data modification, loss, or meddling" between applications). Bhattacharjee, [0364].

Moreover, as discussed above (§V.D.1.i), each layer has a unique root file system and thus the layer's *system files* (in the layer's root or a

– 52 –

subfolder/subdirectory thereof) *cannot* be *accessed* by applications in other layers. Blaser, 29:11-28.  Bhattacharjee, [0365].

When Blaser creates ("captures") a layer, "all operations by any application to create, modify or delete files are entered into a layer" and "[a]pplication files that would be placed on file systems managed by the OS are also redirected into the layer," so that "[a]ll of the captured data is **held separate from the regular OS**."  Blaser, 9:18-34.  Requests to access local system files are redirected into the layer because a layer's application *has no access to system files within the OS*. Bhattacharjee, [0365].

Thus, applications executed within Blaser-Calder's layers *have no access to system files or applications in other containers* (layers) *or to system files within the operating system during execution thereof*.  Bhattacharjee, [0366].

POSAs also had motivation to prevent applications in layers from *accessing system files within the OS during execution* to protect the Base OS's *system files* from being corrupted by layers.  EX1015 discloses one known technique for doing so: assigning a "'namespace'" to "**isolate** software packages from one another even if the same component is used by multiple packages" ([0080]), such that "any files and components installed in that namespace are visible to the application while files and components installed in other **namespaces** are not" ([0086]). Bhattacharjee, [0367]-[0372] (citing also EX1076, 5; EX1077, 120-121).  *See*

EX1079, 64 (VirtaMove arguing "namespaces" "isolat[e] processes in an environment").

**9. Claim 11: "[C]laim 2['s]…containers include files stored in network file storage, and parameters forming descriptors of containers stored in a separate location."**

Blaser-Calder's layers (*containers*) *include* "***files*** located to…***network drives***" (Blaser, 7:36-47) (i.e., *files stored in network file storage*). Blaser, 12:36-44 ("layer may be ***stored*** to a ***network*** server and retrieved…as required"), 12:55-67; Calder, [0139] (disclosing "***files***…***stored*** remotely on separate machine"). Bhattacharjee, [0373]-[0374].

Blaser's "manager application" manages *parameters forming descriptors of* layers (*containers*), such as "view[ing] information about a layer" and "edit[ing] certain layer information." Blaser, 8:19-41, 20:19-38. That information is (or obviously would be) *stored in a separate location* (e.g., to facilitate management by a system administrator). Bhattacharjee, [0375]-[0377].

**10. Claim 14**

**a. [14PRE] "[C]laim 1…creating containers prior to said step of storing containers in memory"**

As discussed above (§V.D.4), Blaser's "layer provides **a package** that may be…transported conveniently" so "application vendors can provide **'pre-installed' applications as layers** on CD-ROM or other media." Blaser, 6:62-7:23. A "packaged" layer is thus *created prior to said step of storing containers in memory*

of the destination server computer.  Bhattacharjee, [0378]-[0379].  *See* Calder, [0073] (disclosing pre-packaged applications "transferred" "from a server to the client").

> **b.**   **[14A] "wherein containers are created by: a) running an instance of a service on a server;"**

Files in a layer are identified by "captur[ing]" how an application's installation process uses/changes the file system and system files.  Blaser, 9:5-39, 10:1-24.  Capturing begins by "execut[ing] an application installation program."  Blaser, 9:18-34.  Executing the application's installation program to create layers meets *running an instance of* the *service* provided by the application.  Bhattacharjee, [0380]-[0382] (citing EX1040, 1:14-25; EX1099, [0104]).

POSAs also had motivation to *create* layers by *running an instance of a service on a server*: e.g., running programs for an accounting service (Blaser, 13:1-23), which, as explained below (§V.D.10.c, [**14B**]) would identify the system files these programs required when executing, and to test the layers+applications to ensure their compatibility with various server hardware-OS combinations in the system.  Bhattacharjee, [0383]-[0387] (citing EX1129, 1:11-20; EX1031, [0064]-[0068]; EX1020, [0007]).

### c. [14B] "b) determining which files are being used; and,"

Blaser discloses that "[d]uring the install, all of the applications shared DLLs, registry entries, and .ini files that would be directed to the Windows system directories become trapped in the capture layer" and "[a]pplication files that would be placed on file systems managed by the OS are also redirected into the layer." Blaser, 9:18-34, 10:1-24. That teaches/suggests *determining which files are being used* by the application. Bhattacharjee, [0388].

As discussed above (§V.D.10.b, [**14A**]), POSAs also had additional motivation to create layers by first "running [*using*] an instance of a service on a server" to *determine* the system files *being used* (and thus needed) to execute the layer's application(s). Bhattacharjee, [0389]-[0391] (citing EX1077, 120-122 ("Sandboxing Applications," similar to creating Blaser-Calder's layers, by "[r]unning the application" to identify *files being used*)).

### d. [14C] "c) copying applications and associated system files to memory without overwriting the associated system files so as to provide a second instance of the applications and associated system files."

Blaser's captured files and applications are "trapped in the capture layer" and "redirected into the layer" rather than "placed on file systems managed by the OS." Blaser, 9:18-34. "[T]he captured data is **held separate from** the regular OS" (e.g., "in a data file, hard disk partition, or some other container"). Blaser, 9:18-

– 56 –

34. As discussed above (§V.D.1.g, [**1E**]), each layer's system files are copies of system files that remain in the Base OS.

Thus, Blaser's capturing process includes *copying applications and associated system files to memory without overwriting the associated system files*. Bhattacharjee, [0392]-[0393].

Pre-existing or subsequent installation of an application *provides a second instance of the applications and associated system files*. *See* Blaser, 6:62-7:23 ("Different versions of an application may be stored as layers on a single computer."), 13:29-41 ("**multiple versions of a software product are installed on a computer**, each isolated in a layer"). Bhattacharjee, [0394]-[0397]. *See* EX1079, 67 (VirtaMove arguing claim met by storing "different instance[s]" of alleged *containers*).

### 11. Claim 16

#### a. [16A] "[C]laim 1…creating containers prior to said step of storing containers in memory,"

*See* §V.D.10.b ([**14A**]). Bhattacharjee, [0398].

#### b. [16B] "wherein a step of creating containers includes using a skeleton set of system files as a container starting point and installing applications into that set of files."

A "*skeleton*" file system is "the OS provided *system files* before an *application* is *installed*." EX1001, 10:41-47.

As discussed above (§V.D.1.e, §V.D.10), Blaser "'capture[s]" (i.e., creates) layers (*containers*) by copying various *system files* that would otherwise "be placed on file systems managed by the OS."  Blaser, 9:18-34.  Bhattacharjee, [0399]-[0400].

Blaser seeks to avoid "application conflicts with the host operating system (OS) and other applications."  Blaser, 1:14-31.  Thus, POSAs had motivation to use *a skeleton set of system files* to serve *as a container starting point* when "capturing" a layer's applications so those *skeleton files* would be *installed into that set of files* to avoid creating conflicts with the base OS's local system files.  Bhattacharjee, [0401]-[0404] (citing EX1077, 119-122).

### 12.  Claim 17

#### a.  [17A] "[C]laim 1…installing a service on a target server selected from one of the plurality of servers,"

Blaser-Calder's *plurality of servers* (*supra* §V.D.1.a.i) "*install*[, e.g.,] the accounting type layer" (with accounting-*service* applications) when "a computer is to be transferred from engineering to accounting."  Blaser, 13:16-23.  Thus, Blaser-Calder meets *installing a service on a target server*.  Bhattacharjee, [0405].

POSAs also had motivation and reasonably expected success to *install services* so they were available to users (e.g., so the accounting-group server could provide accounting *services*), which was conventional, prior-art server

functionality.  Bhattacharjee, [0406]-[0409] (citing EX1014, [0015]; EX1020, [0069]-[0078]).

> **b.** **[17B]: "…using a graphical user interface [GUI], associating a unique icon representing a service with an unique icon representing a server for hosting applications related to the service and for executing the service, so as to cause the applications to be distributed to, and installed on the target server."**

"For ease of configuring and managing a layering system," Blaser provides "a manager application may be provided" that "permits an administrator or user to control the presentation of applications and data on a system" by providing "facilities for importing and exporting layers" between systems.  Blaser, 8:19-41. Using GUIs to configure servers was conventional and provided convenience (e.g., allowing drag-and-drop operations using icons), and Blaser's "layer manager application" "permit[s] control and configuration of the layer[]…through a management API and library."  Blaser, 4:7-27.  Thus, POSAs had motivation and reasonably expected success to use a GUI with Blaser's manager application (accessed via Blaser's API) to *associate a unique icon representing a service with an unique icon representing a server for hosting applications related to the service and for executing the service, so as to cause the applications to be distributed to, and installed on the target server*.  Bhattacharjee, [0410]-[0418] (citing EX1014, [0030]-[0031]; EX1020, [0024], [0046]; EX1047, 1:39-67; EX1109, [0002]-[0005]).

### 13. Claim 18: Claim 17's "target server and" GUI "are at remote locations."

POSAs had motivation and reasonably expected success to allow system administrators at remote locations (e.g., corporate/IT headquarters) to configure target servers using a GUI, rather than require administrators at each target server. Bhattacharjee, [0419]-[0423] (citing EX1014, [0030]; EX1020, [0024], [0046], [0108]; EX1109, [0002]-[0005]).

### 14. Claim 19: Claim 18's GUI "is installed on a computing platform, and wherein the computing platform is a different computing platform than the target server."

The '814 patent says "[a] computer system with a single instance of a fully functional operating system installed is referred to as a ***computing platform***." EX1001, 2:20-22.

If *different computing platforms* include different physical computers, then Blaser-Calder meets claim 19 the same way it meets claim 18 (§V.D.18). Bhattacharjee, [0424]-[0425].

If claim 19 requires computers with different OSs and/or hardware, POSAs knew large organizations typically had multiple OS-families and/or OS-versions on their servers, which often had different hardware configurations. Bhattacharjee, [0426]-[0428] (citing EX1020, [0024], [0046]); *supra* §V.C (Blaser-Calder servers had different OSs).

**15. Claim 20: "Claim 19," where [17B]'s "associating" step "includes…relatively moving the unique icon representing the service to the unique icon representing a server."**

POSAs would have found it obvious to implement Blaser-Calder's associating of server with server icons (*supra* §V.D.12.b ([**17B**])) to include *relatively moving the unique icon representing the service to the unique icon representing a server* because that was a conventional, convenient, drag-and-drop function for GUIs. Bhattacharjee, [0429]-[0433] (citing EX1014, [0031]; EX1047, 1:39-67; EX1109, [0048]).

**16. Claim 21: "[C]laim 20…starting a distributed software application."**

Conventional *distributed software applications* are "spread over several computers that are connected via a network." EX1025, [0038]. Blaser's layers support *distributed software applications* because a layer can "span[] one or more fixed disks," including those on "network drives." Blaser, 7:36-46. Bhattacharjee, [0434]-[0435]. POSAs also had motivation to include a *distributed software application* because it was a common, beneficial implementation of applications. Calder's techniques "relate[] to **distributed** computing" ([0002]), with files "stored remotely **on separate machines**," where calls to a "kernel to perform [a] file operation" are "communicated over the network [] to another…server" ([0139]). Bhattacharjee, [0436]-[0440] (citing EX1025, [0038]; EX1028, [0005]; EX1014, [0046]).

**17. Claim 22: "[C]laims 20…updating a console on the selected target server with information indicating that the service is resident on the selected target server."**

"**Computing devices typically include a *console*"** (e.g., "to control the computing device manually"). EX1022, [0004]. Thus, POSAs would have found it obvious for Blaser-Calder to *update a console on the selected target server with information indicating that the service is resident on the selected target server* to configure the server's console to recognize and properly execute its services. Bhattacharjee, [0441]-[0444] (citing EX1022, [0004]; EX1032, [0025], [0032]-[0033])

**18. Claim 23: "[C]laim 17…testing to determine if the selected target server is a valid computing platform, prior to causing the applications to be distributed to, and installed on the target server."**

POSAs would have found it obvious to *test to determine if the selected target server is a valid computing platform,* before *causing the applications to be distributed to, and installed on the target server*, to avoid wasting time and/or and potentially damaging Blaser-Calder servers by attempting to install incompatible layers. Bhattacharjee, [0445]-[0449] (citing EX1044, 2:25-32; EX1031, [0064]-[0068]; EX1020, [0007]).

**19. Claim 24: "[C]laim 17…creating a user account for the service."**

Blaser "provide[s] a multi-***user*** environment" that allows "an administrator to designate layers accessible to **individual *users*** and…to automatically **enable**

layers on *user login*." Blaser, 7:59-67. Each user has a "user's login name."

Blaser, 8:54-67. That teaches or suggests *creating a user account* (login name) *for*

*the service* the user may access. Bhattacharjee, [0450]-[0453] (citing EX1032,

[0041]-[0042]).

### 20. Claim 25: "[C]laim 17…installing files specific to the selected application on the selected server."

In Blaser, "*install[ing]*…**an *application***" (and *files specific* thereto) to *the*

*selected server* "can be as simple as enabling…a containing layer." Blaser, 7:24-

35. Bhattacharjee, [0454]-[0455].

### 21. Claim 26: "[C]laim 17…setting file access permissions to allow a user to access the one of the applications to be distributed."

As discussed above (§V.D.19), Blaser's "administrator [] designate[s] layers

accessible to individual users" (Blaser, 7:59-67), which POSAs understood would

conventionally include *setting the file access permissions to allow an individual*

*user to access the one of the applications to be distributed* and installed in the

layer. Bhattacharjee, [0456]-[0458] (citing EX1065, 1:33-56).

### 22. Claim 27

#### a. [27A] "[C]laim 1…de-installing a service from a server, comprising:"

Blaser provides for "*de-installation* **of an application**" (and thus its

corresponding *service*) by "disabling a containing layer" (Blaser, 7:24-35). *See*

Blaser, 13:16-23 ("**remov[ing]** the engineering type layer").  Bhattacharjee, [0459]-[0460].

>  b.  **[27B] "displaying the icon representing the service; [and] displaying the icon representing the server on which the service is installed; and"**

As discussed above (§V.D.12.b), POSAs had reason to install a service by dragging and dropping an associated icon into an icon/folder representing the target server and thus would also *display* those icons to provide a user-friendly way to identify which services are installed on which servers.  Bhattacharjee, [0461]-[0465] (citing EX1047, 1:39-67; EX1109, [0048]).

>  c.  **[27C] "utilizing the icon representing the service and the icon representing the server to initiating the de-installation of the selected service from the server on which it was installed."**

POSAs knew a conventional administrator feature was using icons as a user-friendly way to de-install services from target servers.  Bhattacharjee, [0466]-[0470] (citing EX1095, 8:4-13; EX1109, [0048]).

>  **23.  Claim 28: "[C]laim 27…separating icon representing the service from the icon representing the server."**

As discussed above (§§V.D.2.a-b), POSAs would want distinct *icons* for de-installing services and thus would also *separate* those *icons* as a conventional, user-friendly, GUI-based way to de-install services from Blaser-Calder's servers.  Bhattacharjee, [0471]-[0473] (citing EX1109, [0048]).

**24. Claim 29: "[C]laim 27…testing whether the selected server is a valid computing platform for de-installation of the service."**

As discussed above (§V.D.18), POSAs would *test whether the selected server is a valid platform for installing the service* and thus would also *test whether the selected server is a valid computing platform for de-installation of the service* to prevent corrupting the server by improper de-installation. Bhattacharjee, [0474]-[0475].

**25. Claim 30: "[C]laim 27…copying data file changes specific to the service back to a storage medium from which the data file changes originated prior to installation."**

Blaser says it was known to "record[] a series of changes (or 'diffs') to a buffer" so "a system can be restored back to a point in time." Blaser, 2:12-25. Blaser similarly says that as layers use application(s) "it may be desired to record changes to the virtual file system into the writable portion of a layer." Blaser, 10:50-59. Blaser further discloses that a user's "***changes* are recorded to that user's layer**" so the layer can be "**retained for future use**." Blaser, 12:21-35. For example, "**a user layer may be *stored* to a network server and retrieved and *stored* as required**." Blaser, 12:36-44. The above disclosures teach/suggest *copying data file changes specific to the service.* Bhattacharjee, [0476]-[0477].

POSAs would have found it obvious to store those changes *back to a storage medium from which the data file changes originated prior to installation* to

allow any data file changes to be retrievable for later user.  Bhattacharjee, [0478]-[0479].

## VI.   GROUND 2: CLAIMS 5-6, 12-13, 15, AND 31-34 ARE UNPATATENTBALE OVER BLASER-CALDER-SCHMIDT

### A.    Schmidt-449 (EX1007)

Schmidt-449 says "[m]oving (or migrating) [] programs between servers is desirable" (e.g., when a "remote computer" "becomes busy or is off-line for repair or upgrades" or to access a "different machine")).  Schmidt-449, 2:15-28.  However, when a "user migrates to another machine the IP address changes," so "packets received prior to migration [are] lost" and "packets remaining in the transfer will not reach the user."  Schmidt-449, 2:39-54.  Bhattacharjee, [0480]-[0481].

Schmidt-449's solution is to provide software "capsules" with "a unique locator, such as an IP address" that allows the capsule (and the applications it contains) to "be moved to a different machine having potentially a different operating system or on [a] different network," while "maintain[ing] the open network connections [the capsule] had" before migrating.  Schmidt-449, 2:57-65.  Each capsule "comprises one or more processes and their associated system environment," including "state information relating to exactly what the processes are doing," including system files like "configuration settings, working directories

and files…[and] installed software."  Schmidt-449, 4:14-26.  Bhattacharjee, [0482].

## B.    Blaser-Calder-Schmidt

POSAs would have been motivated and reasonably expected success to assign unique capsule IDs, as taught by Schmidt-449, to Blaser-Calder layers.

Blaser's layers can be "accessible to all users or some users" or "only to an individual user" (Blaser, 7:59-67) and "defined for different types of users, for example, secretaries, engineers and accountants" (Blaser, 13:1-15).  One Blaser server can have "multiple layers…active at the same time."  Blaser, 15:27-36.  Bhattacharjee, [0483]-[0484].  Additionally, Blaser provides layers for "software product testers" that "verify software functionality against multiple development versions."  Blaser, 13:29-41.  Like Schmidt-449 moving capsules between computers (§VI.A), Blaser moves layers between computers (6:62-7:23).

Schmidt-449 assigns each application capsule "a unique locator" so it "may be moved to a different machine having potentially a different operating system or on different network" (and thus a different server) "and maintain the open network connections it had prior to the migration."  Schmidt-449 2:57-65.  Bhattacharjee, [0484]-[0485].

Thus, POSAs had motivation to assign Blaser-Calder's layers unique locators like Schmidt-449 assigns to capsules to beneficially facilitate

(i) exchanging data between applications and/or users isolated in different layers,

(ii) moving layers to different machines (including with different OSs) and/or

different networks, and/or (iii) testing/running software that beneficially provided

multiple, unique IP addresses on one server (e.g., so different users/companies

could have their respective websites, with different IP addresses, hosted by a

shared physical server).  Bhattacharjee, [0486].

In the resulting "Blaser-Calder-Schmidt" combination, each layer is assigned

one or more unique locators (e.g., IP address).  POSAs would have reasonably

expected success because unique locators were conventional, Schmidt-449's

capsules (like applications in Blaser-Schmidt's layers) are OS-independent, and

Schmidt-449 says its techniques are "implement[able] in any type of computer

system or programming or processing environment" (11:43-46).  Bhattacharjee,

[0487]-[0488].

### C.    Mapping to Challenged Claims

#### 1.    Claim 5: "[C]laim 2…modifying at least some of the associated system files in plural containers to provide an association with a container specific identity assigned to a particular container."

Blaser-Calder-Schmidt's layers (*supra* §VI.B) have *a container specific*

*identity assigned to [that] particular container* (e.g., an IP address).  Schmidt-449

2:57-65.  POSAs had reason to *modify at least some of the associated system files*

*in plural containers to provide an association* with the unique locators so a layer's

application could identify/communicate with an application isolated in another layer (e.g., to exchange data over IP-based networks). Bhattacharjee, [0489]-[0492].

**2. Claim 6: "[C]laim 2…assigning a unique associated identity to each of a plurality of the containers, wherein the identity includes at least one of IP address, host name, and MAC address."**

Blaser-Calder-Schmidt (*supra* §VI.B) *assigns a unique associated identity to each of a plurality of the containers* (layers) like Schmidt's exemplary "IP address" (Schmidt-449, 2:57-65). POSAs would have been motivated and reasonably expected success to also assign additional conventional unique locators – like a "host name" and "MAC address" – to allow communication protocols that used those identities to address the layer (e.g., MAC address for Ethernet networks; hostname for remote access). Bhattacharjee, [0493]-[0499] (citing EX1039, [0002] ("**hostname is a unique name by which a computing device may be identified** on a network…[and] simplify access to computing devices"); EX1019, [0012], [0023] ("**assign[ing] virtual MAC addresses to each processor node**" so "processing resources may be deployed rapidly and easily through software via configuration commands"); EX1130, 2:6-14; EX1131, 1:27-56).

**3. Claim 12**

As noted above (§V.D.6, claim 8), Blaser-Calder's layer (*container*) files can be retrieved from storage of a "network server." Blaser, 12:36-44. The retrieved

– 69 –

layer "provide[s] files and directories **overlaid on** the existing fixed disk file systems."  Blaser, 12:36-44.  POSAs understood that overlaying is *merging* those *files stored in network storage* with that existing file system.  POSAs also had motivation to further merge those *files with the parameters* discussed above for claim 11 (§V.D.9), *to affect* claim 1's step of storing (§V.D.1.c.i).  For example, it would have been obvious to merge layer *files* with the names of those layers and locations of where to store those layers on the network, which are examples of *parameters forming descriptors of containers* (§V.D.9).  Bhattacharjee, [0500]-[0503].

### 4. Claim 13

As discussed above (§V.C), Blaser-Calder's exemplary OSs include prior art Windows-based and conventional non-Windows OSs; those OS included tools for measuring/tracking processes related to an application, including tracking statistics for resource allocation and monitoring the status of application(s).  Bhattacharjee, [0504]-[0510] (citing, for Windows-based OSs, EX1033, 2:62-3:18, 34:30-39, 36:53-65; EX1055, 5:35-39; for Unix-based OSs, EX1060, 5:57-61; EX1094, 2:5-21, 4:20-30; EX1120, 450; for generic OSs, EX1121, G-14).

Thus, POSAs had motivation (with reasonable expectation of success) to use those (or other conventional tracking) tools in Blaser-Calder-Schmidt to track and store the history of processes in layers for the same reasons as in conventional

computer systems (e.g., projecting server-resource needs for purchasing/assigning additional equipment).  Bhattacharjee, [0511]-[0514] (citing EX1093, 1:66-3:6; EX1121, G-5).

### 5. Claim 15

#### a. [15A] "[C]laim 14…assigning an identity to the containers including at least one of a unique IP address, a unique Mac address and an estimated resource allocation;"

*See* §V.D.10 (claim 14), §V.E.2 (claim 6).  Bhattacharjee, [0515].

#### b. [15B] "installing the container on a server; and,"

Blaser discloses "'pre-installed' applications" provided as "layers on CD-ROM or other media" (Blaser, 6:62-7:23), which are for *installing the container* (layer) *on a* Blaser-Calder *server* (*supra* §V.A.1.a.i).  Bhattacharjee, [0516].

#### c. [15C] "testing the applications and files within the container."

Blaser's "'pre-installed' applications" on CD/media are "**pre-*tested*.**" Blaser, 6:62-7:23.  For example, "software product ***testers***" use layers to "verify software functionality against multiple development versions."  Blaser, 13:29-41. Thus, Blaser meets *testing the applications and files within the* layer (*container*). Bhattacharjee, [0517]-[0520] (citing EX1129, 1:11-20).

### 6. Claim 31

#### a. Previously Addressed Limitations

Blaser-Calder-Schmidt meets the following limitations of claim 31 for the reasons discussed in the corresponding section(s) above. Bhattacharjee, [0521]-[0537].

| Limitation: | Addressed in Section: |
|---|---|
| [**31PRE**] | §§V.D.1.a-b ([**1PREA**]-[**1PREB**]), §V.D.1.c.ii ([**1A**]) |
| [**31A**] | §V.D.1.c ([**1A**]) |
| [**31B**] | §V.D.1.c.i.(2) ([**1A**], "container"-construction part [**2**]) |
| [**31C**] | §VI.C.2 (claim 6) |
| [**31D**] | §V.D.1.c.ii ([**1A**]) |
| [**31E**] | §V.D.1.c ([**1A**]), §§V.D.1.f-g ([**1D**]-[**1E**]) |
| [**31F**] | §V.D.1.c ([**1A**]), §V.D.2 (claim 2) |
| [**31G**] | §V.D.1.c.iv ([**1A**]) |
| [**31H**] | §V.D.1.c.iv ([**1A**]), §V.D.1.e ([**1C**]) |

**b.**     **[31I] "a run time module for monitoring system calls from applications associated with one or more containers and for providing control of the one or more applications."**

Blaser says for Windows-based OSs, "a layering system is formed by adding several files to the stock Windows operating system," "including a **runtime library** FSLLIB32.DLL" "and an FSLX driver."  Blaser, 13:43-57.  "[T]he FSLLIB32.DLL runtime library provides an API…to manage the layered system and communicate with the FSLX driver, and further provides system management function implementations."  Blaser, 20:19-36.  The FSLX driver "operate[s] to intercept key file system and registry calls and manipulate the results to create the appearance that virtual files and registry settings contained in the layer definitions exist in the real file system and real registry."  Blaser, 14:60-15:1.  For example, "[w]hen requests come that access virtual files or virtual registry settings, these requests are redirected by the FSLX driver to the proper locations in the layer."  Blaser, 14:60-15:1.  Bhattacharjee, [0538]-[0539].

Blaser's FSLLIB32.DLL "runtime library" is thus a *run time module for monitoring system calls from applications associated one or more containers* (e.g., by "intercept[ing] key file system and registry calls") and are *for providing control of the one or more applications* (e.g., by "redirect[ing] [access requests] to the proper locations in the layer").  Bhattacharjee, [0540]-[0541].

Moreover, Blaser-Calder-Schmidt incorporates Calder's translating of *system calls* for use on non-native OSs.  Calder, [0101]; *supra* §V.C.  Calder says run-time software module(s) (e.g., an "interception **module**") will *monitor system calls from the applications* to translate them, and thereby *provide control of the one or more applications*.  Calder, [0086]-[0087].  That is another reason Blaser-Calder-Schmidt meets [**31I**].  Bhattacharjee, [0452]-[0544].

### 7.     Claim 32

As discussed above (§V.D.7, claim 9), POSAs had reason to pre-allocate system resources to layers and thus had motivation to include *a scheduler comprising values related to an allotted time in which processes within a container may utilize predetermined resources*, as a conventional way to assign server resources to applications.  Bhattacharjee, [0545]-[0549] (citing EX1120, 452; EX1034, [0003]; EX1094, 2:5-21).

### 8.     Claim 33: "[C]laim 32['s]…run time module includes an intercepting module associated with the…containers for intercepting system calls from any of the…containers and for providing values alternate to values the kernel would have assigned in response to the system calls, so that the containers can run independently of one another without contention, in a secure manner, the values corresponding to at least one of" [31C]'s unique identifiers.

As discussed above (§VI.C.7, claim 32), Blaser-Calder-Schmidt meets a "*run time module*" that "*intercept[s] system calls*" from reaching the host's kernel and redirects them into the layer.  Blaser, 14:60-15:1; Calder, [0139].  As discussed

– 74 –

above (§VI.C.2, claim 6), POSAs would assign each layer *at least one of the IP address, the host name and the Mac_Address*. POSAs knew a conventional way to implement those unique identifiers was for the *run time module* that *intercepts system calls from any of the plurality of containers* to replace the host's identifier with the layer's identifier (or vice-versa) to ensure the layers *can run independently of one another without contention* as Blaser teaches. *Supra* §V.D.1.c.i.(3). For example, if a layer made a system call to request the server's IP address, Blaser-Calder-Schmidt's run-time module would provide the layer's unique IP address. Bhattacharjee, [0550]-[0552].

### 9. Claim 34

#### a. [34A]: "[C]laim 31['s]…run time module performs: monitoring resource usage of applications executing;"

*See* §V.D.7 (claim 9), §VI.C.4 (claim 13). Bhattacharjee, [0553].

#### b. [34B]: "intercepting system calls to kernel mode, made by the at least one respective application within a container, from user mode to kernel mode;"

POSAs knew that applications typically run in *user mode* and make *system calls to kernel mode from user mode* (e.g., to access the server's hardware). Bhattacharjee, [0554] (citing EX1120, 15). As discussed above (§VII.A.4.a.i.(4)), applications in Blaser-Calder-Schmidt's layers share a *kernel*, and *system calls* are *intercepted* and redirected into the layer (e.g., if a requested system file is within

– 75 –

the layer) or passed to the *kernel* (e.g., if server hardware is required).  Blaser, 14:60-15:1; Calder, [0074]-[0076].  Bhattacharjee, [0555]-[0557].

        **c.**      **[34C]: "comparing the monitored resource usage…with the resource limits; and, forwarding the system calls to a kernel on the basis of the comparison…."**

POSAs would have found it obvious to *compare the monitored resource usage of the at least one respective application with the resource limits* discussed *supra* §VI.C.7 (claim 32) and only *forward the system calls to a kernel on the basis of the comparison* so that allocated resource limits would not be violated if the system call were passed to the kernel.  Bhattacharjee, [0558]-[0559] (citing EX1132, [0009]-[0011]).

## VII.  DISCRETIONARY DENIAL IS UNWARRANTED

### A.    §314(a)

"[T]he PTAB will not deny institution based on *Fintiv* if," as here, "there is compelling evidence of unpatentability." Director's Interim Procedure for Discretionary Denials, 5 (June 21, 2022) ("Interim Procedure") (discussing *Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 11 (Mar. 20, 2020) (precedential)). That should conclude the *Fintiv* analysis.

If considered, the *Fintiv* factors weigh against denial.

### 1. Stay Potential

This factor is currently neutral or favors institution. *Sand Revolution II, LLC v. Cont'l Intermodal Group–Trucking*, IPR2019-01393, Paper 24, 7 (June 16, 2020) (informative). The district-court proceeding is currently temporarily stayed pending transfer. EX1087, 4-5.

### 2. Trial Timing

Petitioner's motion to transfer the district-court proceeding to the Northern District of California was recently granted. EX1087. That district's median time-to-trial is 47.9 months (EX1082, 66), and no post-transfer trial schedule has yet been set. Factor 2 therefore weighs against denial. *BMW of North America, LLC v. Michigan Motor Techs., LLC*, IPR2023-01224, Paper 15, 11 (Feb. 15, 2024).

### 3. Litigation Investment

There has been little investment in invalidity-related issues in the district court litigation. A *Markman* hearing was canceled before the transfer decision EX1087, and "a significant portion of work remains to be done" including "fact and expert discovery and dispositive motions." *Protect Animals With Satellites LLC v. OnPoint Sys., LLC*, IPR2021-01483, Paper 11, 14-15 (Mar. 4, 2022).

### 4. Issue Overlap

This Petition challenges all 34 claims, whereas only eight are asserted in district court. EX1079. This weighs against denial. *Markforged Inc. v. Continuous Composites Inc.*, IPR2022-00679, Paper 7, 32-33 (Oct. 25, 2022).

### 5. Litigation Defendants

This factor is at worst neutral. *Id.*, 33.

### 6. Other Circumstances

The Petition's "strong showing on the merits" weighs against denial. Interim Procedure, 3-5.

### B. §325(d)

Blaser, Calder, and Schmidt-449 were not before the Office during prosecution, so denial is unwarranted.

## VIII. CONCLUSION

The Board should institute review and cancel claims 1-34.

Dated:  2025-01-31                    Respectfully submitted,
                                      *Google LLC*

                                      /Elisabeth Hunt/_____
                                      Elisabeth Hunt, Reg. #67,336

# IX. APPENDIX: CLAIM LISTING

The following claim listing assigns element labels (*e.g.*, [**1PREA**], [**1PREB**], [**1A**], etc.) to certain claims for convenience of reference.

| Claim 1 |
|---|
| [**1PREA**] In a system having a plurality of servers with operating systems that differ, operating in disparate computing environments, wherein each server includes a processor and an operating system including a kernel a set of associated local system files compatible with the processor, |
| [**1PREB**] a method of providing at least some of the servers in the system with secure, executable, applications related to a service, wherein the applications are executed in a secure environment, wherein the applications each include an object executable by at least some of the different operating systems for performing a task related to the service, the method comprising: |
| [**1A**] storing in memory accessible to at least some of the servers a plurality of secure containers of application software, each container comprising one or more of the executable applications and a set of associated system files required to execute the one or more applications, for use with a local kernel residing permanently on one of the servers; |
| [**1B**] wherein the set of associated system files are compatible with a local kernel of at least some of the plurality of different operating systems, |
| [**1C**] the containers of application software excluding a kernel, |
| [**1D**] wherein some or all of the associated system files within a container stored in memory are utilized in place of the associated local system files that remain resident on the server, |
| [**1E**] wherein said associated system files utilized in place of the associated local system files are copies or modified copies of the associated local system files that remain resident on the server, |
| [**1F**] and wherein the application software cannot be shared between the plurality of secure containers of application software, |
| [**1G**] and wherein each of the containers has a unique root file system that is different from an operating system's root file system. |

| Claim 2 |
| --- |
| A method as defined in claim 1, wherein each container has an execution file associated therewith for starting the one or more applications. |
| **Claim 3** |
| A method as defined in claim 2, wherein the execution file includes instructions related to an order in which executable applications within will be executed. |
| **Claim 4** |
| A method as defined in claim 1 further comprising the step of pre-identifying applications and system files required for association with the one or more containers prior to said storing step. |
| **Claim 5** |
| A method as defined in claim 2, further comprising the step of modifying at least some of the associated system files in plural containers to provide an association with a container specific identity assigned to a particular container. |
| **Claim 6** |
| A method as defined in claim 2, comprising the step of assigning a unique associated identity to each of a plurality of the containers, wherein the identity includes at least one of IP address, host name, and MAC address. |
| **Claim 7** |
| A method as defined in claim 2 further comprising the step of modifying at least some of the system files to define container specific mount points associated with the container. |
| **Claim 8** |
| A method as defined in claim 1, wherein the one or more applications and associated system files are retrieved from a computer system having a plurality of secure containers. |
| **Claim 9** |
| A method as defined in claim 2, wherein server information related to hardware resource usage including at least one of CPU memory, network bandwidth, and disk allocation is associated with at least some of the containers prior to the applications within the containers being executed. |

| Claim 10 |
| --- |
| A method as defined in claim 2, wherein in operation when an application residing within a container is executed, said application has no access to system files or applications in other containers or to system files within the operating system during execution thereof. |
| **Claim 11** |
| A method as defined in claim 2, wherein containers include files stored in network file storage, and parameters forming descriptors of containers stored in a separate location. |
| **Claim 12** |
| A method as defined in claim 11, further comprising the step of merging the files stored in network storage with the parameters to affect the step of storing in claim 1. |
| **Claim 13** |
| A method as defined in claim 1 further comprising the step of associating with a plurality of containers a stored history of when processes related to applications within the container are executed for at least one of, tracking statistics, resource allocation, and for monitoring the status of the application. |
| **Claim 14** |
| [**14PRE**] A method as defined in claim 1 comprising the step of creating containers prior to said step of storing containers in memory, |
| [**14A**] wherein containers are created by: a) running an instance of a service on a server; |
| [**14B**] b) determining which files are being used; and, |
| [**14C**] c) copying applications and associated system files to memory without overwriting the associated system files so as to provide a second instance of the applications and associated system files. |
| **Claim 15** |
| A method as defined in claim 14 comprising the steps of: assigning an identity to the containers including at least one of a unique IP address, a unique Mac address and an estimated resource allocation; installing the container on a server; and, testing the applications and files within the container. |

Appx0148

| Claim 16 |
|---|
| [16A] A method as defined in claim 1 comprising the step of creating containers prior to said step of storing containers in memory, |
| [16B] wherein a step of creating containers includes: using a skeleton set of system files as a container starting point and installing applications into that set of files. |
| **Claim 17** |
| [17A] A method as defined in claim 1 further comprising installing a service on a target server selected from one of the plurality of servers, |
| [17B] wherein installing the service includes: using a graphical user interface, associating a unique icon representing a service with an unique icon representing a server for hosting applications related to the service and for executing the service, so as to cause the applications to be distributed to, and installed on the target server. |
| **Claim 18** |
| A method as defined in claim 17 wherein the target server and the graphical user interface are at remote locations. |
| **Claim 19** |
| A method as defined in claim 18, wherein the graphical user interface is installed on a computing platform, and wherein the computing platform is a different computing platform than the target server. |
| **Claim 20** |
| A method as defined in claim 19, wherein the step of associating includes the step of relatively moving the unique icon representing the service to the unique icon representing a server. |
| **Claim 21** |
| A method as defined in claim 20 further comprising starting a distributed software application. |
| **Claim 22** |
| A method according to anyone of claims 20 further comprising updating a console on the selected target server with information indicating that the service is resident on the selected target server. |

| |
|---|
| **Claim 23** |
| A method claim 17, further comprising, the step of testing to determine if the selected target server is a valid computing platform, prior to causing the applications to be distributed to, and installed on the target server. |
| **Claim 24** |
| A method according to claim 17 further comprising creating a user account for the service. |
| **Claim 25** |
| A method as defined in claim 17, further comprising the step of installing files specific to the selected application on the selected server. |
| **Claim 26** |
| A method according to claim 17 further comprising the steps of setting file access permissions to allow a user to access the one of the applications to be distributed. |
| **Claim 27** |
| [**27A**] A method as defined in claim 1, further comprising de-installing a service from a server, comprising: displaying the icon representing the service; |
| [**27B**] displaying the icon representing the server on which the service is installed; and |
| [**27C**] utilizing the icon representing the service and the icon representing the server to initiating the de-installation of the selected service from the server on which it was installed. |
| **Claim 28** |
| A method according to claim 27 further comprising separating icon representing the service from the icon representing the server. |
| **Claim 29** |
| A method according to claim 27 further comprising testing whether the selected server is a valid computing platform for de-installation of the service. |
| **Claim 30** |
| A method according to claim 27 further comprising copying data file changes specific to the service back to a storage medium from which the data file changes originated prior to installation. |

| Claim 31 |
|---|
| [**31PRE**] A computing system for performing a plurality of tasks each comprising a plurality of processes comprising: |
| [**31A**] a system having a plurality of secure containers of associated files accessible to, and for execution on, one or more servers, |
| [**31B**] each container being mutually exclusive of the other, such that read/write files within a container cannot be shared with other containers, |
| [**31C**] each container of files is said to have its own unique identity associated therewith, said identity comprising at least one of an IP address, a host name, and a MAC_address; |
| [**31D**] wherein, the plurality of files within each of the plurality of containers comprise one or more application programs including one or more processes, |
| [**31E**] and associated system files for use in executing the one or more processes wherein the associated system files are files that are copies of files or modified copies of files that remain as part of the operating system, |
| [**31F**] each container having its own execution file associated therewith for starting one or more applications, |
| [**31F**] each container having its own execution file associated therewith for starting one or more applications, |
| [**31H**] wherein each container exclusively uses a kernel in an underlying operation system in which it is running and is absent its own kernel; and, |
| [**31I**] a run time module for monitoring system calls from applications associated with one or more containers and for providing control of the one or more applications. |
| Claim 32 |
| A computing system as defined in claim 31, further comprising a scheduler comprising values related to an allotted time in which processes within a container may utilize predetermined resources. |

| Claim 33 |
|---|
| A computing system as defined in claim 32, wherein the run time module includes an intercepting module associated with the plurality of containers for intercepting system calls from any of the plurality of containers and for providing values alternate to values the kernel would have assigned in response to the system calls, so that the containers can run independently of one another without contention, in a secure manner, the values corresponding to at least one of the IP address, the host name and the MAC_Address. |
| **Claim 34** |
| [**34A**] A computing system as defined in claim 31, wherein the run time module performs: monitoring resource usage of applications executing; |
| [**34B**] intercepting system calls to kernel mode, made by the at least one respective application within a container, from user mode to kernel mode; |
| [**34C**] comparing the monitored resource usage of the at least one respective application with the resource limits; and, forwarding the system calls to a kernel on the basis of the comparison between the monitored resource usage and the resource limits. |

## CERTIFICATE OF SERVICE UNDER 37 C.F.R. § 42.6 (E)(4)

I certify that on January 31, 2025, I will cause a copy of the foregoing document, including any exhibits or appendices filed therewith, to be served via USPS Priority Mail Express at the following correspondence address of record for the patent:

> Allen, Dyer, Doppelt + Gilchrist, PA
> 1135 East State Road 434
> Suite 3001
> Winter Springs, FL 32708

Date:  January 31, 2025

/Dara Del Rosario/
Dara Del Rosario
Paralegal
WOLF, GREENFIELD & SACKS, P.C.

# CERTIFICATE OF WORD COUNT

Pursuant to 37 C.F.R. § 42.24, the undersigned certifies that the foregoing Petition for *Inter Partes* Review contains 13,991 words excluding a table of contents, a table of authorities, Mandatory Notices under § 42.8, a certificate of service or word count, or appendix of exhibits or claim listing. Petitioner has relied on the word count feature of the word processing system used to create this paper in making this certification.

Date: January 31, 2025

/Dara Del Rosario/
Dara Del Rosario
Paralegal
WOLF, GREENFIELD & SACKS, P.C.

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

GOOGLE LLC,
Petitioner,

v.

VIRTAMOVE, CORP.,
Patent Owner.

_____

Case No. IPR2025-00488
Patent No. 7,519,814

_____

**PETITION FOR INTER PARTES REVIEW
UNDER 35 U.S.C. §§ 311-319 AND 37 C.F.R. § 42.1 et seq**

# TABLE OF CONTENTS

MANDATORY NOTICES ...........................................................................xv

    A.  Real Party-In-Interest ................................................................xv

    B.  Related Matters ...........................................................................xv

        1.  United States Patent & Trademark Office .........................xv

        1.  USPTO Patent Trial and Appeal Board .............................xvi

        2.  U.S. District Court for the Eastern District of Texas ...............xvi

        3.  U.S. District Court for the Western District of Texas ...............xvi

        4.  U.S. District Court for the Northern District of California ..............xvii

    C.  Counsel and Service Information - § 42.8(b)(3) and (4).......................xvii

I.     STANDING .............................................................................................1

II.    GROUNDS .............................................................................................1

III.   THE '814 PATENT ..................................................................................2

    A.  Specification ..............................................................................2

    B.  Person of Ordinary Skill in the Art ("POSA") .............................4

    C.  Prosecution History ...................................................................4

    D.  Challenged Claims .....................................................................4

IV.   CLAIM INTERPRETATION ..................................................................5

V.    Grounds 1-2: Claims 1-34 ARE UNPATENTABLE OVER Schmidt-
       Tormasov (GROUND 1) OR OVER SCHMIDT-TORMASOV-Calder
       (GROUND 2)..........................................................................................5

    A.  Schmidt-479 (EX1008) .............................................................5

    B.  Tormasov (EX1010) ..................................................................7

    C.  Calder (EX1006)........................................................................10

    D.  Grounds 1-2 ...............................................................................12

        1.  Schmidt-Tormasov Combination (Ground 1) ...................12

        2.  Schmidt-Tormasov-Calder Combination (Ground 2) ............17

    E.  Mapping to Challenged Claims ................................................19

        1.  Claim 1 ..............................................................................19

a.   [1PREA] .........................................................................19

    i.   "1. In a system having a plurality of servers with operating systems that differ" ............................................19

    ii.   "operating in disparate computing environments" .............23

    iii.   "wherein each server includes a processor and an operating system" ........................................................24

    iv.   "[OS] including a kernel [and] a set of associated local system files compatible with the processor" ............27

b.   [1PREB] ........................................................................32

    i.   "a method of providing at least some of the servers in the system with secure, executable, applications" ..............32

    ii.   "[applications] related to a service" ...................................35

    iii.   "wherein the applications are executed in a secure environment" ................................................................37

    iv.   "wherein the applications each include an object executable by at least some of the different operating systems for performing a task related to the service" .........38

c.   [1A] ..............................................................................40

    i.   "storing in memory accessible to at least some of the servers a plurality of secure containers of application software" ..............................................................................40

       (1)   "storing in memory accessible to…the servers" ........40

       (2)   "containers" ..................................................................41

       (3)   "secure containers of application software" ...............45

    ii.   "each container comprising one or more of the executable applications" ......................................................48

    iii.   "and a set of associated system files required to execute the one or more applications" ................................50

    iv.   "for use with a local kernel residing permanently on one of the servers" ...........................................................51

d.   [1B] "wherein the set of associated system files are compatible with a local kernel of at least some of the plurality of different operating systems," ...................................53

e. [1C] "the containers of application software excluding a kernel," ..................................................54

f. [1D] "wherein some or all of the associated system files within a container stored in memory are utilized in place of the associated local system files that remain resident on the server," ..................................................56

g. [1E] "wherein said associated system files…are copies or modified copies of the associated local system files…," ...........60

h. [1F] "and wherein the application software cannot be shared between the plurality of secure containers of application software," ..................................................62

i. [1G] "and wherein each of the containers has a unique root file system that is different from an operating system's root file system." ..................................................63

2. Claim 2: "[C]laim 1…each container has an execution file associated therewith for starting the…applications." ........................67

3. Claim 3 ..................................................68

4. Claim 4: "[C]laim 1…pre-identifying applications and system files required for association with the one or more containers" before [1A]'s "storing step." ..................................................69

5. Claim 5 ..................................................70

6. Claim 6: "[C]laim 2…assigning a unique associated identity to each of a plurality of the containers, wherein the identity includes at least one of IP address, host name, and MAC address." ..................................................70

7. Claim 7 ..................................................72

8. Claim 8 ..................................................73

9. Claim 9: "[C]laim 2, wherein server information related to hardware resource usage including at least one of CPU memory, network bandwidth, and disk allocation is associated with at least some of the containers prior to the applications within the containers being executed." ..................................................74

10. Claim 10: "[C]laim 2, wherein in operation when an application residing within a container is executed, said application has no access to system files or applications in other containers or to

system files within the operating system during execution thereof." ...................75

11. Claim 11 .................................................................77

12. Claim 12 .................................................................77

13. Claim 13: "[C]laim 1…associating with a plurality of containers a stored history of when processes related to applications within the container are executed for at least one of, tracking statistics, resource allocation, and for monitoring the status of the application." ...............................78

14. Claim 14 .................................................................79

    a.  [14PRE] "[C]laim 1…creating containers prior to said step of storing containers in memory" ...............................79

    b.  [14A] "wherein containers are created by: a) running an instance of a service on a server;" ...............................80

    c.  [14B] "b) determining which files are being used; and," ...........81

    d.  [14C] "c) copying applications and associated system files to memory without overwriting the associated system files so as to provide a second instance of the applications and associated system files." ...............................82

15. Claim 15 .................................................................82

    a.  [15A] .................................................................82

    b.  [15B] .................................................................82

    c.  [15C] .................................................................83

16. Claim 16 .................................................................83

    a.  [16A] .................................................................83

    b.  [16B] .................................................................83

17. Claim 17 .................................................................83

    a.  [17A] .................................................................83

    b.  [17B] .................................................................84

18. Claim 18 .................................................................84

19. Claim 19 .................................................................85

20. Claim 20 .................................................................85

21. Claim 21 ...................................................................................85

22. Claim 22 ...................................................................................86

23. Claim 23 ...................................................................................86

24. Claim 24 ...................................................................................86

25. Claim 25 ...................................................................................87

26. Claim 26 ...................................................................................87

27. Claim 27 ...................................................................................87

    a.   [27A] ...............................................................................87

    b.   [27B] ...............................................................................87

    c.   [27C] ...............................................................................88

28. Claim 28 ...................................................................................88

29. Claim 29 ...................................................................................88

30. Claim 30 ...................................................................................88

31. Claim 31 ...................................................................................89

    a.   Previously Addressed Limitations ..............................................89

    b.   [31I] "a run time module for monitoring system calls from applications associated with one or more containers and for providing control of the…applications." ..............................90

32. Claim 32 ...................................................................................91

33. Claim 33 ...................................................................................91

34. Claim 34 ...................................................................................92

    a.   [34A] ...............................................................................92

    b.   [34B] ...............................................................................92

    c.   [34C] ...............................................................................92

VI.   Grounds 3-4: Claims 1-34 Are Unpatentable Over the Combinations OF GROUNDS 1-2 In Further View of Schmidt-629 ....................................93

    1.   Schmidt-629 (EX1116) and the Grounds 3-4 Combinations .............93

    2.   Claims 1-4, 7-30, 32-34 ..........................................................94

    3.   Claims 5-6, 31 ......................................................................94

VII.  DISCRETIONARY DENIAL IS UNWARRANTED ...................................94

A. §314(a) ........................................................................................94

    1. Stay Potential ......................................................................95

    2. Trial Timing .......................................................................95

    3. Litigation Investment ........................................................95

    4. Issue Overlap .....................................................................96

    5. Litigation Defendants ........................................................96

    6. Other Circumstances .........................................................96

B. §325(d) .........................................................................................96

VIII. CONCLUSION .....................................................................................96

IX. APPENDIX: CLAIM LISTING .............................................................97

# TABLE OF AUTHORITIES

**CASES**

*Apple Inc. v. Fintiv, Inc.*,
 IPR2020-00019, Paper 11 (Mar. 20, 2020) ................................................ 94, 95

*BMW of North America, LLC v. Michigan Motor Techs., LLC*,
 IPR2023-01224, Paper 15, 11 (Feb. 15, 2024) .......................................... 95

*Google LLC v. Security First Innovations, LLC*,
 IPR2024-00215, Paper 15, 6 (May 23, 2024) ............................................ 5

*Markforged Inc. v. Continuous Composites Inc.*,
 IPR2022-00679, Paper 7 (Oct. 25, 2022) ................................................... 96

*PLR Worldwide Sales Ltd. v. Flip Phone Games, Inc.*,
 IPR2024-00209, Paper 9 (May 10, 2024) .............................................. 23, 65

*Protect Animals With Satellites LLC v. OnPoint Sys., LLC*,
 IPR2021-01483, Paper 11 (Mar. 4, 2022) .................................................. 95

*Sand Revolution II, LLC, v. Cont'l Intermodal Group–Trucking*,
 IPR2019-01393, Paper 24 (June 16, 2020) ................................................ 95

**REGULATIONS**

37 C.F.R. §42.100(b) ...................................................................................... 5

37 C.F.R. §42.104(a) ...................................................................................... 1

**STATUTES**

35 U.S.C. §102(b) ....................................................................................... 1, 2

35 U.S.C. §102(e) ........................................................................................... 2

35 U.S.C. §103 ............................................................................................... 1

35 U.S.C. §282(b) .......................................................................................... 5

35 U.S.C. §314(a) ......................................................................................... 94

35 U.S.C. §325(d) ......................................................................................... 96

**OTHER AUTHORITIES**

Director's Interim Procedure for Discretionary Denials (June 21, 2022) ........ 95, 96

Appx0163

# APPENDIX LISTING OF EXHIBITS

| Exhibit | Description |
| --- | --- |
| 1001 | U.S. Patent No. 7,519,814 ("'814 patent") |
| 1002 | Prosecution History of U.S. Patent No. 7,519,814 |
| 1003 | Declaration of Samrat Bhattacharjee, Ph.D. ("Bhattacharjee") |
| 1004 | Curriculum Vitae of Samrat Bhattacharjee, Ph.D. |
| 1005 | U.S. Patent No. 7,117,495 ("Blaser") |
| 1006 | U.S. Patent Application Publication No. 20020066022 ("Calder") |
| 1007 | U.S. Patent No. 6,931,449 ("Schmidt-449") |
| 1008 | U.S. Patent Application Publication No. 20020095479 ("Schmidt-479") |
| 1009 | U.S. Patent Application Publication No. 20020133529 ("Schmidt-529") |
| 1010 | U.S. Patent Application Publication No. 20020124072 ("Tormasov") |
| 1011 | U.S. Patent Application Publication No. 20010009425 |
| 1012 | U.S. Patent Application Publication No. 20010018708 |
| 1013 | U.S. Patent Application Publication No. 20010047472 |
| 1014 | U.S. Patent Application Publication No. 20010056572 |
| 1015 | U.S. Patent Application Publication No. 20010029605 |
| 1016 | U.S. Patent Application Publication No. 20020023158 |
| 1017 | U.S. Patent Application Publication No. 20020052727 |
| 1018 | U.S. Patent Application Publication No. 20020143795 |
| 1019 | U.S. Patent Application Publication No. 20020156612 |
| 1020 | U.S. Patent Application Publication No. 20020156877 |
| 1021 | U.S. Patent Application Publication No. 20020174215 |
| 1022 | U.S. Patent Application Publication No. 20020188718 |
| 1023 | U.S. Patent Application Publication No. 20020194394 |
| 1024 | U.S. Patent Application Publication No. 20020194488 |
| 1025 | U.S. Patent Application Publication No. 20030009408 |
| 1026 | U.S. Patent Application Publication No. 20030014381 |
| 1027 | U.S. Patent Application Publication No. 20030014466 |
| 1028 | U.S. Patent Application Publication No. 20030018717 |
| 1029 | U.S. Patent Application Publication No. 20030023839 |
| 1030 | U.S. Patent Application Publication No. 20030041173 |
| 1031 | U.S. Patent Application Publication No. 20030093688 |
| 1032 | U.S. Patent Application Publication No. 20030097464 |
| 1033 | U.S. Patent No. 6,467,052 |
| 1034 | U.S. Patent Application Publication No. 20030140179 |
| 1035 | U.S. Patent Application Publication No. 20030154221 |
| 1036 | U.S. Patent No. 7,159,184 |

| Exhibit | Description |
| --- | --- |
| 1037 | U.S. Patent No. 7,103,745 |
| 1038 | U.S. Patent No. 6,263,440 |
| 1039 | U.S. Patent Application Publication No. 20040190534 |
| 1040 | U.S. Patent No. 7,356,771 |
| 1041 | U.S. Patent No. 5,903,753 |
| 1042 | U.S. Patent No. 4,685,125 |
| 1043 | U.S. Patent No. 5,406,644 |
| 1044 | U.S. Patent No. 5,421,009 |
| 1045 | U.S. Patent No. 5,568,630 |
| 1046 | U.S. Patent No. 5,640,562 |
| 1047 | U.S. Patent No. 5,657,221 |
| 1048 | U.S. Patent No. 5,675,831 |
| 1049 | U.S. Patent No. 5,742,829 |
| 1050 | U.S. Patent No. 4,742,450 |
| 1051 | U.S. Patent No. 5,761,669 |
| 1052 | U.S. Patent No. 5,784,555 |
| 1053 | U.S. Patent No. 5,835,765 |
| 1054 | U.S. Patent No. 6,044,465 |
| 1055 | U.S. Patent No. 6,122,744 |
| 1056 | U.S. Patent No. 6,195,650 |
| 1057 | U.S. Patent No. 6,321,323 |
| 1058 | U.S. Patent No. 6,363,409 |
| 1059 | U.S. Patent No. 6,453,470 |
| 1060 | U.S. Patent No. 6,567,767 |
| 1061 | U.S. Patent No. 6,732,359 |
| 1062 | U.S. Patent No. 6,874,148 |
| 1063 | U.S. Patent No. 6,985,937 |
| 1064 | U.S. Patent No. 7,140,015 |
| 1065 | U.S. Patent No. 7,185,192 |
| 1066 | U.S. Patent No. 7,454,440 |
| 1067 | U.S. Patent No. 8,209,680 |
| 1068 | U.S. Patent No. 5,926,636 |
| 1069 | U.S. Patent No. 5,218,530 |
| 1070 | U.S. Patent No. 6,134,593 |
| 1071 | U.S. Patent No. 6,918,038 |
| 1072 | U.S. Patent Application Publication No. 20040034623 |
| 1073 | U.S. Patent No. 7,461,148 |
| 1074 | U.S. Patent No. 7,136,800 |

| Exhibit | Description |
|---|---|
| 1075 | PCT Application Publication No. WO2002056156 |
| 1076 | Kamp et al., "Jails: Confining the omnipotent root," Proceedings of the 2nd International SANE Conference (Vol. 43, p. 116) (2000) |
| 1077 | Prevelakis et al., "Sandboxing Applications," USENIX Annual Technical Conference, FREENIX Track (pp. 119-126) (2001) |
| 1078 | Plaintiff VirtaMove Corp.'s Supplemental Preliminary Disclosure of Asserted Claims and Infringement Contentions, in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (Sept. 06, 2024) |
| 1079 | Chart re: '814 Patent accompanying Plaintiff VirtaMove Corp.'s Supplemental Preliminary Disclosure of Asserted Claims and Infringement Contentions, in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (Sept. 06, 2024) |
| 1080 | First Amended Complaint for Patent Infringement Against Google LLC in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (May 21, 2024) |
| 1081 | Scheduling Order in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (June 17, 2024) (ECF 34) |
| 1082 | Federal Court Management Statistics–Profiles, U.S. District Courts–Combined Civil and Criminal (June 30, 2024) |
| 1083 | U.S. Patent Application Publication No. 20020095500 ("Schmidt-500") |
| 1084 | U.S. Patent Application Publication No. 20050169073 |
| 1085 | U.S. Provisional Application No. 60/533,388 |
| 1086 | U.S. Patent No. 5,412,808 |
| 1087 | Order Granting Defendant Google LLC's Motion to Transfer Venue to the Northern District of California in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (Jan. 22, 2025) |
| 1088 | Microsoft's Computer Dictionary (5th ed. 2002) (excerpt) |
| 1089 | U.S. Patent No. 6,381,742 |
| 1090 | U.S. Patent Application Publication No. 20030035430 |
| 1091 | U.S. Patent No. 6,477,624 |
| 1092 | U.S. Patent No. 5,931,947 |
| 1093 | U.S. Patent No. 6,148,335 |
| 1094 | U.S. Patent No. 6,944,790 |
| 1095 | U.S. Patent No. 6,014,135 |
| 1096 | U.S. Patent No. 6,282,660 |
| 1097 | U.S. Patent Application Publication No. 20040153709 |
| 1098 | U.S. Patent Application Publication No. 20050050389 |
| 1099 | U.S. Patent Application Publication No. 20040225952 |

| Exhibit | Description |
|---|---|
| 1100 | Google LLC's Proposed Claim Terms for Construction in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (Oct. 1, 2024) |
| 1101 | Plaintiff's Disclosure of Proposed Claim Constructions in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (Oct. 1, 2024) |
| 1102 | Google LLC's Opening Claim Construction Brief in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (Oct. 24, 2024) |
| 1103 | Plaintiff's Responsive Claim Construction Brief in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (Nov. 12, 2024) |
| 1104 | Google LLC's Reply Claim Construction Brief in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (Nov. 26, 2024) |
| 1105 | Plaintiff's Sur-Reply Claim Construction Brief in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (Dec. 13, 2024) |
| 1106 | Joint Claim Construction Statement in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (Dec. 18, 2024) |
| 1107 | U.S. Provisional Application No. 60/502,619 |
| 1108 | U.S. Patent Application Publication No. 20050188268 |
| 1109 | U.S. Patent Application Publication No. 20020140743 |
| 1110 | U.S. Patent Application Publication No. 20020143906 ("Tormasov-906") |
| 1111 | U.S. Patent No. 7,076,633 ("Tormasov-633") |
| 1112 | U.S. Patent Application Publication No. 20060089950 ("Tormasov-950") |
| 1113 | U.S. Patent No. 7,222,132 ("Tormasov-132") |
| 1114 | U.S. Patent Application Publication No. 20020147815 ("Tormasov-815") |
| 1115 | U.S. Patent No. 7,209,973 ("Tormasov-973") |
| 1116 | U.S. Patent Application Publication No. 20020138629 ("Schmidt-629") |
| 1117 | U.S. Patent No. 6,944,860 ("Schmidt-860") |
| 1118 | U.S. Patent Application Publication No. 20020174265 ("Schmidt-265") |
| 1119 | U.S. Patent Application Publication No. 20020116659 ("Tormasov-659") |
| 1120 | Bach, Maurice. 1987. Design of the Unix Operating System by Marice J Bach, 1 edition (Feb. 27, 1987) Prentice Hall; ISBN: 0132017997. |
| 1121 | Crowley, Charles. 1997. Operating Systems: a design-oriented approach. Irwin. 1997. ISBN 0-256-15151-2. |

| Exhibit | Description |
| --- | --- |
| 1122 | Eckel, George and Chris Hare. 1995. Building a Linux Internet Server, Chris Hare", G. Eckel, New Riders Publishing; ISBN: 1562055259. |
| 1123 | RESERVED |
| 1124 | RESERVED |
| 1125 | RESERVED |
| 1126 | RESERVED |
| 1127 | U.S. Patent No. 6,854,009 |
| 1128 | U.S. Patent No. 7,080,356 |
| 1129 | U.S. Patent No. 5,870,539 |
| 1130 | U.S. Patent No. 6,883,028 |
| 1131 | U.S. Patent No. 7,209,959 |
| 1132 | U.S. Patent Application Publication No. 20020065835 |
| 1133 | The Wayback Machine archive of USENIX Association – Home Page (2001-11-14) |
| 1134 | The Wayback Machine archive of USENIX – Publications – Proceedings (2001-11-15) |
| 1135 | The Wayback Machine archive of USENIX – 2001 USENIX Annual Technical Conference (2001-11-11) |
| 1136 | The Wayback Machine archive of USENIX – 2001 USENIX Annual Technical Conference (2001-11-11) |
| 1137 | The Wayback Machine archive of 2001 FREENIX Track Technical Program – Abstract (2002-01-12) |
| 1138 | The Wayback Machine archive of "Sandboxing Applications" (2003-03-29) |
| 1139 | The Wayback Machine archive of "Sandboxing Applications" (2004-01-19) |
| 1140 | The Wayback Machine archive of PDF of "Sandboxing Applications" (2004-01-19) |
| 1141 | The Wayback Machine archive of NLUUG: UNIX User Group – The Netherlands (2001-07-22) |
| 1142 | The Wayback Machine archive of NLUUG: Previous Events (2001-08-03) |
| 1143 | The Wayback Machine archive of Second International SANE Conference (2001-08-12) |
| 1144 | The Wayback Machine archive of Second International SANE Conference (2001-06-20) |
| 1145 | The Wayback Machine archive of "Jails: Confining the omnipotent root." (2000-09-02) |

| Exhibit | Description |
| --- | --- |
| 1146 | The Wayback Machine archive of Linux Journal (1999-05-08) |

**MANDATORY NOTICES**

**A.  Real Party-In-Interest**

Petitioner Google LLC is the Real Party-in-Interest.[1]

**B.  Related Matters**

**1.  United States Patent & Trademark Office**

The application from which U.S. Patent No. 7,519,814 issued claims priority to two provisional applications: No. 60/502,619, filed September 15, 2003 and No. 60/512,103, filed October 20, 2003.

The following U.S. patent applications claim the benefit of priority to U.S. Patent 7,519,814:

(i) U.S. Patent Application 11/432,843 (U.S. Patent No. 7,757,291), filed May 12, 2006;

(ii) U.S. Patent Application 11/380,285 (U.S. Patent No. 7,774,762), filed April 26, 2006;

(iii) U.S. Patent Application 12/075,842 filed March 13, 2008.

---

[1] Google LLC is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc.  XXVI Holdings Inc. and Alphabet Inc. are not real parties-in-interest to this proceeding.

### 1.    USPTO Patent Trial and Appeal Board

Concurrently with the present petition, Petitioner is filing IPR2025-00487, also challenging U.S. Patent No. 7,519,814.

Petitioner is also filing IPR2025-00489 and IPR2025-00490 challenging U.S. Patent No. 7,784,058, which is also asserted in *VirtaMove, Corp. v. Google LLC*, Case No. 7:24-cv-00033, listed below.

### 2.    U.S. District Court for the Eastern District of Texas

(i) *VirtaMove, Corp. v. Hewlett Packard Enterprise Company*, Case No. 2:24-cv-00093;

(ii) *VirtaMove, Corp. v. International Business Machines Corporation*, Case No. 2:24-cv-00064.

### 3.    U.S. District Court for the Western District of Texas

(i) *VirtaMove, Corp. v. Google LLC*, Case No. 7:24-cv-00033 (pending transfer to Northern District of California per Order dated January 22, 2025, *see* EX1087);

(ii) *VirtaMove, Corp. v. Amazon.com, Inc. et al*, Case No. 7:24-cv-00030 (pending transfer to Northern District of California per Order dated January 22, 2025, *see* Docket Entry No. 87);

(iii) *VirtaMove, Corp. v. Microsoft Corp.*, Case No. 7:24-cv-00338; and

(iv) *VirtaMove, Corp. v. Oracle Corp.*, Case No. 7:24-cv-00339.

**4. U.S. District Court for the Northern District of California**

(i) *Red Hat, Inc. v. VirtaMove, Corp.*, Case No. 5:24-cv-04740.

**C. Counsel and Service Information - § 42.8(b)(3) and (4)**

| | |
|---|---|
| Lead Counsel | Elisabeth H. Hunt, Reg. No. 67,336 |
| Backup Counsel | Gregory S. Nieberg, Reg. No. 57,063<br>Anant K. Saraswat, Reg. No. 76,050 |
| Service Information | E-mail: EHunt-PTAB@wolfgreenfield.com<br>GNieberg-PTAB@wolfgreenfield.com<br>ASaraswat-PTAB@wolfgreenfield.com<br><br>Post and hand delivery: Wolf, Greenfield & Sacks, P.C.<br>600 Atlantic Avenue<br>Boston, MA 02210-2206<br><br>Telephone: 617-646-8000    Facsimile: 617-646-8646 |

A power of attorney is submitted with the Petition. Counsel for Petitioner consents to service of all documents via electronic mail.

Petitioner requests *inter partes* review and cancellation of claims 1-34 of the '814 patent (EX1001).

## I.    STANDING

Petitioner certifies that the '814 patent is available for *inter partes* review and that Petitioner is not barred or estopped from requesting *inter partes* review as to the challenged claims.  37 C.F.R. §42.104(a).

## II.    GROUNDS

| Ground Number and Reference(s) | Claims | Basis |
|---|---|---|
| 1  Schmidt-479+Tormasov | 1-34 | §103 |
| 2  Schmidt-479+Tormasov+Calder | 1-34 | §103 |
| 3  Schmidt-479+Tormasov+Schmidt-629 | 1-34 | §103 |
| 4  Schmidt-479+Tormasov+Calder+Schmidt-629 | 1-34 | §103 |

The above references were not of record during prosecution of the '814 patent.

Schmidt-479, Tormasov, and Calder are prior art at least under pre-AIA §102(b) to the '814 patent's earliest claimed priority date.

The '814 patent was filed 2004-09-13, and claims priority to two provisional applications: No. 60/502,619 ("'619 Provisional," EX1107), filed 2003-09-15; and No. 60/512,103, filed 2003-10-20.  However, the '814 patent's claims are not entitled to the '619 Provisional's filing date because they lack written description support in the '619 Provisional.  For example, limitation [**1A**]'s "container" (*see*

– 1 –

*infra* §VIII (claim listing)) is missing from EX1107. EX1003 ("Bhattacharjee"), [0029]-[0035], [0047]-[0048], [0001]-[0014]. Thus, Schmidt-629's 2002-09-26 publication date makes it §102(b) prior art. Even if the '814 patent were entitled to the 2003-09-15 filing date, Schmidt-629 would still be prior art under §102(e).

## III.   THE '814 PATENT

### A.   Specification

Computer Operating Systems ("OSs") typically provide system files (like configuration files and libraries) used by applications. EX1001, 2:52-3:19. Configuration files identify, e.g., the computer's IP address, available font(s), etc. Libraries provide pre-existing code for common functions (e.g., opening files). Problems can arise, however, when one application hogs shared computing "resources" (e.g., the processor or "network port numbers") or updates a library shared by multiple applications in a way that makes it incompatible with another application. EX1001, 1:31-36. Bhattacharjee, [0036]-[0037].

The patent says one known solution to these issues was to "separate[]" applications by installing them on "individual computer system[s]" (EX1001, 1:27-30), but that can quickly become costly. An alternative prior-art solution is "Virtual Machine [VM] technology," where one computer runs multiple VMs, each simulating a different machine with its own hardware, OS, etc. EX1001, 1:51-61. The patent alleges, however, that VMs "impose[] significant performance

Appx0174

overhead" from running multiple full OSs.  EX1001, 1:62-65.  The patent says another known technique "separat[ed]…application[s] from the underlying operating system" but allegedly did "not isolate applications into distinct environments."  EX1001, 2:4-12.  Bhattacharjee, [0038].

Figure 2 (color added below) illustrates the patent's alleged invention: "a single server" executing sets of "[a]pplications" (blue and green) that "are segregated" into respective "secure containers" 20a-20b, each container having respective system files (light blue and light green).  EX1001, 7:4-15, 9:53-57.



Containers share the computer's hardware (grey) and OS kernel (red) (which controls access to the computer's resources) (FIG. 2, 1:56-61) can have their own unique identifier (e.g., IP address) (3:55-57).  Bhattacharjee, [0039].

### B.      Person of Ordinary Skill in the Art ("POSA")

A POSA as of the '814 patent's earliest claimed priority date would have had at least a bachelor's degree in computer science, computer engineering, or a related field, with three years of academic and/or industry experience in the area of "management and deployment of server applications."  EX1001, 1:15-16.  More education may substitute for less experience.  Bhattacharjee, [0040]-[0042].

### C.      Prosecution History

The original application's claims were found anticipated by EX1089.  EX1002, 238-271.  The applicants responded by adding Limitations [**1E**]-[**1G**] and the word "remain" to Limitation [**1D**].  EX1002, 287-288, 291; *see* §IX (Claim Listing).  The Examiner subsequently allowed the claims, stating that the prior art of record failed to disclose application software "not being shareable between" secure containers, and "unique root file systems different from an operating system's root file system."  EX1002, 341-344.  Bhattacharjee, [0043].

### D.      Challenged Claims

The '814 patent's two independent claims (1, 31) each recite a system having secure containers of applications comprising associated system files for

executing applications.  The containers do not include an OS kernel, but instead use a server's underlying OS's kernel.  Bhattacharjee, [0044]-[0046].

## IV.   CLAIM INTERPRETATION

Claim terms are construed herein using the standard used in civil actions under 35 U.S.C. §282(b), in accordance with the ordinary and customary meaning as understood by POSAs and the patent's prosecution history.  37 C.F.R. §42.100(b).  In the concurrent district-court proceeding, Petitioner "Google" and Patent Owner "VirtaMove" have briefed competing constructions of various claim terms.  EX1100-EX1101.  As discussed further within the Grounds, this Petition presents alternative mappings of the prior art under both parties' proposed constructions of disputed terms, thus demonstrating unpatentability regardless of which proposed construction is correct.  *Google LLC v. Security First Innovations, LLC*, IPR2024-00215, Paper 15, 6 (May 23, 2024) (finding this approach "complies with" Rule 42.104(b)(3)).  Bhattacharjee, [0049]-[0065].

## V.   GROUNDS 1-2: CLAIMS 1-34 ARE UNPATENTABLE OVER SCHMIDT-TORMASOV (GROUND 1) OR OVER SCHMIDT-TORMASOV-CALDER (GROUND 2)

### A.   Schmidt-479 (EX1008)

Schmidt-479 discloses software-based "compute capsules" that each "encapsulate an active computing environment" on a server so the environment can be stored and subsequently started/restarted on a server.  Schmidt-479, [0016]. Schmidt-479's Figure 3 (highlighted below) illustrates a "server computer"

– 5 –

([0065]) with two capsules (blue and green), "each hav[ing] two processes"[2] and respective "virtual namespace[s]" ([0044]).  Bhattacharjee, [0066]-[0068].



FIGURE 3

Each virtual namespace has its own "file system view" ([0045]), which can be "automatically populated with system directories and files necessary for normal user operation" ([0048]).  Those "files include…application binaries, libraries…and data files."  Schmidt-479, [0048].  Thus, each capsule "provides a

---

[2] Conventional "processes" are instances of executing computer applications. EX1061, 1:13-16; Bhattacharjee, [0067].

private, customizable view of a shared file system, so that users can modify arbitrary files" within their own virtual namespace, "similar to the way a user might alter the file system on a dedicated computer," but without changing "the underlying file[s] remain[ing]" in the underlying shared file system. Schmidt-479, [0017], [0019]. Bhattacharjee, [0069]-[0071].

Each "virtual namespace is host-independent," which "enables the capsule to migrate between binary compatible machines and provides privacy and isolation between multiple capsules." Schmidt-479, [0018].[3] Capsules can be "migrated to a different instance of an operating system on a different machine." Schmidt-479, [0044]. Bhattacharjee, [0072]-[0073].

### B. Tormasov (EX1010)

Tormasov provides a software-based technique to "efficient[ly] utilize[e]" "a single hardware system with a single operating system kernel" by providing each "end user" of "a server" with their own "virtual computing environment [VCE] that is functionally equivalent to a computer with a full-featured operating system." Tormasov, [0017], [0024]. Like the '814 patent (EX1001, 1:51-2:3), Tormasov

---

[3] POSAs knew that "[b]inary compatible machines" include machines running different OSs from a binary-compatible family (e.g., different versions of Linux-based OSs). Bhattacharjee, [0072] (citing EX1127, 7:46-54; EX1128, 3:14-38).

distinguishes VCEs from "a full hardware emulation-type solution" that executes

multiple OS kernels (e.g., Virtual-Machine techniques).  Tormasov, [0017],

[0013]-[0016].  Bhattacharjee, [0074]-[0076].

Tormasov's Figure 1 (color added below) shows "the same hardware node

100" (server) providing multiple VCEs (orange, blue, green) to potentially

"different users."  Tormasov, [0024], [0017] ("server…provid[ing]" VCEs to "end

user[s]").  For example, one VCE executes an httpd (website) application (blue)

and another executes an Ftp (file-transfer-protocol) application (green).

Bhattacharjee, [0077].



**FIG 1**

Tormasov's Figure 2 (color added below) shows a server executing two VCEs sharing an OS kernel (red) and hardware (grey). Tormasov, [0026]; *compare with* Tormasov, FIG. 3 (alternative VM-based approach using multiple kernels). Each VCE has "its own unique file system" (light blue and light green) for executing processes (blue and green) – e.g., for the above-discussed

– 9 –

applications – where processes in different VCEs are "completely isolated from each other." Tormasov, [0026]. Bhattacharjee, [0078].



FIG. 2

## C.    Calder (EX1006)

Calder teaches techniques for modifying "an application package to be executed safely, securely, and transparently on a remote machine." Calder, [0073]. Conventional "packages" for installing applications typically include application binaries ("also called application program[s]," e.g., executable software files for starting and running the application) and system files (e.g., libraries and

configuration files) used by the application.  Calder, [0076], [0082]; EX1014, [0026]-[0028] ("Typically, one software package includes all the files…required for a local setup procedure…including the Dynamic Link Libraries (DLL)" and "executable file[s]"); EX1005, 1:14-19.  Some conventional libraries include functionality for making system calls, which request services/functionality provided by the OS's kernel (e.g., opening/closing a file).  EX1120, 19-20. Because different OSs may "provide different mechanisms for implementing system calls," an application designed for one OS might not work with another OS.  EX1097, [0082]. Bhattacharjee, [0079]-[0082].

Calder's solution modifies an "application package" by adding "system libraries…that translate" "system calls" native to one OS (e.g., "Windows 2000") to work with a non-native OS (e.g., "Linux").  Calder, [0101].  Bhattacharjee, [0083].

Calder's Figure 2 (color added below) shows a "preprocessing module" (orange) that converts original application-package files (pink) into modified files (blue) (e.g., modified libraries and configuration files) that "allow for the application [] to execute and communicate on any non-native platforms" (i.e., not the application's "native" (originally intended) OS).  Calder, [0101]. Bhattacharjee, [0084]-[0085]; EX1054, 4:33-46 ("'non-native' server…run[s] a" "different" "operating system").



## D. Grounds 1-2

### 1. Schmidt-Tormasov Combination (Ground 1)

As discussed above (§V.A), Schmidt-479 teaches techniques to allow a "user's computing environment [to] be represented in a form that can be understood by" first and second "computers and moved between the computers" so the user can seamlessly transfer their computing "interaction" from one computer to another. Schmidt-479, [0005]. Schmidt-479 does that by placing "active **computing environments**" in "capsules," including one or more applications together with system files needed to allow the application(s) to be stored, moved, and started/restarted on any server. Schmidt-479, [0016]-[0018]. Multiple capsules can execute on the same server and share its hardware and OS (including kernel). Schmidt-479, FIG. 3, [0044], [0054]. Bhattacharjee, [0086].

– 12 –

Like Schmidt-479, Tormasov concerns providing multiple, independent virtual **computing environments** ("VCEs") on a server, where each VCE is functionally equivalent to a "full-featured" OS and, thus, can have applications installed therein and can execute independent services (e.g., two VCEs can serve independent websites from one physical server). Tormasov, [0023]-[0024], FIG. 1; EX1122 (cited in Tormasov, [0035]) at 249 ("httpd" is a "service")); EX1110, [0033]-[0034], FIG. 3 (illustrating multiple servers providing multiple virtual environments). Unlike techniques that had multiple OS kernels on one server, Tormasov's VCEs (like Schmidt-479's capsules) share a server's hardware and OS kernel. Tormasov, [0017], [0023]-[0025]. Bhattacharjee, [0087].

Based on these teachings, POSAs would have been motivated to implement in Schmidt-479's capsules Tormasov's VCEs (and their applications) to provide capsules that each provide an "equivalent to a…full-featured" OS (Tormasov, [0023]) and that could also beneficially be stored and executed on any server in a multi-server system (Schmidt-479, [0016]-[0018]). Bhattacharjee, [0088]-[0092] (citing EX1083, [0002], [0014], [0011], [0061]-[0063]).

POSAs also had motivation to implement Schmidt-Tormasov's VCE-capsules in a system with servers running **different OSs**, because POSAs knew "[i]t is important…that an application be usable with several **different operating systems**." EX1058, 1:14-21. It was background knowledge that "[s]oftware

developers often strive to tailor or 'port' their applications to a variety of computing platforms" (e.g., different "operation system[s]").  EX1057, 1:10-14.  Bhattacharjee, [0093] (citing also EX1017, [0029]-[0030]).

For example, in "a large corporation having many end users, there are usually a number of **computers with different operating systems**" serving/executing applications.  EX1049, 1:41-58.  Typically, that application "software…[is] centrally hosted by a Server and used by a number of Clients."  EX1020, [0004]-[0005]; Bhattacharjee, [0094]-[0096] (citing also EX1058, 1:14-21; EX1057, 1:10-14; EX1017, [0029]-[0030]; EX1016, [0002]; EX1053, 1:36-41; EX1049, 1:12-14, 1:41-58; EX1051, 2:25-37).  Furthermore, in those "larger networks, it is common…for the servers to be running **different network operating systems**."  EX1051, 2:35-37; Bhattacharjee, [0096]-[0107] (citing also EX1054, 1:14-35, 1:48-54, 4:48-50; EX1066, 1:17-37; EX1068, 1:19-27; EX1071, 2:4-14; EX1016, [0002]; EX1053, 1:36-41; EX1049, 1:53-58; EX1012, [0002]-[0005]; EX1093, 1:66-2:25; EX1127, 4:39-52).  Schmidt-479 itself discloses an example system having multiple servers running different OSs "optimized for [an application's] performance" (e.g., servers respectively running "Microsoft Windows," "X11/Unix," etc.).  Schmidt-479, [0077]-[0078].

Thus, POSAs had motivation to implement Schmidt-Tormasov VCE-capsules in a system having multiple servers running different OSs, with a VCE-

capsule being executable on more than one different OS.  Bhattacharjee, [0107]-[0108].

During prosecution (*supra* §III.C), the '814 patent's applicants said different versions of OSs in the same OS-family (e.g., OSs with the same tradename, like Unix-based OSs "Solaris 8" and "Solaris 10") are "different operating systems." EX1002, 300-301.

As discussed above (§V.A), Schmidt-479's "capsules" have "file system view[s]" containing application executable binaries and systems files that allow the capsule (including its applications) to be stored and started/restarted on "a different instance of an operating system on a different" server.  Schmidt-479, [0044], [0048].

POSAs knew applications native to one OS (e.g., Windows 95) were typically compatible with other OSs in the same family (e.g., Windows 98). Bhattacharjee, [0108].  Thus, POSAs would have reasonably expected each Schmidt-Tormasov VCE-capsule to be executable on multiple, different OSs in the same OS family, like Solaris 8/10 or Windows 95/98.  That motivation and reasonable expectation of success are further corroborated by references sharing inventor(s) with Schmidt-479 that disclose "arbitrarily bound[ing]" capsules "to different machines and **different operating systems**."  EX1009, [0018]; EX1116,

– 15 –

[0015].  Bhattacharjee, [0109]-[0115] (citing EX1017, [0019]-[0021]; EX1128, 1:51-57, 3:7-30; EX1050, 2:55-38).

Thus, each Schmidt-Tormasov VCE-capsule (and application(s) installed thereto) would have been storable and executable on servers running different OSs in the same OS family.  Bhattacharjee, [0116].

POSAs would have also reasonably expected success given Schmidt-479's and Tormasov's overlapping teachings regarding compatible techniques.  Schmidt-479's capsules include unique "file system" views and "**virtual** namespaces" to allow a "**computing environment**" to be stored as a unit executable on different servers (Schmidt-479, [0016]-[0018]) running, e.g., conventional OSs, like "Unix" (Schmidt-479, [0048]).  Tormasov's "**virtual computing environments**" similarly use unique local file systems and namespaces to execute on conventional computing systems.  Tormasov, FIGS. 1-2.  Tormasov's VCEs are executable on conventional OSs, like those discussed in Schmidt-479.  Indeed, Tormasov's "BIBLIOGRAPHY" cites textbooks regarding the "Unix Operating System" ([0033]), "Linux" OS ([0035]), and generic "Operating System[s]" ([0034]).  Bhattacharjee, [0117]-[0118] (citing also EX1009, [0074]).

Thus, it would have required only ordinary programming skill to implement a Tormasov VCE in a Schmidt-479 capsule so the VCE-capsule (including its system files and applications) could be stored, installed, and executed on any of

multiple servers running different OSs in the same OS family, in a multi-server system (e.g., large-organization network). Bhattacharjee, [0119].

## 2. Schmidt-Tormasov-Calder Combination (Ground 2)

POSAs further knew that different servers in large organizations often executed OSs in **different** OS families. Bhattacharjee, [0120]-[0121] (citing EX1071, 2:4-14). Thus, POSAs had reason to make Schmidt-Tormasov's VCE-capsules executable on OSs in **different** families (e.g., Windows- and non-Windows-based OSs). As discussed above (§V.A), Schmidt-479 itself discloses a system of servers having OSs in different families. Schmidt-479, [0077]-[0078]. Bhattacharjee, [0122]-[0124] (citing EX1009, [0018]; EX1116, [0015]; EX1017, [0029]-[0030]).

POSAs had additional, independent motivation to make Schmidt-Tormasov's VCE-capsules executable on different OS families based on Calder.

As discussed above (§V.C), Calder teaches how to modify an "application package" (e.g., its libraries and configuration files) so "the application" can "execute and communicate on any non-native platforms," such as making Windows-native applications executable on Unix-based OSs. Calder, [0101]. As discussed above (§V.D.1), Schmidt-Tormasov's VCE-capsule includes similar system files allowing the VCE-capsule (and application(s) therein) to execute on any binary-compatible machine.

Thus, POSAs would been motivated and reasonably expected success to apply Calder's teachings to adapt any suitable bundle of applications with system files (including Schmidt-Tormasov's VCE-capsules) to be executable on multiple, different OSs (including different OS-families).  Bhattacharjee, [0125]-[0126].

Applying Calder's teachings, each Schmidt-Tormasov-Calder VCE-capsule comprises modified system and application files to allow the VCE-capsule (and its application(s)) to execute on servers running different OS-families in a multi-server system.  For example, VCE-capsules with native Windows 2000 applications would have "system libraries added" to support "translat[ing] Windows 2000 system calls to Linux system calls."  Calder, [0101]. Bhattacharjee, [0126].

POSAs would have reasonably expected success in the combination.  Calder says its techniques work with the same conventional OSs discussed in Schmidt-479 and Tormasov (e.g., Windows-, Unix-, Linux-OSs).  Calder, [0083]-[0084]. POSAs also knew those conventional OSs relied on system calls, which Calder's techniques translate for execution with non-native OSs.  Calder, Abstract.  Thus, it would have required only ordinary programming skill to implement in Schmidt-Tormasov's VCE-capsules software that, based on Calder, permits VCE-capsules to execute on different OS families in a multi-server, multi-OS system. Bhattacharjee, [0127]-[0128].

### E. Mapping to Challenged Claims

#### 1. Claim 1

Claim 1's preamble, which the parties agree is limiting (EX1106, 6), is addressed below in two parts: [**1PREA**]'s "*system*" and [**1PREB**]'s "*method*."

##### a. [1PREA]

###### i. "1. In a system having a plurality of servers with operating systems that differ"

As discussed above (§§V.D.1-2), Schmidt-Tormasov's/Schmidt-Tormasov-Calder's VCE-capsules are implemented in *a system having a plurality of servers*, based on both Schmidt-479's and Tormasov's teachings.

Schmidt-479 (e.g., Figure 12, highlighted below) teaches to execute capsules on a "***server***" (yellow) having hardware (gray) (e.g., "processor 1213").  Schmidt-479, [0063]-[0067]; FIGs. 1-3, [0016]-[0019], [0042]-[0044] (discussing "computer **hardware** coupled to the ***operating system***"), [0048].

– 19 –



FIGURE 12

Appx0192

Similarly, Tormasov (e.g., Figure 2, highlighted below) teaches to executes VCEs on a "**hardware** computer" (a "*server* system") using its "**[h]ardware** resources." Tormasov, [0017], [0026].



**FIG. 2**

Thus, Schmidt-Tormasov's/Schmidt-Tormasov-Calder's *system* has physical *servers*, which meet the parties' joint construction of "*servers*" as "physical servers." EX1106, 6. Bhattacharjee, [0129]-[0135].

EX1088's definition of "*operating system*" – which is Google's construction (EX1100, 2) – is "software that controls the allocation and usage of hardware resources such as memory, central processing unit (CPU) time, disk space, and peripheral devices" – and identifies "Windows 98,…and UNIX" as examples. EX1088, 378.

As discussed above (§§V.D.1-2), Schmidt-Tormasov's/Schmidt-Tormasov-Calder's *system* has *a plurality of servers* that execute conventional OSs (e.g., Unix- and Windows-based OSs). Schmidt-479, [0077] ("Unix," "Windows NT"); Tormasov, [0033] (citing EX1120: "Unix" OS), [0035] (citing EX1122: "Linux" OS); Calder, [0084] ("UNIX, LINUX," various "Windows[-based]" OSs). The '814 patent uses similar conventional OSs (e.g., "Windows"). *See* EX1001, 7:34-38.

Thus, Schmidt-Tormasov's/Schmidt-Tormasov-Calder's OSs meet Google's construction and VirtaMove's "ordinary meaning" construction of "*operating system.*" EX1106, 4. Bhattacharjee, [0136]-[0139] (citing EX1121, 2-4 (cited in Tormasov, [0034]); Calder, [0083]).

As discussed above (§§V.D.1-2), Schmidt-Tormasov's/Schmidt-Tormasov-Calder's *servers* have *OSs that differ*.  Bhattacharjee, [0140]-[0141].

### ii.  "operating in disparate computing environments"

Schmidt-Tormasov's/Schmidt-Tormasov-Calder's VCE-capsules "encapsulate" respective "***computing environment[s]***" (Schmidt-479, [0016]), specifically "virtual ***computing environments***" (VCEs) (Tormasov, [0023]).  *See supra* §V.D.1-2.

VirtaMove construes "*disparate computing environments*" as "[e]nvironments run by standalone or unrelated computers," based on the "definition[]" in the specification.  EX1103, 8; EX1001, 2:16-19.  While Google explains that it is unclear what "unrelated" means (EX1102, 5-7), Schmidt-Tormasov's/Schmidt-Tormasov-Calder's servers are (at least) "standalone" computers as discussed below, so the Board should find Schmidt-Tormasov/Schmidt-Tormasov-Calder meet [**1PREA**] even if indefinite.  *PLR Worldwide Sales Ltd. v. Flip Phone Games, Inc.*, IPR2024-00209, Paper 9, 39 (May 10, 2024) ("even if full scope of" term "is indefinite because the specification does not provide a sufficient boundary…that does not prevent us from making a determination that a teaching is well within that boundary").

Consistent with Schmidt-479's Figure 12 and Tormasov's Figure 2 (both highlighted above), Schmidt-Tormasov's/Schmidt-Tormasov-Calder's servers

(*supra* §V.E.1.a.i) are standalone computers (at least) because they are separate computer machines.  Schmidt-Tormasov's/Schmidt-Tormasov-Calder's servers also operate independently of each other, which is what VirtaMove says makes accused computers "standalone."  EX1103, 9; Bhattacharjee, [0142]-[0145].

Additionally, during prosecution, the Examiner found that [**1PREA**] was met by a "network environment" (EX1002, 239-240) having a server and client (EX1089, FIG. 2, 6:28-35).  VirtaMove did not disagree.  EX1002, 286-333. Bhattacharjee, [0146]-[0151].  Schmidt-Tormasov's/Schmidt-Tormasov-Calder's system likewise has servers and client computers in a network environment.  *See supra* §VII.D.1-2.

### iii. "wherein each server includes a processor and an operating system"

*Each* Schmidt-Tormasov/Schmidt-Tormasov-Calder *server includes a processor and an operating system* based on Schmidt-479's and Tormasov's similar teachings.

Schmidt-479's Figure 12 (highlighted below) illustrates conventional server hardware: e.g., a "***processor***" (dark grey) that "reside[s]…wholly on [the] ***server***." Schmidt-479, [0066], FIGS. 1-3, [0042]-[0044] (discussing "communicat[ion] with the ***operating system*** and then…**computer hardware**").  POSAs knew that typical and obvious conventional *processors* are physical hardware, meeting the parties'

joint construction of "*processor*" as "physical computer processor."  EX1106, 6;

Bhattacharjee, [0152]-[0153] (citing EX1087, 1; EX1017, [0003]-[0017]).



FIGURE 12

Similarly, Tormasov's Figure 2 (highlighted below) shows that *each*

conventional *server includes* "**hardware** resource[s]" (grey) and "one ***operating***

***system***" (red).  Tormasov, [0027].  Bhattacharjee, [0154]-[0162] (citing EX1121

– 25 –

(cited in Tormasov, [0034]), 4; EX1113, claim 22; EX1017, [0003]-[0017]; EX1088, 378). *See supra* §V.E.1.a.i (discussing parties' constructions of "*operating system*").



FIG. 2

### iv. "[OS] including a kernel [and][4] a set of associated local system files compatible with the processor"

Schmidt-479's Figure 3 (color added below) shows that each server includes an "operating system" (red) – with a *kernel* – and hardware (gray) (e.g., a *processor*). Bhattacharjee, [0163]-[0167] (citing EX1088, 300; EX1086, 2:53-55 ("the *operating system* is commonly called…the ***kernel***"); EX1120 (cited in Tormasov, [0033] and EX1086, 2:58-60), 4-5; EX1017, [0009]-[0013]).

---

[4] The parties agree "and" should be inserted. EX1106, 6.



FIGURE 3

Similarly, Tormasov's Figure 2 (color added below) shows that each server includes "an **ordinary** single *kernel* **operating system**" (red), hardware (gray), and a "common **file system** 205" (pink). Tormasov, [0025]-[0026].



**FIG. 2**

EX1088's definition of "*kernel*" – which is Google's construction (EX1106, 4) is "[t]he core of an operating system—the portion of the system that manages memory, files, and peripheral devices; maintains the time and date; launches applications; and allocates system resources." EX1088, 300. POSAs would have understood an "ordinary…***kernel***" (Tormasov, [0025]) like the ones Schmidt-

Tormasov/Schmidt-Tormasov-Calder uses meets such a dictionary definition of "*kernel*."  Bhattacharjee, [0168]-[0170] (citing EX1121, (cited in Tormasov, [0034]), 2-4).

Thus, each *kernel* in each OS on a Schmidt-Tormasov/Schmidt-Tormasov-Calder server meets Google's construction and VirtaMove's "ordinary meaning" construction of "*kernel*."  EX1106, 4.  Bhattacharjee, [0169].

The '814 patent defines "***system files***" as "files provided within an operating system and which are available to applications as shared libraries and configuration files."  EX1001, 2:52-54, 2:55-3:19.  Thus, the patent uses conventional *system files* – like libraries and configuration files – that were often provided with conventional prior-art OSs.  EX1001, 2:52-3:19.  Bhattacharjee, [0171].

Schmidt-479's servers have "an underlying file system" with "configuration files" and "system libraries."  Schmidt-479, [0050]-[0051], [0054].  Similarly, POSAs knew a typical, obvious implementation of an OS's "***local*** file system" (Tormasov, FIG. 2) had similar *local system files*.  *See* EX1001, 2:52-3:19, 10:42-46.  *See also infra* §V.E.1.c.iii (demonstrating Schmidt-Tormasov's/Schmidt-Tormasov-Calder's VCE-capsules have ***system files***).  Bhattacharjee, [0172].

Moreover, EX1122 (cited in Tormasov, [0035]) recognizes that when you "restrict users' access to your system" and provide, e.g., an ftpd service in a restricted environment (an example that Tormasov discloses (FIG. 2)), "you need

– 30 –

to move all the files that ftpd needs into the restricted login directory," including library files in the directory "lib." EX1122, 122-123. Bhattacharjee, [0173] (citing EX1113, 2:7-11).

Similarly, another reference by Tormasov inventors that discusses aspects of VCEs (EX1113) notes the desirability in a shared system (like Schmidt-Tormasov/Schmidt-Tormasov-Calder) for "[e]ach of the computer users" to have their "own version…[of] the *system file* **area of the operating system**." Tormasov-132, 2:7-11. Bhattacharjee, [0173]-[0183] (citing EX1120 (cited in Tormasov, [0033]), 19-20, 313-314, FIG 2.1; EX1029, [0027] (typically, "minimum…**OS components include[] a** *kernel*…**and** *system files*"); EX1090, [0053] (Linux "file system may include **configuration files**…[and] **shared libraries**"); EX1108, [0003]; EX1023, [0023] (Windows-based OSs have "*system files* which form the *kernel* part of the operating system"), [0027]; EX1011, [0032]; EX1067, 9:12-20; EX1064, 1:53-62; EX1062, 3:37-40; EX1034, [0041], [0047]).

Each Schmidt-Tormasov/Schmidt-Tormasov-Calder server's *kernel* and *set of associated local system files* discussed above are *compatible with the* server's *processor* because the processor uses those files, which would not occur if they were incompatible. Bhattacharjee, [0184]-[0187] (citing EX1067, 35:48-54 ("*kernel* **must be compatible with the computer's processor**"); EX1045, 16:60-

– 31 –

62 ("***kernel*** programs **tend not to be *compatible*** from *processor* to *processor*");
EX1043, 1:17-20.

**b.  [1PREB]**

**i.  "a method of providing at least some of the servers in the system with secure, executable, applications"**

The '814 patent's "example applications" include web-server applications (e.g., "Apache").  EX1001, 2:55-3:19.  Schmidt-Tormasov's/Schmidt-Tormasov-Calder's VCE-capsules *securely execute* web-server (and other similar) *applications*.  Bhattacharjee, [0188]-[0189] (citing Schmidt-479, [0009]-[0010] (discussing "computer programs" for *applications* like a "word processor"); Tormasov, FIG. 1 ("httpd" web-site server *application*)).

Schmidt-Tormasov/Schmidt-Tormasov-Calder uses Schmidt-479's capsules, which "comprise[] one or more processes and their associated system environment."  Schmidt-479, [0038], FIG. 3 (color added below).  These are "processes" of *executable applications provided to the servers*, like "a word processor, [or] a web browser" application.  Schmidt-479, [0010], [0040], [0048] (file system views in each capsule "include, for instance: ***application* binaries**…"), [0051] ("default set of [the] file system view mappings includes…./bin **for *applications***"), [0077] (servers with capsules of applications for, e.g., "audio or video services").  Bhattacharjee, [0190]-[0194]; Calder, [0076] (corroborating that

– 32 –

an "application package" typically includes "an ***application* binary** (also called

***application* program**)" that is *executable*).



FIGURE 3

Similarly, Tormasov's Figure 1 (color added below) shows VCEs *providing*

"***a method of*** efficient utilization of a single hardware system" ([0017]) for

*executing applications* for, e.g., an httpd (web) server (blue) and ftp (file-transfer

protocol) server (green). Tormasov, [0012] (an identified prior-art problem being

addressed was *executing* "complex ***applications*** requiring a database" or "CGI"

"scripts" "on a remote server"), [0024] (VCEs allow "installation of

programs…and other ***applications***"). Bhattacharjee, [0195] (citing EX1111, 4:58-

64 ("traditional architecture" for a "work organization of computers…

include[s]…*application* software")).



**FIG 1**

As discussed *supra* §V.D.1-2, Schmidt-Tormasov/Schmidt-Tormasov-Calder places one or more of the above applications in VCE-capsules, which are *provided to the system's servers*. The application processes in a VCE-capsule are *secure* (at least) because, as discussed below (§V.E.1.c.i.(3)), VCE-capsules are *secure containers of application software*. Bhattacharjee, [0196]-[0197].

– 34 –

### ii. "[applications] related to a service"

The '814 patent says conventional website-related "applications such as Apache, MySql and PHP" can "support[] a single *service*, such as a web based human resource or customer management type of *service*." EX1001, 4:26-31. The patent identifies additional conventional "*services*" like "CRM (Customer Relation Management) tools, Accounting, and Inventory." EX1001, 7:18-21. Bhattacharjee, [0198]-[0199].

As discussed above (§V.A), Schmidt-479 teaches encapsulating various *applications related to* various "*services*" (e.g., "X11/Unix *services*…Windows NT *service*…and others"). Schmidt-479, [0077]. Similarly, as discussed above (§V.B) and illustrated in Tormasov's Figure 1 (highlighted below), VCEs execute *applications related to* similar *services* as the '814's examples, like applications for an "httpd" server (website service) or "Ftp server" (file-transfer-protocol service), by accessing the *server* over "networking." Tormasov, [0006] (one express goal of Tormasov is to provide, e.g., a "hosting *service*" that allows users to provide services via "websites"), [0024] (VCEs allow "installation of programs, configuration of **network** *services*"); EX1122 (cited in Tormasov, [0035]), 118 ("FTP is…one of the most widely used *services* on the Internet….FTP *service*, **ftpd**," which is shown in Tormasov's FIG. 1 below). Bhattacharjee, [0200]-[0201].



**FIG 1**

POSAs understood the above-discussed applications served by Schmidt-Tormasov's/Schmidt-Tormasov-Calder's networked servers are specialized, software-based functionality provided by Schmidt-Tormasov's/Schmidt-Tormasov-Calder's network servers, meeting Google's construction of "*service*" (EX1100, 3 (quoting EX1088, 475)), and VirtaMove's "ordinary meaning" construction (EX1106, 4). Bhattacharjee, [0201]-[0203] (citing Schmidt-479, [0008]-[0010] ("computer **network** to the **servers**"); Tormasov, FIG. 1 (accessing server over "**networking**")).

### iii. "wherein the applications are executed in a secure environment"

Schmidt-Tormasov/Schmidt-Tormasov-Calder *executes* the above-discussed *applications in a* capsule ("a **private**, portable, persistent *environment*") (Schmidt-479, Abstract) for executing a "virtual computing *environment*" (VCE) (Tormasov, [0026]). *Applications executing in a* VCE-capsule are *executed in a secure environment* (at least) because "[c]apsules offer…*security within a shared environment*." Schmidt-479, [0041]. The virtual computing *environment* executing in the VCE-capsule is further *secure* (at least) because "processes in different" VCEs (and their respective "unique file system[s]") are "**completely isolated** from each other" (Tormasov, [0026]) and "are **never visible** to other" VCEs "running on the same computer" (Tormasov, [0018]). Bhattacharjee, [0204].

Based on Calder, POSAs would have been additionally motivated and reasonably expected success to "intercept[]" "system calls made by the application[(s)]" installed to Schmidt-Tormasov-Calder's *environments* to restrict "access [to] approved files," thereby protecting the servers and "the contents of the application package." Calder, [0087], [0073] ("application package" is "**executed safely, *securely*, and transparently**"), [0100] (using "*security* information" to "**protect both the client computer [], as well as the contents of the**

**application**"); *see also infra* §V.E.c.i.(3) (demonstrating VCE-capsules meet *secure containers*).  Bhattacharjee, [0205]-[0209].

> **iv. "wherein the applications each include an object executable by at least some of the different operating systems for performing a task related to the service"**

The '814 patent says "**[a]n icon is an *object*** supported by a GUI [graphical user interface]" that "**associates an image with an *object*** that can be operated on through a GUI."  EX1001, 14:21-23.  For example, a "GUI supports the ability to **select an *object*, move it and initiate an operation**" (e.g., "copy[ing] and transfer[ring] of files") "when the ***object*** is placed on a specific destination."  EX1001, 14:4-8.  Exemplary "tasks" using icon objects include "[i]nstall[ing] application specific files" and "[s]tarting a first application."  EX1001, 15:35-56.  Those were known, conventional uses of icon objects (e.g., clicking an icon to activate an application's executable object-file).  Bhattacharjee, [0210]-[0218] (citing EX1047, 1:21-67; EX1059, 1:34-38; EX1047, 1:43-51).

POSAs knew that the conventional OSs that Schmidt-Tormasov/Schmidt-Tormasov-Calder servers use (e.g., Linux- and Windows-based OSs, *see supra* §V.D.1-2) provided and/or obviously and beneficially supported GUIs, where *applications each include an object* (e.g., icons, application files, and executables) that, in Schmidt-Tormasov/Schmidt-Tormasov-Calder, is *executable* by **two or more** of the different OSs in the system (e.g., Windows 95/98), which meets each

party's construction of "*at least some….*"  EX1106, 4.  Bhattacharjee, [0210]-[0216]-[0218] (citing EX1047, 1:39-45 (GUI's "[e]xecution of an application program is initiated by selecting its corresponding icon")).  Thus, e.g., an icon for starting an executable file and the executable file itself are each *an object executable* for *performing a task related to the service* provided by the application being started by the icon.  Bhattacharjee, [0219].

Furthermore, based on Schmidt-479, Schmidt-Tormasov's/Schmidt-Tormasov-Calder's active VCE-capsules (*supra* §V.A, §§V.D.1-2) "comprise[]" "processes and their associated system environment."  Schmidt-479, [0038].  These are "processes" of *executable applications related to a service*.  Schmidt-479, [0008] ("computing has become '*service*-oriented'" and when "the user accesses [] data or computing programs, the remote computer is said to be providing a *service*"), [0010] (exemplary applications include, e.g., "a word processor, a web browser"), [0040], [0048] ("files [in each capsule's file-system view] include, for instance: **application** **binaries**").  Bhattacharjee, [0221]-[0223] (citing EX1121 (cited in Tormasov,[0034]), 43).  Furthermore, "an *object* in one capsule" is isolated and protected from *objects* in another capsule.  Schmidt-479, [0041].  Bhattacharjee, [0223]-[0224].

Additionally, based on Tormasov, each Schmidt-Tormasov/Schmidt-Tormasov-Calder VCE-capsule (*supra* §§V.D.1-2) separates "user processes on

the level of kernel *objects*/resources namespace," which is a "collection of unique names" that each "applie[s] to such *objects* as files" that can be executed to support the services provided by applications.  Tormasov, [0018].  Bhattacharjee, [0220].

Thus, Schmidt-Tormasov/Schmidt-Tormasov-Calder meets [**1PREB**]. Bhattacharjee, [0224].

Based on Calder, Schmidt-Tormasov-Calder's VCE-capsule (*supra* §V.D.2) comprises additional system files (modified libraries and configuration files, Calder, [0082]) that allow the above-discussed *objects* "to execute and communicate on **any non-native [or native] platforms**" (i.e., different OS-families) (Calder, [0101]).  That is an additional reason Schmidt-Tormasov-Calder meets [**1PREB**].  Bhattacharjee, [0225]-[0230].

     c.    **[1A]**

        i.  **"storing in memory accessible to at least some of the servers a plurality of secure containers of application software"**

          (1)    **"storing in memory accessible to…the servers"[5]**

Based on Tormasov, Schmidt-Tormasov/Schmidt-Tormasov-Calder *stores* "[a]ll the processes of all" VCE-capsules running on a server "inside the same

---

[5] *See infra* §V.E.1.c.i.(2) (demonstrating VCE-capsules are *containers*), §V.E.1.c.i.(3) (demonstrating VCE-capsules are *secure containers of application software*).

physical ***memory***" *accessible to that server*.  Tormasov, [0026].  That meets

VirtaMove's construction, which only requires the claimed *memory* to be

*accessible* to (usable by) one server.  *See* EX1103, 12.  Bhattacharjee, [0231]-

[0235].

Calder teaches storing application packages *in* the *memory* of a "master

control center" accessible to *servers*.  Calder, [0078]-[0079].  That would have

motivated POSAs (with reasonable expectation of success) to *store* any suitable

application package (including Schmidt-Tormasov's/Schmidt-Tormasov-Calder's

VCE-capsules) in *memory* of a centralized-storage system that is *accessible to the*

system's plurality of *servers*, to beneficially provide at least two *servers* in the

network a centralized location from which to read/write, manage, and use VCE-

capsules, which meets both parties' constructions of "*memory accessible to…the*

*servers*."  EX1106, 4.  Bhattacharjee, [0236]-[0237].

### (2)     "containers"

The parties' joint construction of "*container*" (EX1106, 6) is addressed in

two parts ([**1**]-[**2**]) below.

> **[1]**: *"An aggregate of files required to successfully execute*
> *a set of software applications on a computing platform."*
> EX1106, 6.

As discussed above (§V.E.1.b.i), Schmidt-479, Tormasov, and Calder each

teach executing similar *sets of software applications on a computing platform*, any

of which POSAs would have been motivated and reasonably expected success to *execute* in Schmidt-Tormasov's/Schmidt-Tormasov-Calder's VCE-capsules. Bhattacharjee, [0238]-[0239].

Based on Schmidt-479, each VCE-capsule comprises "the complete state necessary to allow the encapsulation to be suspended and revived on any binary compatible machine." Schmidt-479, [0016]. That necessary data includes "[s]ystem environment information," which includes "**configuration settings**, working directories and files…**installed software**, and internal program state." Schmidt-479, [0038]. Each capsule further comprises "file system views," which are "system directories and **files <u>necessary</u> [i.e., *required*] for normal user operation**…for instance: *application* **binaries, libraries**, certain **device drivers**…etc." Schmidt-479, [0048]. Those are *files required to successfully execute software applications* on each server-*computing platform* in Schmidt-Tormasov/Schmidt-Tormasov-Calder. Bhattacharjee, [0240].

Based on Tormasov, each VCE-capsule "includes a complete ***set of*** processes [*executing software applications*] and ***files*** of an operating system that can be modified by the end user," which is an additional teaching of processes and files *required to successfully execute software applications* (e.g., web-server applications) on each server's *computing platform*. Tormasov, FIG. 1, [0026]. Bhattacharjee, [0241]-[0243].

Calder's teachings further confirm that Schmidt-Tormasov-Calder's VCE-capsules include "*application* binar[ies]," "libraries," and "configuration files" that are *required to successfully execute a set of software applications on any computing platform* (*server*) running OSs non-native to the VCE-capsule. Calder, [0082], [0102]. Bhattacharjee, [0244].

Thus, Schmidt-Tormasov/Schmidt-Tormasov-Calder meets part [**1**] of the joint construction of *container*. Bhattacharjee, [0245], [0246]-[0249].

> [**2**]: *"Each container for use on a server is mutually exclusive of the other containers, such that read/write files within a container cannot be shared with other containers."* EX1106, 6.

Based on Schmidt-479, each VCE-capsule is *for use on a* Schmidt-Tormasov *server* and those "[c]apsules offer privacy, **isolation**, and security" because "capsule contents are **not externally visible or accessible** (unless they are explicitly exported). Thus, capsules **provide privacy and isolation** because they are completely disjoint, (i.e., it is impossible for an object in one capsule to name an object in another capsule)." Schmidt-479, [0041]. Bhattacharjee, [0250].

Based on Tormasov, each VCE-capsule further "includes a complete set of processes and files of an operating system that can be modified by the end user" (i.e., read/write files) ([0025]) and "its own **unique** [i.e., *mutually exclusive*] file system," which includes its read/write files ([0026]). Tormasov further discloses

that "two processes in different" VCEs are "**completely isolated** from each other" ([0026]) and each VCE has a "root file system [that] is **independent** and…**never visible to other**" VCEs, including those "running on the same computer" (*server*) ([0030]).  Bhattacharjee, [0251].

Thus, *each* VCE-capsule *is mutually exclusive of the other* VCE-capsules on that server, so the *read/write files* associated with[6] each VCE-capsule – e.g., its "complete set of…files that can be modified" (Tormasov, [0025]) and the VCE-capsule's read/write "objects" (Schmidt-479, [0041]) – *cannot be shared with other* VCE-capsules.  Bhattacharjee, [0252].  *See also infra* §V.E.1.c.i.(3) (demonstrating VCE-capsules are *secure containers of application software*).

Each VCE-capsule's read/write files are further prevented *from being shared with other* VCE-capsules because each VCE-capsule has its own root directory, as discussed below (§V.E.1.i).  Bhattacharjee, [0253].  Conventional techniques for providing different root directories– like chroot (change-root) – existed to prevent users from corrupting other users' files and/or the OS's system files, and thus required only ordinary skill to implement.  Bhattacharjee, [0253]-[0258] (citing EX1027, [0042]; EX1035, [0002]-[0003]; EX1072, [0014]-[0015], [0049]-[0053]).

---

[6] The parties agree that "within a container" in the joint construction of "*container*" means "associated with a container."  EX1106, 6; EX1001, 2:29-34.

POSAs also had motivation to prevent sharing of read/write files to protect them from being corrupted, based on Calder's teaching to intercept system calls to "**protect[] the contents** of the application package." Calder, [0087], [0100]. Bhattacharjee, [0254].

Thus, Schmidt-Tormasov's/Schmidt-Tormasov-Calder's VCE-capsules meet part [**2**] of the parties' construction of *container*. Bhattacharjee, [0259], [0260]-[0281] (citing EX1064, 1:53-62, 2:12-13; EX1048, 6:7-8; EX1097, [0051]).

### (3) "secure containers of application software"

Google's construction of "*secure containers of application software*" – which quotes the '814 patent (EX1001, 2:43-48) – is "environments where each application set appears to have individual control of some critical system resources and/or where data within each application set is insulated from effects of other application sets." EX1106, 5. VirtaMove's construction replaces "environments" with "containers." *Id.*

An "application set" includes "a set of one or more software applications that support a specific service." EX1001, 7:39-41. Exemplary "resource[s]" "include CPU time, memory, file activity and network bandwidth." EX1001, 10:15-17.

Schmidt-Tormasov/Schmidt-Tormasov-Calder uses Schmidt-479's capsule to encapsulate a Tormasov VCE. *Supra* §§V.D.1-2.

Schmidt-479's "[c]apsules offer privacy, **isolation** [*insulation*], and *security*" because they "are completely disjoint, (i.e., it is **impossible for an object in one capsule to name an object in another capsule**)." Schmidt-479, [0041], [0014] ("allow[ing] a user to **customize** their computing environment"), [0020] (giving an "untrusted guest…a limited set of *resources*"). Tormasov's Figure 1 (color added below) illustrates VCEs executing applications that support a specific service (an application set), such as an httpd application set (blue) for a web-server service. Tormasov, [0024].



FIG 1

As discussed above (§V.D.1), each VCE-capsule (*container*) comprises a "virtual computing **environment**" that "is **perceived by** the personal computer

user **as if he has obtained full network root access** to a common computer" (Tormasov, [0023]) and allows "different users" running applications to "work with the same hardware node…**as if they worked on totally separate computers with no associated hardware**" (Tormasov, [0024]). VCE users can "perform all actions allowed for the ordinary computer," like "installation of programs, configuration of network services," and execution of "applications." *Id.* Bhattacharjee, [0282]-[0290].

Thus, application sets in each VCE-capsule appear to have individual control of some critical system resource(s) (e.g., the processor and/or "network address," Tormasov, [0024]; "naming their file system," Schmidt, [0013]), which meets each party's construction of "*secure containers of application software*" (EX1106, 5). Bhattacharjee, [0291].

Additionally, each VCE-capsule also "has its own unique file system" and application processes in different VCE-capsules are "completely isolated from each other." Tormasov, [0026]. Thus, data (e.g., read/write files) within each application set in a VCE-capsule are insulated ("isolated") from effects of other application sets in other VCE-capsules, which also meets each party's construction of "*secure containers of application software.*" EX1106, 5. Bhattacharjee, [0294]-[0298].

As discussed above (§V.E.1.b.iii), based on Calder, "applications" in Schmidt-Tormasov-Calder VCE-capsules are also "prevent[ed]" "from improperly modifying or accessing data on the" computers, which further insulates them from effects of other application sets.  Calder, [0079].  Bhattacharjee, [0292]-[0293], [0299].

### ii. "each container comprising one or more of the executable applications"

Based on Schmidt-479, each "[VCE-]capsule comprises one or more processes and their associated system environment."  Schmidt-479, [0038].  Each process is an *application* "program in *execution*."  EX1121, 43.  Bhattacharjee, [0300]-[0301] (citing EX1121 (cited in Tormasov, [0034]), 42-43).

Each capsule further comprises "an **active** computing environment," which includes "**active processes** and the complete state necessary to allow the encapsulation to be suspended and revived on any binary compatible machine."  Schmidt-479, [0016].  That "[s]ystem environment information may include, for instance,…**installed software, and internal program state**."  Schmidt-479, [0038].  Bhattacharjee, [0302].

Tormasov's Figure 1 (color added below) further demonstrates that VCE-capsules *comprise executable applications*, like an http web-server application (blue) or Ftp (file-transfer-protocol) server application (green) that users can *execute*, as in a conventional OS.  Tormasov, [0023]. Bhattacharjee, [0303].



**FIG 1**

Thus, Schmidt-Tormasov's VCE-capsules (*containers*) *each comprise one or more of the executable applications*. Bhattacharjee, [0304].

Based on Calder, each Schmidt-Tormasov-Calder VCE-capsule also includes "modified **application** binaries" and modified *system files* so the *applications* in VCE-capsules (*containers*) can be *executed* on both native and non-native OSs. Calder, [0098]. Bhattacharjee, [0304]-[0306].

– 49 –

### iii. "and a set of associated system files required to execute the one or more applications"

The '814 patent defines "*system files*" as "files provided within an operating system and which are available to applications as shared libraries and configuration files." EX1001, 2:52-54. Thus, the patent recognizes (as POSAs knew) that conventional OSs typically provided *system files*. Bhattacharjee, [0307].

In Schmidt-Tormasov/Schmidt-Tormasov-Calder, each VCE-capsule "is functionally equivalent to a computer with a full-featured" OS (Tormasov, [0023]) and has its own "root file system" (Tormasov, [0030]). POSAs knew a typical, obvious implementation of a conventional prior-art OS local file system used in Schmidt-Tormasov/Schmidt-Tormasov-Calder would have its own *set of associated system files required to execute* the VCE-capsule *application* (and any additional applications therein). *See* EX1122 (cited in Tormasov, [0035]), 122-123 (when you "restrict users' access to your system" and put an ftpd application in a restricted environment, as in Tormasov, "you need to move all the files that ftpd needs into the restricted login directory," including *system files* like library files in the Unix-OS directory "lib"). Bhattacharjee, [0308]-[0316] (citing EX1029, [0027] (the "**minimum**…**OS components include[]** a kernel…and *system files*"); EX1023, [0023], [0027]; EX1011, [0032]; EX1067, 9:12-20; EX1064, 1:53-62; EX1062, 3:37-40; EX1094, 3:34-63; EX1034, [0041], [0047]).

Schmidt-479 says it was "desirable" to allows "users" of computing environments (like VCE-capsules) to "arrange and organize the appearance of the data and computer programs [*applications*] in a way that is suitable for them." Schmidt-479, [0007]. Tormasov's VCEs similarly "allow[] a root user" "to make file modifications and **configure** their own local parameters of the" OS. Tormasov, [0030]. In the conventional OSs that Schmidt-Tormasov/Schmidt-Tormasov-Calder uses, those modifications/configurations would conventionally be made in configuration files, which are additional *system file required to execute the applications* that exist in VCE-capsules. Bhattacharjee, [0317]-[0318] (citing EX1061, 1:12-16, 2:28-33, 2:53-3:5 ("Typically, when" an OS "instantiate[s] an application," it will "locate[]…and then process[]…the **configuration file[] for the application**…."")).

Moreover, based on Calder (*supra* §V.D.2), Schmidt-Tormasov-Calder's VCE-capsules include additional modified *system files* (e.g., libraries and configuration files) *required to execute the applications* on non-native OSs. Calder, [0077], [0082], [0094], [0101]. Bhattacharjee, [0319].

### iv. "for use with a local kernel residing permanently on one of the servers"

Tormasov's Figure 2 (color added below) shows VCEs do not include, but rather share *use* of "a single hardware system with a single operating system [*local*] **kernel**" (red) *on one of the servers*. Tormasov, [0017], [0023]-[0025]

(VCEs "share [*use*] the same **kernel** of the [*local*] operating system" *residing on the server*), [0029]. Bhattacharjee, [0320]-[0321].



FIG. 2

The conventional *local kernel* (red) used by VCE-capsules *resides permanently* in memory of the *server* (a hardware resource (gray)) because the kernel is not lost when power is removed from the server (e.g., it's stored in non-volatile memory), and thus meets Google's construction of "*local kernel…*" and VirtaMove's "ordinary meaning" construction. EX1106, 4. Bhattacharjee, [0322]-[0326] (citing EX1121 (cited in Tormasov, [0034]), 2 (OS, and thus its *kernel*, "is

– 52 –

the first program run on a computer when the computer boots up," which corroborates that the OS+*kernel* is stored in non-volatile memory); EX1091, 1:23-38).

Based on Calder, Schmidt-Tormasov-Calder's VCE-capsules (*supra* §V.D.2) "execute [i.e., *use*] an interrupt call on the [*local*] operating system **kernel** of a client computer" (which are *servers* in Schmidt-Tormasov-Calder) to execute on non-native OSs. *See* Calder, [0150]. Bhattacharjee, [0327]-[0328].

> **d.** **[1B] "wherein the set of associated system files are compatible with a local kernel of at least some of the plurality of different operating systems,"**

As discussed above (§V.E.1.c.iii, [**1A**]), each Schmidt-Tormasov/Schmidt-Tormasov-Calder VCE-capsule (*container*) comprises a *set of associated system files*, like libraries and configuration files. Schmidt-479, [0048]-[0052]; Tormasov, [0026]; Calder, [0077], [0082], [0094], [0101]. Moreover (*see supra* §V.E.1.c.iv), each server's VCE-capsules use the server's OS's *local kernel*, and thus *system files* within each VCE-capsule *are compatible with* the *local kernel of at least* that server's "single **operating system**." Tormasov, [0017]. Bhattacharjee, [0329]-[0331].

Furthermore, Schmidt-Tormasov/Schmidt-Tormasov-Calder VCE-capsules are compatible with at least two different OSs (*see* §V.E.1.a.i, [**1PREA**]), and thus their *system files* are also compatible with *the plurality of different* OSs under each

party's construction of "*at least some of the different operating systems*" (EX1106, 4; EX1100, 4; EX1101, 2).  Schmidt-479, [0044] (capsules can be "migrated to a **different instance of an *operating system*** on a different machine"); EX1116, [0015] (capsules can be moved to "a **different *operating system***"); EX1009, [0018] (the "capsule is entirely self-contained and can be suspended in secondary storage, [and] arbitrarily bound to different machines and **different *operating systems*** …."); Calder, [0101] (modifying copies of system files to execute an application on "any non-native [OS] platform" and thereby utilize non-native kernels).  Bhattacharjee, [0332]-[0336].

   e. **[1C] "the containers of application software excluding a kernel,"**

Schmidt-479's Figure 3 (color added below) shows the OS (red) and thus the OS kernel is *excluded* from capsules.  Bhattacharjee, [0337]-[0338] (citing

Appx0226

EX1086, 2:53-55 ("the *operating system* is commonly called the system *kernel* [],
or just the *kernel*")).



FIGURE 3

Tormasov's Figure 2 (color added below) similarly shows the kernel (red)
outside (*excluded* from) VCEs. Tormasov, [0014]-[0016] (distinguishing prior-art

techniques requiring "several…*kernels*"), [0025] ("processes…are shared…inside an ordinary **single** *kernel*" OS).



**FIG 3**

Thus, Schmidt-Tormasov's/Schmidt-Tormasov-Calder's VCE-capsules *exclude a kernel*. Bhattacharjee, [0339]-[0340], [0260]-[0277]. *See also supra* §§V.D.1-2; §V.E.1.c.i.(2).

    **f.**    **[1D] "wherein some or all of the associated system files within a container stored in memory are utilized in place of the associated local system files that remain resident on the server,"**

Tormasov's Figure 2 (highlighted below) shows a "common *file system*" (pink) *that remains resident on the server*. Tormasov, FIG. 2, [0026]. POSAs

– 56 –

understood that a typical, obvious implementation of a conventional file system for a conventional, prior-art OS comprises *associated local system files* needed to execute the OS and to execute applications that are not in VCEs (and thus execute without accessing a VCE's local file system). Bhattacharjee, [0341]-[0343] (citing EX1029, [0027] (the "minimum…**OS components include[] a kernel**…**and system files**")). POSAs also understood that a "kernel API" like in Tormasov's Figure 2 is used, *e.g.*, to make system calls to the OS, which are activated and processed by libraries (*system files*) *that remain resident on the server*. Bhattacharjee, [0344]-[0345] (citing EX1086, 2:37-3:11).



**FIG. 2**

EX1122 (cited in Tormasov, [0035]) corroborates that an obvious implementation of a local file system in each VCE includes "cop[ies]" of "the files that" the application(s) (e.g., "ftpd") "needs," including *system files*, like various library files ("lib") and configuration files.  EX1122, 122-123; *see* EX1001, 2:55-3:13 (identifying the same Unix-OS files as "***system files***").  Bhattacharjee, [0346].

– 58 –

As discussed above (§V.E.1.c.iii), each VCE-capsule (*container*) installs *associated system files* to a "local file system" in the VCE-capsule (light blue and green above), which are *stored in memory* and *utilized* by each VCE-capsule's application(s) (as illustrated by arrows running from the local file systems to application processes).  Tormasov, [0026], FIG. 2.  Bhattacharjee, [0346].

As discussed above (§V.B), Tormasov allows for "installation of programs….and other ***applications***" inside a VCE, where the applications are only accessible to that VCE.  Tormasov, [0024] ("users…can work with the same hardware node [] without noticing each other").  Users may also "stop and start the virtual computing environment in the same manner as with a common operating system." Tormasov, [0025].  Thus, POSAs understood that when an application is installed to a VCE, the application uses the *associated system files* inside the VCE (e.g., blue above) *in place of the associated local system files that remain resident on the server* (pink above).  Bhattacharjee, [0347].

Based on Schmidt-479, each VCE-capsule further includes its own "libraries" (*system files*) that allow the capsule (and its application(s)) to be stored and started/restarted on different servers.  Schmidt-479, [0048], [0051].  Bhattacharjee, [0348]-[0355] (citing EX1077, 122).

Based on Calder, Schmidt-Tormasov-Calder's VCE-capsules include additional, modified copies of *system files* – "libraries" and "configuration files"

– 59 –

(Calder, [0082]) – that *are utilized in place of* local *system files* to allow VCE-capsules (and their application(s)) to execute on non-native OSs.  Calder, [0082].  Bhattacharjee, [0356]-[0357].

Thus, Schmidt-Tormasov's/Schmidt-Tormasov-Calder's *system files* meet [**1D**].

      g.      **[1E] "wherein said associated system files…are copies or modified copies of the associated local system files…,"**

As discussed above (§V.E.1.f, [**1D**]), Schmidt-Tormasov's/Schmidt-Tormasov-Calder's servers comprise respective "local file system[s]" (Tormasov, FIG. 2, [0026]) with *system files* (Tormasov, [0026]-[0031]; Schmidt-479, [0048], [0051]; Calder, [0082]).

When the VCE-capsule's application(s) are native to the server's local OS, at least some of a VCE's *system files* are *copies of* the server's *local system files* (e.g., identical libraries used to make that OS's system calls), meeting [**1E**] under the apparent claim scope VirtaMove applies in district court.  *See* EX1079, 30 (VirtaMove arguing [**1E**] is met because allegedly "the host OS and container will use one or more identical system files, for example when both…incorporate the same Linux distribution version, or…use the same version of libc," a conventional Unix library).  Bhattacharjee, [0358]-[0360] (citing EX1122 (cited in Tormasov, [0035]), 122-23 (when "using chroot() to restrict users' access," as in Schmidt-

Tormasov/Schmidt-Tormasov-Calder (*see infra* §V.E.1.i, [**1G**]), "you need" "*cop[ies]*" of "the files that" the application(s) "needs," including various library *system files*)).

Based on Schmidt-479, Schmidt-Tormasov's/Schmidt-Tormasov-Calder's VCE-capsules (*containers*) can be installed to/restarted on any server by having "portions of" a first server's "underlying file system" "map[ped, i.e., **copied**]…into their namespace." Schmidt-479, [0045]-[0046], [0052] ("mounts of directories such as /lib" are "*cop[ied]*" into each user's view of the file system); *see also* Tormasov, [0018] (noting that VCEs are also "separat[ed]" based on "namespace[s]"). Bhattacharjee, [0361].

"[T]he default set of file system view mappings includes standard system directories, such as…/lib for **system** libraries" (*system files*). Schmidt-479, [0051]. Schmidt-479 also provides a "**copy**-on-write mode of file access to support the modification of read-only or **system files**," where editing those *system files* creates a *copy* in the user's environment (Schmidt-479, [0046]), which Schmidt-Tormasov/Schmidt-Tormasov-Calder stores in VCE-capsules. Thus, Schmidt-Tormasov's/Schmidt-Tormasov-Calder's VCE-capsule comprises *associated system files* that *are copies of the associated local system files that remain resident on the server*. Bhattacharjee, [0362]-[0366] (citing EX1077, 122).

Moreover, based on Calder, Schmidt-Tormasov-Calder's VCE-capsules include "*modified*" system files (e.g., "*modified* libraries [and], *modified* configuration files," Calder, [0082]) that are based on "*cop[ying]* specific information from the **existing** [*local*] **system registry**" (Calder, [0121]). Bhattacharjee, [0367]-[0368].

Thus, Schmidt-Tormasov/Schmidt-Tormasov-Calder meets [**1E**].

> **h.** **[1F] "and wherein the application software cannot be shared between the plurality of secure containers of application software,"**

Users accessing VCEs "can work with the same [server] hardware node [] without noticing each other, just as if they worked on totally separate computers with no associated hardware." Tormasov, [0024]. Even when "two processes in different" VCEs are "started for execution from one file (for example from the shared file system) they would be **completely isolated from each other**." Tormasov, [0026]. A VCE's "processes are never visible to other" VCEs "running on the same computer." Tormasov, [0030]. Similarly, each VCE's "root file system…allows a root user of every" VCE "to make file modifications and configure their own local parameters of the" OS, where "changes done in the file system in one" VCE "do not influence the file systems in the other" VCEs. Tormasov, [0030]-[0031]. Bhattacharjee, [0369].

Because (i) users can run and configure applications in their VCEs as if they were using separate computers, (ii) each VCE's processes (e.g., executing applications) are **completely isolated**, and (iii) VCEs can be stopped and started independently, POSAs understood that *the application software* within a VCE-capsule (*container*) *cannot be shared between the plurality of secure containers of application software.* Bhattacharjee, [0370]-[0371].

Moreover, as discussed above and further below (§V.E.1.i. [**1G**]), each VCE-capsule has a respective, unique root directory where applications are installed, which teaches (or at minimum renders obvious) that applications cannot be shared across VCE-capsules (because they are confined to different root directories). Tormasov, [0030]-[0031]; Bhattacharjee, [0372]-[0374] (citing EX1075, 2:9-15 ("sandbox[ed]" applications have "access only to the constrained environment and **cannot corrupt software applications outside it**, i.e. beyond the sandbox boundary")).

Thus, Schmidt-Tormasov/Schmidt-Tormasov-Calder meets [**1F**]. Bhattacharjee, [0375].

>     i.  **[1G] "and wherein each of the containers has a unique root file system that is different from an operating system's root file system."**

Based on Tormasov, each VCE-capsule "has a **completely independent root file system**." Tormasov, Abstract. As Tormasov's FIG. 2 (highlighted below)

illustrates, "[e]ach of…two [VCEs] 40, 50 has its own ***unique file system*** 45, 55 and each [VCE] can also see the common file system 205" (the computer's *operating system's root file system*).  Tormasov, [0026].



**FIG. 2**

Thus, each VCE's local *root file system* (e.g., 45, 55) is different from the server OS's *root file system* 205, meeting VirtaMove's interpretation of [**1G**].  *See*

– 64 –

EX1103, 8 ("Realistically if a container on a particular server does not share a root file system with the OS *on that server*, it will not share a root file system with ***any*** operating system (in the entire world).") (emphasis original); Bhattacharjee, [0376]-[0379].

Moreover, a VCE's "***root file system***…allows a root user" of the VCE "to make file **modifications** and **configure** their own local parameters," but "**changes** done in the file system in one [VCE] **do not influence** the file systems in the other [VCE]." Tormasov, [0030]-[0031], [0018]. Because VCEs on the same computer (e.g., VCEs 40, 50) access the computer's *operating system's root file system* 205 but cannot see changes made in the other VCEs' *unique root file systems* (e.g., VCE 50 cannot see VCE 40's file system 45), POSAs would have understood this to teach that the changes made to one VCE's *unique root file system* (e.g., file system 45) are not made to (and thus make it *different from*) the computer's *operating system's root file system* 205. Tormasov, [0029]-[0031]; Bhattacharjee, [0380]. This also meets VirtaMove's interpretation of [**1G**]. *See* EX1103, 9.

Google explained in district court that [**1G**] is indefinite because it recites "*different from **an** operating system*" without indicating **which** OS the *container*'s *root file system* must be "*different from*." EX1102, 14. The Board need not resolve that dispute (*see PLR*, IPR2024-00209, Paper 9, 39), because it would have been obvious to POSAs that some modifications users may make to their own

VCE-capsule's *unique root file system* would make it *different from* the *root file system* of **every** OS in the world, which would meet [**1G**] regardless of the uncertain boundaries of what OS (or set of OSs) the claim is referring to. Bhattacharjee, [0381]-[0382] (citing, Tormasov, [0018] [0023]).

Additionally, Schmidt-479's capsule technique (used in Schmidt-Tormasov/Schmidt-Tormasov-Calder, *supra* §§V.D.1-.2) uses "a **chroot** system call [that] re-assigns the ***root*** of the file system to be the ***root*** of the file system view, which gives capsules" "the illusion of a private file system." Schmidt-479, [0052] ("it is not desirable" for users "to modify the underlying local-level files (for which they may not have permission)"), [0013], [0020]. Similarly, Tormasov teaches that a VCE's "***unique file system***" provides a changed root environment (that could be implemented using a chroot system call, as in Schmidt-479) because, as discussed above in this section, the *root file systems* of VCEs on the same computer are isolated and invisible to each other. Tormasov, [0026], FIG. 2. Bhattacharjee, [0383]-[0386] (cites also EX1079, 40-51).

Thus, each VCE-capsule meets VirtaMove's apparent claim scope in district court, which alleges that a *container* assigned to a "**chroot**" file system meets [**1G**]. EX1079, 40-51 (emphasis original); EX1120 (cited in Tormasov, [0033]), 109-110 ("*chroot* system call" means "[p]rocesses can change their notion of the file system root") (emphasis original). Bhattacharjee, [0387]-[0392].

– 66 –

## 2. Claim 2: "[C]laim 1…each container has an execution file associated therewith for starting the…applications."

POSAs knew as part of their background knowledge that conventional prior-art OSs had at least one *execution file associated therewith for starting applications*, e.g., upon start-up of the OS. For example, EX1041 evidences POSAs' knowledge that Windows-based OSs have their "own initialization files" that contain "a list of *application* programs to *start* automatically." EX1041, 2:8-17. Similarly, EX1013 evidences POSAs' knowledge that a typical prior-art OS has "start-up data maintained by the operating system" that identifies "what *applications* to **load** [*start*] and the order in which the *applications* are **loaded** [*started*] by the operating system." EX1013, [0003]. POSAs knew that those conventional OS initialization files and start-up data are, or typically were processed by, *execution files for starting* the *application(s)* identified in those files/data. Bhattacharjee, [0393]-[0397] (citing also EX1027, [0070]-[0073]).

Each Tormasov VCE is an "environment that is functionally equivalent to a computer with a full-featured operating system" that allows for "command shells, compilation and installation of programs, configuration of network services," etc. Tormasov, [0023]-[0024]. Tormasov further discloses that a user "may stop and **start** the virtual computing environment **in the same manner as with a common operating system**." Tormasov, [0025]. POSAs would thus have found it obvious to use a conventional *execution file* to *start* a Schmidt-Tormasov/Schmidt-

Tormasov-Calder VCE-capsule and, once the VCE-capsule was started, a conventional *execution file* to *start* the VCE-capsule's *application(s)* therein, in the same manner as was done when starting common prior-art OSs, as discussed above. Bhattacharjee, [0398]-[0399].

Additionally, VirtaMove alleges claim 2 is met by an "image configuration" that "includes information such as application arguments, environments, etc." EX1079, 51-55. Based on Schmidt-479's teachings, each VCE-capsule includes "[s]ystem **environment information**," such as "privileges, configuration settings, working directories and files, assigned resources, open devices, installed software, and internal program state." Schmidt-479, [0038]. POSA would have found it obvious for that environment information to be read by an *execution file associated therewith for starting applications* – e.g., an *execution file* for *starting* application(s) and configuring the various settings, privileges, etc. that the application(s) need to execute properly. Bhattacharjee, [0400]-[0402] (citing EX1084, [0145]-[0153]).

Schmidt-Tormasov/Schmidt-Tormasov-Calder meets claim 2 in either of the above ways. Bhattacharjee, [0403].

### 3. Claim 3

Schmidt-Tormasov/Schmidt-Tormasov-Calder meets claim 3 for the same reasons discussed above (§V.E.2) that POSAs had motivation and expected

success to include *execution files* that, as discussed above, *included instructions related to an order in which executable applications will be executed* within VCE-capsules (e.g., to first start applications that other applications need to execute properly).  Bhattacharjee, [0404]-[0409] (citing EX1041, 2:8-17; EX1027, [0070]-[0073]; EX1013, [0003]; EX1021, [0020]).

    **4.**     **Claim 4: "[C]laim 1…pre-identifying applications and system files required for association with the one or more containers" before [1A]'s "storing step."**

As discussed above (§V.E.1.c.i.(2)), Schmidt-Tormasov's/Schmidt-Tormasov-Calder's VCE-capsules are transportable *containers* of software applications stored in memory accessible to servers before being installed to a server (*see supra* §§V.E.1.c.i.(1)); POSAs would have understood this involves *pre-identifying* the *application(s) and system files required for association* with the VCE-capsules (*containers*) *prior to said storing step* in [**1A**].  Bhattacharjee, [0410]-[0415] (citing EX1084, [0145]-[0150]).

Based on Calder, Schmidt-Tormasov-Calder VCE-capsules stored in memory accessible to servers also have *pre-identified* applications and associated system files (Calder, [0082]), for use on servers running non-native OSs (Calder, [0073]), which also meets claim 4.  Bhattacharjee, [0416]-[0417].

### 5. Claim 5

Tormasov "separate[es]" VCEs by *assigning each* a "namespace" ([0029]), which is a *container specific identity*. POSAs would *modify at least some of the associated system files in* VCE-capsules *to provide an association* with their namespace so applications could identify/communicate with applications outside their VCE. Bhattacharjee, [0418]-[0419].

### 6. Claim 6: "[C]laim 2…assigning a unique associated identity to each of a plurality of the containers, wherein the identity includes at least one of IP address, host name, and MAC address."

Tormasov's Figure 1 (highlighted below) shows that each VCE is *assigned* its own "***IP address***" meeting claim 6: e.g., the VE executing an httpd application is accessed at one *assigned IP address* (light blue) and the VE executing the Ftp server is accessed at a different *assigned IP address* (light green). Bhattacharjee, [0420].



**FIG 1**

Tormasov's VCEs allow different users of the same server hardware to deploy, e.g., independent, different web servers. Tormasov, [0011], FIG. 1. The users "perceive" themselves as having "obtained **full network root access** to a common computer" (Tormasov, [0023]) and "can perform all actions allowed for the ordinary computer," such as "**configuration of network services**" and working "with the same hardware node" "as if they worked on **totally separate computers with no associated hardware**" (Tormasov, [0024]). Hosting independent web-server applications and configuring independent "network services" as if they each

– 71 –

had "no associated hardware" further teaches (or at least renders obvious) that each VCE is *assigned a unique identity* that *includes at least* an *IP address*, because POSAs knew that different web servers were conventionally (and beneficially) assigned different IP addresses. Bhattacharjee, [0421]-[0423] (citing EX1130, 2:6-14; EX1131, 1:27-56).

Based on Schmidt-479 (*supra* §§V.D.1-2), the server's "physical resources" used by a VCE-capsule (e.g., "Internet addresses") are assigned "unique" "tokens." Schmidt-479, [0054]-[0054]. That also motivates *assigning* a *unique* Internet (*IP*) address to facilitate moving capsules to different machines, as Schmidt-479 teaches (Schmidt-479, [0058]). Bhattacharjee, [0424]-[0425].

POSAs would have assigned VCE-capsules additional unique identifiers – e.g., *host name* and *MAC address* – to support communication protocols that used those unique identities (e.g., MAC addresses for Ethernet networks; hostnames for remote access). Bhattacharjee, [0426]-[0431] (citing EX1039, [0002]; EX1019, [0012], [0023]; EX1130, 2:16-14; EX1131, 1:27-56).

### 7.     Claim 7

The '814 patent mentions "***mount points***" without explanation. EX1001, 11:17-18. POSAs knew "[a] ***mount point*** simply allows a drive volume to be ***mounted*** at some point within an existing directory tree structure." EX1056, [0008]. Schmidt-479 "create[s]" "***mount points*** [that] are established for each of

the required directories" mapped to a capsule.  Schmidt-479, [0052].  "[O]nce *mounts* have been established, a chroot system call re-assigns the root of the file system to be the root of the file system view."  Schmidt-479, [0052].  POSAs would have *modified* similar configuration files (*system files*) *to define container specific mount points associated with the* VCE-capsules as an obvious, conventional way to mount each VCE-capsule's local file-system view.  Bhattacharjee, [0432]-[0435] (citing EX1018, [0044]).

### 8.    Claim 8

Calder teaches a "**server that transmits *application* packages to the member computers**" (Calder, [0075]), which motivates (and provides reasonable expectation of success in) *retrieving* Schmidt-Tormasov-Calder's VCE-capsules (*secure containers* of *applications and associated system files*, *supra* §V.E.1.c) *from a computing system* (*e.g.*, a server) storing (*having*) those VCE-capsules.  Bhattacharjee, [0436]-[0444] (citing, e.g., EX1084, [0162]-[0166], FIGs. 11A).

Moreover, when VCE-capsules are executing on a server having multiple VCE-capsules (*e.g.*, Tormasov, [0017], [0027], FIG. 1), each VCE-capsule is *retrieved from* that *computer system*, as claimed.  Bhattacharjee, [0445]-[0446].

9. **Claim 9: "[C]laim 2, wherein server information related to hardware resource usage including at least one of CPU memory, network bandwidth, and disk allocation is associated with at least some of the containers prior to the applications within the containers being executed."**

Calder teaches to modify any suitable application package to manage its use of *associated* computer *hardware resources*, like "***memory***," "***network bandwidth***," and "***disk* usage**." Calder, [0125]-[0126]. The "grant[ed] allocation" of resources is "predicted" using "heuristics" (e.g., "amount of virtual memory currently being consumed"). Calder, [0126]. Bhattacharjee, [0447]-[0448].

Schmidt-Tormasov's/Schmidt-Tormasov-Calder's VCE-capsule share a server's "***resources***" (e.g., hardware, network bandwidth, shared memory), but are isolated and thus unaware of competition for those *resources*. Tormasov, [0025]-[0026]. Bhattacharjee, [0447]-[0448].

Thus, based on Calder, POSAs had motivation for Schmidt-Tormasov/Schmidt-Tormasov-Calder to allocate to (*associate with*) VCE-capsules *hardware resource usage* – using *information related to at least one of CPU memory, network bandwidth, and disk allocation* – before *execution* of the *applications within* VCE-capsules, to ensure those applications had sufficient *resources* to execute properly. Bhattacharjee, [0449]-[0459] (citing EX1036, 1:16-26; EX1063, 1:52-2:62, 4:41-46; EX1027, [0176]; EX1037, 6:29-38; EX1076, 13; EX1083, [0035]-[0040]; EX1094, 2:5-21). POSAs would have reasonably

– 74 –

expected success because using such *information* to pre-allocate resources to applications/processes was conventional, as the cited corroboration demonstrates. Bhattacharjee, [0460]-[0461].

**10.  Claim 10: "[C]laim 2, wherein in operation when an application residing within a container is executed, said application has no access to system files or applications in other containers or to system files within the operating system during execution thereof."**

Schmidt-479 teaches "it is **not desirable**" to permit users sharing one computing device "to modify the underlying local system-level files" (e.g., modifying "/lib for system libraries").  Schmidt-479, [0051]-[0052].  To prevent unauthorized modifications, Schmidt-479 executes a "**chroot** system call [to] re-assign[] the root of the file system."  Schmidt-479, [0052].  Thus, *applications residing within a* capsule *have no access to system files or applications in other* capsules or *to system files within the* server's OS.  Bhattacharjee, [0462].

Similarly, Tormasov teaches another way of preventing applications from having *access to system files or applications in other* environments by ensuring "processes [*executing applications*] in different" VCEs are "**completely isolated** from each other" ([0026]) and "are **never visible to other**" VCEs "running on the same computer" ([0018]).  Similar to Schmidt-479's chroot, Tormasov's VCEs have an "independent" "root file system" comprising respective *system files*, as discussed above (§V.E.1.i, [**1G**]).  Thus, a VCE's *application has no access to*

*system files or applications in other* VCEs.  Bhattacharjee, [0463].  *See also supra* §V.E.1.c.i.(3) (demonstrating VCE-capsules are *secure containers*).

Thus, Schmidt-479 and Tormasov each teach, or at minimum render obvious, techniques for preventing *applications residing within* VCE-capsules from accessing *system files within the operating system during execution thereof* to protect the server OS's system files from corruption by users and/or applications executing in VCE-capsules.  Permitting a VCE-capsule's "root user" to access the OS's system files would contradict Tormasov's desire for VCEs to "not influence" each other (Tormasov, [0031]).  Bhattacharjee, [0464].

Additionally, Schmidt-479 and Tormasov separate applications using namespaces.  Schmidt-479, [0041]; Tormasov, [0018], [0029].  POSAs knew that a "'namespace'" can "isolate software packages" so that "any files and components installed in that namespace are visible to the application while files and components installed **in other namespaces are not**."  EX1015, [0080], [0086]; Bhattacharjee, [0465]-[0470] (citing also EX1076, 5; EX1077, 120).  *See* EX1079, 59 (VirtaMove arguing "namespaces" "isolat[e] processes in an environment").  Thus, POSAs reasonably expected success in beneficially using namespaces in Schmidt-Tormasov/Schmidt-Tormasov-Calder to prevent applications from *accessing system files or applications* in other VCE-capsules (*containers*).

### 11. Claim 11

In Schmidt-479, capsule data (e.g., files) are *stored in network file storage*. Schmidt-479, [0063]-[0070]. Calder similarly discloses application "files…***stored remotely***." Calder, [0139]. Bhattacharjee, [0471]-[0472]. Those disclosures motivate implementing Schmidt-Tormasov's/Schmidt-Tormasov-Calder's VCE-capsules to *include files stored* remotely *in network file storage* to provide the well-known benefits of remote access. Bhattacharjee, [0473] (citing EX1092, 1:21-30).

Another reference by a Schmidt-479 inventor discloses a remote "[c]apsule directory service" that manages and "keep[s] track of" capsule "unique locators" (e.g., "IP address[es]"). EX1116, [0057]. POSAs had motivation to store similar *parameters* for VCE-capsules in a similar remote directory, to facilitate management thereof. Bhattacharjee, [0474]-[0476].

### 12. Claim 12

As discussed above (§V.E.8), POSAs would retrieve VCE-capsules (*containers*) from network-server storage, and thus had motivation to merge retrieved files with claim 11's parameters (§V.E.11) *to affect* claim 1's *step of storing* (§V.E.1.c.i, [**1A**]), by using *parameters forming descriptors of containers* (§V.E.11), such as information about where to store VCE-capsules. Bhattacharjee, [0477]-[0479].

**13. Claim 13: "[C]laim 1…associating with a plurality of containers a stored history of when processes related to applications within the container are executed for at least one of, tracking statistics, resource allocation, and for monitoring the status of the application."**

EX1114, filed by Tormasov's inventors, corroborates POSAs' background knowledge that distributed storage systems used "data storage algorithms" based on tracking a history of "***resource*** utilization" to "provide optimate data storage" for distributed systems. EX1114, [0018]. Additionally, Schmidt-Tormasov's/Schmidt-Tormasov-Calder's servers run conventional prior-art OSs like Windows- and Unix-based OS (*see supra* §V.E.1.a.i); those OSs typically included tools for measuring/*tracking* processes related to applications, including tracking statistics for *resource allocation and monitoring the status of application(s)*. Bhattacharjee, [0480]-[0488] (citing, e.g., for Windows-based OSs, EX1033, 2:62-3:18; e.g., for Unix-based OSs, EX1060, 5:57-61; for generic OSs, EX1121, G-14).

POSAs had motivation and would have expected success to use those (or other conventional tracking) tools in Schmidt-Tormasov/Schmidt-Tormasov-Calder to track the history of processes in VCE-capsules for the same reasons POSAs used those tools to track process history (e.g., to project server-resource needs). Bhattacharjee, [0489]-[0492] (citing EX1093, 1:66-3:6; EX1121, G-5).

– 78 –

### 14. Claim 14

#### a. [14PRE] "[C]laim 1…creating containers prior to said step of storing containers in memory"

As discussed above (§V.E.4), Schmidt-Tormasov's/Schmidt-Tormasov-Calder's VCE-capsules (*containers*) contain pre-identified applications and system files stored therein.

Based on Schmidt-479, VCE-capsules are "stored off-line, for instance on a disk drive['s]" *memory* accessible to servers on which the VCE-capsule will be started/restarted. Schmidt-479, [0038]. Thus, each VCE-capsule is *created prior to storing* the capsule *in memory* of one storage device from which it is subsequently *stored in memory* accessible to a destination server that executes the VCE-capsule. Bhattacharjee, [0493]-[0494].

Similarly, users can log-in to a server providing multiple VCEs. Tormasov, FIG. 1, [0017]. From this teaching, POSAs would have understood that the VCE-capsules (and applications therein) are *created prior to storing in memory* so they are available to users when accessing the server. Bhattacharjee, [0495]. Tormasov also says users "may stop and start the [VCE] in the same manner as with a common operating system" ([0025]), from which POSAs would have understood that VCEs are stored in memory when stopped, and retrieved when started. Another reference by Tormasov inventors (EX1111) similarly discloses "computers with a set of **installed** virtual environments" (5:38-41), which further

corroborates POSAs' understanding that VCEs (and applications and system files contained therein) are created before *storing in memory accessible* to the server. Bhattacharjee, [0495]-[0497].

Calder's "transferr[ing]" of pre-packaged applications "from a server to the client" (Calder, [0078]), provides additional teaching to have Schmidt-Tormasov's/Schmidt-Tormasov-Calder's VCE-capsules *created prior to the step of storing containers in memory* accessible to the servers retrieving VCE-capsules. Bhattacharjee, [0498]-[0499].

> **b.  [14A] "wherein containers are created by: a) running an instance of a service on a server;"**

To create capsules, Schmidt-479 *runs* applications processes and related system files and stores them in capsules that can be started/restarted on the same or a different server.  Schmidt-479, [0044]-[0048].  Bhattacharjee, [0500]-[0502] (citing EX1040, 1:14-25; EX1099, [0104]).

As discussed above (§§V.E.1.b.ii-iv), applications in Schmidt-Tormasov's/Schmidt-Tormasov-Calder's VCE-capsules relate to *a service* (e.g., an httpd (web-server) *service*).  *See* Tormasov, FIG. 2 (executing various *services* in VCEs).  Based on Schmidt-479 and/or POSAs' background knowledge, POSAs had motivation and reasonable expectation of success to create Schmidt-Tormasov/Schmidt-Tormasov-Calder VCE-capsules by *running an instance of* a VCE-capsule and its application(s) *on a server* before encapsulating them so as, as

– 80 –

explained below (§V.E.14.c, [**14B**]), to identify the system files required to provide that service, and to test the VCE-capsule (and the applications therein) for compatibility with the various server hardware-OS combinations in the system. Bhattacharjee, [0503]-[0509] (citing EX1129, 1:11-20; EX1031, [0064]-[0068]; EX1020, [0007]).

### c. [14B] "b) determining which files are being used; and,"

As discussed above (§V.E.14.b, [**14A**]), based on Schmidt-479, POSAs had motivation to run applications on a server to *determine which files* (e.g., binaries, libraries, configuration files, etc.) *are being used* so the VCE-capsule could be stored and properly executed on any server in the system. Bhattacharjee, [0510]-[0511].

Alternatively, POSAs would have had additional motivation to identify *which files are being used* by an application as a conventional way to *determine which files* were required to execute applications in isolated computing environments like VCE-capsules to ensure applications were beneficially sandboxed (i.e., free to operate without harming the underlying server). Bhattacharjee, [0512]-[0514] (citing EX1077, 120-122 ("Sandboxing Applications" into secure directories to protect computers from applications – like Schmidt-Tormasov/Schmidt-Tormasov-Calder protects servers from applications

Appx0253

in VCE-capsules (*supra* §V.E.c.iv) – first by "[r]unning the application" to identify required system files)).

**d.    [14C] "c) copying applications and associated system files to memory without overwriting the associated system files so as to provide a second instance of the applications and associated system files."**

As discussed above (§§V.E.1.c.i-iv), Schmidt-Tormasov's/Schmidt-Tormasov-Calder's VCE-capsules include *copies of applications and system files* required to execute the applications, so the VCE-capsule can be copied to and executed on multiple servers in the system, thereby providing independent instances of the applications (e.g., multiple web-server applications).  Each encapsulated VCE (and applications and system files therein) is a *second instance* of that data beyond the computer's local first instance or another VCE's instance, as claimed.  Bhattacharjee, [0515]-[0517]; *see* EX1079, 67 (VirtaMove arguing claim is met by storing "different instance[s]" of an alleged *container*).

**15.    Claim 15**

**a.    [15A]**

*See supra* §V.E.14, §V.E.6.  Bhattacharjee, [0518]-[0519].

**b.    [15B]**

As discussed above (§V.E.1.a.i), Schmidt-Tormasov's/Schmidt-Tormasov-Calder's VCE-capsules (*containers*) are *installed on* "***server*** system[s]." Tormasov, [0017]; Schmidt-479, [0064]-[0067].  Bhattacharjee, [0520]-[0521].

### c. [15C]

POSAs would *test the applications and files within* each VCE-capsule "to ensure proper operation…on several different various operating systems" in the system. EX1129, 1:11-20. Bhattacharjee, [0522]-[0525].

### 16. Claim 16

#### a. [16A]

*See supra* §V.E.14.a. Bhattacharjee, [0526].

#### b. [16B]

A "***skeleton***" file system includes "OS provided ***system files*** before an application is installed." EX1001, 10:41-47.

Schmidt-479 can create capsule files using a "'copy-on-write mode,'" which "modif[ies] the file within their virtual namespace only, while **the underlying file remains unchanged**." Schmidt-479, [0019], [0045]-[0048]. Those "unchanged" "underlying file[s]" are *a skeleton set of system files* that serve *as a starting point* for creating VCE-capsules. Bhattacharjee, [0527]-[0531] (citing EX1077, 119-122).

### 17. Claim 17

#### a. [17A]

As discussed above (§V.E.1.b.ii), Schmidt-Tormasov/Schmidt-Tormasov-Calder makes a VCE-capsule's *service* available by *installing* it (e.g., an httpd (web-server)) *on a target server selected from one of the* system's *plurality of*

– 83 –

*servers*.  Tormasov, FIG. 1.  Bhattacharjee, [0532]-[0537] (citing EX1014, [0015]; EX1020, [0069]-[0078]).

### b.  [17B]

Tormasov wants to reduce "time and effort setting up and administering" "complex software packages," including "administration of a remote node on a data storage network."  Tormasov, [0011]-[0012].  Bhattacharjee, [0538].

Thus, POSAs had motivation and reasonably expected success to *install* and configure VCE-capsules using a GUI that *associates a unique icon representing a service with an unique icon representing a server for hosting applications related to the service and for executing the service, so as to cause the applications to be distributed to, and installed on the target server* because of the well-known convenience of using conventional GUIs (e.g., supporting drag-and-drop installation operations using icons).  Bhattacharjee, [0539]-[0546] (citing, e.g., EX1014, [0030]-[0031]).

### 18.  Claim 18

Tormasov teaches to reduce "time and effort setting up and administering" software packages on a "***remote*** node" ([0011]-[0012]), which suggests/motivates system administrators configuring VCEs on *target servers* from remote locations (e.g., headquarters) using a conventional *remote*-administration GUI.

Bhattacharjee, [0547]-[0552] (citing EX1014, [0030]; EX1020, [0024], [0046], [0108]; EX1109, [0002]-[0005]).

### 19. Claim 19

The '814 patent says "[a] computer system with a single instance of a fully functional operating system installed is referred to as a ***computing platform***." EX1001, 2:20-22.

If *different computing platforms* include different physical computers, then Schmidt-Tormasov/Schmidt-Tormasov-Calder meet claim 19 the same way they meet claim 18 (§V.E.18). Bhattacharjee, [0553]-[0554].

If claim 19 requires computers with different OSs and/or hardware, POSAs knew that was typical for servers in large organizations. Bhattacharjee, [0555]-[0557] (citing corroboration); *supra* §§V.D.1-2.

### 20. Claim 20

POSAs would implement [**17B**]'s associating step (*supra* §V.E.17.b) by *relatively moving the unique icon representing the service to the unique icon representing a server* as a conventional, convenient, drag-and-drop function for GUIs. Bhattacharjee, [0558]-[0562] (citing corroboration).

### 21. Claim 21

Conventional *distributed software applications* are "spread over several computers that are connected via a network." EX1025, [0038]. Calder's techniques "relate[] to ***distributed*** computing" ([0002]), with files "stored

remotely **on separate machines**" ([0139]).  Thus, POSAs had motivation for some VCE-capsules to have *distributed software applications*.  Bhattacharjee, [0563]-[0572] (citing corroboration).

### 22.  Claim 22

"**Computing devices typically include a *console*…to control the computing device** manually."  EX1022, [0004].  Thus, POSAs had motivation for Schmidt-Tormasov/Schmidt-Tormasov-Calder to *update a console on the selected target server with information indicating that the service is resident* thereon so the server's *console* recognized and properly executed its *services*.  Bhattacharjee, [0573]-[0576] (citing corroboration).

### 23.  Claim 23

It would have been obvious to POSAs to *test to determine if the selected target server is a valid computing platform, prior to causing the applications to be distributed to, and installed on the target server* to avoid wasting time and/or and potentially damaging Schmidt-Tormasov/Schmidt-Tormasov-Calder servers with incompatible VCE-capsules.  Bhattacharjee, [0577]-[0581] (citing corroboration).

### 24.  Claim 24

Tormasov permits "different *users*" ([0024]) to "connect[] to a server system" to execute a VCE related to *the service* (e.g., httpd service), as discussed above (§V.B, §§V.E.1.b.ii-iii).  POSAs would thus *create a user account for*

accessing *the service*, a conventional system-administrator function. Bhattacharjee, [0582]-[0585] (citing corroboration).

### 25. Claim 25

Tormasov permits "***installation*** of…***applications***" into a *server's* VCEs (Tormasov, [0024]), which *installs* the *files specific to the selected application on the selected server*.  Bhattacharjee, [0586]-[0587].

### 26. Claim 26

Schmidt-Tormasov's/Schmidt-Tormasov-Calder's VCE-capsules implement "***access*** restrictions enforce[d] inside the" server's OS kernel.  Tormasov, [0018]. That typically included *setting file access permissions to allow an individual user to access the one of the applications to be distributed* and installed in the VCE-capsule.  Bhattacharjee, [0588]-[0590] (citing corroboration).

### 27. Claim 27

#### a. [27A]

Tormasov's users "may **stop**" VCEs "in the same manner as with a common operating system" ([0025]), which teaches/motivates *de-installing* the VCE (and the *service* it provides) *from the server*.  Bhattacharjee, [0591]-[0592].

#### b. [27B]

As discussed above (§V.E.17.b, [**17B**]), POSAs would install a service using drag-and-drop to associate the *service's* and *target server's* icons, and thus would implement those icons to be *displayed*, as a user-friendly way to identify the

– 87 –

services installed on each server.  Bhattacharjee, [0593]-[0597] (citing corroboration).

### c. [27C]

POSAs knew a conventional, user-friendly administrator feature was using icons to de-install *services* from *target servers*.  Bhattacharjee, [0598]-[0602] (citing corroboration).

### 28. Claim 28

As discussed above (§§V.E.27.b-c, **[27B]**-**[27C]**), POSAs would want distinct icons for de-installing services from servers and thus would also *separate* those icons as a conventional, user-friendly, GUI-based way to de-install services. Bhattacharjee, [0603]-[0605] (citing corroboration).

### 29. Claim 29

As discussed above (§V.E.23), POSAs would *test whether the selected server is a valid platform* for installing services and thus would also *test whether* it *is a valid computing platform for de-installing the service* to prevent improper de-installation.  Bhattacharjee, [0606]-[0607].

### 30. Claim 30

Schmidt-479 supports a "virtual desktop system architecture" that presents capsule environments executing on a remote server.  Schdmit-479, [0073]-[0074]. In that implementation, POSAs would implement any *data file changes specific to the service* being executed by the server to be *copied back to a storage medium*

*from which the data file changes originated* to allow data-file changes to be
retrievable for later use.  Bhattacharjee, [0608]-[0610].

### 31.  Claim 31

#### a.  Previously Addressed Limitations

Schmidt-Tormasov/Schmidt-Tormasov-Calder meet the following
limitations of claim 31 for the reasons discussed in the corresponding section(s)
above.  Bhattacharjee, [0611]-[0631].

| Limitation: | Addressed in Section: |
|---|---|
| [**31PRE**] | §§V.E.1.a-b ([**1PREA**]-[**1PREB**]), §§V.E.1.c.i-ii ([**1A**]) |
| [**31A**] | §V.E.1.c.i.(2) ([**1A**]) |
| [**31B**] | §V.E.1.c.i.(2) ([**1A**], "container"-construction part [**2**]) |
| [**31C**] | §V.E.6 (claim 6) |
| [**31D**] | §§V.E.1.c.i-ii ([**1A**]) |
| [**31E**] | §V.E.1.c.iii ([**1A**]), §§V.E.1.f-g ([**1D**]-[**1E**]) |
| [**31F**] | §V.E.1.c.i. ([**1A**]), §V.E.2 (claim 2) |
| [**31G**] | §V.E.1.c.iv ([**1A**]) |
| [**31H**] | §V.E.1.c.i.(2) ([**1A**]), §V.E.1.e ([**1C**]) |

**b.    [31I] "a run time module for monitoring system calls from applications associated with one or more containers and for providing control of the…applications."**

Schdmit-479 uses "a chroot *system call* [that] re-assigns the root of file system" seen by applications *running* in a capsule ([0052]) and "hash tables" that are "segmented based on capsule identity," which includes "system entry points (e.g., *system calls*)" made by those running applications ([0059]).  That chroot functionality teaches/suggests a *run time module for monitoring system calls from applications associated with one or more* Schmidt-Tormasov/Schmidt-Tormasov-Calder VCE-capsules (*containers*) *and for providing control of the one or more applications* in the VCE-capsules (e.g., by re-directing application requests for file access).  *See also* EX1118 (filed by Schmidt-479 inventors), [0061], [0066], [0072] (describing capsule creation/re-starting via *system calls*).  Thus, Schmidt-Tormasov/Schmidt-Tormasov-Calder meets [**31I**].  Bhattacharjee, [0632]-[0633].

Calder translates *system calls* for use on non-native OSs.  Calder, [0101]. Calder taught a run-time software module(s) (e.g., an "interception *module*") that *monitors system calls from the applications* to translate them, and thereby *provide control of the one or more applications*.  Calder, [0086]-[0088].  That is another way Schmidt-Tormasov-Calder meets [**31I**].  Bhattacharjee, [0634]-[0637].

– 90 –

### 32. Claim 32

As discussed above (§V.E.9, claim 9), POSAs would pre-*allocate*, *predetermined* system *resources* to VCE-capsules and thus it was also obvious to include *a scheduler comprising values related to an allotted time in which processes within a* VCE-capsule (*container*) *may utilize predetermined resources*, a conventional way to assign server-resources to applications. Bhattacharjee, [0638]-[0642] (citing corroboration).

### 33. Claim 33

As discussed above (§V.E.32, claim 32), Schmidt-Tormasov/Schmidt-Tormasov-Calder meets a *run time module* that *intercepts system calls* before reaching the host's kernel and redirects them into the VCE-capsule. Schmidt-479, [0052], [0059]; Calder, [0139]. As discussed above (§V.E.6, claim 6), each VCE-capsule is assigned, *e.g.*, an IP address. Schmidt-479 discloses a *run-time module* that monitors "where interface objections are named," including in "**system calls**." Schmidt-479, [0059]. Exemplary named interface objects are communication interfaces (e.g., for IP-based networks). Schdmidt-479, [0070].

An obvious, conventional way to ensure *unique identifiers* were conveyed to applications was for the *run time module* that *intercepts system calls from any of the plurality of* VCE-capsules (*containers*) to replace the host's identifier with the VCE-capsule's identifier (or vice-versa) to ensure the VCE-capsules *can run*

– 91 –

*independently of one another without contention*, as Schmidt-479 and Tormasov intended.  Schmidt-479, [0054]; Tormasov, [0030].  For example, in response to system calls requesting the server's IP address, the run-time module would provide the VCE-capsule's assigned, *unique* IP address.  Bhattacharjee, [0643]-[0647].

### 34. Claim 34

#### a. [34A]

*See supra* §V.E.9, §V.E.13.  Bhattacharjee, [0648]-[0649].

#### b. [34B]

POSA knew conventional applications run in *user mode* and make *system calls to kernel mode* (e.g., to access hardware resources).  Bhattacharjee, [0650]-[0651].  As discussed above (§V.E.1.c.i.(2), §V.E.1.c.iv), applications in VCE-capsules share a *kernel*, and system calls are *intercepted* and *redirected* into the VCE-capsule (e.g., if a requested system file is within the VCE-capsule) or passed to the kernel (e.g., if server hardware is required).  Schmidt-479, [0052], [0059]; Tormasov, FIG. 1; Calder, [0074]-[0076].  Bhattacharjee, [0650]-[0656] (citing EX1120, 15).

#### c. [34C]

POSAs would have found it obvious to *compare the monitored resource usage of the at least one respective application with the resource limits* discussed *supra* §V.E.32 and only *forward the system calls based* on *the comparison* to ensure allocated resource-limits are not violated.  Bhattacharjee, [0657]-[0659].

## VI. GROUNDS 3-4: CLAIMS 1-34 ARE UNPATENTABLE OVER THE COMBINATIONS OF GROUNDS 1-2 IN FURTHER VIEW OF SCHMIDT-629

### 1. Schmidt-629 (EX1116) and the Grounds 3-4 Combinations

Schmidt-629 and Schmidt-479 share an inventor, were filed within months of each other, and describe complementary (and overlapping) aspects of the same capsule technique. *Compare* Schmdit-629, [0033]-[0035] *with* Schmidt-479, [0038]-[0040]. Schmidt-629 teaches to implement each "capsule [to] ha[ve] a unique locator, such as IP address, assigned to it," to beneficially support "mov[ing]" the capsule "to a different machine having a potentially different operating system or" to a "different network." Schmidt-629, [0015]-[0017], [0056]-[0057]. For example, the IP addresses allow capsules having moved to different locations to communicate with each other, by "us[ing] the unique locator (i.e., IP address) of the target capsule as the final destination" of a communication. Schmidt-629, [0016]. Bhattacharjee, [0660]-[0664].

Thus, based on Schmidt-629, POSAs would have been motivated and reasonably expected success to assign a unique locator identifier, such as an IP address, to each of Schmidt-Tormasov's VCE-capsules (Ground 3) and each of Schmidt-Tormasov-Calder's VCE-capsules (Ground 4). Schmidt-629, [0015]-[0017]. Bhattacharjee, [0665]-[0667].

### 2. Claims 1-4, 7-30, 32-34

Claims 1-4, claims 7-30, independent claim 31's limitations other than [**31C**], and the limitations added by (dependent) claims 32-34 are rendered obvious by Schmidt-479's and Tormasov's teachings (with or without Calder's teachings) in the Grounds 3-4 combinations for the same reasons as in the Grounds 1-2 combinations. *Supra* §§V.E.1-4, §§V.E.7-31.a, §§V.E.32-34. Bhattacharjee, [0668], [0673], [0677]-[0679].

### 3. Claims 5-6, 31

Claim 5 recites, *inter alia*, that each container has *a container specific identity assigned to* it; claim 6 and limitation [**31C**] recite, *inter alia*, that each container is assigned a *unique* [*associated*] *identity* which includes an *IP address*. *See infra* §IX.

As discussed above (§VI.1), in view of Schmidt-629, each VCE-capsule in the Grounds 3-4 combinations is "***assign[ed]***" "a ***unique*** locator," e.g., "an ***IP address***" (Schmidt-629, [0015]), which is an additional reason the Grounds 3-4 combinations render obvious claims 5-6 and [**31C**]. Bhattacharjee, [0669]-[0672], [0674]-[0676].

## VII. DISCRETIONARY DENIAL IS UNWARRANTED

### A. §314(a)

"[T]he PTAB will not deny institution based on *Fintiv* if," as here, "there is compelling evidence of unpatentability." Director's Interim Procedure for

Discretionary Denials, 5 (June 21, 2022) ("Interim Procedure") (discussing *Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 11 (Mar. 20, 2020) (precedential)). That should conclude the *Fintiv* analysis.

If considered, the *Fintiv* factors weigh against denial.

### 1. Stay Potential

This factor is currently neutral or favors institution. *Sand Revolution II, LLC, v. Cont'l Intermodal Group–Trucking*, IPR2019-01393, Paper 24, 7 (June 16, 2020) (informative). The district-court proceeding is currently temporarily stayed pending transfer. EX1087, 4-5.

### 2. Trial Timing

Petitioner's motion to transfer the district-court proceeding to the Northern District of California was recently granted. EX1087. That district's median time-to-trial is 47.9 months (EX1082, 66), and no post-transfer trial schedule has yet been set. Factor 2 therefore weighs against denial. *BMW of North America, LLC v. Michigan Motor Techs., LLC*, IPR2023-01224, Paper 15, 11 (Feb. 15, 2024).

### 3. Litigation Investment

There has been little investment in invalidity-related issues in the district court litigation. A *Markman* hearing was canceled before the transfer decision EX1087, and "a significant portion of work remains to be done" including "fact and expert discovery and dispositive motions." *Protect Animals With Satellites LLC v. OnPoint Sys., LLC*, IPR2021-01483, Paper 11, 14-15 (Mar. 4, 2022).

– 95 –

### 4. Issue Overlap

This Petition challenges all 34 claims, whereas only eight are asserted in district court. EX1079. This weighs against denial. *Markforged Inc. v. Continuous Composites Inc.*, IPR2022-00679, Paper 7, 32-33 (Oct. 25, 2022).

### 5. Litigation Defendants

This factor is at worst neutral. *Id.*, 33.

### 6. Other Circumstances

The Petition's "strong showing on the merits" weighs against denial. Interim Procedure, 3-5.

## B. §325(d)

Schmidt-479, Tormasov, Calder, and Schmidt-629 were not before the Office during prosecution, so denial is unwarranted.

## VIII. CONCLUSION

The Board should institute review and cancel claims 1-34.

Dated: 01-31-2025                      Respectfully submitted,

                                            /Gregory Nieberg/    
                                        Gregory Nieberg, Reg. #57,063

## IX. APPENDIX: CLAIM LISTING

The following claim listing assigns element labels (*e.g.*, [**1PREA**], [**1PREB**], [**1A**], etc.) to certain claims for convenience of reference.

| Claim 1 |
|---|
| [**1PREA**] In a system having a plurality of servers with operating systems that differ, operating in disparate computing environments, wherein each server includes a processor and an operating system including a kernel a set of associated local system files compatible with the processor, |
| [**1PREB**] a method of providing at least some of the servers in the system with secure, executable, applications related to a service, wherein the applications are executed in a secure environment, wherein the applications each include an object executable by at least some of the different operating systems for performing a task related to the service, the method comprising: |
| [**1A**] storing in memory accessible to at least some of the servers a plurality of secure containers of application software, each container comprising one or more of the executable applications and a set of associated system files required to execute the one or more applications, for use with a local kernel residing permanently on one of the servers; |
| [**1B**] wherein the set of associated system files are compatible with a local kernel of at least some of the plurality of different operating systems, |
| [**1C**] the containers of application software excluding a kernel, |
| [**1D**] wherein some or all of the associated system files within a container stored in memory are utilized in place of the associated local system files that remain resident on the server, |
| [**1E**] wherein said associated system files utilized in place of the associated local system files are copies or modified copies of the associated local system files that remain resident on the server, |
| [**1F**] and wherein the application software cannot be shared between the plurality of secure containers of application software, |
| [**1G**] and wherein each of the containers has a unique root file system that is different from an operating system's root file system. |

| Claim 2 |
| --- |
| A method as defined in claim 1, wherein each container has an execution file associated therewith for starting the one or more applications. |
| **Claim 3** |
| A method as defined in claim 2, wherein the execution file includes instructions related to an order in which executable applications within will be executed. |
| **Claim 4** |
| A method as defined in claim 1 further comprising the step of pre-identifying applications and system files required for association with the one or more containers prior to said storing step. |
| **Claim 5** |
| A method as defined in claim 2, further comprising the step of modifying at least some of the associated system files in plural containers to provide an association with a container specific identity assigned to a particular container. |
| **Claim 6** |
| A method as defined in claim 2, comprising the step of assigning a unique associated identity to each of a plurality of the containers, wherein the identity includes at least one of IP address, host name, and MAC address. |
| **Claim 7** |
| A method as defined in claim 2 further comprising the step of modifying at least some of the system files to define container specific mount points associated with the container. |
| **Claim 8** |
| A method as defined in claim 1, wherein the one or more applications and associated system files are retrieved from a computer system having a plurality of secure containers. |
| **Claim 9** |
| A method as defined in claim 2, wherein server information related to hardware resource usage including at least one of CPU memory, network bandwidth, and disk allocation is associated with at least some of the containers prior to the applications within the containers being executed. |

| Claim 10 |
| --- |
| A method as defined in claim 2, wherein in operation when an application residing within a container is executed, said application has no access to system files or applications in other containers or to system files within the operating system during execution thereof. |
| **Claim 11** |
| A method as defined in claim 2, wherein containers include files stored in network file storage, and parameters forming descriptors of containers stored in a separate location. |
| **Claim 12** |
| A method as defined in claim 11, further comprising the step of merging the files stored in network storage with the parameters to affect the step of storing in claim 1. |
| **Claim 13** |
| A method as defined in claim 1 further comprising the step of associating with a plurality of containers a stored history of when processes related to applications within the container are executed for at least one of, tracking statistics, resource allocation, and for monitoring the status of the application. |
| **Claim 14** |
| [**14PRE**] A method as defined in claim 1 comprising the step of creating containers prior to said step of storing containers in memory, |
| [**14A**] wherein containers are created by: a) running an instance of a service on a server; |
| [**14B**] b) determining which files are being used; and, |
| [**14C**] c) copying applications and associated system files to memory without overwriting the associated system files so as to provide a second instance of the applications and associated system files. |
| **Claim 15** |
| A method as defined in claim 14 comprising the steps of: assigning an identity to the containers including at least one of a unique IP address, a unique Mac address and an estimated resource allocation; installing the container on a server; and, testing the applications and files within the container. |

| |
|---|
| **Claim 16** |
| [**16A**] A method as defined in claim 1 comprising the step of creating containers prior to said step of storing containers in memory, |
| [**16B**] wherein a step of creating containers includes: using a skeleton set of system files as a container starting point and installing applications into that set of files. |
| **Claim 17** |
| [**17A**] A method as defined in claim 1 further comprising installing a service on a target server selected from one of the plurality of servers, |
| [**17B**] wherein installing the service includes: using a graphical user interface, associating a unique icon representing a service with an unique icon representing a server for hosting applications related to the service and for executing the service, so as to cause the applications to be distributed to, and installed on the target server. |
| **Claim 18** |
| A method as defined in claim 17 wherein the target server and the graphical user interface are at remote locations. |
| **Claim 19** |
| A method as defined in claim 18, wherein the graphical user interface is installed on a computing platform, and wherein the computing platform is a different computing platform than the target server. |
| **Claim 20** |
| A method as defined in claim 19, wherein the step of associating includes the step of relatively moving the unique icon representing the service to the unique icon representing a server. |
| **Claim 21** |
| A method as defined in claim 20 further comprising starting a distributed software application. |
| **Claim 22** |
| A method according to anyone of claims 20 further comprising updating a console on the selected target server with information indicating that the service is resident on the selected target server. |

| Claim 23 |
|---|
| A method claim 17, further comprising, the step of testing to determine if the selected target server is a valid computing platform, prior to causing the applications to be distributed to, and installed on the target server. |
| **Claim 24** |
| A method according to claim 17 further comprising creating a user account for the service. |
| **Claim 25** |
| A method as defined in claim 17, further comprising the step of installing files specific to the selected application on the selected server. |
| **Claim 26** |
| A method according to claim 17 further comprising the steps of setting file access permissions to allow a user to access the one of the applications to be distributed. |
| **Claim 27** |
| [**27A**] A method as defined in claim 1, further comprising de-installing a service from a server, comprising: displaying the icon representing the service; |
| [**27B**] displaying the icon representing the server on which the service is installed; and |
| [**27C**] utilizing the icon representing the service and the icon representing the server to initiating the de-installation of the selected service from the server on which it was installed. |
| **Claim 28** |
| A method according to claim 27 further comprising separating icon representing the service from the icon representing the server. |
| **Claim 29** |
| A method according to claim 27 further comprising testing whether the selected server is a valid computing platform for de-installation of the service. |
| **Claim 30** |
| A method according to claim 27 further comprising copying data file changes specific to the service back to a storage medium from which the data file changes originated prior to installation. |

| Claim 31 |
| --- |
| [**31PRE**] A computing system for performing a plurality of tasks each comprising a plurality of processes comprising: |
| [**31A**] a system having a plurality of secure containers of associated files accessible to, and for execution on, one or more servers, |
| [**31B**] each container being mutually exclusive of the other, such that read/write files within a container cannot be shared with other containers, |
| [**31C**] each container of files is said to have its own unique identity associated therewith, said identity comprising at least one of an IP address, a host name, and a MAC_address; |
| [**31D**] wherein, the plurality of files within each of the plurality of containers comprise one or more application programs including one or more processes, |
| [**31E**] and associated system files for use in executing the one or more processes wherein the associated system files are files that are copies of files or modified copies of files that remain as part of the operating system, |
| [**31F**] each container having its own execution file associated therewith for starting one or more applications, |
| [**31F**] each container having its own execution file associated therewith for starting one or more applications, |
| [**31H**] wherein each container exclusively uses a kernel in an underlying operation system in which it is running and is absent its own kernel; and, |
| [**31I**] a run time module for monitoring system calls from applications associated with one or more containers and for providing control of the one or more applications. |
| Claim 32 |
| A computing system as defined in claim 31, further comprising a scheduler comprising values related to an allotted time in which processes within a container may utilize predetermined resources. |

| Claim 33 |
|---|
| A computing system as defined in claim 32, wherein the run time module includes an intercepting module associated with the plurality of containers for intercepting system calls from any of the plurality of containers and for providing values alternate to values the kernel would have assigned in response to the system calls, so that the containers can run independently of one another without contention, in a secure manner, the values corresponding to at least one of the IP address, the host name and the MAC_Address. |

| Claim 34 |
|---|
| [34A] A computing system as defined in claim 31, wherein the run time module performs: monitoring resource usage of applications executing; |
| [34B] intercepting system calls to kernel mode, made by the at least one respective application within a container, from user mode to kernel mode; |
| [34C] comparing the monitored resource usage of the at least one respective application with the resource limits; and, forwarding the system calls to a kernel on the basis of the comparison between the monitored resource usage and the resource limits. |

# CERTIFICATE OF SERVICE UNDER 37 C.F.R. § 42.6 (E)(4)

I certify that on January 31, 2025, I will cause a copy of the foregoing document, including any exhibits or appendices filed therewith, to be served via USPS Priority Mail Express at the following correspondence address of record for the patent:

> Allen, Dyer, Doppelt + Gilchrist, PA
> 1135 East State Road 434
> Suite 3001
> Winter Springs, FL 32708

Date:  January 31, 2025

/Dara Del Rosario/
Dara Del Rosario
Paralegal
WOLF, GREENFIELD & SACKS, P.C.

# <u>CERTIFICATE OF WORD COUNT</u>

Pursuant to 37 C.F.R. § 42.24, the undersigned certifies that the foregoing

Petition for *Inter Partes* Review contains 13,999 words excluding a table of

contents, a table of authorities, Mandatory Notices under § 42.8, a certificate of

service or word count, or appendix of exhibits or claim listing.  Petitioner has

relied on the word count feature of the word processing system used to create this

paper in making this certification.

Date:  January 31, 2025

/Dara Del Rosario/
Dara Del Rosario
Paralegal
WOLF, GREENFIELD & SACKS, P.C.

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

GOOGLE LLC,
Petitioner,

v.

VIRTAMOVE, CORP.,
Patent Owner.

———————

Case No. IPR2025-00487
Patent No. 7,519,814

———————

**PATENT OWNER'S REQUEST FOR DISCRETIONARY DENIAL OF
INSTITUTION**

# **TABLE OF CONTENTS**

I. INTRODUCTION ...................................................................................... 1

II. THE PETITION'S EXTRAORDINARY OVER-RELIANCE ON EXPERT TESTIMONY WEIGHS AGAINST INSTITUTION. ...................................... 3

III. DENIAL OF INSTITUTION UNDER §314 IS WARRANTED. .................... 5

    A. *Fintiv* Factor 1: There is no evidence that a second stay will be granted. ............................................................................................ 6

    B. *Fintiv* Factor 2: The District Court trial will likely at or before the time for a final written decision. ................................................ 7

    C. *Fintiv* Factor 3: The parties will have invested substantially in the District Court case before any institution decision ...................... 9

    D. *Fintiv* Factor 4: There is substantial overlap between this IPR and the District Court proceeding. ............................................... 10

    E. *Fintiv* Factor 5: Petitioner is a defendant in in the District Court litigation. ...................................................................................... 12

    F. *Fintiv* Factor 6: Other considerations weigh against institution. ........ 13

    G. Additional considerations weigh in favor of discretionary denial. ............................................................................................ 14

        1. No changes in the law support reconsideration of patentability. ....................................................................... 15

        2. The Petition is weak and overly reliant on conclusory expert testimony. .................................................................. 15

        3. Settled expectations weigh against institution. ........................ 17

    H. The balance of the *Fintiv* factors favor denial. ................................. 18

IV. PARALLEL PETITIONS WEIGH AGAINST INSTITUTION. .................... 18

V. CONCLUSION ........................................................................................ 19

# TABLE OF AUTHORITIES

**Cases**

*Apple Inc. v. Fintiv, Inc.*,
     IPR2020-00019, Paper No. 11 (PTAB Mar. 20, 2020)........6, 7, 9, 10, 11, 12, 13

*Apple Inc. v. Fintiv, Inc.*,
     IPR2020-00019, Paper No. 15 (PTAB May 13, 2020) .................................6, 12

*NHK Spring Co. v. Intri-Plex Techs., Inc.*,
     IPR2018-00752, Paper No. 8 (PTAB Sept. 12, 2018) ....................................6, 7

*Sand Revolution II, LLC v. Continental Intermodal Group-Trucking LLC,*
     IPR2019-01393, Paper 24 (Jun.16, 2020) .......................................................7

**Statutes**

35 U.S.C. § 101 ...............................................................................................11

35 U.S.C. § 112 ...............................................................................................11

35 U.S.C. § 314 ................................................................................2, 5, 9, 19

Appx0280

## PATENT OWNER'S EXHIBIT LIST

| No. | Description |
| --- | --- |
| 2001 | May 7, 2025 Transfer Order in *VirtaMove v. Google*, 24-CV-00033 (W.D. Tex.) |
| 2002 | DocketNavigator Median Time-to-Trial Statistics |
| 2003 | National Judicial Caseload Profile, *available at* https://www.uscourts.gov/sites/default/files/2025-02/fcms_na_distprofile1231.2024.pdf |
| 2004 | Petitioner Google's October 17, 2024 Invalidity Contentions |

## I. INTRODUCTION

Pursuant to the Director's March 26, 2025 memorandum regarding Interim Processes for PTAB Workload Management ("March 26, 2025 Memo"), Patent Owner requests that the Director exercise discretion to deny institution of the Petition for numerous discretionary reasons.

**First**, under the PTAB's new guidelines, "the extent of the petition's reliance on expert testimony bear[s] on discretion to institute IPR" because "extensive reliance on expert testimony… may suggest that the questions are better resolved in an Article III Court." FAQs for Interim Processes for PTAB Workload Management, https://www.uspto.gov/patents/ptab/faqs ("Interim Processes FAQ"), at numbered item 21. Here, the Petition's reliance on expert testimony is ***extraordinary*** (spanning nearly 300 pages for this IPR alone, and over 600 pages of expert testimony when considered along with the parallel petition filed by Petitioner), and would render resolution of disputed issues of expert testimony impractical.

Accordingly, the extraordinary over-reliance of the Petition on expert testimony alone justifies the Board's exercise of discretion to deny institution. [1]

---

[1] Patent Owner does not mean to suggest that typical, or even extensive reliance on expert testimony should, standing alone, result in discretionary denial. However, where, as here, the over-reliance on expert testimony is particularly egregious and abusive, discretionary denial is appropriate to avoid burdening the Board and

**Second**, the *Fintiv* factors taken as a whole favor denial of institution. This case was recently transferred, and trial is likely to be set before the deadline for a final written decision. And all of the other *Fintiv* factors also either weigh strongly against institution or are neutral, including additional factors such as settled expectations (where here, the challenged patent was issued before the America Invents Act was even signed into law). Accordingly, even if the Petition's extraordinary over-reliance on expert testimony is not itself sufficient to deny institution, institution should be denied pursuant to *Fintiv* and 35 U.S.C. §314.

**Finally,** there are numerous parallel petitions filed against the challenged patent (U.S. Patent No. 7,519,814, or "'814 patent"). Specifically, between Google and Amazon, there are **four** IPR Petitions filed challenging the independent claims of the '814 patent, presenting nine distinct grounds involving ten different explicitly identified references (including over a hundred different "shadow" references relied on to support the presented invalidity theories). To the extent the Board finds *any* of these Petitions should be instituted, Patent Owner requests that institution be limited to one Petition challenging validity of the '814 Patent, as both Google and Amazon's interests can be represented by a single Petition challenging validity (and VirtaMove would not oppose a motion for joinder if only one Petition is granted).

---

Patent Owner with such an unworkably large record of expert testimony.

## II. THE PETITION'S EXTRAORDINARY OVER-RELIANCE ON EXPERT TESTIMONY WEIGHS AGAINST INSTITUTION.

The Board has indicated that "Parties are encouraged to address any factor or circumstance they believe bears on whether the Office should or should not institute trial, including reasons not discussed in current Board precedent or the Process Memorandum." Interim FAQ at numbered item 20. The Board has also indicated that "[t]he failure to provide focused expert testimony may weigh against institution."

Here, Patent Owner believes that Petitioner Google's extraordinary overreliance on expert testimony (and the manner of that expert testimony, as introducing dozens of additional prior art references into Petitioner's theories) justifies denial of institution, irrespective of any other factors.

For instance, although the Petition despite is limited to 14,000 words by regulation (of which 13,991 were used), the Petition submitted a ***271-page*** declaration spanning ***more than 55,000 words*** (excluding tables, claim listing, etc.). This is exactly the type of over-reliance on expert testimony that the Director has indicated is ill-suited for resolution at the PTAB, because the Board should base its decision on patents and printed publications, not the written opinions of an expert who will not even testify at the hearing. (Notably, if he was allowed to simply read the entirety of opinions into the record at the hearing, that testimony alone would

take more than *six hours* based on the average human speech rate of 150 words per minute.)

As a practical matter, it is not even clear how Patent Owner can practically respond to 55,000+ words of expert testimony with a 14,000 page word limit, particularly when Petitioner reserves the right to submit an ***additional*** expert declaration in its reply briefing to which Patent Owner will only be permitted a 5,600-word response. The impracticality of adjudicating the credibility of extensive expert testimony in the limited and purportedly streamlined IPR proceedings are exactly why over-reliance on expert testimony at the PTAB should be highly disfavored. The PTAB, with limited opportunity for expert testimony at the hearing, is simply not well-equipped to handle detailed factual disputes between experts which are likely to rely on evaluations of witness credibility, particularly when expert testimony spans hundreds of pages and exceeds the word limit for briefing many times over.

The Petition's overreliance on expert testimony is compounded further because the expert declaration relies on approximately *87* different additional patents or printed publications to support the opinions set forth therein. *See generally* Ex. 1003. (This number exclude non-prior art documents, dictionary definitions, and documents merely used to authenticate the priority date of other documents—the Petition is actually accompanied by *146* different exhibits.) Thus, although the

Petition *nominally* relies on only three different references in combination (Blaser, Calder, and Schmidt), the total number of alleged prior art references relied on by Petitioner's expert in alleging invalidity approaches **90**. In many instances, these references are used to justify addition of features not found in any of the combination references. *See, e.g.*, Ex. 1003, ¶¶83-94 (not alleging that Blaser itself "teaches" "operating layers in systems having multiple servers having different OSs, with each layer being executable on at least some of the different OSs in the system," and instead relies on numerous non-combination references to arguing the obviousness of such a modification.

This scorched-earth approach to *inter partes* review, wherein hundreds of pages of expert testimony rely upon many dozens of alleged prior art references, should not be rewarded with institution, because it is directly contrary to the purpose of IPR proceedings were envisioned as a *streamlined and efficient* alternative to evaluating the novelty and obviousness of asserted patents. Accordingly, Patent Owner respectfully requests that the Director exercise discretion to deny institution to avoid overburdening the PTAB and Patent Owner with several hundred pages of expert testimony to evaluate.

## III. DENIAL OF INSTITUTION UNDER §314 IS WARRANTED.

35 U.S.C. § 314(a) gives the Director discretion to deny institution of IPR due to the advanced state of parallel district court litigation regarding the same issues.

*See NHK Spring Co. v. Intri-Plex Techs., Inc*., IPR2018-00752, Paper 8 at 19-21

(PTAB Sept. 12, 2018) (precedential) ("*NHK*"). The Board has set forth six factors

for determining whether discretionary denial in light of such parallel litigation is

appropriate:

1.  whether the court granted a stay or evidence exists that one may be granted if a proceeding is instituted;

2.  proximity of the court's trial date to the Board's projected statutory deadline for a final written decision;

3.  investment in the parallel proceeding by the court and the parties;

4.  overlap between issues raised in the petition and in the parallel proceeding;

5.  whether the petitioner and the defendant in the parallel proceeding are the same party;

6.  other circumstances that impact the Board's exercise of discretion.

*Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 11 at 5-6 (PTAB Mar. 20, 2020)

(precedential) ("*Fintiv I*"). In evaluating these factors, the Board "takes a holistic

view of whether efficiency and integrity of the system are best served by denying or

instituting review." *Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 15 at 7-17

(PTAB May 13, 2020) (informative) ("*Fintiv II*").

> **A.** **_Fintiv_ Factor 1: There is no evidence that a second stay will be granted.**

*Fintiv* Factor 1 looks to "whether the court granted a stay or evidence exists

that one may be granted if a proceeding is instituted." *Fintiv I* at 5-6.

Here, the District Court Proceeding was transferred to the Northern District

of California on May 7, 2025, after previously being filed in the Western District of Texas. *See* Ex 2001. While the case was previously stayed pending transfer (Ex. 1087 at 4-5), the case has now been transferred and the stay has thus lapsed. *See* Ex. 2001 (transferring case on May 7, 2025). Because the Board ordinarily "will not attempt to predict" how a district court will proceed if a stay has not been granted (*see Sand Revolution II, LLC v. Continental Intermodal Group-Trucking LLC,* IPR2019-01393, Paper 24 at 7 (June 16, 2020) (informative)), there is no reason to suggest that the Northern District of California will issue a stay, particularly because claim construction briefing has already been concluded as discussed below. *Fintiv* Factor 1 is thus neutral.

### B. *Fintiv* Factor 2: The District Court trial will likely at or before the time for a final written decision.

*Fintiv* Factor 2 looks to "proximity of the court's trial date to the Board's projected statutory deadline for a final written decision." *Fintiv I* at 5-6. "If the court's trial date is earlier than the projected statutory deadline, the Board generally has weighed this fact in favor of exercising authority to deny institution under *NHK*." *Id.* at 9.

Here, because the case has only just transferred to the Northern District of California, there is no set trial date. Because claim construction briefing was already completed while the case was pending in the Western District of Texas, the case is approximately halfway to trial. And the five-year average of median time-to-trial

from original filing for patent cases in the Northern District of California, excluding cases with stays, is 18 months. *See* Ex. 2003 (Docket Navigator median time-to-trial statistics for the Northern District of California, from May 2020 to present).[2]

Given that the time to trial will be reduced significantly due to the prior completion of claim construction briefing, trial can be set for 9-12 months from the May 7 transfer date. And even at the higher end of that range (12 months time-to-trial from transfer), the trial date would occur approximately ***four months*** before the due date for a final written decision.

Accordingly, *Fintiv* factor 2 strongly weighs against institution.

---

[2] Petitioner's time-to-trial statistics are unreliable because they involve ***all*** civil cases, not patent cases, and because there is wide variance in time-to-trial from year to year. *See, e.g.*, Ex. 2003 at 66 (showing that the median time-to-trial for all civil cases dropped to 34.5 months for the 12-month period ending December 31, 2024, in contrast to Petitioner's statistics showing a significantly longer 47.9 month time-to-trial for the 12-month period ending September 30, 2024 (*see* Ex. 1082 at 66). The significant variance in Petitioner's statistics evidences the need to rely on more than a 12-month period, which is why Patent Owner presents a 5-year median that relates solely to patent cases. And only non-stayed cases are included, because if the case *were* hypothetically stayed pending IPR, then its time-to-trial is not relevant (because trial would necessarily occur *after* final written decision).

### C. *Fintiv* Factor 3: The parties will have invested substantially in the District Court case before any institution decision

*Fintiv* Factor 3 looks to "amount and type of work already completed in the parallel litigation by the court and the parties ***at the time of the institution decision***." *Fintiv I* at 9 (emphasis added). For example, "if, at the time of the institution decision, the district court has issued substantive orders related to the patent at issue in the petition," this factor favors denial. *Id.* at 9-10. "Likewise, district court claim construction orders may indicate that the court and parties have invested sufficient time in the parallel proceeding to favor denial." *Id.* at 10.

Here, an institution decision would be due by September 10, 2025. *See* 35 U.S.C. § 314(b). Prior to the deadline for an institution decision, the parties will have invested significant resources in the parallel District Court Proceeding. For example, the parties have already served extensive infringement and invalidity contentions, and fully briefed and already had a hearing on claim construction. And although the case was only transferred on May 7, 2025 (three business days before filing of this brief), there will have been four months of additional activity by September 10, 2025. Under a typical schedule, a claim construction order will have issued, the parties will have nearly completed fact discovery, and the parties will be preparing opening expert reports by the expected date of an institution decision.

Accordingly, *Fintiv* Factor 3 weighs in favor of discretionary denial.

**D.** *Fintiv* **Factor 4: There is substantial overlap between this IPR and the District Court proceeding.**

*Fintiv* Factor 4 looks to "whether all or some of the claims challenged in the petition are also at issue in district court" and whether the "petition includes the same or substantially the same claims, grounds, arguments, and evidence" as the parallel district court case. *Fintiv I* at 12-13. In short, this factor evaluates "concerns of inefficiency and the possibility of conflicting decisions" when substantially identical prior art is submitted in both the district court and the IPR proceeding. *Id*. at 12. Here, the challenged claims cover all asserted claims, and the prior art relied upon in the Petition and at the District Court is substantially overlapping (with the prior art relied upon in the District Court being far more expansive than the prior art relied upon in the Petition).

First, the Petition challenges claims 1–34, covering all claims that are asserted in the District Court Proceeding. *See* Ex. 1078 (VirtaMove's July 12, 2024 Supplemental Infringement Contentions) at 1 (showing claims 1, 2, 4, 6, 9, 10, 13, and 14 are asserted). And if institution is denied, Patent Owner stipulates that it will not assert against Google any claims of the '814 patent other than those already asserted against Google.

Second, there is substantial overlap between the prior art arguments presented in the Petition and arguments advanced by Petitioner in the District Court litigation. For example, Petitioner's invalidity contentions in the District Court litigation assert

that the same Blaser and Calder references relied upon in the Petition anticipate or render obvious claims of the '814 patent. *Compare* Petition at 1 *with* Ex. 2004 (Google's Supplemental Invalidity Contentions) at 8. Moreover, while the Petition relies on one additional reference, Schmidt, Google's invalidity references this reference is only used in combination with the Petition's other two references, and further only as invalidity grounds against certain dependent claims of the '814 patent. *See* Petition at 1-2.

Moreover, Petitioner's District Court invalidity contentions are still far more expansive than the invalidity arguments set forth in the Petition. For example, Petitioner's District Court invalidity contentions assert that the '814 patent is anticipated or rendered obvious in view of 10 total prior art patents and applications, 6 non-patent literatures, and 5 prior art systems. *See* Ex. 2004 at 8-14. Petitioner's District Court invalidity contentions further assert that the '814 patent claims are invalid under 35 U.S.C. 101 and 112. *Id*. at 44-45, 54-60.

Thus, while the Petition includes one reference that is not currently listed in Petitioner's District Court invalidity contentions, Petitioner's contentions are still significantly more expansive than the prior art arguments made in the Petition. This raises "concerns of inefficiency and the possibility of conflicting decisions" (*Fintiv I* at 12), as the District Court will likely decide the validity of the '814 patent claims months prior to any Final Written Decision, based on substantially similar (and

indeed far more expansive) invalidity arguments.

Furthermore, Petitioner has offered *no* stipulation to mitigate concerns of inefficiency and conflicting decisions; in fact, Petitioner reserves the right to supplement its invalidity contentions as discovery progresses. Accordingly, Petitioner will be able to pursue the *same* invalidity theories before the PTAB and the District Court, compounding the inefficiency introduced by Petitioner's extensive overreliance on expert testimony and shadow prior art references.

Petitioner would *also* be free to pursue subsequent *ex parte* reexamination petitions on grounds that could have been raised in the Petition. Thus, if the Board were to institute, Petitioner would be able to serially challenge the validity of the '814 Patent in this proceeding, in the District Court Proceeding, and in an *ex parte* reexamination proceeding. This is the exact opposite of the efficiency contemplated when the America Invents Act introduced the *inter partes* review process as a more efficient and streamlined alternative to other invalidity challenges.

Thus, *Fintiv* Factor 4 weighs ***strongly*** in favor of discretionary denial.

**E.      *Fintiv* Factor 5: Petitioner is a defendant in in the District Court litigation.**

*Fintiv* Factor 5 looks to "whether the petitioner and the defendant in the parallel proceeding are the same party." *Fintiv I* at 5-6. Specifically, when "the petitioner and the defendant in the parallel proceeding are the same party, this factor weighs in favor of discretionary denial." *Fintiv II* at 15. Here, the Petitioner is a

defendant in the parallel litigation.

Thus, *Fintiv* Factor 5 weighs in favor of discretionary denial.

**F.      *Fintiv* Factor 6: Other considerations weigh against institution.**

*Fintiv* Factor 6 looks to "other circumstances that impact the Board's exercise of discretion, including the merits." *Fintiv I* at 5-6. This factor also weighs heavily against institution for at least three reasons.

First, Petitioner waited nearly an entire year to file its Petition, thus making it extremely likely that even with a stay pending transfer (which has since been lifted), that the validity of the '814 patent claims will be decided in the District Court months prior to any Final Written Decision in these proceedings.

Second, contrary to Petitioner's assertions, the Petition fails to present any compelling merits of unpatentability. The Petition does not even ***allege*** any anticipatory prior art under §102. Instead, the Petition relies solely on obvious combinations under §103 (relying on nearly 300 pages of expert testimony). Petition at *passim*; Ex. 1003 (Bhattacharjee Decl.). Thus, the Petition only serves to highlight the novelty of the challenged claims, and the web of repurposed §103 prior art presented in the Petition and expert declaration (including many dozens of shadow references) fails to render the challenged claims obvious for reasons that Patent Owner will highlight in its POPR merit-based briefing, including the fact that numerous claim limitations are not disclosed by ***any*** of the alleged combination

references.

Third, as discussed further below, "additional considerations" (as outlined in the Director's March 26, 2025 Interim Processes for PTAB Workload Management) weigh **strongly** in favor of discretionary denial, including the Petition's extraordinary over-reliance on expert testimony to gap-fill holes in the prior art, as well as the length of time the challenged claims have been in effect.

## G.     Additional considerations weigh in favor of discretionary denial.

In addition to the above factors, as explained in the March 26, 2025 Interim Processes for PTAB Workload Management, additional relevant considerations may weigh in favor of discretionary denial, including:

- Whether the PTAB or another forum has already adjudicated the validity or patentability of the challenged patent claims;

- Whether there have been changes in the law or new judicial precedent issued since issuance of the claims that may affect patentability;

- The strength of the unpatentability challenge;

- The extent of the petition's reliance on expert testimony;

- Settled expectations of the parties, such as the length of time the claims have been in force;

- Compelling economic, public health, or national security interests; and

- Any other considerations bearing on the Director's discretion.

Here, as discussed further below: 1) no changes in the law support reconsideration of validity of the '814 patent claims; 2) the Petition is weak and is

overly reliant on conclusory expert testimony; and 3) the claims have been in effect for nearly 15 years.

### 1. No changes in the law support reconsideration of patentability.

First, no changes in the law support reconsideration of the validity of the '814 patent claims, and Petitioner does not identify any such change.

### 2. The Petition is weak and overly reliant on conclusory expert testimony.

Second, the Petition is particularly weak and overly reliant on unreliable expert testimony to gap-fill holes in the prior art. For example, as discussed in the Interim Processes FAQ, "[w]hile the Board may consider expert testimony, as a matter of efficiency, extensive reliance on expert testimony and/or reasonable disputes between experts on dispositive issues may suggest that the questions are better resolved in an Article III court." Interim Processes FAQ at numbered item 21. Thus, a "failure to provide focused expert testimony may weigh against institution." *Id*.

As discussed above, the Petition relies on ***nearly 300 pages*** of expert testimony in an attempt to cobble together up to three different enumerated combination references (and dozens upon dozens of additional "shadow" references) to support the Petition's invalidity grounds. *See generally* Ex. 1003. This over-

reliance on expert testimony to overcome deficiencies in the prior art is an additional relevant consideration weighing against institution.

By way of one specific example of the weakness of the Petition, in support of the Petition's proposed Blaser-Calder combination, the Petition mischaracterizes the prior art as disclosing that "Blaser's layers are compatible with various 'Windows operating system[s]' ('Windows 95, 98, NT, 2000, and XP' (Blaser, 13:43-57)) and 'operating systems other than Windows (Blaser, 3:28-36).'" Pet. 9-10 (citing Ex. 1005 (Blaser) and Ex. 1003 (Bhattacharjee Declaration) at ¶¶76-82).

The prior art, however, makes clear that the layers are "provided of an application layering system under *a* [single] 32-bit Microsoft Windows architecture, such as Windows 95, 98, NT, 2000, and XP" (Ex. 1005 13:43-57); the cited portion of Blaser does not teach that a system would involve **numerous different** architectures. Likewise, the prior art's discussion of "operating systems other than Windows" does not, as the Petition asserts, teach that Blaser's *layers are compatible with* "operating systems other than Windows"; instead, it teaches (under a discussion titled "General Concepts") that *"[t]he meaning of registries and registry settings is therefore extended to future Windows operating systems and operating systems other than windows."* Ex. 1005, 3:15, 3:28-36.

In other words, the Petition simply mischaracterizes the prior art as supposedly disclosing that a single layer containing an application that would be

compatible with numerous different operating systems. In an apparent attempt to cure this deficiency (in the even the Board discovered it), Petitioner cites to ***seven paragraphs*** of expert testimony in support of a single conclusory sentence. *See* Pet. 9-10 (citing Ex. 1003, ¶¶76-82). And the corresponding expert paragraphs rely on three separate shadow references (Exs. 1017, 1128, and 1050) regarding how "POSAs would have reasonably expected that Blaser's applications [in Blaser's layers] would have been compatible with multiple, different OSs." Ex. 1003, ¶82. Of course, none of this extensive reliance on expert testimony would have been necessary if Petitioner had accurately characterized the prior art in the first place, and Petitioner's *extraordinary* over-reliance on expert testimony evidences the weakness of the Petition's representations.

Accordingly, the credibility of the Petition and its extreme overreliance on expert testimony to fill gaps in the prior art weighs strongly against institution. This is particularly true here, when issues of credibility for extensive disputes between experts are better resolved by a jury.

### 3.     Settled expectations weigh against institution.

The '814 Patent issued in 2010 (before the America Invents Act was even signed into law), and has been in effect for nearly ***fifteen years***. When the patent issued, VirtaMove was not even aware of the possibility of an IPR challenge.

Accordingly, the settled expectations of VirtaMove of being able to adjudicate its patent claims before an Article III Court weigh against institution.

## H.     The balance of the *Fintiv* factors favor denial.

In sum, all six *Fintiv* Factors weigh in favor of discretionary denial. Furthermore, additional relevant considerations further weigh in favor of discretionary denial. Thus, considered as a whole, the relevant facts all weigh in favor of exercising discretionary denial.

## IV.     PARALLEL PETITIONS WEIGH AGAINST INSTITUTION.

The Board has indicated that "[a]ny other considerations bearing on the Director's discretion" may be briefed. Here, the Board should exercise its discretion because of the extraordinary power imbalance between tech giants Google (Petitioner in this and one other IPR challenging the '814 patent) and Amazon (another petitioner in two other IPRs challenging the '814 patent).

Between the two Google IPRs alone, Google has submitted over 600 pages of expert testimony attacking the validity of the '814 patent. When combined with the fact that tech giant Amazon filed an *additional* two IPRs on the '814 Patent within a day of Google's filings (*see Amazon.co, Inc. v. VirtaMove Corp.*, Nos. IPR2025-00563 and IPR2025-00566), accompanied by hundreds of additional pages of expert testimony regarding invalidity (*see* Ex. 1002 to each of Amazon's IPRs), there appears to be a coordinated attempt by technology giants with a combined several

trillion dollars of market capitalization to overwhelm relatively small VirtaMove[3] in litigation expenses, separate and aside from the typical costs of litigating a patent case in a district court proceeding.

Given the nature of the seemingly coordinated attack on the validity of the '814 patent, the Board should exercise its discretion to avoid institution of the four parallel petitions filed by Amazon and Google. If any are instituted, they should be limited to, at most, one institution.

## V.     CONCLUSION

For the foregoing reasons, Patent Owner respectfully requests that the Director exercise discretion to deny institution.


Date: May 12, 2025                              Respectfully submitted,

                                               /James A. Milkey/
                                               James A. Milkey, Reg. No. 79,503
                                               RUSS, AUGUST & KABAT
                                               12424 Wilshire Blvd., 12th Fl.
                                               Los Angeles, CA 90025

                                               *Counsel for Patent Owner*

---

[3] *See* https://getlatka.com/companies/virtamove (describing "[h]ow VirtaMove hit $4.3M revenue with a 9 person team in 2024").

## CERTIFICATION REGARDING WORD COUNT

Pursuant to 37 C.F.R. §42.24(d), Patent Owner certifies that there are 4,235

words in the paper excluding the portions exempted under 37 C.F.R. §42.24(a)(1).


Date: May 12, 2025

Respectfully submitted,

/James A. Milkey/
James A. Milkey, Reg. No. 79,503
RUSS, AUGUST & KABAT
12424 Wilshire Blvd., 12th Fl.
Los Angeles, CA 90025

*Counsel for Patent Owner*

## CERTIFICATE OF SERVICE (37 C.F.R. § 42.6(e))

The undersigned hereby certifies that the above document was served on April May 12, 2025 by filing this document through the Patent Trial and Appeal Case Tracking System (PTACTS) as well as delivering a copy via electronic mail upon the following attorneys of record for Petitioner:

Elisabeth H. Hunt, Reg. No. 67,336
Gregory S. Nieberg, Reg. No. 57,063
Anant K. Saraswat, Reg. No. 76,050
Wolf, Greenfield & Sacks, P.C.
600 Atlantic Avenue
Boston, MA 02210-2206
EHunt-PTAB@wolfgreenfield.com
GNieberg-PTAB@wolfgreenfield.com
ASaraswat-PTAB@wolfgreenfield.com

Date: May 12, 2025

Respectfully submitted,

/James A. Milkey/
James A. Milkey, Reg. No. 79,503
RUSS, AUGUST & KABAT
12424 Wilshire Blvd., 12th Fl.
Los Angeles, CA 90025

*Counsel for Patent Owner*

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

GOOGLE LLC,
Petitioner,

v.

VIRTAMOVE, CORP.,
Patent Owner.

Case No. IPR2025-00488
Patent No. 7,519,814

**PATENT OWNER'S REQUEST FOR DISCRETIONARY DENIAL OF INSTITUTION**

**TABLE OF CONTENTS**

I.  INTRODUCTION ..................................................................................1

II.  THE PETITION'S EXTRAORDINARY OVER-RELIANCE ON EXPERT
TESTIMONY WEIGHS AGAINST INSTITUTION. ....................................3

III.  DENIAL OF INSTITUTION UNDER §314 IS WARRANTED.....................5

A.  *Fintiv* Factor 1: There is no evidence that a second stay will be
granted. ................................................................................6

B.  *Fintiv* Factor 2: The District Court trial will likely at or before
the time for a final written decision.......................................7

C.  *Fintiv* Factor 3: The parties will have invested substantially in
the District Court case before any institution decision .........9

D.  *Fintiv* Factor 4: There is substantial overlap between this IPR
and the District Court proceeding........................................10

E.  *Fintiv* Factor 5: Petitioner is a defendant in in the District Court
litigation.............................................................................12

F.  *Fintiv* Factor 6: Other considerations weigh against institution.........13

G.  Additional considerations weigh in favor of discretionary
denial..................................................................................14

1.  No changes in the law support reconsideration of
patentability. ...........................................................15

2.  The Petition is weak and overly reliant on conclusory
expert testimony. ....................................................15

3.  Settled expectations weigh against institution..........17

H.  The balance of the *Fintiv* factors favor denial. ..................17

IV.  PARALLEL PETITIONS WEIGH AGAINST INSTITUTION. ...................17

A.  Petitioner's parallel petition is not justified in light of Patent
Owner's stipulation............................................................17

B.  Other parallel proceedings filed by Amazon justify
discretionary denial............................................................18

V.  CONCLUSION ..................................................................................19

# TABLE OF AUTHORITIES

**Cases**

*Apple Inc. v. Fintiv, Inc.*,
    IPR2020-00019, Paper No. 11 (PTAB Mar. 20, 2020)........6, 7, 9, 10, 11, 12, 13

*Apple Inc. v. Fintiv, Inc.*,
    IPR2020-00019, Paper No. 15 (PTAB May 13, 2020) ................................6, 12

*NHK Spring Co. v. Intri-Plex Techs., Inc.*,
    IPR2018-00752, Paper No. 8 (PTAB Sept. 12, 2018) ...................................6, 7

*Sand Revolution II, LLC v. Continental Intermodal Group-Trucking LLC,*
    IPR2019-01393, Paper 24 (Jun.16, 2020) ......................................................7

**Statutes**

35 U.S.C. § 101 ...........................................................................................11

35 U.S.C. § 112 ...........................................................................................11

35 U.S.C. § 314 .................................................................................2, 5, 9, 19

Appx0305

## PATENT OWNER'S EXHIBIT LIST

| No. | Description |
|---|---|
| 2001 | May 7, 2025 Transfer Order in *VirtaMove v. Google*, 24-CV-00033 (W.D. Tex.) |
| 2002 | DocketNavigator Median Time-to-Trial Statistics |
| 2003 | National Judicial Caseload Profile, *available at* https://www.uscourts.gov/sites/default/files/2025-02/fcms_na_distprofile1231.2024.pdf |
| 2004 | Petitioner Google's October 17, 2024 Invalidity Contentions |

## I.       INTRODUCTION

Pursuant to the Director's March 26, 2025 memorandum regarding Interim Processes for PTAB Workload Management ("March 26, 2025 Memo"), Patent Owner requests that the Director exercise discretion to deny institution of the Petition for numerous discretionary reasons.

**First**, under the PTAB's new guidelines, "the extent of the petition's reliance on expert testimony bear[s] on discretion to institute IPR" because "extensive reliance on expert testimony… may suggest that the questions are better resolved in an Article III Court." FAQs for Interim Processes for PTAB Workload Management, https://www.uspto.gov/patents/ptab/faqs ("Interim Processes FAQ"), at numbered item 21. Here, the Petition's reliance on expert testimony is ***extraordinary*** (spanning over 330 pages for this IPR alone, and over 600 pages of expert testimony when considered along with the parallel petition filed by Petitioner), and would render resolution of disputed issues of expert testimony impractical.

Accordingly, the extraordinary over-reliance of the Petition on expert testimony alone justifies the Board's exercise of discretion to deny institution.[1]

---

[1] Patent Owner does not mean to suggest that typical, or even extensive reliance on expert testimony should, standing alone, result in discretionary denial. However, where, as here, the over-reliance on expert testimony is particularly egregious and abusive, discretionary denial is appropriate to avoid burdening the Board and

**Second**, the *Fintiv* factors taken as a whole favor denial of institution. This case was recently transferred, and trial is likely to be set before the deadline for a final written decision. And all of the other *Fintiv* factors also either weigh strongly against institution or are neutral, including additional factors such as settled expectations (where here, the challenged patent was issued before the America Invents Act was even signed into law). Accordingly, even if the Petition's extraordinary over-reliance on expert testimony is not itself sufficient to deny institution, institution should be denied pursuant to *Fintiv* and 35 U.S.C. §314.

**Finally,** this Petition should be denied based on parallel petitions, because Google filed two Petitions challenging validity on U.S. Patent No. 7,519,814 (the "'814 patent") justified only on the basis of a potential priority dispute. But Patent Owner stipulates to not raise a priority dispute in the other parallel proceeding if this Petition is denied on discretionary grounds, thus eliminating any justification for two parallel petitions. Furthermore, there are numerous parallel petitions filed against the challenged patent (U.S. Patent No. 7,519,814, or "'814 patent"). Specifically, between Google and Amazon, there are *four* IPR Petitions filed challenging the independent claims of the '814 patent, presenting nine distinct grounds involving ten different explicitly identified references (including over a hundred different

---

Patent Owner with such an unworkably large record of expert testimony.

"shadow" references relied on to support the presented invalidity theories). To the extent the Board finds *any* of these Petitions should be instituted, Patent Owner requests that institution be limited to one Petition challenging validity of the '814 Patent, as both Google and Amazon's interests can be represented by a single Petition challenging validity (and VirtaMove would not oppose a motion for joinder if only one Petition is granted).

## II. THE PETITION'S EXTRAORDINARY OVER-RELIANCE ON EXPERT TESTIMONY WEIGHS AGAINST INSTITUTION.

The Board has indicated that "Parties are encouraged to address any factor or circumstance they believe bears on whether the Office should or should not institute trial, including reasons not discussed in current Board precedent or the Process Memorandum." Interim FAQ at numbered item 20. The Board has also indicated that "[t]he failure to provide focused expert testimony may weigh against institution."

Here, Patent Owner believes that Petitioner Google's extraordinary overreliance on expert testimony (and the manner of that expert testimony, as introducing dozens of additional prior art references into Petitioner's theories) justifies denial of institution, irrespective of any other factors.

For instance, although the Petition despite is limited to 14,000 words by regulation (of which 13,991 were used), the Petition submitted a ***335-page*** declaration spanning ***more than 64,000 words*** (excluding tables, claim listing, etc.).

This is exactly the type of over-reliance on expert testimony that the Director has indicated is ill-suited for resolution at the PTAB, because the Board should base its decision on patents and printed publications, not the written opinions of an expert who will not even testify at the hearing. (Notably, if he was allowed to simply read the entirety of opinions into the record at the hearing, that testimony alone would take more than *seven hours* based on the average human speech rate of 150 words per minute.)

As a practical matter, it is not even clear how Patent Owner can practically respond to 64,000+ words of expert testimony with a 14,000 page word limit, particularly when Petitioner reserves the right to submit an *additional* expert declaration in its reply briefing to which Patent Owner will only be permitted a 5,600-word response. The impracticality of adjudicating the credibility of extensive expert testimony in the limited and purportedly streamlined IPR proceedings are exactly why over-reliance on expert testimony at the PTAB should be highly disfavored. The PTAB, with limited opportunity for expert testimony at the hearing, is simply not well-equipped to handle detailed factual disputes between experts which are likely to rely on evaluations of witness credibility, particularly when expert testimony spans hundreds of pages and exceeds the word limit for briefing many times over.

The Petition's overreliance on expert testimony is compounded further because the expert declaration relies on a massive number of additional patents or printed publications to support the opinions set forth therein. *See generally* Ex. 1003. (The Petition submitted 146 different exhibits, the majority of which are prior art references relied upon by Dr. Bhattacharjee's declaration.) Thus, although the Petition *nominally* relies on four different references in various combinations (Schmidt, Tormasov, Calder, and Schmidt-629), the total number of alleged prior art references relied on by Petitioner's expert approaches nearly 100.

This scorched-earth approach to *inter partes* review, wherein hundreds of pages of expert testimony rely upon many dozens of alleged prior art references, should not be rewarded with institution, because it is directly contrary to the purpose of IPR proceedings were envisioned as a *streamlined and efficient* alternative to evaluating the novelty and obviousness of asserted patents. Accordingly, Patent Owner respectfully requests that the Director exercise discretion to deny institution to avoid overburdening the PTAB and Patent Owner with several hundred pages of expert testimony to evaluate.

## III. DENIAL OF INSTITUTION UNDER §314 IS WARRANTED.

35 U.S.C. § 314(a) gives the Director discretion to deny institution of IPR due to the advanced state of parallel district court litigation regarding the same issues. *See NHK Spring Co. v. Intri-Plex Techs., Inc.*, IPR2018-00752, Paper 8 at 19-21

(PTAB Sept. 12, 2018) (precedential) ("*NHK*"). The Board has set forth six factors

for determining whether discretionary denial in light of such parallel litigation is

appropriate:

1. whether the court granted a stay or evidence exists that one may be granted if a proceeding is instituted;

2. proximity of the court's trial date to the Board's projected statutory deadline for a final written decision;

3. investment in the parallel proceeding by the court and the parties;

4. overlap between issues raised in the petition and in the parallel proceeding;

5. whether the petitioner and the defendant in the parallel proceeding are the same party;

6. other circumstances that impact the Board's exercise of discretion.

*Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 11 at 5-6 (PTAB Mar. 20, 2020)

(precedential) ("*Fintiv I*"). In evaluating these factors, the Board "takes a holistic

view of whether efficiency and integrity of the system are best served by denying or

instituting review." *Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 15 at 7-17

(PTAB May 13, 2020) (informative) ("*Fintiv II*").

> **A.** **_Fintiv_ Factor 1: There is no evidence that a second stay will be granted.**

*Fintiv* Factor 1 looks to "whether the court granted a stay or evidence exists

that one may be granted if a proceeding is instituted." *Fintiv I* at 5-6.

Here, the District Court Proceeding was transferred to the Northern District

of California on May 7, 2025, after previously being filed in the Western District of

Texas (Ex. 2001). While the case was previously stayed pending transfer (Ex. 1087 at 4-5), the case has now been transferred and the stay has thus lapsed. *See* Ex. 2001 (transferring case on May 7, 2025). Because the Board ordinarily "will not attempt to predict" how a district court will proceed if a stay has not been granted (*see Sand Revolution II, LLC v. Continental Intermodal Group-Trucking LLC,* IPR2019-01393, Paper 24 at 7 (June 16, 2020) (informative)), there is no reason to suggest that the Northern District of California will issue a stay, particularly because claim construction briefing has already been concluded as discussed below. *Fintiv* Factor 1 is thus neutral.

> **B.** **_Fintiv_ Factor 2: The District Court trial will likely at or before the time for a final written decision.**

*Fintiv* Factor 2 looks to "proximity of the court's trial date to the Board's projected statutory deadline for a final written decision." *Fintiv I* at 5-6. "If the court's trial date is earlier than the projected statutory deadline, the Board generally has weighed this fact in favor of exercising authority to deny institution under *NHK*." *Id.* at 9.

Here, because the case has only just transferred to the Northern District of California, there is no set trial date. Because claim construction briefing was already completed while the case was pending in the Western District of Texas, the case is approximately halfway to trial. And the five-year average of median time-to-trial from original filing for patent cases in the Northern District of California, excluding

cases with stays, is 18 months. *See* Ex. 2002 (Docket Navigator median time-to-trial statistics for the Northern District of California, from May 2020 to present).[2]

Given that the time to trial will be reduced significantly due to the prior completion of claim construction briefing, trial can be set for 9-12 months from the May 7 transfer date. And even at the higher end of that range (12 months time-to-trial from transfer), the trial date would occur approximately ***four months*** before the due date for a final written decision.

Accordingly, *Fintiv* factor 2 strongly weighs against institution.

---

[2] Petitioner's time-to-trial statistics are unreliable because they involve ***all*** civil cases, not patent cases, and because there is wide variance in time-to-trial from year to year. *See, e.g.*, 2003 at 66 (showing that the median time-to-trial for all civil cases dropped to 34.5 months for the 12-month period ending December 31, 2024, in contrast to Petitioner's statistics showing a significantly longer 47.9 month time-to-trial for the 12-month period ending September 30, 2024 (*see* Ex. 1082 at 66). The significant variance in Petitioner's statistics evidences the need to rely on more than a 12-month period, which is why Patent Owner presents a 5-year median that relates solely to patent cases. And only non-stayed cases are included, because if the case *were* hypothetically stayed pending IPR, then its time-to-trial is not relevant.

### C. *Fintiv* Factor 3: The parties will have invested substantially in the District Court case before any institution decision

*Fintiv* Factor 3 looks to "amount and type of work already completed in the parallel litigation by the court and the parties ***at the time of the institution decision***." *Fintiv I* at 9 (emphasis added). For example, "if, at the time of the institution decision, the district court has issued substantive orders related to the patent at issue in the petition," this factor favors denial. *Id.* at 9-10. "Likewise, district court claim construction orders may indicate that the court and parties have invested sufficient time in the parallel proceeding to favor denial." *Id.* at 10.

Here, an institution decision would be due by September 10, 2025. *See* 35 U.S.C. § 314(b). Prior to the deadline for an institution decision, the parties will have invested significant resources in the parallel District Court Proceeding. For example, the parties have already served extensive infringement and invalidity contentions, and fully briefed and already had a hearing on claim construction. And although the case was only transferred on May 7, 2025 (three business days before filing of this brief), there will have been four months of additional activity by September 10, 2025. Under a typical schedule, a claim construction order will have issued, the parties will have nearly completed fact discovery, and the parties will be preparing opening expert reports by the expected date of an institution decision.

Accordingly, *Fintiv* Factor 3 weighs in favor of discretionary denial.

**D.** *Fintiv* **Factor 4: There is substantial overlap between this IPR and the District Court proceeding.**

*Fintiv* Factor 4 looks to "whether all or some of the claims challenged in the petition are also at issue in district court" and whether the "petition includes the same or substantially the same claims, grounds, arguments, and evidence" as the parallel district court case. *Fintiv I* at 12-13. In short, this factor evaluates "concerns of inefficiency and the possibility of conflicting decisions" when substantially identical prior art is submitted in both the district court and the IPR proceeding. *Id.* at 12. Here, the challenged claims cover all asserted claims, and the prior art relied upon in the Petition and at the District Court is substantially overlapping (with the prior art relied upon in the District Court being far more expansive than the prior art relied upon in the Petition).

First, the Petition challenges claims 1–34, covering all claims that are asserted in the District Court Proceeding. *See* Ex. 1078 (VirtaMove's July 12, 2024 Supplemental Infringement Contentions) at 1 (showing claims 1, 2, 4, 6, 9, 10, 13, and 14 are asserted). And if institution is denied, Patent Owner stipulates that it will not assert against Google any claims of the '814 patent other than those already asserted against Google.

Second, there is substantial overlap between the prior art arguments presented in the Petition and arguments advanced by Petitioner in the District Court litigation. For example, Petitioner's invalidity contentions in the District Court litigation assert

that the *same* Schmidt-479, Tormasov, Calder, and Schmidt-629 references relied upon in the Petition allegedly anticipate or render obvious claims of the '814 patent. *Compare* Petition at 1 *with* Ex. 2004 (Google's Supplemental Invalidity Contentions) at 8.

Moreover, Petitioner's District Court invalidity contentions are even *more* expansive than the invalidity arguments set forth in the Petition. For example, Petitioner's District Court invalidity contentions assert that the '814 patent is anticipated or rendered obvious in view of 10 total prior art patents and applications, 6 non-patent literatures, and 5 prior art systems. *See* Ex. 2004 at 8-14. Petitioner's District Court invalidity contentions further assert that the '814 patent claims are invalid under 35 U.S.C. 101 and 112. *Id*. at 44-45, 54-60.

Accordingly, Petitioner's contentions are even more expansive than the prior art arguments made in the Petition. This raises "concerns of inefficiency and the possibility of conflicting decisions" (*Fintiv I* at 12), as the District Court will likely decide the validity of the '814 patent claims months prior to any Final Written Decision, based on substantially similar (and indeed far more expansive) invalidity arguments.

Furthermore, Petitioner has offered *no* stipulation to mitigate concerns of inefficiency and conflicting decisions; in fact, Petitioner reserves the right to supplement its invalidity contentions as discovery progresses. Accordingly,

Petitioner will be able to pursue all of the same invalidity theories before the PTAB and the District Court, including any number of additional theories based on additional art, compounding the inefficiency introduced by Petitioner's extensive overreliance on expert testimony and shadow prior art references.

Petitioner would *also* be free to pursue subsequent *ex parte* reexamination petitions on grounds that could have been raised in the Petition. Thus, if the Board were to institute, Petitioner would be able to serially challenge the validity of the '814 Patent in this proceeding, in the District Court Proceeding, and in an *ex parte* reexamination proceeding. This is the exact opposite of the efficiency contemplated when the America Invents Act introduced the *inter partes* review process as a more efficient and streamlined alternative to other invalidity challenges.

Thus, *Fintiv* Factor 4 weighs **strongly** in favor of discretionary denial.

### E.      *Fintiv* **Factor 5: Petitioner is a defendant in in the District Court litigation.**

*Fintiv* Factor 5 looks to "whether the petitioner and the defendant in the parallel proceeding are the same party." *Fintiv I* at 5-6. Specifically, when "the petitioner and the defendant in the parallel proceeding are the same party, this factor weighs in favor of discretionary denial." *Fintiv II* at 15. Here, the Petitioner is a defendant in the parallel litigation.

Thus, *Fintiv* Factor 5 weighs in favor of discretionary denial.

**F.** ***Fintiv* Factor 6: Other considerations weigh against institution.**

*Fintiv* Factor 6 looks to "other circumstances that impact the Board's exercise of discretion, including the merits." *Fintiv I* at 5-6. This factor also weighs heavily against institution for at least three reasons.

First, Petitioner waited nearly an entire year to file its Petition, thus making it extremely likely that even with a stay pending transfer (which has since been lifted), that the validity of the '814 patent claims will be decided in the District Court months prior to any Final Written Decision in these proceedings.

Second, contrary to Petitioner's assertions, the Petition fails to present any compelling merits of unpatentability. The Petition does not even ***allege*** any anticipatory prior art under §102. Instead, the Petition relies solely on obvious combinations under §103 (relying on over 330 pages of expert testimony). Petition at *passim*; Ex. 1003 (Bhattacharjee Decl.). Thus, the Petition only serves to highlight the novelty of the challenged claims, and the web of repurposed §103 prior art presented in the Petition and expert declaration (including many dozens of shadow references) fails to render the challenged claims obvious for reasons that Patent Owner will highlight in its POPR merit-based briefing, including the fact that numerous claim limitations are not disclosed by ***any*** of the alleged combination references.

Third, as discussed further below, "additional considerations" (as outlined in

the Director's March 26, 2025 Interim Processes for PTAB Workload Management) weigh **strongly** in favor of discretionary denial, including the Petition's extraordinary over-reliance on expert testimony to gap-fill holes in the prior art, as well as the length of time the challenged claims have been in effect.

## G. Additional considerations weigh in favor of discretionary denial.

In addition to the above factors, as explained in the March 26, 2025 Interim Processes for PTAB Workload Management, additional relevant considerations may weigh in favor of discretionary denial, including:

- Whether the PTAB or another forum has already adjudicated the validity or patentability of the challenged patent claims;

- Whether there have been changes in the law or new judicial precedent issued since issuance of the claims that may affect patentability;

- The strength of the unpatentability challenge;

- The extent of the petition's reliance on expert testimony;

- Settled expectations of the parties, such as the length of time the claims have been in force;

- Compelling economic, public health, or national security interests; and

- Any other considerations bearing on the Director's discretion.

Here, as discussed further below: 1) no changes in the law support reconsideration of validity of the '814 patent claims; 2) the Petition is weak and is overly reliant on conclusory expert testimony; and 3) the claims have been in effect for nearly 15 years.

1. **No changes in the law support reconsideration of patentability.**

First, no changes in the law support reconsideration of the validity of the '814 patent claims, and Petitioner does not identify any such change.

2. **The Petition is weak and overly reliant on conclusory expert testimony.**

Second, the Petition is particularly weak and overly reliant on unreliable expert testimony to gap-fill holes in the prior art. For example, as discussed in the Interim Processes FAQ, "[w]hile the Board may consider expert testimony, as a matter of efficiency, extensive reliance on expert testimony and/or reasonable disputes between experts on dispositive issues may suggest that the questions are better resolved in an Article III court." Interim Processes FAQ at numbered item 21. Thus, a "failure to provide focused expert testimony may weigh against institution." *Id*.

As discussed above, the Petition relies on ***over 330 pages*** of expert testimony in an attempt to combine up to four different enumerated combination references (and dozens upon dozens of additional "shadow" references) to support the Petition's invalidity grounds. *See generally* Ex. 1003. This over-reliance on expert testimony to overcome deficiencies in the prior art is an additional relevant consideration weighing against institution.

By way of one specific example of the weakness of the Petition, in support of the Petition's proposed Ground 1 combination, the Petition proposes that the system would include "several different operating systems" despite no teaching in any of the combination references that this would be the case. *See* Pet. 13-14 (citing Bhattacharjee, Ex. 1003 at ¶¶94-107). Over the ***fourteen*** paragraphs of expert testimony cited in support of this proposition alleged in a single paragraph of the Petition, Petitioner's expert cites to ***fifteen*** different non-combination references in support of a feature not disclosed in the combination art itself. *See* Ex. 1003 ¶¶94-107 (citing each of Exs. 1012, 1016, 1017, 1020, 1027, 1049, 1051, 1053, 1054, 1057, 1058, 1066, 1068, 1071, and 1093).

Of course, none of this extensive reliance on expert testimony and shadow prior art references would have been necessary if the references relied on by Petitioner actually disclosed the purportedly "obvious" aspect alleged by Petitioner, and Petitioner's *extraordinary* over-reliance on expert testimony evidences the weakness of the Petition's representations.

Accordingly, the Petition's extreme overreliance on expert testimony to fill gaps in the prior art weighs strongly against institution. This is particularly true here, when issues of credibility regarding extensive disputes between experts are better resolved by a jury.

3.    **Settled expectations weigh against institution.**

The '814 Patent issued in 2010 (before the America Invents Act was even signed into law), and has been in effect for nearly ***fifteen years***. When the patent issued, VirtaMove was not even aware of the possibility of an IPR challenge. Accordingly, the settled expectations of VirtaMove of being able to adjudicate its patent claims before an Article III Court weigh against institution.

H.    **The balance of the *Fintiv* factors favor denial.**

In sum, all six *Fintiv* Factors weigh in favor of discretionary denial. Furthermore, additional relevant considerations further weigh in favor of discretionary denial. Thus, considered as a whole, the relevant facts all weigh in favor of exercising discretionary denial.

## IV.    PARALLEL PETITIONS WEIGH AGAINST INSTITUTION.

A.    **Petitioner's parallel petition is not justified in light of Patent Owner's stipulation.**

Petitioner Google filed two separate IPRs challenging the same claims of the '814 Patent (this Petition and one in IPR2025-00487). Google's only plausible justification for doing so is on the basis of a "Potential Priority Dispute" regarding the art presented in IPR2025-00487. Paper 3 at 4-5 (identifying only "[t]he potential priority dispute between the parties" as "justif[ying] institution of two petitions").

However, if the instant Petition is denied on discretionary grounds and IPR2025-00487 is instituted, Patent Owner stipulates that it will not contest the prior

art status of the combination references relied on in IPR2025-00487 for purposes of that proceeding.[3] Accordingly, there is no need to institute both IPR proceedings on the basis of a potential priority dispute, and institution of the instant petition should be denied on that basis alone.

## B.  Other parallel proceedings filed by Amazon justify discretionary denial.

The Board has indicated that "[a]ny other considerations bearing on the Director's discretion" may be briefed. Here, the Board should exercise its discretion because of the extraordinary power imbalance between tech giants Google (Petitioner in this and one other IPR challenging the '814 patent) and Amazon (another petitioner in two other IPRs challenging the '814 patent).

Between the two Google IPRs alone, Google has submitted over 600 pages of expert testimony attacking the validity of the '814 patent. When combined with the fact that tech giant Amazon filed an *additional* two IPRs on the '814 Patent within a day of Google's filings (*see Amazon.co, Inc. v. VirtaMove Corp.*, Nos. IPR2025-00563 and IPR2025-00566), accompanied by hundreds of additional pages of expert testimony regarding invalidity (*see* Ex. 1002 to each of Amazon's IPRs), there appears to be a coordinated attempt by technology giants with a combined several

---

[3] Patent Owner reserves all rights to argue that any art is not prior art in any other proceeding, including any district court proceeding.

trillion dollars of market capitalization to overwhelm relatively small VirtaMove[4] in litigation expenses, separate and aside from the typical costs of litigating a patent case in a district court proceeding.

Given the nature of the seemingly coordinated attack on the validity of the '814 patent, the Board should exercise its discretion to avoid institution of the four parallel petitions filed by Amazon and Google. If any are instituted, they should be limited to, at most, one institution.

## V. CONCLUSION

For the foregoing reasons, Patent Owner respectfully requests that the Director exercise discretion to deny institution.


Date: May 12, 2025

Respectfully submitted,

/James A. Milkey/
James A. Milkey, Reg. No. 79,503
RUSS, AUGUST & KABAT
12424 Wilshire Blvd., 12th Fl.
Los Angeles, CA 90025

*Counsel for Patent Owner*

---

[4] *See* https://getlatka.com/companies/virtamove (describing "[h]ow VirtaMove hit $4.3M revenue with a 9 person team in 2024").

# CERTIFICATION REGARDING WORD COUNT

Pursuant to 37 C.F.R. §42.24(d), Patent Owner certifies that there are 4,174

words in the paper excluding the portions exempted under 37 C.F.R. §42.24(a)(1).

Date: May 12, 2025

Respectfully submitted,

/James A. Milkey/
James A. Milkey, Reg. No. 79,503
RUSS, AUGUST & KABAT
12424 Wilshire Blvd., 12th Fl.
Los Angeles, CA 90025

*Counsel for Patent Owner*

## CERTIFICATE OF SERVICE (37 C.F.R. § 42.6(e))

The undersigned hereby certifies that the above document was served on April

May 12, 2025 by filing this document through the Patent Trial and Appeal Case

Tracking System (PTACTS) as well as delivering a copy via electronic mail upon

the following attorneys of record for Petitioner:

Elisabeth H. Hunt, Reg. No. 67,336
Gregory S. Nieberg, Reg. No. 57,063
Anant K. Saraswat, Reg. No. 76,050
Wolf, Greenfield & Sacks, P.C.
600 Atlantic Avenue
Boston, MA 02210-2206
EHunt-PTAB@wolfgreenfield.com
GNieberg-PTAB@wolfgreenfield.com
ASaraswat-PTAB@wolfgreenfield.com

Date: May 12, 2025

Respectfully submitted,

/James A. Milkey/
James A. Milkey, Reg. No. 79,503
RUSS, AUGUST & KABAT
12424 Wilshire Blvd., 12th Fl.
Los Angeles, CA 90025

*Counsel for Patent Owner*

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

GOOGLE LLC,
Petitioner,

v.

VIRTAMOVE, CORP.,
Patent Owner.

_____

Case No. IPR2025-00487
Patent No. 7,519,814

**PETITIONER'S OPPOSITION TO PATENT OWNER'S REQUEST FOR
DISCRETIONARY DENIAL OF INSTITUTION**

# TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................1

II.  DISCRETIONARY DENIAL IS NOT WARRANTED UNDER
     *FINTIV* ...............................................................................................3

     A.  Factor 1 (Stay Potential) Weighs Against Denial Because NDCA
         Commonly Stays Litigation Once IPR Is Instituted..................................5

     B.  Factor 2 (Timing of Trial and FWD) Weighs Heavily Against
         Denial Because No Trial Date Has Been Set and Any Trial Date
         Will Be After FWD ...................................................................................6

         1.  No trial date has been scheduled........................................................6

         2.  NDCA's median time-to-trial statistics for civil actions ....................7

         3.  Schedules in cases transferred into NDCA at a similar stage
             reinforce that a trial is unlikely to take place before FWD..................9

         4.  VirtaMove's statistics here are not a reliable indicator of what
             trial date will be scheduled in VirtaMove's litigation against
             Google ..............................................................................................10

         5.  NDCA is the correct venue to consider under *Fintiv*........................12

         6.  Factor 2 conclusion ..........................................................................13

     C.  Factor 3 (Litigation Investment) Weighs Against Discretionary
         Denial........................................................................................................14

     D.  Factor 4 (Issue Overlap) Weighs Against Discretionary Denial...............15

     E.  Factor 5 (Litigation Defendant) Weighs Against Discretionary
         Denial........................................................................................................21

     F.  Factor 6 (Other Circumstances: Strong Merits) ......................................22

III. GOOGLE'S PARALLEL PETITION AND AMAZON'S
     INDEPENDENT PETITIONS DO NOT SUPPORT
     DISCRETIONARY DENIAL .................................................................24

     A.  Google's Second-Ranked '814 Petition Provides No Basis to
         Discretionarily Deny This Petition, Which Google Ranked First.............25

     B.  Amazon's Independently-Filed Petitions Do Not Weigh Against
         Institution of Google's Petitions.............................................................26

IV.  NONE OF THE OTHER CONSIDERATIONS LISTED IN THE DIRECTOR'S INTERIM MEMORANDUM SUPPORT DISCRETIONARY DENIAL ........................................................31

  A.  The Petition Does Not Over-Rely on Expert Testimony ..........................31

    1.  The Petition does not inappropriately rely on Dr. Bhattacharjee's testimony ..............................................32

    2.  VirtaMove does not substantiate any alleged inappropriate reliance on Dr. Bhattacharjee's testimony ........................................33

    3.  VirtaMove's single example fails to show extensive reliance on expert testimony rather than on the prior art..........................................39

  B.  No Other Forum Has Already Adjudicated the Validity or Patentability of the Challenged Patent Claims, Which Weighs Against Discretionary Denial ..................................................45

  C.  No Settled Expectation of the Parties Supports Discretionary Denial......45

  D.  Compelling Economic Interests Weigh Against Discretionary Denial.......................................................................47

V.  CONCLUSION: A HOLISTIC ASSESSMENT OF ALL DISCRETIONARY FACTORS WEIGHS STRONGLY AGAINST DENIAL..................................................................48

# TABLE OF AUTHORITIES

**CASES**

*Amazon.com, Inc. v. NL Giken Inc.*,
IPR2025-00250, Paper 14 (PTAB May 16, 2025) ................................................48

*Apple Inc. v. Fintiv, Inc.*,
IPR2020-00019, Paper 11 (PTAB Mar. 20, 2020) ...................................... passim

*Apple, Inc. v. Fintiv, Inc.*,
IPR2020-00019, Paper 15 (PTAB May 13, 2020) ...............................................21

*Ariosa Diagnostics v. Verinata Health, Inc.*,
805 F.3d 1359 (Fed. Cir. 2015) ........................................................................44

*B/E Aerospace, Inc. v. Mag Aerospace Indus., LLC*,
IPR2014-01510, Paper 24 (PTAB Mar. 26, 2015) ...........................................36

*BioNTech SE v. ModernaTX, Inc.*,
IPR2023-01359, Paper 20 (PTAB Mar. 19, 2024) ............................................24

*Bio-Rad Labs., Inc. v. Cal. Inst. of Tech.*,
IPR2024-01451, Paper 11 (PTAB Mar. 27, 2025) ............................................14

*BMW of N. Am., LLC v. Michigan Motor Techs., LLC*,
IPR2023-01224, Paper 15 (PTAB Feb. 15, 2024) ...............................................7

*Canon USA, Inc. v. Slingshot Printing LLC*,
IPR2022-01541, Paper 7 (PTAB May. 22, 2023) ...............................................37

*Charter Commncs., Inc. v. Adaptive Spectrum & Signal Alignment, Inc.*,
IPR2025-00087, Paper 14 (PTAB May 5, 2025) ..................................................8

*CrowdStrike, Inc. v. Open Text Inc.*,
IPR2023-00124, Paper 11 (PTAB June 15, 2023) .............................................22

*Cuozzo Speed Techs., LLC v. Lee*,
579 U.S. 261 (2016) ...........................................................................................47

*Ericsson Inc. v. Active Wireless Techs. LLC*,
IPR2024-00985, Paper 11 (PTAB Dec. 12, 2024) .............................................24

*Ford Motor Co. v. Neo Wireless, LLC*,
   IPR2023-00763, Paper 28 (PTAB Mar. 22, 2024)..................................................27

*Freewheel Media, Inc. v. Intent IQ, LLC*,
   IPR2024-00419, Paper 9 (PTAB Sept. 4, 2024) ..................................................37

*General Plastic Indus. Co. v. Canon Kabushiki Kaisha*,
   IPR2016-01357, Paper 19 (PTAB Sept. 6, 2017) ......................................... 26, 30

*GREE, Inc. v. Supercell Oy*,
   2020 WL 6731050 (E.D. Tex. Aug. 14, 2020).....................................................19

*Hanwha Solutions Corp. v. Rec Solar Pte. Ltd.*,
   IPR2021-00988, Paper 12 (PTAB Dec. 13, 2021)................................................25

*HP Inc. v. Universal Connectivity Techs., Inc.*,
   IPR2024-01429, Paper 11 (PTAB Apr. 16, 2025) ..................................................8

*IXI IP, LLC v. Samsung Elec. Co.*,
   903 F.3d 1257 (Fed. Cir. 2018) ..........................................................................44

*Liberty Energy, Inc. v. U.S. Well Servs., LLC*,
   IPR2025-00031, Paper 9 (PTAB Apr. 29, 2025) ...................................................8

*Markforged Inc. v. Continuous Composites Inc.*,
   IPR2022-00679, Paper 7 (PTAB Oct. 25, 2022.).................................... 16, 21, 22

*Nat'l Beef Packing Co., LLC v. Inst. For Envtl. Health, Inc.*,
   IPR2024-00186, Paper 8 (PTAB Jan. 13, 2025)..................................................35

*Nokia of Am. Corp. v. Soto*,
   IPR2023-00680, Paper 30 (PTAB Dec. 3, 2024)..................................................21

*Palo Alto Networks, Inc. v. Centripetal Networks*,
   IPR2021-01149, Paper 10 (PTAB Feb. 22, 2022) ...............................................16

*Pisony v. Commando Constructions, Inc.*,
   2020 WL 4934463 (W.D. Tex. Aug. 24, 2020) ...................................................19

*PLR Worldwide Sales Ltd., v. Flip Phone Games, Inc.*,
   IPR2024-00209, Paper 28 (PTAB Apr. 24, 2025)................................................44

*Protect Animals With Satellites LLC v. OnPoint Sys., LLC,*
 IPR2021-01483, Paper 11 (PTAB Mar. 4, 2022)....................................................14

*Purdue Pharma L.P. v. Collegium Pharm., Inc.,*
 86 F.4th 1338 (Fed. Cir. 2023) .........................................................................20

*Regents of Univ. of Michigan v. Novartis Pharms. Corp.,*
 2023 WL 6795971 (N.D. Cal. Oct. 12, 2023) ...........................................5

*Samsung Elecs. Co. v. Hardin,*
 IPR2022-01333, Paper 13 (PTAB Feb. 7, 2023) ................................................25

*SAP Am. Inc. v. Cyandia, Inc.,*
 IPR2024-01433, Paper 13 (PTAB Apr. 7, 2025) ................................................24

*Shenzen Root Tech. Co., Ltd. v. Chiaro Tech. Ltd.,*
 IPR2024-01296, Paper 9 (PTAB Feb. 25, 2025) ................................................21

*SNF SA v. Chevron USA Inc.,*
 IPR2022-01534, Paper 12 (PTAB Apr. 19, 2023) ..............................................37

*Solus Advanced Materials Co., Ltd. v. SK Nexilis Co., Ltd.,*
 IPR2024-01463, Paper 14 (PTAB Apr. 25, 2025) ..............................................18

*Sotera Wireless, Inc. v. Masimo Corp.,*
 IPR2020-01019, Paper 12 (PTAB Dec. 1, 2020)......................................... 17, 18

*Tesla, Inc. v. Charge Fusion Techs., LLC,*
 IPR2025-00032, Paper 11 (PTAB May 19, 2025)................................. 33, 38, 39

*Thryv, Inc. v. Click-To-Call Techs., LP,*
 590 U.S. 45 (2020) .........................................................................................46

*Twitch Interactive, Inc. v. Razdog Holdings LLC,*
 IPR2025-00307, Paper 18 (PTAB May 16, 2025)....................................... passim

*Valve Corp. v. Elec. Scripting Prods., Inc.,*
 IPR2019-00062, Paper 11 (PTAB Apr. 2, 2019) ................................. 26, 27, 30

*Videndum Prod. v. Rotolight,*
 IPR2023-01218, Paper 12 (PTAB Apr. 19, 2024) ................................. 26, 27, 30

– v –

*Wasica Finance GmbH v. Continental Auto Sys.*,
   853 F.3d 1272 (Fed. Cir. 2017) ................................................................35

*Zomm, LLC v. Apple Inc.*,
   391 F. Supp. 3d 946 (N.D. Cal. 2019)..................................................5

**STATUTES**

35 U.S.C. §315(e)(1).............................................................................17

35 U.S.C. §315(e)(2)...................................................................... 17, 18

**REGULATIONS**

37 C.F.R. §42.53 ....................................................................................39

37 C.F.R. §42.6(a)(3) .............................................................................41

37 C.F.R. §42.65(a)................................................................................44

**OTHER AUTHORITIES**

FAQs for Interim Processes for PTAB Workload Management.......... 32, 34, 38, 42

Interim Processes for PTAB Workload Management (Mar. 26, 2025)........... passim

# LISTING OF EXHIBITS

| Exhibit | Description |
| --- | --- |
| 1001 | U.S. Patent No. 7,519,814 ("'814 patent") |
| 1002 | Prosecution History of U.S. Patent No. 7,519,814 |
| 1003 | Declaration of Samrat Bhattacharjee, Ph.D. ("Bhattacharjee") |
| 1004 | Curriculum Vitae of Samrat Bhattacharjee, Ph.D. |
| 1005 | U.S. Patent No. 7,117,495 ("Blaser") |
| 1006 | U.S. Patent Application Publication No. 20020066022 ("Calder") |
| 1007 | U.S. Patent No. 6,931,449 ("Schmidt-449") |
| 1008 | U.S. Patent Application Publication No. 20020095479 ("Schmidt-479") |
| 1009 | U.S. Patent Application Publication No. 20020133529 ("Schmidt-529") |
| 1010 | U.S. Patent Application Publication No. 20020124072 ("Tormasov") |
| 1011 | U.S. Patent Application Publication No. 20010009425 |
| 1012 | U.S. Patent Application Publication No. 20010018708 |
| 1013 | U.S. Patent Application Publication No. 20010047472 |
| 1014 | U.S. Patent Application Publication No. 20010056572 |
| 1015 | U.S. Patent Application Publication No. 20010029605 |
| 1016 | U.S. Patent Application Publication No. 20020023158 |
| 1017 | U.S. Patent Application Publication No. 20020052727 |
| 1018 | U.S. Patent Application Publication No. 20020143795 |
| 1019 | U.S. Patent Application Publication No. 20020156612 |
| 1020 | U.S. Patent Application Publication No. 20020156877 |
| 1021 | U.S. Patent Application Publication No. 20020174215 |
| 1022 | U.S. Patent Application Publication No. 20020188718 |
| 1023 | U.S. Patent Application Publication No. 20020194394 |
| 1024 | U.S. Patent Application Publication No. 20020194488 |
| 1025 | U.S. Patent Application Publication No. 20030009408 |
| 1026 | U.S. Patent Application Publication No. 20030014381 |

| Exhibit | Description |
|---|---|
| 1027 | U.S. Patent Application Publication No. 20030014466 |
| 1028 | U.S. Patent Application Publication No. 20030018717 |
| 1029 | U.S. Patent Application Publication No. 20030023839 |
| 1030 | U.S. Patent Application Publication No. 20030041173 |
| 1031 | U.S. Patent Application Publication No. 20030093688 |
| 1032 | U.S. Patent Application Publication No. 20030097464 |
| 1033 | U.S. Patent No. 6,467,052 |
| 1034 | U.S. Patent Application Publication No. 20030140179 |
| 1035 | U.S. Patent Application Publication No. 20030154221 |
| 1036 | U.S. Patent No. 7,159,184 |
| 1037 | U.S. Patent No. 7,103,745 |
| 1038 | U.S. Patent No. 6,263,440 |
| 1039 | U.S. Patent Application Publication No. 20040190534 |
| 1040 | U.S. Patent No. 7,356,771 |
| 1041 | U.S. Patent No. 5,903,753 |
| 1042 | U.S. Patent No. 4,685,125 |
| 1043 | U.S. Patent No. 5,406,644 |
| 1044 | U.S. Patent No. 5,421,009 |
| 1045 | U.S. Patent No. 5,568,630 |
| 1046 | U.S. Patent No. 5,640,562 |
| 1047 | U.S. Patent No. 5,657,221 |
| 1048 | U.S. Patent No. 5,675,831 |
| 1049 | U.S. Patent No. 5,742,829 |
| 1050 | U.S. Patent No. 4,742,450 |
| 1051 | U.S. Patent No. 5,761,669 |
| 1052 | U.S. Patent No. 5,784,555 |
| 1053 | U.S. Patent No. 5,835,765 |

| Exhibit | Description |
|---|---|
| 1054 | U.S. Patent No. 6,044,465 |
| 1055 | U.S. Patent No. 6,122,744 |
| 1056 | U.S. Patent No. 6,195,650 |
| 1057 | U.S. Patent No. 6,321,323 |
| 1058 | U.S. Patent No. 6,363,409 |
| 1059 | U.S. Patent No. 6,453,470 |
| 1060 | U.S. Patent No. 6,567,767 |
| 1061 | U.S. Patent No. 6,732,359 |
| 1062 | U.S. Patent No. 6,874,148 |
| 1063 | U.S. Patent No. 6,985,937 |
| 1064 | U.S. Patent No. 7,140,015 |
| 1065 | U.S. Patent No. 7,185,192 |
| 1066 | U.S. Patent No. 7,454,440 |
| 1067 | U.S. Patent No. 8,209,680 |
| 1068 | U.S. Patent No. 5,926,636 |
| 1069 | U.S. Patent No. 5,218,530 |
| 1070 | U.S. Patent No. 6,134,593 |
| 1071 | U.S. Patent No. 6,918,038 |
| 1072 | U.S. Patent Application Publication No. 20040034623 |
| 1073 | U.S. Patent No. 7,461,148 |
| 1074 | U.S. Patent No. 7,136,800 |
| 1075 | PCT Application Publication No. WO2002056156 |
| 1076 | Kamp et al., "Jails: Confining the omnipotent root," Proceedings of the 2nd International SANE Conference (Vol. 43, p. 116) (2000) |
| 1077 | Prevelakis et al., "Sandboxing Applications," USENIX Annual Technical Conference, FREENIX Track (pp. 119-126) (2001) |
| 1078 | Plaintiff VirtaMove Corp.'s Supplemental Preliminary Disclosure of Asserted Claims and Infringement Contentions, in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (Sept. 06, 2024) |

| Exhibit | Description |
|---|---|
| 1079 | Chart re: '814 Patent accompanying Plaintiff VirtaMove Corp.'s Supplemental Preliminary Disclosure of Asserted Claims and Infringement Contentions, in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (Sept. 6, 2024) |
| 1080 | First Amended Complaint for Patent Infringement Against Google LLC in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (May 21, 2024) |
| 1081 | Scheduling Order in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (June 17, 2024) (ECF 34) |
| 1082 | Federal Court Management Statistics–Profiles, U.S. District Courts–Combined Civil and Criminal (September 2024) |
| 1083 | U.S. Patent Application Publication No. 20020095500 ("Schmidt-500") |
| 1084 | U.S. Patent Application Publication No. 20050169073 |
| 1085 | U.S. Provisional Application No. 60/533,388 |
| 1086 | U.S. Patent No. 5,412,808 |
| 1087 | Order Granting Defendant Google LLC's Motion to Transfer Venue to the Northern District of California in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (Jan. 22, 2025) |
| 1088 | Microsoft's Computer Dictionary (5th ed. 2002) (excerpt) |
| 1089 | U.S. Patent No. 6,381,742 |
| 1090 | U.S. Patent Application Publication No. 20030035430 |
| 1091 | U.S. Patent No. 6,477,624 |
| 1092 | U.S. Patent No. 5,931,947 |
| 1093 | U.S. Patent No. 6,148,335 |
| 1094 | U.S. Patent No. 6,944,790 |
| 1095 | U.S. Patent No. 6,014,135 |
| 1096 | U.S. Patent No. 6,282,660 |
| 1097 | U.S. Patent Application Publication No. 20040153709 |
| 1098 | U.S. Patent Application Publication No. 20050050389 |
| 1099 | U.S. Patent Application Publication No. 20040225952 |

| Exhibit | Description |
| --- | --- |
| 1100 | Google LLC's Proposed Claim Terms for Construction in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (Oct. 1, 2024) |
| 1101 | Plaintiff's Disclosure of Proposed Claim Constructions in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (Oct. 1, 2024) |
| 1102 | Google LLC's Opening Claim Construction Brief in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (Oct. 24, 2024) |
| 1103 | Plaintiff's Responsive Claim Construction Brief in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (Nov. 12, 2024) |
| 1104 | Google LLC's Reply Claim Construction Brief in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (Nov. 26, 2024) |
| 1105 | Plaintiff's Sur-Reply Claim Construction Brief in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (Dec. 13, 2024) |
| 1106 | Joint Claim Construction Statement in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (Dec. 18, 2024) |
| 1107 | U.S. Provisional Application No. 60/502,619 |
| 1108 | U.S. Patent Application Publication No. 20050188268 |
| 1109 | U.S. Patent Application Publication No. 20020140743 |
| 1110 | U.S. Patent Application Publication No. 20020143906 ("Tormasov-906") |
| 1111 | U.S. Patent No. 7,076,633 ("Tormasov-633") |
| 1112 | U.S. Patent Application Publication No. 20060089950 ("Tormasov-950") |
| 1113 | U.S. Patent No. 7,222,132 ("Tormasov-132") |
| 1114 | U.S. Patent Application Publication No. 20020147815 ("Tormasov-815") |
| 1115 | U.S. Patent No. 7,209,973 ("Tormasov-973") |
| 1116 | U.S. Patent Application Publication No. 20020138629 ("Schmidt-629") |
| 1117 | U.S. Patent No. 6,944,860 ("Schmidt-860") |
| 1118 | U.S. Patent Application Publication No. 20020174265 ("Schmidt-265") |

| Exhibit | Description |
|---|---|
| 1119 | U.S. Patent Application Publication No. 20020116659 ("Tormasov-659") |
| 1120 | Bach, Maurice. 1987. Design of the Unix Operating System by Marice J Bach, 1 edition (Feb. 27, 1987) Prentice Hall; ISBN: 0132017997. |
| 1121 | Crowley, Charles. 1997. Operating Systems: a design-oriented approach. Irwin. 1997. ISBN 0-256-15151-2. |
| 1122 | Eckel, George and Chris Hare. 1995. Building a Linux Internet Server, Chris Hare", G. Eckel, New Riders Publishing; ISBN: 1562055259. |
| 1123 | RESERVED |
| 1124 | RESERVED |
| 1125 | RESERVED |
| 1126 | RESERVED |
| 1127 | U.S. Patent No. 6,854,009 |
| 1128 | U.S. Patent No. 7,080,356 |
| 1129 | U.S. Patent No. 5,870,539 |
| 1130 | U.S. Patent No. 6,883,028 |
| 1131 | U.S. Patent No. 7,209,959 |
| 1132 | U.S. Patent Application Publication No. 20020065835 |
| 1133 | The Wayback Machine archive of USENIX Association – Home Page (2001-11-14) |
| 1134 | The Wayback Machine archive of USENIX – Publications – Proceedings (2001-11-15) |
| 1135 | The Wayback Machine archive of USENIX – 2001 USENIX Annual Technical Conference (2001-11-11) |
| 1136 | The Wayback Machine archive of USENIX – 2001 USENIX Annual Technical Conference (2001-11-11) |
| 1137 | The Wayback Machine archive of 2001 FREENIX Track Technical Program – Abstract (2002-01-12) |
| 1138 | The Wayback Machine archive of "Sandboxing Applications" (2003-03-29) |

| Exhibit | Description |
|---|---|
| 1139 | The Wayback Machine archive of "Sandboxing Applications" (2004-01-19) |
| 1140 | The Wayback Machine archive of PDF of "Sandboxing Applications" (2004-01-19) |
| 1141 | The Wayback Machine archive of NLUUG: UNIX User Group – The Netherlands (2001-07-22) |
| 1142 | The Wayback Machine archive of NLUUG: Previous Events (2001-08-03) |
| 1143 | The Wayback Machine archive of Second International SANE Conference (2001-08-12) |
| 1144 | The Wayback Machine archive of Second International SANE Conference (2001-06-20) |
| 1145 | The Wayback Machine archive of "Jails: Confining the omnipotent root." (2000-09-02) |
| 1146 | The Wayback Machine archive of Linux Journal (1999-05-08) |
| 1147 | RESERVED |
| 1148 | RESERVED |
| 1149 | RESERVED |
| 1150 | Cong. Rsch. Serv., R48016, The Patent Trial and Appeal Board and Inter Partes Review (May 28, 2024) |
| 1151 | Docket Navigator Statistics for Motion Success for Stay Pending IPR (Post-Institution) in N.D. Cal. (2013–present) |
| 1152 | Docket Navigator Median Time to Trial for NDCA (May 1, 2020 to May 11, 2025) |
| 1153 | RESERVED |
| 1154 | Civil Docket in *VirtaMove, Corp. v. Google LLC*, 5:25-cv-00860-NW (N.D. Cal.) (as of June 9, 2025) (includes civil docket for 7:24-cv-00033 (W.D. Tex.)) |
| 1155 | Civil Docket in *Anonymous Media Research Holdings, LLC v. Roku, Inc.*, 3:24-cv-04171-VC (N.D. Cal.) (includes civil docket for 1:23-cv-01143 (W.D. Tex.)) |

| Exhibit | Description |
|---|---|
| 1156 | Civil Docket in *Universal Connectivity Techs. Inc. v. HP Inc.*, 5:24-cv-04097-NW (N.D. Cal.) (includes civil docket for 1:23-cv-01177 (W.D. Tex.)) |
| 1157 | Civil Docket in *IP, LLC v. Lyft, Inc.*, 3:24-cv-03348-RFL (N.D. Cal.) (includes civil docket for 7:24-cv-00051 (W.D. Tex.)) |
| 1158 | Civil Docket in *Safecast Ltd. v. Google, LLC*, 5:23-cv-03128-PCP (N.D. Cal.) (includes civil docket for 6:22-cv-00678 (W.D. Tex.)) |
| 1159 | Civil Docket in *eCardless Bancorp, Ltd. v. PayPal Holdings Inc.*, 5:24-cv-01054-BLF (N.D. Cal.) (includes civil docket for 7:22-cv-00245 (W.D. Tex.)) |
| 1160 | RESERVED |
| 1161 | Docket Navigator Data on Granted Petitions for Writ of Mandamus by Federal Circuit for Legal Issues Regarding Venue |
| 1162 | RESERVED |
| 1163 | RESERVED |
| 1164 | Scheduling Order in *Safecast Ltd. v. Google, LLC*, 5:23-cv-03128-PCP (N.D. Cal. Nov. 27, 2023) |
| 1165 | Scheduling Order in *Safecast Ltd. v. Google, LLC*, 6:22-cv-00678-ADA (W.D. Tex. Jan. 6, 2023) |
| 1166 | Scheduling Order in *eCardless Bancorp, Ltd. v. PayPal Holdings Inc.*, 5:24-cv-01054-BLF (N.D. Cal. May 27, 2024) |
| 1167 | Scott R. Boalick (Chief APJ), *Guidance on USPTO's recission of "Interim Procedure for Discretionary Denials in AIA Post-Grant Proceedings with Parallel District Court Litigation"* (Mar. 24, 2025), *available at* https://www.uspto.gov/sites/default/files/documents/guidance_memo_on_interim_procedure_recission_20250324.pdf (last checked June 2, 2025) |
| 1168 | *Oracle Corp. v. VirtaMove, Corp.*, IPR2025-00964, Paper 4 (May 16, 2025) (joinder motion) |
| 1169 | *Microsoft Corp. v. VirtaMove, Corp.*, IPR2025-00849, Paper 3 (Apr. 18, 2025) (joinder motion) |

| Exhibit | Description |
| --- | --- |
| 1170 | RESERVED |
| 1171 | RESERVED |
| 1172 | VirtaMove Corp's Petition for Writ of Mandamus, *In re VirtaMove Corp.*, Misc. Dkt. No. 25-130 (Fed. Cir. June 5, 2025) |
| 1173 | Civil Docket in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (as of June 5, 2025) |

## I.    INTRODUCTION

VirtaMove's lawsuit against Google was recently transferred from the Western District of Texas (WDTX) to the Northern District of California (NDCA), where no trial date has been set and an initial case management conference has yet to be scheduled.  The *Fintiv* factors weigh strongly against denial because it is highly likely that a final written decision ("FWD") will issue in this IPR well before any trial will take place in NDCA.

As the Director found in the *Twitch Interactive* cases discussed *infra* §II.A, NDCA has stayed parallel litigation 76% of the time after institution of an *inter partes* review.  And if the NDCA litigation is not stayed, there is no reason to believe that any trial date (there currently is none) would precede an FWD in this IPR.  EX2003, at 66; *infra* §§II.B.1-3.  VirtaMove says that because of progress allegedly made in WDTX before the litigation was transferred, a trial is likely to take place in NDCA within the next 12 months.  That baseless assertion is refuted by objective evidence.  Fact discovery in WDTX had only just commenced before the case was stayed and then transferred to NDCA.  *See infra* §II.C.  In two examples of similarly-situated cases that were also recently transferred to NDCA from WDTX after claim construction briefing was concluded, trials were scheduled for 20 months or more after the initial case management conference (EX1164, EX1166), which is currently unscheduled in this case.  *See infra* §II.B.3.

– 1 –

Thus, any trial date to be scheduled in NDCA will likely be well after the FWD issues. *Infra* §II.B.2-3. The *Fintiv* factors therefore weigh heavily against discretionary denial.

VirtaMove's separate assertion that discretionary denial is warranted because the Petition allegedly "over"-relies on expert testimony is baseless. VirtaMove exalts form over substance by criticizing the declaration's length. The Director and the Board have consistently rejected that argument based on declarations of comparable length. *See infra* §§IV.A.1-2. VirtaMove's other complaint is that the expert declaration cites prior-art references (which VirtaMove pejoratively calls "shadow references") to corroborate the expert's explanations of background knowledge of those of skill in the art. These citations show exactly the opposite of "over"-reliance on expert testimony, by demonstrating that the Petition makes its case based on patents and printed publications rather than an expert's say-so. Indeed, in a recent decision rejecting the same argument VirtaMove advances, the Board applauded an expert declaration for extensively citing corroborating references. *See infra* §IV.A.2. There is nothing about the Petition's citation to the expert declaration that warrants discretionary denial.

VirtaMove's additional assertion that Amazon having filed its own petitions warrants discretionary denial is premised on the assertion that Google "coordinated" with Amazon on the IPRs. That unsubstantiated assertion is false.

VirtaMove sued Amazon, Google, IBM, and Hewlett Packard Enterprise ("HPE") over a two-week period, and then Microsoft and Oracle several months later, on the same patents. That VirtaMove faces IPRs from multiple petitioners is the unsurprising direct result of VirtaMove's own choices. VirtaMove's assertion that discretionary denial is warranted because an unrelated company (Amazon) filed its own IPR petition is contrary to the Board's established precedent.

Finally, VirtaMove ignores the Petition's merits. Petitioner identified prior art that was not of record during original prosecution and that discloses the claim feature that the examiner found missing from the prior art of record during prosecution in allowing the '814 patent. *See infra* §II.F. The strength of the Petition is reinforced by the fact that two sophisticated companies—Microsoft and Oracle—have moved to join this IPR. The Petition's strong merits weigh against discretionary denial.

VirtaMove fails to identify any legitimate basis for discretionary denial because there is none. The Director should decline to discretionarily deny this Petition and should pass this case to a Board panel to be evaluated on its merits.

## II.     DISCRETIONARY DENIAL IS NOT WARRANTED UNDER *FINTIV*

There is no basis to deny this IPR under *Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 11 (precedential) (Mar. 20, 2020) ("*Fintiv*"). The parties' litigation was recently transferred from WDTX to NDCA and no trial date has been

scheduled. Indeed, NDCA has yet to schedule an initial case management conference ("CMC") to discuss a schedule and set a trial date.

There is every reason to believe that no trial will take place in NDCA until after an FWD issues in this IPR. Examples of other recent cases in procedural postures like Google's NDCA case (i.e., transferred from WDTX to NDCA after claim construction briefing was completed), as well as NDCA's median time-to-trial statistics, demonstrate that the trial is highly likely to be scheduled for a date *after* the date by which an FWD will issue here. *See infra* §§II.B.2-3. And as the Director recently found in deciding not to exercise her discretion to deny an IPR based on a parallel litigation in NDCA, stays are granted at a high rate (76%) in that jurisdiction after an IPR is instituted, which further weighs against discretionary denial. *See infra* §II.A.

"The framers of the AIA intended for IPR to serve as a faster, less costly alternative to district court litigation" and to "improve patent quality by providing a more efficient means to adjudicate patent validity issues." EX1150, i, 13. Those objectives would be served here by having a merits panel evaluate Google's IPR on the merits. The efficiencies gained if the Board were to institute an IPR trial would be further magnified given that Oracle and Microsoft have sought to join Google's IPRs in understudy roles.

The *Fintiv* factors weigh heavily in favor of instituting this IPR.

**A.      Factor 1 (Stay Potential) Weighs Against Denial Because NDCA Commonly Stays Litigation Once IPR Is Instituted**

*Fintiv* Factor 1, which considers the likelihood of a stay, weighs against discretionary denial.  As ***the Director recently recognized***, the stay rate in NDCA is 76% in cases like this where an FWD will precede the trial date (which is as-yet unscheduled here).  *See Twitch Interactive, Inc. v. Razdog Holdings LLC*, IPR2025-00307, Paper 18 at 2-3 (May 16, 2025) (finding potential for stay in NDCA weighed against discretionary denial where a yet-to-be-scheduled trial would likely occur after FWD, because "[o]ver the past twelve years" NDCA judges "have granted or partially granted 76% of all post-institution motions to stay pending" IPRs) (citing evidence from Docket Navigator);[1] *see also Regents of Univ. of Michigan v. Novartis Pharms. Corp.*, No. 22-CV-04913-AMO, 2023 WL 6795971, at *1 (N.D. Cal. Oct. 12, 2023) ("Courts in this district have often recognized a 'liberal policy in favor of granting motions to stay' pending IPR." (quoting *Zomm, LLC v. Apple Inc.*, 391 F. Supp. 3d 946, 956 (N.D. Cal. 2019)).

Nevertheless, VirtaMove argues "there is no reason to suggest" that NDCA will stay the litigation.  *See* VirtaMove's Request for Discretionary Denial (Paper 8, hereafter "DD-Brief"), 7.  This is not credible.  VirtaMove itself represented to the Federal Circuit in a mandamus petition filed just last week seeking to undo the

---

[1] The most up-to-date stay percentage for NDCA is the same.  EX1151 (76%).

transfer to NDCA that the NDCA "is known to stay cases pending USPTO proceedings." EX1172, 34.

Thus, Factor 1 weighs against discretionary denial.

**B.      Factor 2 (Timing of Trial and FWD) Weighs Heavily Against Denial Because No Trial Date Has Been Set and Any Trial Date Will Be After FWD**

Factor 2 considers the relative timing of the court's trial date and the IPR's FWD.  Because no trial date has been set in NDCA, and because any trial is likely to take place after the FWD here, Factor 2 weighs heavily against denial. VirtaMove's arguments, which are inconsistent with representations it has made in other forums, do not show otherwise.

### 1.      No trial date has been scheduled

On May 7, 2025, WDTX ordered VirtaMove's case against Google transferred to NDCA.  EX1173, at 9 (DKT#102).  Google's motion for transfer had been granted by the WDTX magistrate judge in January but was stayed at VirtaMove's request to allow VirtaMove time to object.  *See id.*, 8 (DKT#86), 9 (DKT#94-95).  In May, the WDTX District Court Judge overruled VirtaMove's objections to the magistrate's transfer order, and ordered the case transferred to NDCA.  *See id.*, 9 (DKT#102).

The court normally will not set a schedule with a trial date until at or after the initial case management conference, which itself currently does not have a

scheduled date.[2]  Given that NDCA has not set a trial date, Factor 2 weighs against discretionary denial.  *Twitch*, IPR2025-00307, Paper 18 at 2-3 (Director declining to discretionarily deny institution where, like here, an NDCA trial had not yet been scheduled but some discovery had already occurred); *id.*, Paper 11 at 12-13 (discussing some discovery having occurred); *see also BMW of N. Am., LLC v. Michigan Motor Techs., LLC*, IPR2023-01224, Paper 15 at 11 (Feb. 15, 2024) ("Factor 2 favors institution as it is undisputed that no trial date was set in district court.").

### 2.  NDCA's median time-to-trial statistics for civil actions

In a memorandum dated March 24, 2025, Chief APJ Boalick stated that the Board will consider "median time-to-trial statistics for civil actions" under *Finitiv* Factor 2.  EX1167, at 3.  The Director's March 26, 2025 Memorandum addressing "Interim Processes for PTAB Workload Management" (hereafter "Interim Memo") issued two days later on March 26, 2025.  Since the issuance of the Director's Interim Memo, several Board decisions have relied on the most recent median-time-to-trial statistics for all civil actions.  *See Charter Commncs., Inc. v. Adaptive*

---

[2] There have been some false-starts in setting a case management conference in NDCA but, at present, no initial case management conference is on the schedule. *See* EX1154.

*Spectrum & Signal Alignment, Inc.*, IPR2025-00087, Paper 14 at 9-11 (May 5, 2025) (citing the most recent median time-to-trial statistics for all civil cases); *Liberty Energy, Inc. v. U.S. Well Servs., LLC*, IPR2025-00031, Paper 9 at 11-12 (Apr. 29, 2025) (citing the Interim Memo as support for finding consistency between "median time-to-trial statistics" and a scheduled trial date); *HP Inc. v. Universal Connectivity Techs., Inc.*, IPR2024-01429, Paper 11 at 8-9 (Apr. 16, 2025) (citing the most recent median "time-to-trial statistics" for civil actions).

VirtaMove concedes that NDCA's current median time-to-trial for all civil actions is 34.5 months.  DD-Brief, 8 n.2 (citing EX2003, at 66).  Thus, even if VirtaMove were right that its litigation against Google in NDCA is about "halfway" to trial (DD-Brief, 7),[3] applying NDCA's median time-to-trial for all civil actions indicates that even if a case management conference were held tomorrow, a trial would likely be scheduled for a date more than 17 months (half of 34 months) from now, which would be two months ***after*** the FWD will issue here.[4]

---

[3] The litigation is not halfway to trial.  *See infra* §§II.B.3-4, §II.C.

[4] Also, as discussed *infra* §II.B.4, even if representative statistics for only patent cases were used, they still would put trial later than FWD.

### 3. Schedules in cases transferred into NDCA at a similar stage reinforce that a trial is unlikely to take place before FWD

Petitioner has been able to identify two other cases that were transferred from WDTX to NDCA in the past two years at a similar procedural stage to VirtaMove's case against Google—where claim construction briefing had occurred in WDTX but a *Markman* hearing had not—and thereafter had scheduling orders entered in NDCA. Those scheduling orders provide further evidence that trial likely will be scheduled for a date after the FWD in this case.

*eCardless Bancorp, Ltd. v. PayPal Holdings Inc.*, 5-24-cv-01054 (NDCA) involved a case transferred to NDCA from WDTX after claim construction briefing was completed but before a *Markman* hearing. EX1159, at 6 (DKT#61, 11/01/2023 reply claim construction brief filed in WDTX), 8 (DKT#86, 02/22/2024 transfer of case to NDCA). Trial in that case was scheduled for ***20 months*** after the case management conference—i.e., 23 months after WDTX's transfer order. *See* EX1159, at 10-11 (DKT#116, order setting case management conference for 05/02/2024; DKT#123, scheduling order setting trial for 01/12/2026).

*Safecast Ltd. v. Google LLC* was also transferred to NDCA from WDTX after claim construction briefing was completed but before a *Markman* hearing. EX1158, at 5 (DKT#53, WDTX *Markman* hearing scheduled for 06/29/2023; DKT#54, joint claim construction brief filed; DKT#56, 06/23/2023 order granting

– 9 –

motion to transfer to NDCA). Trial in that case was scheduled for *24 months* after the case management conference—i.e., 28.5 months after WDTX's transfer order. *See* EX1158, at 9-10 (DKT#87, order setting case management conference for 11/09/2023; DKT#98, scheduling order setting trial for 11/10/2025).

Thus, the above two cases having similar procedural postures as Google's had their NDCA trial dates scheduled for a date 20-24 months after the date of the case management conference. An FWD will be due in this IPR within 15 months from now; thus, similar timing in NDCA would place trial months after FWD, even if a case management conference in Google's case were held tomorrow.

> **4.** **VirtaMove's statistics here are not a reliable indicator of what trial date will be scheduled in VirtaMove's litigation against Google**

Initially, despite telling the Director that trial in NDCA is likely to happen within 9-12 months (DD-Brief, 8), in its just-filed petition seeking mandamus to overturn or vacate the order transferring the case to NDCA, VirtaMove told the Federal Circuit that "VirtaMove's case is likely to languish in the NDCA for 6-7 years without trial." EX1172, at 1. Regardless, VirtaMove bases an estimated trial date on EX2002, which VirtaMove characterizes as including Docket Navigator's "median time-to-trial statistics" for NDCA for patent cases "from May [01,] 2020 to" May 11, 2025. But as VirtaMove notes, this "exclud[es] cases with stays." DD-Brief, 7-8. As such, VirtaMove lists just *five* patent cases. When cases with

stays are ***not*** excluded over the same five-year period covered by EX2002, there are 12 patent cases that went to trial, and Docket Navigator's median time-to-trial for those cases in NDCA is ***31*** months.  *See* EX1152.  That is comparable to NDCA's median time-to-trial for all civil cases, which VirtaMove concedes is 34.5 months.  DD-Brief, 8 n.2 (citing EX2003, at 66).

Despite the Board's practice to the contrary (*supra* §II.B.2), VirtaMove alleges that stayed cases should be excluded when determining median time-to-trial because if this case were "hypothetically stayed pending IPR, then its time-to-trial is not relevant (because trial would necessarily occur *after* final written decision)."  DD-Brief, 8 n.2 (emphasis original).  VirtaMove cites no case where the Director or the Board has excluded stayed cases in determining a median time-to-trial.  There is good reason why the Director and the Board should consider all cases (including stayed cases) in determining the median time-to-trial.  Considering ***all*** patent cases in NDCA is a more accurate indicator of when this case will go to trial than VirtaMove's sample because nothing suggests that this case will be among the minority of cases that would not be stayed if this IPR is instituted.

VirtaMove also argues that "[b]ecause claim construction briefing was already completed" in WDTX, "the case is approximately halfway to trial" so that "the time to trial will be reduced significantly" and "be set for 9-12 months from

the May 7 transfer date." DD-Brief, 7-8. This is unsupported by any *evidence*. As discussed further below (§II.C addressing Factor 3), there is much work to be done before the trial would occur. While claim construction briefing occurred in WDTX, no *Markman* hearing has yet been held, and no decision has been issued. Fact discovery had only just opened on January 10 before the WDTX case was stayed on January 22 and then transferred. And as explained above (§§II.B.2-3), median time-to-trial statistics for all civil cases and actual schedules for similarly-situated patent cases transferred into NDCA illustrate that a trial is not likely to be scheduled to occur until after the FWD.

By any reasonable metric (*see supra* §§II.B.1-3), a trial in NDCA is highly unlikely to take place until after an FWD has issued in this IPR.

### 5. NDCA is the correct venue to consider under *Fintiv*

Although VirtaMove filed a petition for writ of mandamus with the Federal Circuit on June 4, 2025 seeking reversal or vacatur of the transfer to NDCA (EX1172, at 3), VirtaMove does not dispute that the NDCA proceeding is the one to consider for *Fintiv* analysis. VirtaMove's request to the Director for

discretionary denial only argues for denial under *Fintiv* in view of the case proceeding in NDCA, not back in WDTX.[5]  DD-Brief, 5-14.

The Federal Circuit typically takes about two and a half months to issue orders responsive to mandamus petitions.  *See* EX1155-EX1157.  Docket Navigator lists few, if any, cases since 2017 where the Federal Circuit granted a ***plaintiff's*** mandamus petition to overturn or vacate a district court's venue-transfer order.  *See* EX1161.  Even in the highly unlikely event that the case was transferred back, WDTX would have to issue a new scheduling order.  Trial in WDTX was still 12.5 months away when the court granted Google's transfer motion.  EX1154, at 4 (DKT#34, setting WDTX trial for 02/02/2026), 8 (DKT#86, 01/22/2025 order granting motion to transfer).  It is highly unlikely that there will be a trial in WDTX at all, let alone one that would occur before the FWD issues.

### 6. Factor 2 conclusion

For the reasons discussed above (§§II.B.1-5), there is every reason to believe that no district-court trial will take place until after an FWD issues.  Thus, Factor 2 weighs heavily against denial.

---

[5] If the Director were to authorize VirtaMove to belatedly seek discretionary denial under *Fintiv* in view of an anticipated trial in WDTX rather than NDCA, Google would seek authorization to respond to any such belated argument.

### C. Factor 3 (Litigation Investment) Weighs Against Discretionary Denial

There has been limited investment in the district-court litigation. "[A] significant portion of work remains to be done," including scheduling and conducting a *Markman* hearing and conducting most "fact" discovery and all "expert discovery and dispositive motions." *Protect Animals With Satellites LLC v. OnPoint Sys., LLC*, IPR2021-01483, Paper 11 at 14-15 (Mar. 4, 2022). Indeed, in NDCA, "the court has not set any deadlines for those activities" yet. *Bio-Rad Labs., Inc. v. Cal. Inst. of Tech.*, IPR2024-01451, Paper 11 at 10 (Mar. 27, 2025). Thus, Factor 3 weighs strongly against discretionary denial.

VirtaMove alleges that "the parties have already served extensive infringement and invalidity contentions, and fully briefed and already had a hearing on claim construction." DD-Brief, 9. Much of that is false. A claim construction hearing was scheduled for January 21, 2025, but was never held because WDTX cancelled the hearing before transferring the case to NDCA. EX1154, at 7 (DKT#84, cancelling *Markman* hearing). And only ***preliminary*** infringement and invalidity contentions were served, not final contentions. Fact discovery had opened January 10, 2025 (EX1081, at 3) and the parties served discovery requests, but neither party responded to them given the transfer order and stay that occurred 12 days later.

VirtaMove further argues (without evidence) that, under an alleged "typical schedule," by the time of the institution decision (three months from now), "a claim construction order will have issued, the parties will have nearly completed fact discovery, and the parties will be preparing opening expert reports." DD-Brief, 9. But actual schedules in NDCA for similarly-situated cases (transferred from WDTX after claim construction briefing) support that a *Markman* hearing, an order, and nearly-complete fact discovery would not happen until after the institution decision. *See* EX1166 (*eCardless* scheduling order setting *Markman* hearing over 5 months after the case management conference, fact discovery closing 8.5 months after the case management conference); EX1165 (*SafeCast* scheduling order leaving *Markman* hearing unscheduled and setting fact discovery to close 12 months after the case management conference).

Factor 3 weighs heavily against denial.

### D. Factor 4 (Issue Overlap) Weighs Against Discretionary Denial

This Petition challenges all 34 claims of the '814 patent, while only 8 are asserted in district court. EX1079; DD-Brief, 10. VirtaMove's "stipulat[ion] that it will not assert against Google any claims of the '814 patent other than those already asserted against Google" ("if institution is denied") (DD-Brief, 10) does not change the fact that Google's IPR addresses 26 claims that NDCA will not address. That "fact alone minimizes the potential overlap between the issues raised

here vis-à-vis those raised in the parallel proceeding," and weighs against denial. *Markforged Inc. v. Continuous Composites Inc.*, IPR2022-00679, Paper 7 at 32-33 (Oct. 25, 2022).

VirtaMove's stipulation to not assert additional claims against Google (DD-Brief, 10) also does not tilt Factor 4 in VirtaMove's favor because VirtaMove has not made the same assurances for any of Google's customers, despite the fact that VirtaMove's Complaint alleges induced infringement. EX1080, 7.

Moreover, if Google's IPR is not considered on its merits, at least 26 demonstrably unpatentable claims will remain at large for VirtaMove to assert against others. Denying Google its opportunity to demonstrate to the Board why these claims should be cancelled to prevent further litigation would be a public disservice and contrary to the purposes and charge of the Board. That more than three quarters of the '814 patent's 34 claims will be addressed by the Board but not NDCA further illustrates that an IPR trial will be a "true alternative" to the NDCA litigation in addressing issues the court will not address. *Palo Alto Networks, Inc. v. Centripetal Networks*, IPR2021-01149, Paper 10 at 10-11 (Feb. 22, 2022).

Furthermore, as noted above, the Director recently found that NDCA often issues a stay if an IPR trial is instituted. *Supra* §II.A (citing *Twitch*, IPR2025-00307, Paper 18 at 2-3). That reduces "concerns of inefficiency and the possibility of conflicting decisions" (*Fintiv*, IPR2020-00019, Paper 11 at 12) because the

parties will not expend further resources on any invalidity issue in parallel with this IPR.

And again, even if the litigation is not stayed, an FWD is highly likely to issue before any NDCA trial date. *Supra* §II.B. Once the FWD issues, Google will be estopped from asserting in litigation "any ground that the petitioner raised or reasonably could have raised during" the IPR. 35 U.S.C. §315(e)(2).[6] The statutory estoppel provision ensures that the efficiency of Google's IPR accrues regardless of which party prevails on claims challenged in the IPR and asserted in NDCA, and moots VirtaMove's concern about potential overlap between invalidity arguments in NDCA. That is because if Google prevails the claims will have been found unpatentable, whereas if VirtaMove prevails Google would be estopped from "pursu[ing] the ***same*** invalidity theories" (DD-Brief, 12 (emphasis original)) in NDCA. Given that an FWD will so clearly precede a trial in the district court, it was unnecessary for Google to offer a *Sotera* stipulation because any such stipulation would be moot in view of statutory estoppel. But to remove any doubt,

---

[6] Google would also be estopped from pursuing a reexamination "with respect to [any challenged] claim on any ground that the petitioner raised or reasonably could have raised during" this IPR. 35 U.S.C. §315(e)(1). That alleviates VirtaMove's protestations about a possible duplicative reexamination. DD-Brief, 12.

– 17 –

Google hereby stipulates that if the Office institutes this IPR, then Google will not pursue in the district-court litigation any grounds that were raised or reasonably could have been raised in this IPR. *See* 35 U.S.C. §315(e)(2); *Sotera Wireless, Inc. v. Masimo Corp.*, IPR2020-01019, Paper 12 at 13 (precedential) (Dec. 1, 2020); *see also Solus Advanced Materials Co., Ltd. v. SK Nexilis Co., Ltd.*, IPR2024-01463, Paper 14 at 16-17 (Apr. 25, 2025) (finding *Sotera* stipulation causes Factor 4 to weigh against denial even where petitioner maintained right to pursue in district court "invalidity assertions based on combinations of art with 'unpublished systems prior art'").

Factor 4 weighs strongly against discretionary denial. VirtaMove's below-addressed arguments to the contrary (DD-Brief, 12) are baseless.

VirtaMove argues "there is substantial overlap between the prior art arguments" in the Petition and those "advanced by Petitioner in the District Court litigation." DD-Brief, 10. This ignores the lack of overlap in the challenged claims. With respect to the prior art, Google was obligated under the district court's standing order to identify ***all possible*** prior art to preserve its defenses months before this Petition was filed. The purpose of disclosing invalidity contentions early in the litigation is to provide notice and preserve a right to make an argument later, not to identify the arguments that will ultimately be presented at

– 18 –

trial, which happens much later.[7]  Regardless, VirtaMove's assertion that this causes Factor 4 to favor denial is premised on the assumption that "the District Court will likely decide the validity of the '814 patent claims months prior to" the FWD (DD-Brief, 11), which again is plainly wrong.  *See supra* §§II.A-B.

Finally, VirtaMove argues that this IPR should be discretionarily denied because "if the Board were to institute, Petitioner would be able to serially challenge the validity of the '814 Patent in this proceeding, in the District Court Proceeding, and in an *ex parte* reexamination proceeding," which is the "opposite of the efficiency contemplated" by the AIA.  DD-Brief, 12.  VirtaMove has it exactly wrong—instituting this IPR would ***increase*** efficiency.

---

[7] *See, e.g.*, *Pisony v. Commando Constructions, Inc.*, No. 6:17-CV-00055-ADA, 2020 WL 4934463, at *1 (W.D. Tex. Aug. 24, 2020) ("[T]he purpose of invalidity contentions is to provide notice while discovery is intended to develop details so that legal theories become more concrete as the litigation progresses.") (internal quotation marks and citation omitted); *see also GREE, Inc. v. Supercell Oy*, No. 2:19-CV-00070-JRG-RSP, 2020 WL 6731050, at *3 (E.D. Tex. Aug. 14, 2020) ("Indeed, one of the desired outcomes of discovery and a result of expert reports is the crystallization of invalidity and infringement theories preserved in a party's contentions.").

As the Federal Circuit has explained, "the purpose of the AIA" is "to create a ***more efficient*** alternative to district court litigation." *Purdue Pharma L.P. v. Collegium Pharm., Inc.*, 86 F.4th 1338, 1344 (Fed. Cir. 2023).[8]  Google is availing itself of the IPR process that Congress created to cost-effectively and efficiently demonstrate that the '814 patent's claims are unpatentable.  If IPR is instituted, Google will seek a stay of the litigation, which will further help avoid "conflicting decisions."  DD-Brief, 12.  If the Board finds merit in Google's Petition and finds the challenged claims unpatentable, substantial cost savings and efficiencies will have been achieved for the parties and the NDCA court in not litigating over a patent that never should have issued in the first place.  And if any asserted claim were to survive this IPR, Google will be subject to the AIA's estoppel provisions.

The efficiencies that would be gained by instituting IPR here are further enhanced because two defendants in separate litigations (Microsoft and Oracle) have filed motions for joinder.  *See Microsoft Corp. v. VirtaMove, Corp.*, IPR2025-00849, Paper 3 (Apr. 18, 2025); *Oracle Corp. v. VirtaMove, Corp.*, IPR2025-00964, Paper 4 (May 16, 2025); *see also infra* §III.B.  The Board can efficiently address Google's patentability challenges that Microsoft and Oracle seek to join in a single proceeding.

---

[8] All emphases herein are added unless otherwise indicated.

Thus, for the reasons discussed above, Factor 4 weighs strongly against discretionary denial.

**E.** **Factor 5 (Litigation Defendant) Weighs Against Discretionary Denial**

VirtaMove argues "this factor weighs in favor of discretionary denial." DD-Brief, 12 (citing *Apple, Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 15 at 15 [sic: 13-14] (May 13, 2020) (informative)).

VirtaMove ignores that the Board's "precedent takes varying approaches on how to weigh the fifth *Fintiv* factor when the parties in the two proceedings are the same." *Shenzen Root Tech. Co., Ltd. v. Chiaro Tech. Ltd.*, IPR2024-01296, Paper 9 at 20 (Feb. 25, 2025) (granting institution and collecting cases). Some panels have found that the petitioner being the litigation defendant is simply ***neutral*** and does not weigh in favor of denial. *See, e.g.*, *Nokia of Am. Corp. v. Soto*, IPR2023-00680, Paper 30 at 13 (Dec. 3, 2024) (Decision Granting Director Review) ("agree[ing] with the parties that *Fintiv* factor 5 is neutral" where petitioner was a litigation defendant, *see* Paper 1 at 75); *Markforged Inc. v. Continuous Composites Inc.*, IPR2022-00679, Paper 7 at 33 (Oct. 25, 2022)

In fact, in cases such as this where the Board is "likely to address the challenged patent first" before the district court (*see supra* §II.B), panels have found that "this factor weigh[s] ***against*** exercising discretion to deny institution" because it is more efficient to have the Board address patentability so that the

district court does not have to. *Markforged*, IPR2022-00679, Paper 7 at 33; *CrowdStrike, Inc. v. Open Text Inc.*, IPR2023-00124, Paper 11 at 13 (June 15, 2023) ("This factor **weighs against exercising discretion to deny** institution because, although the parties are the same as in the related litigation…, that trial is scheduled to occur after the deadline for a final written decision in this proceeding.").

Factor 5 weighs against denial here (or is, at worst, neutral) because the Board is likely to issue an FWD before a district-court trial, which will maximize efficiencies for the parties and the court.

## F.     Factor 6 (Other Circumstances: Strong Merits)

The merits of Google's Petition are particularly strong because the cited prior art plainly teaches the allegedly "key difference" between the '814 patent and the prior art. EX1001, 1:56-61.

The '814 patent alleges that the "key difference between" the invention and the prior art's "existing solutions" are so-called "application containers." EX1001, 1:56-61. Google's Petition demonstrates that the Blaser reference (EX1005), which is used in every ground, expressly teaches application containers. Petition (Paper 2), 7 (quoting Blaser, 6:62-7:23 ("[a] layer [] provides a convenient **container** to limit access to an **application**")). The Petition also demonstrated that Blaser expressly teaches that applications in layers are not shareable between

different layers and that layers have unique root file systems, which are the features the Examiner found missing in the prior art of record during prosecution of the '814 patent. *See* Petition, 4 (summarizing prosecution history), 41-45 (explaining how Blaser meets elements [1F]-[1G]).

The Petition presents strong merits of unpatentability because the allegedly novel disclosure of the '814 patent, and the limitations the Examiner found missing in the prior art, were explicitly taught by the Petition's prior-art Blaser reference.

The Petition's strong merits are further demonstrated by the fact that Microsoft and Oracle have each agreed to join the Petition. *See* EX1168-EX1169.

VirtaMove says its "merit-based briefing" will "highlight" "claim limitations [that] are not disclosed by *any* of the alleged combination references." DD-Brief, 13-14 (original emphasis). Google cannot respond to arguments that VirtaMove has not yet made. But in §IV.A below, which relates to VirtaMove's baseless accusations that the Petition overly relies on expert testimony, Google responds to VirtaMove's allegation that the Petition mischaracterizes teachings in the prior art.

VirtaMove asserts that the Petition's merits are not strong because the Petition "relies solely on obvious combinations under §103," which allegedly "serves to highlight the novelty of the challenged claims." DD-Brief, 13. But the Board has repeatedly found strong merits demonstrated by obviousness grounds. *See, e.g., SAP Am. Inc. v. Cyandia, Inc.*, IPR2024-01433, Paper 13 at 12-13 (Apr.

7, 2025); *Ericsson Inc. v. Active Wireless Techs. LLC*, IPR2024-00985, Paper 11 at 19-25 (Dec. 12, 2024); *BioNTech SE v. ModernaTX, Inc.*, IPR2023-01359, Paper 20 at 77 (Mar. 19, 2024).  Google's obviousness grounds present strong merits because the Petition shows that the allegedly novel feature of the '814 patent is taught by Blaser, which also discloses (or requires only a minor obvious modification to meet) every other limitation of the challenged claims.  *See SAP*, IPR2024-01433, Paper 13 at 12-13 (finding the petition "present[ed] particularly strong merits" because its "showing depends on a single reference for nearly every limitation, with a modification to only one aspect of that reference").

Lastly, VirtaMove argues that Factor 6 favors denial because "it [is] extremely likely" that the district court will decide validity before an FWD.  DD-Brief, 13.  That argument fails for the reasons discussed *supra* §II.B.

Given the Petition's strong merits, Factor 6 weighs against denial.

## III. GOOGLE'S PARALLEL PETITION AND AMAZON'S INDEPENDENT PETITIONS DO NOT SUPPORT DISCRETIONARY DENIAL

VirtaMove argues that if any of Google's or Amazon's IPR petitions on the '814 patent "are instituted, they should be limited to, at most, one institution."  DD-Brief, 19.  For the reasons discussed below, neither Google's second-ranked '814 Petition (IPR2025-00488) nor Amazon's '814 petitions (IPR2025-00563, IPR2023-00566) support discretionarily denying this Petition.

– 24 –

**A.    Google's Second-Ranked '814 Petition Provides No Basis to Discretionarily Deny This Petition, Which Google Ranked First**

The Consolidated Trial Practice Guide (at 59) recognizes that "more than one petition may be necessary" "when there is a dispute about priority date requiring arguments under multiple prior art references."  VirtaMove acknowledges that there is a potential dispute about the '814 patent's priority date. *See* IPR2025-00488, Paper 8 at 17-18.  Because this Petition (IPR2025-00487) is ranked first (*see* Paper 3, 1) and VirtaMove does not object to the order of Google's ranking of its petitions, Google's second-ranked petition provides no basis to discretionarily deny this first-ranked Petition.  *See Samsung Elecs. Co. v. Hardin*, IPR2022-01333, Paper 13 at 50-51 (Feb. 7, 2023) ("declin[ing] to exercise" discretion "to deny institution" of the first-ranked of several parallel petitions because "[p]atent [o]wner does not object to the order in which [the p]etitioner ranks the petitions for consideration on the merits"); *Hanwha Solutions Corp. v. Rec Solar Pte. Ltd.*, IPR2021-00988, Paper 12 at 10-11 (Dec. 13, 2021) (finding that "even if [p]atent [o]wner's argument" objecting to "multiple petitions were persuasive, [p]atent [o]wner's position would not provide a basis for denying institution of the single [p]etition, ranked first in priority").

**B.     Amazon's Independently-Filed Petitions Do Not Weigh Against Institution of Google's Petitions**

Under the Board's precedential *General Plastic* decision, the principal factor in deciding whether to deny institution of an IPR based on another IPR having challenged the same patent is "whether the ***same petitioner*** previously filed a petition directed to the same claims of the patent." *General Plastic Indus. Co. v. Canon Kabushiki Kaisha*, IPR2016-01357, Paper 19 at 15-16 (Sept. 6, 2017) (precedential). The "same petitioner" was extended to include a petitioner having "a significant relationship" with an earlier petitioner in *Valve Corp. v. Elec. Scripting Prods., Inc.*, IPR2019-00062, Paper 11 at 9-10 (Apr. 2, 2019) (precedential); *Videndum Prod. v. Rotolight*, IPR2023-01218, Paper 12 at 6 (Apr. 19, 2024) (Decision Granting Director Review) ("Under USPTO policy and precedent, *General Plastic* has not been extended to any cases in which the first and second petitioners do not have a significant relationship.").

Google and Amazon are different entities and do not have a significant relationship under *Valve*. VirtaMove presents no evidence of such a relationship because no such relationship exists. Google had no involvement in preparing

Amazon's IPRs, and vice versa.[9]  *See Ford Motor Co. v. Neo Wireless, LLC*,

IPR2023-00763, Paper 28 at 9 (Mar. 22, 2024) (holding that petitioners with

"different allegedly infringing products and in different district court proceedings"

who did not coordinate, as here, did not have a "significant relationship" under

*Valve*).

In cases like this, where separate petitioners have challenged the same

patent but "are neither the same party, nor possess a significant relationship under

*Valve*, *General Plastic* **factor one necessarily outweighs the other General**

**Plastics factors**" and weighs strongly against discretionary denial.  *Videndum*,

IPR2023-01218, Paper 12 at 5-6.

VirtaMove alleges that discretionary denial of at least three of the four '814

Petitions brought by Google and Amazon is warranted because "there appears to

be a coordinated attempt by [these] technology giants" to challenge VirtaMove's

'814 patent.  DD-Brief, 18-19.  VirtaMove does not even attempt to substantiate

this baseless and irresponsible allegation of coordination.  That Google and

---

[9] Google's and Amazon's '814 Petitions raise different grounds.  *See Amazon.com,*

*Inc. v. VirtaMove, Corp.*, IPR2025-00563, -00566, Paper 1 at 9 (Jan. 31, 2025)

(both challenging claims based on Osman, Tucker, Bandhole, and Gélinas, none of

which are named in any ground of Google's '814 Petitions).

Amazon filed separate petitions against the '814 patent around the same time is an unremarkable and highly predictable consequence of *VirtaMove's strategic decision* to sue Google and Amazon within one week of each other.  Amazon and Google did not coordinate their IPRs in any way.  VirtaMove's speculation to the contrary is baseless and simply wrong.

VirtaMove's protestation that it is a "relatively small" company being "overwhelm[ed]" by litigation expenses (DD-Brief, 18-19) is belied by VirtaMove's own strategic decision to assert its patents against six corporations in parallel across two districts.  Within the span of two weeks last year, VirtaMove elected to sue four companies—Amazon, Google, IBM, and Hewlett Packard Enterprise—in two different jurisdictions (EDTX and WDTX), on two patents in different patent families.  Several months later, VirtaMove elected to bring lawsuits in WDTX against two additional defendants—Microsoft and Oracle.  Thus, in less than a year, VirtaMove chose to file *six* lawsuits in *two* separate districts against different companies, with the full knowledge that multiple IPR petitions by those separate defendants were not just possible but also easily foreseeable.[10]

---

[10] At the time of filing its suits against Microsoft and Oracle, the '814 patent was also involved in a declaratory-judgment suit brought by Red Hat in NDCA, which

But even if the expenses of the party that chose to initiate litigation could be a relevant consideration for discretionary denial, IPRs were specifically designed to be ***more efficient and streamlined*** than district-court actions, as VirtaMove itself concedes. DD-Brief, 5. Two additional defendants (Microsoft and Oracle) have sought to join Google's IPRs. *See supra* §II.D. Thus, if the Board grants either (or both) of those joinder motions, the overall efficiencies to be gained by (and potential litigation expenses to be saved because of) Google's IPRs will be more even pronounced here as compared to a typical one-defendant IPR. *See* EX1168, at 6-7 (joinder motion) (Oracle's joinder motion "accepting an 'understudy' role") (citing IPR2015-01353, Paper 11 at 6-7 (finding "joinder would increase efficiency by eliminating duplicative filings and discovery, and would reduce costs and burdens on the parties as well as the Board" because the petitioners agreed to an "understudy" role)); EX1169, at 5 (Microsoft's joinder motion agreeing to "tak[ing] an 'understudy' role").

Thus, to the extent VirtaMove's alleged concern for reducing its litigation expenses are at all relevant to the Director's consideration, the cost-saving benefit

---

was recently dismissed for lack of subject matter jurisdiction and is on appeal. *See Red Hat Inc. v. VirtaMove, Corp.*, 5-24-cv-04740 (N.D. Cal.).

over district-court actions is ***multiplied*** here where two additional defendants can be joined with Google's IPRs.

VirtaMove's suggestion that it was entitled to sue six companies across multiple jurisdictions but that "at most" only one IPR should be instituted (DD-Brief, 19) is plainly unreasonable. Google would be prejudiced if the Director were to discretionarily deny Google's Petition simply because Amazon filed its own. Google did not choose the prior art in Amazon's '814 petitions and has no control over how (or even whether) that IPR will proceed. Amazon's IPR petition is no substitute for Google being able to present its own challenge to the '814 patent.[11] Moreover, Google's and Amazon's petitions were filed at essentially the same time. There is no basis to favor Amazon's petition over Google's.

Under the Board's existing precedent (*General Plastic*, *Valve*, and *Videndum*) discussed above, Amazon's '814 petitions provide no basis for discretionarily denying this Petition. *See also* Interim Memo, 2 (interim

---

[11] At this point, it is unclear whether either of Amazon's '814 petitions will be instituted on its merits. VirtaMove's "one institution" argument provides no basis for denying Google's '814 Petition because it might be the only petition filed against the '814 patent that the Board finds meritorious enough to warrant institution.

procedures are designed to be "consistent with the discretionary considerations enumerated in existing Board precedent").

## IV. NONE OF THE OTHER CONSIDERATIONS LISTED IN THE DIRECTOR'S INTERIM MEMORANDUM SUPPORT DISCRETIONARY DENIAL

The Director's Interim Memorandum has a list of other considerations that may be relevant for discretionary denial.[12]  Interim Memo, 2-3.  None of these considerations warrants discretionary denial here.

### A. The Petition Does Not Over-Rely on Expert Testimony

Recognizing the weakness of its *Fintiv*-based arguments, VirtaMove leads its brief by arguing that discretionary denial is warranted "irrespective of any other factors" because of "Google's extraordinary over-reliance on expert testimony." DD-Brief, 3-5.  Neither the Director nor the Board has ever discretionarily denied a petition on this basis.  VirtaMove hopes that this case will be the first.  It should not be for numerous reasons discussed below.

---

[12] Petitioner reserves the right to challenge the Interim Process for PTAB Workload Management announced in the Director's March 26, 2025 memorandum at least because it is legally invalid as (1) exceeding the Director's authority, (2) arbitrary and capricious, and (3) adopted without notice-and-comment rulemaking.

This Petition was filed before the Director's Interim Memo issued and is supported by an expert declaration that is similar to, and relied upon in the same way, as numerous prior expert declarations that have been credited by the Board in instituting IPR trials and finding claims unpatentable at FWD. *See infra* §§IV.A.1-2. There is nothing "extraordinary" about the Petition's reliance on Dr. Bhattacharjee's testimony. DD-brief, 3. The Petition demonstrates unpatentability based on patents and printed publications. The Petition does not in any sense ***over-***rely on expert testimony, let alone do so in a manner that would warrant discretionary denial of this Petition despite its strong merits and the fact that the *Fintiv* factors (*supra* §II) weigh strongly against denial.

### 1. The Petition does not inappropriately rely on Dr. Bhattacharjee's testimony

The prior art's teachings themselves clearly meet the claims. Most of the Petition's citations to Dr. Bhattacharjee's declaration simply confirm that Dr. Bhattacharjee agrees with the Petition's analysis of the prior-art teachings. That is different from the Petition ***over-relying*** on expert testimony to make its unpatentability showing. If there are any issues on which the Board might find it helpful to review expert testimony to "provide helpful context or to explain terms of art," Dr. Bhattacharjee's testimony corroborates everything he says with citation to a prior-art patent or printed publication. *See* USPTO's "FAQs for Interim Processes for PTAB Workload Management" ("Interim-Processes FAQs"), FAQ

#21.[13]  While VirtaMove *criticizes* the corroborating references (pejoratively labelling them as "shadow references," DD-Brief, 2), Board decisions have "***applauded***" similar expert testimony that is corroborated by extensive citation to published references.  *Tesla, Inc. v. Charge Fusion Techs., LLC*, IPR2025-00032, Paper 11 at 39 (May 19, 2025); *see infra* §§IV.A.2-3.

### 2.    VirtaMove does not substantiate any alleged inappropriate reliance on Dr. Bhattacharjee's testimony

In its allegations of extensive reliance on expert testimony, VirtaMove mainly criticizes the ***length*** of Dr. Bhattacharjee's declaration and the ***number*** of corroborating references.  DD-Brief, 3-5, 15-17.  As discussed below, both criticisms fail.

As to the declaration's length, VirtaMove alleges that the Petition's submission of a "***271-page*** declaration spanning ***more than 55,000 words***" is "exactly the type of over-reliance on expert testimony that the Director has indicated is ill-suited for resolution at the PTAB, because the Board should base its decision on patents and printed publications, not the written opinions of an expert who will not even testify at the hearing."  DD-Brief, 3 (emphasis original).  VirtaMove cites no authority to support this assertion.

---

[13] https://www.uspto.gov/patents/ptab/faqs/interim-processes-workload-management (last checked June 9, 2025).

VirtaMove acknowledges that a concern about overreliance on expert testimony is implicated if a petition relies on expert testimony **in place of** patents or printed publications.  *Id*. ("__because the Board should base its decision on__ __patents and printed publications__, not the written opinions of an expert");[14] *see also* Interim Processes FAQs (FAQ #21: "The statute and our reviewing court require that petitions be based on prior art patents and printed publications.").  But the length of the expert declaration has no bearing on whether the Petition relies on expert testimony instead of patents or printed publications.  VirtaMove's focus on length exalts form over substance.  VirtaMove does not identify a single issue on which the Petition's arguments would require the Board to "base its decision on" on "the written opinions of an expert" instead of the teachings of the prior art that both the Petition and the expert discuss.  DD-Brief, 3.  That is because there is no such issue.  *See infra* §IV.A.3.

The length of Dr. Bhattacharjee's declaration results primarily from the fact that most substantive paragraphs of the Petition cite Dr. Bhattacharjee's testimony.

---

[14] VirtaMove's assertion that Dr. Bhattacharjee "will not even testify at the hearing" is plainly wrong.  DD-Brief, 3  His sworn declaration is "testimony" and VirtaMove will have the opportunity to cross-examine him and submit that testimony as well.  37 C.F.R. §42.53.

That is because, at least before the recent guidance in the Director's Interim Memo dated after this Petition was filed, it had been common practice for petitioners to cite expert testimony to support every argument—even those that the petitioner did not expect the patent owner to reasonably dispute. It has been common for petitioners to do so because they could not anticipate what issue(s) a patent owner might dispute with expert testimony, and it was not uncommon for the Board to favor a party who submitted expert testimony on a disputed issue over one that relied simply on attorney argument. *See, e.g.*, *Wasica Finance GmbH v. Continental Auto Sys.*, 853 F.3d 1272, 1284-85 (Fed. Cir. 2017) (finding it "reasonable for the Board to accept" one party's "expert testimony over" the other party's "bare attorney argument"). There is nothing "extraordinary" about the Petition being accompanied by a lengthy expert declaration. DD-Brief, 3. It is consistent with common practice since the AIA created IPRs.

The Director's Interim Memo refers to the extent to which the Petition **relies on** expert testimony, not the declaration's length. The length of Dr. Bhattacharjee's declaration does not matter because the declaration does nothing but provide "appropriate supporting technical details and/or testimony as to the understanding of a" person of ordinary skill in the art without "offer[ing] wholly new arguments not found in the Petition." *Nat'l Beef Packing Co., LLC v. Inst. For Envtl. Health, Inc.*, IPR2024-00186, Paper 8 at 50-51 (Jan. 13, 2025) (rejecting

– 35 –

patent owner's complaints about a 317-page expert declaration); *see also B/E Aerospace, Inc. v. Mag Aerospace Indus., LLC*, IPR2014-01510, Paper 24 at 13-14 (Mar. 26, 2015) ("[T]he length of the Declaration relative to the Petition is not the critical inquiry.  The critical inquiry is whether an argument that is made in the Declaration is explained sufficiently in the Petition.").

VirtaMove's assertion that it cannot "practically respond" to every word in the expert declaration in a 14,000 word patent owner response is a red herring. DD-Brief, 4.  VirtaMove need only respond to the arguments in the Petition, because the Petition cannot (and did not) incorporate by reference any argument from the expert declaration.  37 C.F.R. §42.6(a)(3); *see also B/E Aerospace*, IPR2014-01510, Paper 24 at 14 ("In our analysis of the grounds of unpatentability that follows, we address the declaration evidence commensurate in scope with the presentation and discussion of that evidence in the Petition.").

Just last month, the Director declined to discretionarily deny two related IPRs despite the patent owner arguing that the petition extensively relied on expert testimony because the petition "cite[d] its expert's ***269-page declaration at least 260 times***."  *Twitch*, IPR2025-00307, Paper 11 at 18-19 (patent owner's request for discretionary denial); *id.*, Paper 18 at 3 (May 16, 2025) (decision denying request). That declaration's 269 pages was a comparable length to Dr. Bhattacharjee's declaration here, and the Director did not discuss the declaration's length as

relevant to her discretionary-denial consideration. That decision is consistent with prior decisions instituting an IPR despite a patent owner's complaint about a declaration's length. *See also Freewheel Media, Inc. v. Intent IQ, LLC*, IPR2024-00419, Paper 9 at 24 (Sept. 4, 2024) (instituting despite "[p]atent [o]wner complain[t]s about" "a 349-page declaration"); *Canon USA, Inc. v. Slingshot Printing LLC*, IPR2022-01541, Paper 7 at 21 (May. 22, 2023) (instituting where petitioner submitted a "232 pages long" declaration); *SNF SA v. Chevron USA Inc.*, IPR2022-01534, Paper 12 at 21 n.15 (Apr. 19, 2023) (instituting where petitioner submitted a "290 page[]" declaration).

There is no reason to treat this Petition differently.

VirtaMove's other primary complaint is that the Petition and Dr. Bhattacharjee cite a substantial number of corroborating references. DD-Brief, 15-16 (referring to them derisively as "dozens upon dozens of additional 'shadow' references"). But once again, VirtaMove does not identify a single instance where the Petition relies only on Dr. Bhattacharjee's testimony to fill an alleged gap in the prior art's teachings, because no such examples exist. *See supra* §II.F (discussing the Petition's strong merits); *infra* §IV.A.3 (discussing VirtaMove's single example of the Petition allegedly mischaracterizing the prior art).

Citation to corroborating references does not demonstrate overreliance on Dr. Bhattacharjee's testimony—it demonstrates precisely the opposite. The

– 37 –

substantial number of corroborating references reveals that the Petition relies on "prior art patents and printed publications" to make its case, rather than on Dr. Bhattacharjee's testimony. *See* Interim Processes FAQs (FAQ #21). The Board thus can decide any disputed issues of material fact from the corroborating references themselves, without relying on Dr. Bhattacharjee's testimony.

The Board's rules are clear that an expert must "disclose the underlying facts or data upon which the opinion is based" or the testimony may be given "little or no weight." 37 C.F.R. §42.65(a). That is all Dr. Bhattacharjee did here. Dr. Bhattacharjee's opinions are supported by multiple pieces of corroborating evidence. That does not render his testimony unfocused. It strengthens his testimony because he provides the underlying facts and data on which he based his opinions.

The Board recently instituted a petition and rejected discretionary-denial arguments by a patent owner that were nearly identical to VirtaMove's arguments here that criticize the length of the expert declaration and the number of corroborating references cited. *Tesla*, IPR2025-00032, Paper 11 at 39. In *Tesla*, the patent owner (much like VirtaMove here) complained about an expert declaration that was "twice as long as the Petition at 278 pages with a substantive portion containing 42,329 words." *Id.* at 39 (internal quotation marks omitted). Like VirtaMove here, the patent owner in *Tesla* also complained that it was unfair

– 38 –

to have "to wade through the 42,329 words" in the expert declaration to understand the petition's argument and complained that the expert "cit[ed] forty-three references that are not expressly identified as a basis for that challenge" (what VirtaMove calls "shadow" references, DD-Brief, 15). The Board rejected those complaints because it did not find any improper incorporation by reference of arguments from the declaration into the petition, which is equally true here. Indeed, *the Board "applaud[ed]" the expert* for "support[ing] his extensive explanations of his opinions with citations to dozens of pieces of objective evidence," which "is a feature, not a bug of his testimony" *because the expert* "*le[ft] virtually none of the substance of his testimony unsupported by objective evidence*." *Tesla*, IPR2025-00032, Paper 11 at 39. There is no reason to treat this Petition differently than the Board treated the *Tesla* petition.

### 3. VirtaMove's single example fails to show extensive reliance on expert testimony rather than on the prior art

As explained below, despite using far fewer than the 14,000 words allowed, VirtaMove's Request for discretionary denial identified no claim limitation that the Petition meets via expert testimony alone, rather than via the teachings of a patent or printed publication. VirtaMove also failed to identify any issue on which there could be a reasonable dispute between experts, let alone one that the Board could not resolve as well as an Article III court.

VirtaMove provides "one specific example" that purports to establish that the Petition is "weak and overly reliant on unreliable expert testimony to gap-fill holes in the prior art." DD-Brief, 15-16. VirtaMove's argument is based on the assertion that "the Petition mischaracterizes the prior art" Blaser reference. *Id*. The Petition does no such thing. Indeed, it is VirtaMove that mischaracterizes both the prior art and the Petition's reliance on expert testimony.

The '814 patent's claim 1 requires "a system having a plurality of servers with operating systems that differ" and containers of applications that "include an object executable by at least some of [the system's] different operating systems." *See* Petition, Claim Listing ([1PREA]-[1PREB]). To meet those limitations, the Petition demonstrates that Blaser explicitly discloses layers of object-including application software that map to the claimed containers and discloses implementing application layers in systems having a plurality of servers with differing operating systems. Petition, 9-15. The Petition also argued in the alternative, with support from multiple pieces of corroborating evidence, that it would have been obvious to implement Blaser's layers to execute on different operating systems for use in a system having servers running different operating systems. Petition, 10-13.

VirtaMove disputes the arguments based on Blaser's teachings and alleges that Blaser "makes clear that the layers are 'provided of an application layering

system under *a* [single] 32-bit Microsoft Windows architecture," which, according to VirtaMove, "does not teach that a system would involve *numerous different* architectures." DD-Brief, 16 (emphasis & bracketing original). VirtaMove similarly argues that Blaser does not "teach that Blaser's *layers are compatible with* operating systems other than Windows." DD-Brief, 16 (italics original; quotation marks omitted).

Based on these assertions, VirtaMove argues that the Petition extensively relies on Dr. Bhattacharjee's testimony because VirtaMove alleges that Blaser does not expressly disclose that its layers of applications are compatible with various operating systems. DD-Brief, 16-17. VirtaMove is wrong on both counts. Blaser's disclosure is as the Petition explains, and the Petition relies on those disclosures, not merely Dr. Bhattacharjee's testimony.

The Petition explains that Blaser expressly discloses that its layer technique applies to "computing systems" that include "servers" (Blaser (EX1005), 3:16-27; cited in Petition, 14) to provide for "transfer of applications between similar computing systems" (Blaser, 7:12-15; cited in Petition, 14). That is, Blaser discloses using layers to transfer applications between different computers (e.g., servers) in a computer network having multiple servers that are "similar" (not identical) "computing systems" to each other. Blaser, 7:12-15, 6:62-7:23, 8:48-9:4 (cited in Petition, 14). The Petition also demonstrated that Blaser expressly

– 41 –

discloses that its "[e]xample systems" include different versions of "a 32-bit Microsoft Windows architecture, such as Windows 95, 98, NT, 2000, and XP," which are different operating systems based on the patentee's own remarks during prosecution. Blaser, 13:43-57 (cited in Petition, 14); EX1002, 300-301 (cited in Petition, 11-12). Blaser also discloses that its "inventions may be applied to…computing systems" with "Windows$^{TM}$ operating systems" and with "operating systems other than Windows." Blaser, 3:15-36 (cited in Petition, 9-10). Thus, the Petition relies on Blaser's explicit disclosure as teaching those of skill in the art that its layers are compatible with multiple, different operating systems.

As demonstrated above, for both arguments that VirtaMove identifies as allegedly demonstrating extensive reliance on expert testimony, the Petition relies on explicit disclosures in Blaser. The Petition cites Dr. Bhattacharjee "to provide helpful context" for how a person of ordinary skill in the art would understand Blaser's disclosures, consistent with the Office's guidance. *See* Interim Processes FAQs (FAQ #21). For example, Dr. Bhattacharjee explains that Blaser's disclosure of different versions of Windows-based operating systems, like "Windows 95 and Windows 98 would be different OSs" by the "same reasoning" argued during prosecution of the '814 patent where the applicants argued that "Unix-based OSs" like "'Solaris 8' and Solaris 10'" "are OSs that differ." EX1003, ¶[0077] (cited in Petition, 10). Dr. Bhattacharjee further explained that

skilled persons knew (as part of their background knowledge in the art) that applications native to one Windows OS (e.g., Blaser's Windows 95) were often compatible with other Windows OSs (e.g., Blaser's Windows 98), and Dr. Bhattacharjee corroborated this explanation by citing three references demonstrating that knowledge in the art. EX1003, ¶¶[0077]-[0082] (citing EX1017, EX1128, EX1050) (cited in Petition, 12).

VirtaMove also ignores the Petition's alternative obviousness argument that a skilled person would have been "motivate[d to] us[e] Blaser's layers in a system having multiple servers running different OSs" and to make each layer "executable on more than one different OS." Petition, 9-13. VirtaMove does not allege that those arguments are over-reliant on Dr. Bhattacharjee's testimony. With good reason, because the Petition established this motivation to combine by citation to explicit disclosures in Blaser and multiple pieces of independent, corroborating evidence. Petition, 9-11 (citing, quoting, and explaining, *e.g.*, Blaser, 13:1-15, 13:29-41; EX1058, 1:14-21; EX1049, 1:41-58; EX1020, [0004]-[0005]; EX1051, 2:35-37). The Petition explained that the Calder reference—used in combination with Blaser—explicitly discloses techniques for making applications compatible with "non-native platforms" (i.e., making an application compatible with operating systems that are different from the operating system the application was originally intended for). Calder (EX1006), [0101] (cited in Petition, 12). The Petition's

obviousness arguments rely on the plain teachings of Calder (and other corroborating references), not just Dr. Bhattacharjee's testimony, to demonstrate unpatentability.

To the extent VirtaMove's characterization of the corroborating references (e.g., EX1017, EX1128, EX1050) as "shadow references" is intended to criticize them for not being "enumerated" in the Petition's "combination[s]" (DD-Brief, 15, 17), that argument fails because "[t]here is nothing improper with using additional references as corroboration." *PLR Worldwide Sales Ltd., v. Flip Phone Games, Inc.*, IPR2024-00209, Paper 28 at 24 (Apr. 24, 2025) (finding a petition properly relied on evidence providing "corroboration of" the expert's "testimony as to how a person having ordinary skill in the art would have understood the teachings of" a reference in the prior-art combination) (citing *IXI IP, LLC v. Samsung Elec. Co.*, 903 F.3d 1257, 1262-63 (Fed. Cir. 2018)); *PLR*, IPR2024-00209, Paper 28 at 31 (explaining that "corroboration evidence" does not have to be "part of the ground[s]" and "there is no reason to identify it as such"); *Ariosa Diagnostics v. Verinata Health, Inc.*, 805 F.3d 1359, 1365 (Fed. Cir. 2015) ("Art can legitimately serve to document the knowledge that skilled artisans would bring to bear in reading the prior art identified as producing obviousness.").

As discussed above (§§IV.A.1-2), the Petition's extensive citation to corroborating evidence demonstrates the exact opposite of over-reliance on expert testimony.

**B.**  **No Other Forum Has Already Adjudicated the Validity or Patentability of the Challenged Patent Claims, Which Weighs Against Discretionary Denial**

Neither the PTAB nor any other forum has adjudicated the validity or patentability of the challenged patent claims.  *See* Interim Memo, 2.  Thus, this consideration weighs against discretionary denial.

**C.**  **No Settled Expectation of the Parties Supports Discretionary Denial**

The Director's Interim Memorandum says that an additional consideration is the "[s]ettled expectations of the ***parties***" (i.e., the settled expectations of the patent owner ***and*** petitioner).  Interim Memo, 2.  There were no settled expectations of the parties about the '814 patent that would warrant discretionary denial.

The '814 patent issued in 2009.  VirtaMove did not sue Google until 15 years later.  VirtaMove's complaint does not allege that VirtaMove ever called the '814 patent to Google's attention prior to suing Google.[15]  After being sued, Google filed this Petition because the '814 patent's claims are demonstrably unpatentable.  The very "purpose and design" of IPRs—to "weed out bad patent

---

[15] Around the same time VirtaMove also sued Amazon, IBM, and HPE.

claims"—would be fulfilled by the Board addressing the (strong) merits of the Petition, which demonstrates that VirtaMove's '814 patent should never have issued in the first place. *Thryv, Inc. v. Click-To-Call Techs., LP*, 590 U.S. 45, 54 (2020) ("By providing for inter partes review, Congress, concerned about overpatenting and its diminishment of competition, sought to weed out bad patent claims efficiently").

VirtaMove alleges that it had a "settled expectation[]" that it could "adjudicate its patent claims [only] before an Article III court" because the patent issued nearly fifteen years ago at a time before IPRs were available. DD-Brief, 17-18. VirtaMove has known for thirteen of those fifteen years (since 2012) that its patent was subject to IPR, and certainly knew that before it filed suit against Google and others. Any "expectation" VirtaMove allegedly had that the '814 patent was immune from IPR was baseless, unreasonable, and cannot warrant discretionary denial.

That the '814 patent has gone unchallenged for fifteen years also does not demonstrate that VirtaMove had a reasonable, settled expectation of patentability of the challenged claims. It is unsurprising that the '814 patent went unchallenged because it was never asserted before 2024. Once VirtaMove asserted its patent, multiple independent parties challenged its patentability on a multitude of independent grounds. *Google LLC v. VirtaMove, Corp.*, IPR2025-00488 (Jan. 31,

2025); *Amazon.com, Inc. v. VirtaMove, Corp.*, IPR2025-00563, -00566 (Jan. 31, 2025); *IBM Corp. v. VirtaMove, Corp.*, IPR2025-00599 (Feb. 7, 2025). There was never any settled expectation of patentability of the '814 patent's claims that would warrant discretionary denial.

Instead, the public interest is best served by the Director not rewarding VirtaMove for having waited until nearly the end of its patent's life to file suit against Google (and others) by insulating VirtaMove from having to defend the patentability of its claims in this IPR on the merits. *Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 263 (2016) ("The purpose of inter partes review" includes "protect[ing] the public's paramount interest in seeing that patent monopolies are kept within their legitimate scope.") (internal quotation marks and citation omitted).

### D. Compelling Economic Interests Weigh Against Discretionary Denial

There are compelling economic interests in instituting this IPR, which weigh against discretionary denial. Interim Memo, 2. VirtaMove is asserting the '814 patent against several companies: Google, Amazon, HPE, IBM, Microsoft, and Oracle. EX1080, 2; Paper 2, xvii. Thus, there are compelling reasons to have the Board efficiently assess the patentability of the asserted claims. Conversely, there stand to be substantial negative economic consequences if VirtaMove's unpatentable claims remain in force and continue to be asserted in more expensive

and time-consuming litigations.  These considerations weigh against discretionary denial.

## V.     CONCLUSION: A HOLISTIC ASSESSMENT OF ALL DISCRETIONARY FACTORS WEIGHS STRONGLY AGAINST DENIAL

It is highly likely that an FWD will issue well before a district-court trial, which weighs heavily against discretionary denial under *Fintiv*.  *See supra* §II.B.

VirtaMove's other primary assertion is that the length of the Petition's expert declaration "justifies denial of institution, irrespective of any other factors." DD-Brief, 3-5.  That assertion is unsupported by any authority and has been repeatedly rejected by the Director and the Board.  *See supra* §IV.A; *see, e.g.*, *Twitch*, IPR2025-00307, Paper 18 at 3.

The Interim Memo's other additional considerations are considered under a "holistic assessment of all of the evidence and arguments presented" in determining whether to "exercise discretion to deny institution."  *Twitch*, IPR2025-00307, Paper 18 at 3; *Amazon.com, Inc. v. NL Giken Inc.*, IPR2025-00250, Paper 14 at 2 (May 16, 2025).  No other consideration warrants discretionary denial, as discussed above (§§IV.B-D).

Discretionary denial under §314 is not warranted.[16]

Respectfully submitted,

Date:  June 10, 2025

/Elisabeth Hunt/

Elisabeth Hunt, Reg. No. 67,336
WOLF, GREENFIELD & SACKS, P.C.

---

[16] As the Petition established and VirtaMove does not dispute, the prior-art references combined in the Petition's Grounds were not previously presented to the Office.  Petition, 78.  Thus, there is also no basis to deny the Petition under §325(d), and VirtaMove does not allege otherwise.

<u>**CERTIFICATE OF WORD COUNT**</u>

Pursuant to 37 C.F.R. §42.24, the undersigned certifies that the foregoing

**PETITIONER'S OPPOSITION TO PATENT OWNER'S REQUEST FOR**

**DISCRETIONARY DENIAL OF INSTITUTION** contains 10,456 words

excluding; a table of contents, a table of authorities, a certificate of service or word

count, or appendix of exhibits or claim listing. Petitioner has relied on the word

count feature of the word processing system used to create this paper in making

this certification.

Date: June 10, 2025

<u>/Dara Del Rosario/</u>
Dara Del Rosario
Paralegal
WOLF, GREENFIELD & SACKS, P.C.

**CERTIFICATE OF SERVICE UNDER 37 C.F.R. §42.6(E)(4)**

I certify that on June 10, 2025, a copy of the foregoing document, including any exhibits or appendices filed therewith, is being served via electronic mail, as previously consented to by Patent Owner, upon the following:

| | |
|---|---|
| Reza Mirzaie | rmirzaie@raklaw.com |
| | rak_almondnet@raklaw.com |
| Marc A. Fenster | mfenster@raklaw.com |
| Neil Rubin | nrubin@raklaw.com |
| James A. Milkey | jmilkey@raklaw.com |
| Qi (Peter) Tong | ptong@raklaw.com |
| | rak_virtamove@raklaw.com |

Date: June 10, 2025

/Dara Del Rosario/
Dara Del Rosario
Paralegal
WOLF, GREENFIELD & SACKS, P.C.

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

GOOGLE LLC,
Petitioner,

v.

VIRTAMOVE, CORP.,
Patent Owner.

_____

Case No. IPR2025-00488
Patent No. 7,519,814

**PETITIONER'S OPPOSITION TO PATENT OWNER'S REQUEST FOR DISCRETIONARY DENIAL OF INSTITUTION**

<strong><u>TABLE OF CONTENTS</u></strong>

I. INTRODUCTION ................................................................................1

II. DISCRETIONARY DENIAL IS NOT WARRANTED UNDER
*FINTIV* ...........................................................................................4

   A. Factor 1 (Stay Potential) Weighs Against Denial Because NDCA
Commonly Stays Litigation Once IPR Is Instituted.................................5

   B. Factor 2 (Timing of Trial and FWD) Weighs Heavily Against
Denial Because No Trial Date Has Been Set and Any Trial Date
Will Be After FWD ...................................................................................7

      1. No trial date has been scheduled.........................................................7

      2. NDCA's median time-to-trial statistics for civil actions ....................8

      3. Schedules in cases transferred into NDCA at a similar stage
reinforce that a trial is unlikely to take place before FWD................10

      4. VirtaMove's statistics here are not a reliable indicator of what
trial date will be scheduled in VirtaMove's litigation against
Google ..............................................................................................11

      5. NDCA is the correct venue to consider under *Fintiv*........................13

      6. Factor 2 conclusion ..........................................................................14

   C. Factor 3 (Litigation Investment) Weighs Against Discretionary
Denial......................................................................................................15

   D. Factor 4 (Issue Overlap) Weighs Against Discretionary Denial...............16

   E. Factor 5 (Litigation Defendant) Weighs Against Discretionary
Denial......................................................................................................22

   F. Factor 6 (Other Circumstances: Strong Merits) ......................................23

III. AMAZON'S INDEPENDENTLY-FILED PETITIONS DO NOT
WEIGH AGAINST INSTITUTION OF GOOGLE'S PETITIONS...............26

IV. GOOGLE'S OTHER PETITION DOES NOT SUPPORT
DISCRETIONARY DENIAL UNLESS AND UNTIL A TRIAL IS
INSTITUTED ON THAT PETITION ..........................................................31

   A. It Was Appropriate for Google to File Two Petitions Given the
Priority Date Dispute...............................................................................31

– i –

B. VirtaMove's Stipulation Provides No Basis to Discretionarily Deny This Petition Now ................................................................................32

C. This Petition Being Second-Ranked Provides No Basis to Discretionarily Deny This Petition Now .................................................32

D. Google Would Not Oppose Discretionary Denial of This Petition If and Only If a Trial on Google's First-Ranked Petition (IPR2025-00487) Is Instituted So That Discretionary Denial Here Would Trigger VirtaMove's Stipulation .................................................33

V. NONE OF THE OTHER CONSIDERATIONS LISTED IN THE DIRECTOR'S INTERIM MEMORANDUM SUPPORT DISCRETIONARY DENIAL ................................................................35

A. The Petition Does Not Over-Rely on Expert Testimony ...........................35

    1. The Petition does not inappropriately rely on Dr. Bhattacharjee's testimony ................................................36

    2. VirtaMove does not substantiate any alleged inappropriate reliance on Dr. Bhattacharjee's testimony .........................................37

    3. VirtaMove's single example fails to show extensive reliance on expert testimony rather than on the prior art .......................................43

B. No Other Forum Has Already Adjudicated the Validity or Patentability of the Challenged Patent Claims, Which Weighs Against Discretionary Denial ........................................................47

C. No Settled Expectation of the Parties Supports Discretionary Denial ......47

D. Compelling Economic Interests Weigh Against Discretionary Denial ..............................................................................................49

VI. CONCLUSION: A HOLISTIC ASSESSMENT OF ALL DISCRETIONARY FACTORS WEIGHS STRONGLY AGAINST DENIAL ..............................................................................................50

# TABLE OF AUTHORITIES

**CASES**

*Amazon.com, Inc. v. NL Giken Inc.*,
 IPR2025-00250, Paper 14 (PTAB May 16, 2025)................................................50

*Apple Inc. v. Fintiv, Inc.*,
 IPR2020-00019, Paper 11 (PTAB Mar. 20, 2020)..................................... passim

*Apple, Inc. v. Fintiv, Inc.*,
 IPR2020-00019, Paper 15 (PTAB May 13, 2020)................................................22

*Ariosa Diagnostics v. Verinata Health, Inc.*,
 805 F.3d 1359 (Fed. Cir. 2015) .......................................................................46

*B/E Aerospace, Inc. v. Mag Aerospace Indus., LLC*,
 IPR2014-01510, Paper 24 (PTAB Mar. 26, 2015)................................................40

*BioNTech SE v. ModernaTX, Inc.*,
 IPR2023-01359, Paper 20 (PTAB Mar. 19, 2024)................................................25

*Bio-Rad Labs., Inc. v. Cal. Inst. of Tech.*,
 IPR2024-01451, Paper 11 (PTAB Mar. 27, 2025)................................................15

*BMW of N. Am., LLC v. Michigan Motor Techs., LLC*,
 IPR2023-01224, Paper 15 (PTAB Feb. 15, 2024) ................................................8

*Canon USA, Inc. v. Slingshot Printing LLC*,
 IPR2022-01541, Paper 7 (PTAB May. 22, 2023)................................................41

*Charter Commncs., Inc. v. Adaptive Spectrum & Signal Alignment, Inc.*,
 IPR2025-00087, Paper 14 (PTAB May 5, 2025)................................................9

*CrowdStrike, Inc. v. Open Text Inc.*,
 IPR2023-00124, Paper 11 (PTAB June 15, 2023)................................................23

*Cuozzo Speed Techs., LLC v. Lee*,
 579 U.S. 261 (2016) .......................................................................................49

*Ericsson Inc. v. Active Wireless Techs. LLC*,
 IPR2024-00985, Paper 11 (PTAB Dec. 12, 2024)................................................25

*Ford Motor Co. v. Neo Wireless, LLC*,
  IPR2023-00763, Paper 28 (PTAB Mar. 22, 2024)................................................27

*Freewheel Media, Inc. v. Intent IQ, LLC*,
  IPR2024-00419, Paper 9 (PTAB Sept. 4, 2024) ....................................................41

*General Plastic Indus. Co. v. Canon Kabushiki Kaisha*,
  IPR2016-01357, Paper 19 (PTAB Sept. 6, 2017) ......................................... 26, 30

*Google LLC v. Singular Computing LLC*,
  IPR2023-00397, Paper 8 (PTAB July 25, 2023)....................................................33

*GREE, Inc. v. Supercell Oy*,
  2020 WL 6731050 (E.D. Tex. Aug. 14, 2020).......................................................20

*HP Inc. v. Universal Connectivity Techs., Inc.*,
  IPR2024-01429, Paper 11 (PTAB Apr. 16, 2025) ...................................................9

*IXI IP, LLC v. Samsung Elec. Co.*,
  903 F.3d 1257 (Fed. Cir. 2018) ............................................................................46

*Liberty Energy, Inc. v. U.S. Well Servs., LLC*,
  IPR2025-00031, Paper 9 (PTAB Apr. 29, 2025) .....................................................9

*Markforged Inc. v. Continuous Composites Inc.*,
  IPR2022-00679, Paper 7 (PTAB Oct. 25, 2022.)..................................... 17, 22, 23

*Nat'l Beef Packing Co., LLC v. Inst. For Envtl. Health, Inc.*,
  IPR2024-00186, Paper 8 (PTAB Jan. 13, 2025)....................................................39

*Nokia of Am. Corp. v. Soto*,
  IPR2023-00680, Paper 30 (PTAB Dec. 3, 2024)...................................................22

*Palo Alto Networks, Inc. v. Centripetal Networks*,
  IPR2021-01149, Paper 10 (PTAB Feb. 22, 2022) .................................................17

*Pisony v. Commando Constructions, Inc.*,
  2020 WL 4934463 (W.D. Tex. Aug. 24, 2020) ......................................................20

*PLR Worldwide Sales Ltd., v. Flip Phone Games, Inc.*,
  IPR2024-00209, Paper 28 (PTAB Apr. 24, 2025)..................................................46

*Protect Animals With Satellites LLC v. OnPoint Sys., LLC*,
 IPR2021-01483, Paper 11 (PTAB Mar. 4, 2022)...................................................15

*Purdue Pharma L.P. v. Collegium Pharm., Inc.*,
 86 F.4th 1338 (Fed. Cir. 2023) ...................................................................21

*Regents of Univ. of Michigan v. Novartis Pharms. Corp.*,
 2023 WL 6795971 (N.D. Cal. Oct. 12, 2023) ..........................................6

*SAP Am. Inc. v. Cyandia, Inc.*,
 IPR2024-01433, Paper 13 (PTAB Apr. 7, 2025) ...................................25

*Shenzen Root Tech. Co., Ltd. v. Chiaro Tech. Ltd.*,
 IPR2024-01296, Paper 9 (PTAB Feb. 25, 2025) ...................................22

*SNF SA v. Chevron USA Inc.*,
 IPR2022-01534, Paper 12 (PTAB Apr. 19, 2023) ...................................41

*Solus Advanced Materials Co., Ltd. v. SK Nexilis Co., Ltd.*,
 IPR2024-01463, Paper 14 (PTAB Apr. 25, 2025) ...................................19

*Sotera Wireless, Inc. v. Masimo Corp.*,
 IPR2020-01019, Paper 12 (PTAB Dec. 1, 2020).......................................... 18, 19

*Tesla, Inc. v. Charge Fusion Techs., LLC*,
 IPR2025-00032, Paper 11 (PTAB May 19, 2025)................................. 37, 42, 43

*Thryv, Inc. v. Click-To-Call Techs., LP*,
 590 U.S. 45 (2020) ...................................................................................48

*Twitch Interactive, Inc. v. Razdog Holdings LLC*,
 IPR2025-00307, Paper 18 (PTAB May 16, 2025)...................................... passim

*Valve Corp. v. Elec. Scripting Prods., Inc.*,
 IPR2019-00062, Paper 11 (PTAB Apr. 2, 2019) ................................. 26, 27, 30

*Videndum Prod. v. Rotolight*,
 IPR2023-01218, Paper 12 (PTAB Apr. 19, 2024) ................................. 26, 27, 30

*Wasica Finance GmbH v. Continental Auto Sys.*,
 853 F.3d 1272 (Fed. Cir. 2017).................................................................39

*Zomm, LLC v. Apple Inc.*,
   391 F. Supp. 3d 946 (N.D. Cal. 2019)..................................................................6

## STATUTES

35 U.S.C. §314(a) ...............................................................................................33

35 U.S.C. §315(e)(1)...........................................................................................18

35 U.S.C. §315(e)(2)...................................................................................... 18, 19

## REGULATIONS

37 C.F.R. §42.53 .................................................................................................38

37 C.F.R. §42.6(a)(3) ..........................................................................................40

37 C.F.R. §42.65(a)..............................................................................................42

## OTHER AUTHORITIES

FAQs for Interim Processes for PTAB Workload Management................ 36, 38, 42

Interim Processes for PTAB Workload Management (Mar. 26, 2025)........... passim

Patent Trial and Appeal Board
   Consolidated Trial Practice Guide (Nov. 2019)...................................... 31, 32, 33

# LISTING OF EXHIBITS

| Exhibit | Description |
| --- | --- |
| 1001 | U.S. Patent No. 7,519,814 ("'814 patent") |
| 1002 | Prosecution History of U.S. Patent No. 7,519,814 |
| 1003 | Declaration of Samrat Bhattacharjee, Ph.D. ("Bhattacharjee") |
| 1004 | Curriculum Vitae of Samrat Bhattacharjee, Ph.D. |
| 1005 | U.S. Patent No. 7,117,495 ("Blaser") |
| 1006 | U.S. Patent Application Publication No. 20020066022 ("Calder") |
| 1007 | U.S. Patent No. 6,931,449 ("Schmidt-449") |
| 1008 | U.S. Patent Application Publication No. 20020095479 ("Schmidt-479") |
| 1009 | U.S. Patent Application Publication No. 20020133529 ("Schmidt-529") |
| 1010 | U.S. Patent Application Publication No. 20020124072 ("Tormasov") |
| 1011 | U.S. Patent Application Publication No. 20010009425 |
| 1012 | U.S. Patent Application Publication No. 20010018708 |
| 1013 | U.S. Patent Application Publication No. 20010047472 |
| 1014 | U.S. Patent Application Publication No. 20010056572 |
| 1015 | U.S. Patent Application Publication No. 20010029605 |
| 1016 | U.S. Patent Application Publication No. 20020023158 |
| 1017 | U.S. Patent Application Publication No. 20020052727 |
| 1018 | U.S. Patent Application Publication No. 20020143795 |
| 1019 | U.S. Patent Application Publication No. 20020156612 |
| 1020 | U.S. Patent Application Publication No. 20020156877 |
| 1021 | U.S. Patent Application Publication No. 20020174215 |
| 1022 | U.S. Patent Application Publication No. 20020188718 |
| 1023 | U.S. Patent Application Publication No. 20020194394 |
| 1024 | U.S. Patent Application Publication No. 20020194488 |
| 1025 | U.S. Patent Application Publication No. 20030009408 |
| 1026 | U.S. Patent Application Publication No. 20030014381 |

| Exhibit | Description |
| --- | --- |
| 1027 | U.S. Patent Application Publication No. 20030014466 |
| 1028 | U.S. Patent Application Publication No. 20030018717 |
| 1029 | U.S. Patent Application Publication No. 20030023839 |
| 1030 | U.S. Patent Application Publication No. 20030041173 |
| 1031 | U.S. Patent Application Publication No. 20030093688 |
| 1032 | U.S. Patent Application Publication No. 20030097464 |
| 1033 | U.S. Patent No. 6,467,052 |
| 1034 | U.S. Patent Application Publication No. 20030140179 |
| 1035 | U.S. Patent Application Publication No. 20030154221 |
| 1036 | U.S. Patent No. 7,159,184 |
| 1037 | U.S. Patent No. 7,103,745 |
| 1038 | U.S. Patent No. 6,263,440 |
| 1039 | U.S. Patent Application Publication No. 20040190534 |
| 1040 | U.S. Patent No. 7,356,771 |
| 1041 | U.S. Patent No. 5,903,753 |
| 1042 | U.S. Patent No. 4,685,125 |
| 1043 | U.S. Patent No. 5,406,644 |
| 1044 | U.S. Patent No. 5,421,009 |
| 1045 | U.S. Patent No. 5,568,630 |
| 1046 | U.S. Patent No. 5,640,562 |
| 1047 | U.S. Patent No. 5,657,221 |
| 1048 | U.S. Patent No. 5,675,831 |
| 1049 | U.S. Patent No. 5,742,829 |
| 1050 | U.S. Patent No. 4,742,450 |
| 1051 | U.S. Patent No. 5,761,669 |
| 1052 | U.S. Patent No. 5,784,555 |
| 1053 | U.S. Patent No. 5,835,765 |

| Exhibit | Description |
|---|---|
| 1054 | U.S. Patent No. 6,044,465 |
| 1055 | U.S. Patent No. 6,122,744 |
| 1056 | U.S. Patent No. 6,195,650 |
| 1057 | U.S. Patent No. 6,321,323 |
| 1058 | U.S. Patent No. 6,363,409 |
| 1059 | U.S. Patent No. 6,453,470 |
| 1060 | U.S. Patent No. 6,567,767 |
| 1061 | U.S. Patent No. 6,732,359 |
| 1062 | U.S. Patent No. 6,874,148 |
| 1063 | U.S. Patent No. 6,985,937 |
| 1064 | U.S. Patent No. 7,140,015 |
| 1065 | U.S. Patent No. 7,185,192 |
| 1066 | U.S. Patent No. 7,454,440 |
| 1067 | U.S. Patent No. 8,209,680 |
| 1068 | U.S. Patent No. 5,926,636 |
| 1069 | U.S. Patent No. 5,218,530 |
| 1070 | U.S. Patent No. 6,134,593 |
| 1071 | U.S. Patent No. 6,918,038 |
| 1072 | U.S. Patent Application Publication No. 20040034623 |
| 1073 | U.S. Patent No. 7,461,148 |
| 1074 | U.S. Patent No. 7,136,800 |
| 1075 | PCT Application Publication No. WO2002056156 |
| 1076 | Kamp et al., "Jails: Confining the omnipotent root," Proceedings of the 2nd International SANE Conference (Vol. 43, p. 116) (2000) |
| 1077 | Prevelakis et al., "Sandboxing Applications," USENIX Annual Technical Conference, FREENIX Track (pp. 119-126) (2001) |
| 1078 | Plaintiff VirtaMove Corp.'s Supplemental Preliminary Disclosure of Asserted Claims and Infringement Contentions, in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (Sept. 06, 2024) |

| Exhibit | Description |
|---|---|
| 1079 | Chart re: '814 Patent accompanying Plaintiff VirtaMove Corp.'s Supplemental Preliminary Disclosure of Asserted Claims and Infringement Contentions, in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (Sept. 6, 2024) |
| 1080 | First Amended Complaint for Patent Infringement Against Google LLC in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (May 21, 2024) |
| 1081 | Scheduling Order in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (June 17, 2024) (ECF 34) |
| 1082 | Federal Court Management Statistics–Profiles, U.S. District Courts–Combined Civil and Criminal (September 2024) |
| 1083 | U.S. Patent Application Publication No. 20020095500 ("Schmidt-500") |
| 1084 | U.S. Patent Application Publication No. 20050169073 |
| 1085 | U.S. Provisional Application No. 60/533,388 |
| 1086 | U.S. Patent No. 5,412,808 |
| 1087 | Order Granting Defendant Google LLC's Motion to Transfer Venue to the Northern District of California in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (Jan. 22, 2025) |
| 1088 | Microsoft's Computer Dictionary (5th ed. 2002) (excerpt) |
| 1089 | U.S. Patent No. 6,381,742 |
| 1090 | U.S. Patent Application Publication No. 20030035430 |
| 1091 | U.S. Patent No. 6,477,624 |
| 1092 | U.S. Patent No. 5,931,947 |
| 1093 | U.S. Patent No. 6,148,335 |
| 1094 | U.S. Patent No. 6,944,790 |
| 1095 | U.S. Patent No. 6,014,135 |
| 1096 | U.S. Patent No. 6,282,660 |
| 1097 | U.S. Patent Application Publication No. 20040153709 |
| 1098 | U.S. Patent Application Publication No. 20050050389 |
| 1099 | U.S. Patent Application Publication No. 20040225952 |

| Exhibit | Description |
|---|---|
| 1100 | Google LLC's Proposed Claim Terms for Construction in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (Oct. 1, 2024) |
| 1101 | Plaintiff's Disclosure of Proposed Claim Constructions in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (Oct. 1, 2024) |
| 1102 | Google LLC's Opening Claim Construction Brief in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (Oct. 24, 2024) |
| 1103 | Plaintiff's Responsive Claim Construction Brief in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (Nov. 12, 2024) |
| 1104 | Google LLC's Reply Claim Construction Brief in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (Nov. 26, 2024) |
| 1105 | Plaintiff's Sur-Reply Claim Construction Brief in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (Dec. 13, 2024) |
| 1106 | Joint Claim Construction Statement in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (Dec. 18, 2024) |
| 1107 | U.S. Provisional Application No. 60/502,619 |
| 1108 | U.S. Patent Application Publication No. 20050188268 |
| 1109 | U.S. Patent Application Publication No. 20020140743 |
| 1110 | U.S. Patent Application Publication No. 20020143906 ("Tormasov-906") |
| 1111 | U.S. Patent No. 7,076,633 ("Tormasov-633") |
| 1112 | U.S. Patent Application Publication No. 20060089950 ("Tormasov-950") |
| 1113 | U.S. Patent No. 7,222,132 ("Tormasov-132") |
| 1114 | U.S. Patent Application Publication No. 20020147815 ("Tormasov-815") |
| 1115 | U.S. Patent No. 7,209,973 ("Tormasov-973") |
| 1116 | U.S. Patent Application Publication No. 20020138629 ("Schmidt-629") |
| 1117 | U.S. Patent No. 6,944,860 ("Schmidt-860") |
| 1118 | U.S. Patent Application Publication No. 20020174265 ("Schmidt-265") |

| Exhibit | Description |
|---|---|
| 1119 | U.S. Patent Application Publication No. 20020116659 ("Tormasov-659") |
| 1120 | Bach, Maurice. 1987. Design of the Unix Operating System by Marice J Bach, 1 edition (Feb. 27, 1987) Prentice Hall; ISBN: 0132017997. |
| 1121 | Crowley, Charles. 1997. Operating Systems: a design-oriented approach. Irwin. 1997. ISBN 0-256-15151-2. |
| 1122 | Eckel, George and Chris Hare. 1995. Building a Linux Internet Server, Chris Hare", G. Eckel, New Riders Publishing; ISBN: 1562055259. |
| 1123 | RESERVED |
| 1124 | RESERVED |
| 1125 | RESERVED |
| 1126 | RESERVED |
| 1127 | U.S. Patent No. 6,854,009 |
| 1128 | U.S. Patent No. 7,080,356 |
| 1129 | U.S. Patent No. 5,870,539 |
| 1130 | U.S. Patent No. 6,883,028 |
| 1131 | U.S. Patent No. 7,209,959 |
| 1132 | U.S. Patent Application Publication No. 20020065835 |
| 1133 | The Wayback Machine archive of USENIX Association – Home Page (2001-11-14) |
| 1134 | The Wayback Machine archive of USENIX – Publications – Proceedings (2001-11-15) |
| 1135 | The Wayback Machine archive of USENIX – 2001 USENIX Annual Technical Conference (2001-11-11) |
| 1136 | The Wayback Machine archive of USENIX – 2001 USENIX Annual Technical Conference (2001-11-11) |
| 1137 | The Wayback Machine archive of 2001 FREENIX Track Technical Program – Abstract (2002-01-12) |
| 1138 | The Wayback Machine archive of "Sandboxing Applications" (2003-03-29) |

| Exhibit | Description |
|---|---|
| 1139 | The Wayback Machine archive of "Sandboxing Applications" (2004-01-19) |
| 1140 | The Wayback Machine archive of PDF of "Sandboxing Applications" (2004-01-19) |
| 1141 | The Wayback Machine archive of NLUUG: UNIX User Group – The Netherlands (2001-07-22) |
| 1142 | The Wayback Machine archive of NLUUG: Previous Events (2001-08-03) |
| 1143 | The Wayback Machine archive of Second International SANE Conference (2001-08-12) |
| 1144 | The Wayback Machine archive of Second International SANE Conference (2001-06-20) |
| 1145 | The Wayback Machine archive of "Jails: Confining the omnipotent root." (2000-09-02) |
| 1146 | The Wayback Machine archive of Linux Journal (1999-05-08) |
| 1147 | RESERVED |
| 1148 | RESERVED |
| 1149 | RESERVED |
| 1150 | Cong. Rsch. Serv., R48016, The Patent Trial and Appeal Board and Inter Partes Review (May 28, 2024) |
| 1151 | Docket Navigator Statistics for Motion Success for Stay Pending IPR (Post-Institution) in N.D. Cal. (2013–present) |
| 1152 | Docket Navigator Median Time to Trial for NDCA (May 1, 2020 to May 11, 2025) |
| 1153 | RESERVED |
| 1154 | Civil Docket in *VirtaMove, Corp. v. Google LLC*, 5:25-cv-00860-NW (N.D. Cal.) (as of June 9, 2025) (includes civil docket for 7:24-cv-00033 (W.D. Tex.)) |
| 1155 | Civil Docket in *Anonymous Media Research Holdings, LLC v. Roku, Inc.*, 3:24-cv-04171-VC (N.D. Cal.) (includes civil docket for 1:23-cv-01143 (W.D. Tex.)) |

| Exhibit | Description |
| --- | --- |
| 1156 | Civil Docket in *Universal Connectivity Techs. Inc. v. HP Inc.*, 5:24-cv-04097-NW (N.D. Cal.) (includes civil docket for 1:23-cv-01177 (W.D. Tex.)) |
| 1157 | Civil Docket in *IP, LLC v. Lyft, Inc.*, 3:24-cv-03348-RFL (N.D. Cal.) (includes civil docket for 7:24-cv-00051 (W.D. Tex.)) |
| 1158 | Civil Docket in *Safecast Ltd. v. Google, LLC*, 5:23-cv-03128-PCP (N.D. Cal.) (includes civil docket for 6:22-cv-00678 (W.D. Tex.)) |
| 1159 | Civil Docket in *eCardless Bancorp, Ltd. v. PayPal Holdings Inc.*, 5:24-cv-01054-BLF (N.D. Cal.) (includes civil docket for 7:22-cv-00245 (W.D. Tex.)) |
| 1160 | RESERVED |
| 1161 | Docket Navigator Data on Granted Petitions for Writ of Mandamus by Federal Circuit for Legal Issues Regarding Venue |
| 1162 | RESERVED |
| 1163 | RESERVED |
| 1164 | Scheduling Order in *Safecast Ltd. v. Google, LLC*, 5:23-cv-03128-PCP (N.D. Cal. Nov. 27, 2023) |
| 1165 | Scheduling Order in *Safecast Ltd. v. Google, LLC*, 6:22-cv-00678-ADA (W.D. Tex. Jan. 6, 2023) |
| 1166 | Scheduling Order in *eCardless Bancorp, Ltd. v. PayPal Holdings Inc.*, 5:24-cv-01054-BLF (N.D. Cal. May 27, 2024) |
| 1167 | Scott R. Boalick (Chief APJ), *Guidance on USPTO's recission of "Interim Procedure for Discretionary Denials in AIA Post-Grant Proceedings with Parallel District Court Litigation"* (Mar. 24, 2025), *available at* https://www.uspto.gov/sites/default/files/documents/guidance_memo_on_interim_procedure_recission_20250324.pdf (last checked June 2, 2025) |
| 1168 | *Oracle Corp. v. VirtaMove, Corp.*, IPR2025-00965, Paper 4 (May 16, 2025) (joinder motion) |
| 1169 | *Microsoft Corp. v. VirtaMove, Corp.*, IPR2025-00850, Paper 3 (Apr. 18, 2025) (joinder motion) |

| Exhibit | Description |
|---|---|
| 1170 | RESERVED |
| 1171 | RESERVED |
| 1172 | VirtaMove Corp's Petition for Writ of Mandamus, *In re VirtaMove Corp.*, Misc. Dkt. No. 25-130 (Fed. Cir. June 5, 2025) |
| 1173 | Civil Docket in *VirtaMove, Corp. v. Google LLC*, 7:24-cv-00033-DC-DTG (W.D. Tex.) (as of June 5, 2025) |

## I. INTRODUCTION

In filing both this IPR2025-00488 and IPR2025-00487 challenging the '814 patent, Petitioner Google explained that "[t]he potential priority dispute between the parties justifies institution of two petitions." Paper 3 at 4. Google ranked IPR2025-00487 first and ranked this IPR2025-00488 second. *Id*. at 1. Patent Owner VirtaMove now states that "if the instant Petition is denied on discretionary grounds and IPR2025-00487 is instituted, Patent Owner stipulates that it will not contest the prior art status of the combination references relied on in IPR2025-00487 for purposes of that proceeding." Paper 8 (VirtaMove's Request for Discretionary Denial, hereafter "DD-Brief") at 17-18. As discussed *infra* §IV.D, in reliance on VirtaMove's stipulation which is conditioned on IPR2025-00487 being instituted, Google would not oppose this IPR2025-00488 being discretionarily denied institution if IPR2025-00487 is instituted. Accordingly, Google respectfully requests that the Director send this IPR2025-00488 to a merits panel with an instruction to discretionarily deny institution of this Petition, because of VirtaMove's stipulation, ***if and only if*** the merits panel first institutes a trial in IPR2025-00487.

As discussed in the other sections below and likewise in Google's Opposition to VirtaMove's discretionary-denial request in IPR2025-00487, VirtaMove's other alleged bases for requesting discretionary denial are meritless.

VirtaMove's lawsuit against Google was recently transferred from the Western District of Texas (WDTX) to the Northern District of California (NDCA), where no trial date has been set and an initial case management conference has yet to be scheduled. The *Fintiv* factors weigh strongly against denial because it is highly likely that a final written decision ("FWD") will issue in this IPR well before any trial will take place in NDCA.

As the Director found in the *Twitch Interactive* cases discussed *infra* §II.A, NDCA has stayed parallel litigation 76% of the time after institution of an *inter partes* review. And if the NDCA litigation is not stayed, there is no reason to believe that any trial date (there currently is none) would precede an FWD in this IPR. EX2003, at 66; *infra* §II.B.1-3. VirtaMove says that because of progress allegedly made in WDTX before the litigation was transferred, a trial is likely to take place in NDCA within the next 12 months. That baseless assertion is refuted by objective evidence. Fact discovery in WDTX had only just commenced before the case was stayed and then transferred to NDCA. *See infra* §II.C. In two examples of similarly-situated cases that were also recently transferred to NDCA from WDTX after claim construction briefing was concluded, trials were scheduled for 20 months or more after the initial case management conference (EX1164, EX1166), which is currently unscheduled in this case. *See infra* §II.B.3. Thus, any trial date to be scheduled in NDCA will likely be well after the FWD

issues.  *Infra* §§II.B.2-3.  The *Fintiv* factors therefore weigh heavily against discretionary denial.

VirtaMove's separate assertion that discretionary denial is warranted because the Petition allegedly "over"-relies on expert testimony is baseless. VirtaMove exalts form over substance by criticizing the declaration's length.  The Director and the Board have consistently rejected that argument based on declarations of comparable length.  *See infra* §§V.A.1-2.  VirtaMove's other complaint is that the expert declaration cites prior-art references (which VirtaMove pejoratively calls "shadow references") to corroborate the expert's explanations of background knowledge of those of skill in the art.  These citations show exactly the opposite of "over"-reliance on expert testimony, by demonstrating that the Petition makes its case based on patents and printed publications rather than an expert's say-so.  Indeed, in a recent decision rejecting the same argument VirtaMove advances, the Board applauded an expert declaration for extensively citing corroborating references.  *See infra* §V.A.2.  There is nothing about the Petition's citation to the expert declaration that warrants discretionary denial.

VirtaMove's additional assertion that Amazon having filed its own petitions warrants discretionary denial is premised on the assertion that Google "coordinated" with Amazon on the IPRs.  That unsubstantiated assertion is false. VirtaMove sued Amazon, Google, IBM, and Hewlett Packard Enterprise ("HPE")

over a two-week period, and then Microsoft and Oracle several months later, on the same patents. That VirtaMove faces IPRs from multiple petitioners is the unsurprising direct result of VirtaMove's own choices. VirtaMove's assertion that discretionary denial is warranted because an unrelated company (Amazon) filed its own IPR petition is contrary to the Board's established precedent.

Finally, VirtaMove ignores the Petition's merits. Petitioner identified prior art that was not of record during original prosecution and that discloses the claim feature that the examiner found missing from the prior art of record during prosecution in allowing the '814 patent. *See infra* §II.F. The strength of the Petition is reinforced by the fact that two sophisticated companies—Microsoft and Oracle—have moved to join this IPR. The Petition's strong merits weigh against discretionary denial.

## II.  DISCRETIONARY DENIAL IS NOT WARRANTED UNDER *FINTIV*

There is no basis to deny this IPR under *Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 11 (precedential) (Mar. 20, 2020) ("*Fintiv*"). The parties' litigation was recently transferred from WDTX to NDCA and no trial date has been scheduled. Indeed, NDCA has yet to schedule an initial case management conference ("CMC") to discuss a schedule and set a trial date.

There is every reason to believe that no trial will take place in NDCA until after an FWD issues in this IPR. Examples of other recent cases in procedural

postures like Google's NDCA case (i.e., transferred from WDTX to NDCA after claim construction briefing was completed), as well as NDCA's median time-to-trial statistics, demonstrate that the trial is highly likely to be scheduled for a date *after* the date by which an FWD will issue here. *See infra* §§II.B.2-3. And as the Director recently found in deciding not to exercise her discretion to deny an IPR based on a parallel litigation in NDCA, stays are granted at a high rate (76%) in that jurisdiction after an IPR is instituted, which further weighs against discretionary denial. *See infra* §II.A.

"The framers of the AIA intended for IPR to serve as a faster, less costly alternative to district court litigation" and to "improve patent quality by providing a more efficient means to adjudicate patent validity issues." EX1150, i, 13. Those objectives would be served here by having a merits panel evaluate Google's IPR on the merits. The efficiencies gained if the Board were to institute an IPR trial would be further magnified given that Oracle and Microsoft have sought to join Google's IPRs in understudy roles.

The *Fintiv* factors weigh heavily in favor of instituting this IPR.

### A. Factor 1 (Stay Potential) Weighs Against Denial Because NDCA Commonly Stays Litigation Once IPR Is Instituted

*Fintiv* Factor 1, which considers the likelihood of a stay, weighs against discretionary denial. As ***the Director recently recognized***, the stay rate in NDCA is 76% in cases like this where an FWD will precede the trial date (which is as-yet

unscheduled here).  *See Twitch Interactive, Inc. v. Razdog Holdings LLC*, IPR2025-00307, Paper 18 at 2-3 (May 16, 2025) (finding potential for stay in NDCA weighed against discretionary denial where a yet-to-be-scheduled trial would likely occur after FWD, because "[o]ver the past twelve years" NDCA judges "have granted or partially granted 76% of all post-institution motions to stay pending" IPRs) (citing evidence from Docket Navigator);[1] *see also Regents of Univ. of Michigan v. Novartis Pharms. Corp.*, No. 22-CV-04913-AMO, 2023 WL 6795971, at *1 (N.D. Cal. Oct. 12, 2023) ("Courts in this district have often recognized a 'liberal policy in favor of granting motions to stay' pending IPR." (quoting *Zomm, LLC v. Apple Inc.*, 391 F. Supp. 3d 946, 956 (N.D. Cal. 2019)).

Nevertheless, VirtaMove argues "there is no reason to suggest" that NDCA will stay the litigation.  *See* DD-Brief, 7.  This is not credible.  VirtaMove itself represented to the Federal Circuit in a mandamus petition filed just last week seeking to undo the transfer to NDCA that the NDCA "is known to stay cases pending USPTO proceedings."  EX1172, 34.

Thus, Factor 1 weighs against discretionary denial.

---

[1] The most up-to-date stay percentage for NDCA is the same.  EX1151 (76%).

**B. Factor 2 (Timing of Trial and FWD) Weighs Heavily Against Denial Because No Trial Date Has Been Set and Any Trial Date Will Be After FWD**

Factor 2 considers the relative timing of the court's trial date and the IPR's FWD. Because no trial date has been set in NDCA, and because any trial is likely to take place after the FWD here, Factor 2 weighs heavily against denial. VirtaMove's arguments, which are inconsistent with representations it has made in other forums, do not show otherwise.

**1. No trial date has been scheduled**

On May 7, 2025, WDTX ordered VirtaMove's case against Google transferred to NDCA. EX1173, at 9 (DKT#102). Google's motion for transfer had been granted by the WDTX magistrate judge in January but was stayed at VirtaMove's request to allow VirtaMove time to object. *See id.*, 8 (DKT#86), 9 (DKT#94-95). In May, the WDTX District Court Judge overruled VirtaMove's objections to the magistrate's transfer order, and ordered the case transferred to NDCA. *See id.*, 9 (DKT#102).

The court normally will not set a schedule with a trial date until at or after the initial case management conference, which itself currently does not have a

– 7 –

scheduled date.[2]  Given that NDCA has not set a trial date, Factor 2 weighs against discretionary denial.  *Twitch*, IPR2025-00307, Paper 18 at 2-3 (Director declining to discretionarily deny institution where, like here, an NDCA trial had not yet been scheduled but some discovery had already occurred); *id.*, Paper 11 at 12-13 (discussing some discovery having occurred); *see also BMW of N. Am., LLC v. Michigan Motor Techs., LLC*, IPR2023-01224, Paper 15 at 11 (Feb. 15, 2024) ("Factor 2 favors institution as it is undisputed that no trial date was set in district court.").

**2.  NDCA's median time-to-trial statistics for civil actions**

In a memorandum dated March 24, 2025, Chief APJ Boalick stated that the Board will consider "median time-to-trial statistics for civil actions" under *Finitiv* Factor 2.  EX1167, at 3.  The Director's March 26, 2025 Memorandum addressing "Interim Processes for PTAB Workload Management" (hereafter "Interim Memo") issued two days later on March 26, 2025.  Since the issuance of the Director's Interim Memo, several Board decisions have relied on the most recent median-time-to-trial statistics for all civil actions.  *See Charter Commncs., Inc. v. Adaptive*

---

[2] There have been some false-starts in setting a case management conference in NDCA but, at present, no initial case management conference is on the schedule. *See* EX1154.

*Spectrum & Signal Alignment, Inc.*, IPR2025-00087, Paper 14 at 9-11 (May 5, 2025) (citing the most recent median time-to-trial statistics for all civil cases); *Liberty Energy, Inc. v. U.S. Well Servs., LLC*, IPR2025-00031, Paper 9 at 11-12 (Apr. 29, 2025) (citing the Interim Memo as support for finding consistency between "median time-to-trial statistics" and a scheduled trial date); *HP Inc. v. Universal Connectivity Techs., Inc.*, IPR2024-01429, Paper 11 at 8-9 (Apr. 16, 2025) (citing the most recent median "time-to-trial statistics" for civil actions).

VirtaMove concedes that NDCA's current median time-to-trial for all civil actions is 34.5 months.  DD-Brief, 8 n.2 (citing EX2003, at 66).  Thus, even if VirtaMove were right that its litigation against Google in NDCA is about "halfway" to trial (DD-Brief, 7),[3] applying NDCA's median time-to-trial for all civil actions indicates that even if a case management conference were held tomorrow, a trial would likely be scheduled for a date more than 17 months (half of 34 months) from now, which would be two months ***after*** the FWD will issue here.[4]

---

[3] The litigation is not halfway to trial.  *See infra* §§II.B.3-4, §II.C.

[4] Also, as discussed *infra* §II.B.4, even if representative statistics for only patent cases were used, they still would put trial later than FWD.

### 3. Schedules in cases transferred into NDCA at a similar stage reinforce that a trial is unlikely to take place before FWD

Petitioner has been able to identify two other cases that were transferred from WDTX to NDCA in the past two years at a similar procedural stage to VirtaMove's case against Google—where claim construction briefing had occurred in WDTX but a *Markman* hearing had not—and thereafter had scheduling orders entered in NDCA. Those scheduling orders provide further evidence that trial likely will be scheduled for a date after the FWD in this case.

*eCardless Bancorp, Ltd. v. PayPal Holdings Inc.*, 5-24-cv-01054 (NDCA) involved a case transferred to NDCA from WDTX after claim construction briefing was completed but before a *Markman* hearing. EX1159, at 6 (DKT#61, 11/01/2023 reply claim construction brief filed in WDTX), 8 (DKT#86, 02/22/2024 transfer of case to NDCA). Trial in that case was scheduled for *20 months* after the case management conference—i.e., 23 months after WDTX's transfer order. *See* EX1159, at 10-11 (DKT#116, order setting case management conference for 05/02/2024; DKT#123, scheduling order setting trial for 01/12/2026).

*Safecast Ltd. v. Google LLC* was also transferred to NDCA from WDTX after claim construction briefing was completed but before a *Markman* hearing. EX1158, at 5 (DKT#53, WDTX *Markman* hearing scheduled for 06/29/2023; DKT#54, joint claim construction brief filed; DKT#56, 06/23/2023 order granting

motion to transfer to NDCA).  Trial in that case was scheduled for *24 months* after the case management conference—i.e., 28.5 months after WDTX's transfer order. *See* EX1158, at 9-10 (DKT#87, order setting case management conference for 11/09/2023; DKT#98, scheduling order setting trial for 11/10/2025).

Thus, the above two cases having similar procedural postures as Google's had their NDCA trial dates scheduled for a date 20-24 months after the date of the case management conference.  An FWD will be due in this IPR within 15 months from now; thus, similar timing in NDCA would place trial months after FWD, even if a case management conference in Google's case were held tomorrow.

### 4. VirtaMove's statistics here are not a reliable indicator of what trial date will be scheduled in VirtaMove's litigation against Google

Initially, despite telling the Director that trial in NDCA is likely to happen within 9-12 months (DD-Brief, 8), in its just-filed petition seeking mandamus to overturn or vacate the order transferring the case to NDCA, VirtaMove told the Federal Circuit that "VirtaMove's case is likely to languish in the NDCA for 6-7 years without trial."  EX1172, at 1.  Regardless, VirtaMove bases an estimated trial date on EX2002, which VirtaMove characterizes as including Docket Navigator's "median time-to-trial statistics" for NDCA for patent cases "from May [01,] 2020 to" May 11, 2025.  But as VirtaMove notes, this "exclud[es] cases with stays." DD-Brief, 7-8.  As such, VirtaMove lists just *five* patent cases.  When cases with

stays are ***not*** excluded over the same five-year period covered by EX2002, there are 12 patent cases that went to trial, and Docket Navigator's median time-to-trial for those cases in NDCA is ***31*** months. *See* EX1152. That is comparable to NDCA's median time-to-trial for all civil cases, which VirtaMove concedes is 34.5 months. DD-Brief, 8 n.2 (citing EX2003, at 66).

Despite the Board's practice to the contrary (*supra* §II.B.2), VirtaMove alleges that stayed cases should be excluded when determining median time-to-trial because if this case were "hypothetically stayed pending IPR, then its time-to-trial is not relevant" (because trial would necessarily occur *after* final written decision). DD-Brief, 8 n.2. VirtaMove cites no case where the Director or the Board has excluded stayed cases in determining a median time-to-trial. There is good reason why the Director and the Board should consider all cases (including stayed cases) in determining the median time-to-trial. Considering ***all*** patent cases in NDCA is a more accurate indicator of when this case will go to trial than VirtaMove's sample because nothing suggests that this case will be among the minority of cases that would not be stayed if this IPR is instituted.

VirtaMove also argues that "[b]ecause claim construction briefing was already completed" in WDTX, "the case is approximately halfway to trial" so that "the time to trial will be reduced significantly" and "be set for 9-12 months from the May 7 transfer date." DD-Brief, 7-8. This is unsupported by any ***evidence***. As

discussed further below (§II.C addressing Factor 3), there is much work to be done before the trial would occur. While claim construction briefing occurred in WDTX, no *Markman* hearing has yet been held, and no decision has been issued. Fact discovery had only just opened on January 10 before the WDTX case was stayed on January 22 and then transferred. And as explained above (§§II.B.2-3), median time-to-trial statistics for all civil cases and actual schedules for similarly-situated patent cases transferred into NDCA illustrate that a trial is not likely to be scheduled to occur until after the FWD.

By any reasonable metric (*see supra* §§II.B.1-3), a trial in NDCA is highly unlikely to take place until after an FWD has issued in this IPR.

### 5. NDCA is the correct venue to consider under *Fintiv*

Although VirtaMove filed a petition for writ of mandamus with the Federal Circuit on June 4, 2025 seeking reversal or vacatur of the transfer to NDCA (EX1172, at 3), VirtaMove does not dispute that the NDCA proceeding is the one to consider for *Fintiv* analysis. VirtaMove's request to the Director for

discretionary denial only argues for denial under *Fintiv* in view of the case proceeding in NDCA, not back in WDTX.[5]  DD-Brief, 5-14.

The Federal Circuit typically takes about two and a half months to issue orders responsive to mandamus petitions.  *See* EX1155-EX1157.  Docket Navigator lists few, if any, cases since 2017 where the Federal Circuit granted a ***plaintiff's*** mandamus petition to overturn or vacate a district court's venue-transfer order.  *See* EX1161.  Even in the highly unlikely event that the case was transferred back, WDTX would have to issue a new scheduling order.  Trial in WDTX was still 12.5 months away when the court granted Google's transfer motion.  EX1154, at 4 (DKT#34, setting WDTX trial for 02/02/2026), 8 (DKT#86, 01/22/2025 order granting motion to transfer).  It is highly unlikely that there will be a trial in WDTX at all, let alone one that would occur before the FWD issues.

### 6.    Factor 2 conclusion

For the reasons discussed above (§§II.B.1-5), there is every reason to believe that no district-court trial will take place until after an FWD issues.  Thus, Factor 2 weighs heavily against denial.

---

[5] If the Director were to authorize VirtaMove to belatedly seek discretionary denial under *Fintiv* in view of an anticipated trial in WDTX rather than NDCA, Google would seek authorization to respond to any such belated argument.

## C. Factor 3 (Litigation Investment) Weighs Against Discretionary Denial

There has been limited investment in the district-court litigation. "[A] significant portion of work remains to be done," including scheduling and conducting a *Markman* hearing and conducting most "fact" discovery and all "expert discovery and dispositive motions." *Protect Animals With Satellites LLC v. OnPoint Sys., LLC*, IPR2021-01483, Paper 11 at 14-15 (Mar. 4, 2022). Indeed, in NDCA, "the court has not set any deadlines for those activities" yet. *Bio-Rad Labs., Inc. v. Cal. Inst. of Tech.*, IPR2024-01451, Paper 11 at 10 (Mar. 27, 2025). Thus, Factor 3 weighs strongly against discretionary denial.

VirtaMove alleges that "the parties have already served extensive infringement and invalidity contentions, and fully briefed and already had a hearing on claim construction." DD-Brief, 9. Much of that is false. A claim construction hearing was scheduled for January 21, 2025, but was never held because WDTX cancelled the hearing before transferring the case to NDCA. EX1154, at 7 (DKT#84, cancelling *Markman* hearing). And only ***preliminary*** infringement and invalidity contentions were served, not final contentions. Fact discovery had opened January 10, 2025 (EX1081, at 3) and the parties served discovery requests, but neither party responded to them given the transfer order and stay that occurred 12 days later.

VirtaMove further argues (without evidence) that, under an alleged "typical schedule," by the time of the institution decision (three months from now), "a claim construction order will have issued, the parties will have nearly completed fact discovery, and the parties will be preparing opening expert reports." DD-Brief, 9. But actual schedules in NDCA for similarly-situated cases (transferred from WDTX after claim construction briefing) support that a *Markman* hearing, an order, and nearly-complete fact discovery would not happen until after the institution decision. *See* EX1166 (*eCardless* scheduling order setting *Markman* hearing over 5 months after the case management conference, fact discovery closing 8.5 months after the case management conference); EX1165 (*SafeCast* scheduling order leaving *Markman* hearing unscheduled and setting fact discovery to close 12 months after the case management conference).

Factor 3 weighs heavily against denial.

### D. Factor 4 (Issue Overlap) Weighs Against Discretionary Denial

This Petition challenges all 34 claims of the '814 patent, while only 8 are asserted in district court. EX1079; DD-Brief, 10. VirtaMove's "stipulat[ion] that it will not assert against Google any claims of the '814 patent other than those already asserted against Google" ("if institution is denied") (DD-Brief, 10) does not change the fact that Google's IPR addresses 26 claims that NDCA will not address. That "fact alone minimizes the potential overlap between the issues raised

here vis-à-vis those raised in the parallel proceeding," and weighs against denial. *Markforged Inc. v. Continuous Composites Inc.*, IPR2022-00679, Paper 7 at 32-33 (Oct. 25, 2022).

VirtaMove's stipulation to not assert additional claims against Google (DD-Brief, 10) also does not tilt Factor 4 in VirtaMove's favor because VirtaMove has not made the same assurances for any of Google's customers, despite the fact that VirtaMove's Complaint alleges induced infringement. EX1080, at 7.

Moreover, if Google's IPR is not considered on its merits, at least 26 demonstrably unpatentable claims will remain at large for VirtaMove to assert against others. Denying Google its opportunity to demonstrate to the Board why these claims should be cancelled to prevent further litigation would be a public disservice and contrary to the purposes and charge of the Board. That more than three quarters of the '814 patent's 34 claims will be addressed by the Board but not NDCA further illustrates that an IPR trial will be a "true alternative" to the NDCA litigation in addressing issues the court will not address. *Palo Alto Networks, Inc. v. Centripetal Networks*, IPR2021-01149, Paper 10 at 10-11 (Feb. 22, 2022).

Furthermore, as noted above, the Director recently found that NDCA often issues a stay if an IPR trial is instituted. *Supra* §II.A (citing *Twitch*, IPR2025-00307, Paper 18 at 2-3). That reduces "concerns of inefficiency and the possibility of conflicting decisions" (*Fintiv*, IPR2020-00019, Paper 11 at 12) because the

parties will not expend further resources on any invalidity issue in parallel with this IPR.

And again, even if the litigation is not stayed, an FWD is highly likely to issue before any NDCA trial date. *Supra* §II.B. Once the FWD issues, Google will be estopped from asserting in litigation "any ground that the petitioner raised or reasonably could have raised during" the IPR. 35 U.S.C. §315(e)(2).[6] The statutory estoppel provision ensures that the efficiency of Google's IPR accrues regardless of which party prevails on claims challenged in the IPR and asserted in NDCA, and moots VirtaMove's concern about potential overlap between invalidity arguments in NDCA. That is because if Google prevails the claims will have been found unpatentable, whereas if VirtaMove prevails Google would be estopped from "pursu[ing] the ***same*** invalidity theories" (DD-Brief, 12 (emphasis original)) in NDCA. Given that an FWD will so clearly precede a trial in the district court, it was unnecessary for Google to offer a *Sotera* stipulation because any such stipulation would be moot in view of statutory estoppel. But to remove any doubt,

---

[6] Google would also be estopped from pursuing a reexamination "with respect to [any challenged] claim on any ground that the petitioner raised or reasonably could have raised during" this IPR. 35 U.S.C. §315(e)(1). That alleviates VirtaMove's protestations about a possible duplicative reexamination. DD-Brief, 12.

Google hereby stipulates that if the Office institutes this IPR, then Google will not pursue in the district-court litigation any grounds that were raised or reasonably could have been raised in this IPR. *See* 35 U.S.C. §315(e)(2); *Sotera Wireless, Inc. v. Masimo Corp.*, IPR2020-01019, Paper 12 at 13 (precedential) (Dec. 1, 2020); *see also Solus Advanced Materials Co., Ltd. v. SK Nexilis Co., Ltd.*, IPR2024-01463, Paper 14 at 16-17 (Apr. 25, 2025) (finding *Sotera* stipulation causes Factor 4 to weigh against denial even where petitioner maintained right to pursue in district court "invalidity assertions based on combinations of art with 'unpublished systems prior art'").

Factor 4 weighs strongly against discretionary denial. VirtaMove's below-addressed arguments to the contrary (DD-Brief, 12) are baseless.

VirtaMove argues "there is substantial overlap between the prior art arguments" in the Petition and those "advanced by Petitioner in the District Court litigation." DD-Brief, 10. This ignores the lack of overlap in the challenged claims. With respect to the prior art, Google was obligated under the district court's standing order to identify ***all possible*** prior art to preserve its defenses months before this Petition was filed. The purpose of disclosing invalidity contentions early in the litigation is to provide notice and preserve a right to make an argument later, not to identify the arguments that will ultimately be presented at

trial, which happens much later.[7]  Regardless, VirtaMove's assertion that this causes Factor 4 to favor denial is premised on the assumption that "the District Court will likely decide the validity of the '814 patent claims months prior to" the FWD (DD-Brief, 11), which again is plainly wrong.  *See supra* §§II.A-B.

Finally, VirtaMove argues that this IPR should be discretionarily denied because "if the Board were to institute, Petitioner would be able to serially challenge the validity of the '814 Patent in this proceeding, in the District Court Proceeding, and in an *ex parte* reexamination proceeding," which is the "opposite of the efficiency contemplated" by the AIA.  DD-Brief, 12.  VirtaMove has it exactly wrong—instituting this IPR would ***increase*** efficiency.

---

[7] *See, e.g.*, *Pisony v. Commando Constructions, Inc.*, No. 6:17-CV-00055-ADA, 2020 WL 4934463, at *1 (W.D. Tex. Aug. 24, 2020) ("[T]he purpose of invalidity contentions is to provide notice while discovery is intended to develop details so that legal theories become more concrete as the litigation progresses.") (internal quotation marks and citation omitted); *see also GREE, Inc. v. Supercell Oy*, No. 2:19-CV-00070-JRG-RSP, 2020 WL 6731050, at *3 (E.D. Tex. Aug. 14, 2020) ("Indeed, one of the desired outcomes of discovery and a result of expert reports is the crystallization of invalidity and infringement theories preserved in a party's contentions.").

As the Federal Circuit has explained, "the purpose of the AIA" is "to create a ***more efficient*** alternative to district court litigation." *Purdue Pharma L.P. v. Collegium Pharm., Inc.*, 86 F.4th 1338, 1344 (Fed. Cir. 2023).[8] Google is availing itself of the IPR process that Congress created to cost-effectively and efficiently demonstrate that the '814 patent's claims are unpatentable. If IPR is instituted, Google will seek a stay of the litigation, which will further help avoid "conflicting decisions." DD-Brief, 11. If the Board finds merit in Google's Petition and finds the challenged claims unpatentable, substantial cost savings and efficiencies will have been achieved for the parties and the NDCA court in not litigating over a patent that never should have issued in the first place. And if any asserted claim were to survive this IPR, Google will be subject to the AIA's estoppel provisions.

The efficiencies that would be gained by instituting IPR here are further enhanced because two defendants in separate litigations (Microsoft and Oracle) have filed motions for joinder. *See Microsoft Corp. v. VirtaMove, Corp.*, IPR2025-00849, Paper 3 (Apr. 18, 2025); *Oracle Corp. v. VirtaMove, Corp.*, IPR2025-00964, Paper 4 (May 16, 2025); *see also infra* §III. The Board can efficiently address Google's patentability challenges that Microsoft and Oracle seek to join in a single proceeding.

---

[8] All emphases herein are added unless otherwise indicated.

Thus, for the reasons discussed above, Factor 4 weighs strongly against discretionary denial.

### E. Factor 5 (Litigation Defendant) Weighs Against Discretionary Denial

VirtaMove argues "this factor weighs in favor of discretionary denial." DD-Brief, 12 (citing *Apple, Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 15 at 15 [sic: 13-14] (May 13, 2020) (informative)).

VirtaMove ignores that the Board's "precedent takes varying approaches on how to weigh the fifth *Fintiv* factor when the parties in the two proceedings are the same." *Shenzen Root Tech. Co., Ltd. v. Chiaro Tech. Ltd.*, IPR2024-01296, Paper 9 at 20 (Feb. 25, 2025) (granting institution and collecting cases). Some panels have found that the petitioner being the litigation defendant is simply **neutral** and does not weigh in favor of denial. *See, e.g.*, *Nokia of Am. Corp. v. Soto*, IPR2023-00680, Paper 30 at 13 (Dec. 3, 2024) (Decision Granting Director Review) ("agree[ing] with the parties that *Fintiv* factor 5 is neutral" where petitioner was a litigation defendant, *see* Paper 1 at 75); *Markforged Inc. v. Continuous Composites Inc.*, IPR2022-00679, Paper 7 at 33 (Oct. 25, 2022)

In fact, in cases such as this where the Board is "likely to address the challenged patent first" before the district court (*see supra* §II.B), panels have found that "this factor weigh[s] **against** exercising discretion to deny institution" because it is more efficient to have the Board address patentability so that the

– 22 –

district court does not have to. *Markforged*, IPR2022-00679, Paper 7 at 33;

*CrowdStrike, Inc. v. Open Text Inc.*, IPR2023-00124, Paper 11 at 13 (June 15,

2023) ("This factor **weighs against exercising discretion to deny** institution

because, although the parties are the same as in the related litigation…, that trial is

scheduled to occur after the deadline for a final written decision in this

proceeding.").

Factor 5 weighs against denial here (or is, at worst, neutral) because the

Board is likely to issue an FWD before a district-court trial, which will maximize

efficiencies for the parties and the court.

### F.     Factor 6 (Other Circumstances: Strong Merits)

The merits of Google's Petition are particularly strong because the cited

prior art plainly teaches the allegedly "key difference" between the '814 patent and

the prior art.  EX1001, 1:56-61.

The '814 patent alleges that the "key difference between" the invention and

the prior art's "existing solutions" are so-called "application containers."  EX1001,

1:56-61.  Google's Petition demonstrates that the Schmidt-479 reference

(EX1008), which is used in every ground, expressly teaches "capsules" of

computing environments that comprise "installed *software*" and "*application*

binaries."  Petition (Paper 2), 42 (quoting Schmidt-479, [0038] (capsule data

includes "installed software"), [0048] (capsules include "file system views," which

include "application binaries")); *see also* Petition, 41-44 (citing and explaining Schmidt-479, [0038], [0048], [0041] as demonstrating that Schmidt-479's capsules meet the parties' joint construction of "container").

The Petition also demonstrated that the Tormasov reference (EX1010), which is used in every ground in combination with Schmidt-479, expressly teaches to implement computing environments such as in Schmidt-479's capsules to be "completely isolated from each other" (so applications cannot be shared across environments) and have unique root file systems, which are the features the Examiner found missing in the prior art of record during prosecution of the '814 patent. *See* Petition, 4 (summarizing prosecution history), 62-66 (explaining how Tormasov's teachings incorporated in the Schmidt-Tormasov combination meet elements [1F]-[1G]).

Thus, the Petition presents strong merits of unpatentability because the allegedly novel disclosure of the '814 patent is explicitly taught by the combination's prior-art Schmidt-479 reference, and the limitations the Examiner found missing in the prior art were explicitly taught by the combination's prior-art Tormasov reference.

The Petition's strong merits are further demonstrated by the fact that Microsoft and Oracle have each agreed to join the Petition. *See* EX1168-EX1169.

VirtaMove says its "merit-based briefing" will "highlight" "claim limitations

[that] are not disclosed by *any* of the alleged combination references." DD-Brief, 13-14 (original emphasis). Google cannot respond to arguments that VirtaMove has not yet made. But in §V.A below, which relates to VirtaMove's baseless accusations that the Petition overly relies on expert testimony, Google responds to VirtaMove's allegation that the Petition mischaracterizes teachings in the prior art.

VirtaMove asserts that the Petition's merits are not strong because the Petition "relies solely on obvious combinations under §103," which allegedly "serves to highlight the novelty of the challenged claims." DD-Brief, 13. But the Board has repeatedly found strong merits demonstrated by obviousness grounds. *See, e.g.*, *SAP Am. Inc. v. Cyandia, Inc.*, IPR2024-01433, Paper 13 at 12-13 (Apr. 7, 2025); *Ericsson Inc. v. Active Wireless Techs. LLC*, IPR2024-00985, Paper 11 at 19-25 (Dec. 12, 2024); *BioNTech SE v. ModernaTX, Inc.*, IPR2023-01359, Paper 20 at 77 (Mar. 19, 2024). Google's obviousness grounds present strong merits because the Petition shows that the allegedly novel feature of the '814 patent is taught by Schmidt-479, which in combination with Tormasov meets every other limitation of the challenged claims.

Lastly, VirtaMove argues that Factor 6 favors denial because "it [is] extremely likely" that the district court will decide validity before an FWD. DD-Brief, 13. That argument fails for the reasons discussed *supra* §II.B.

Given the Petition's strong merits, Factor 6 weighs against denial.

## III. AMAZON'S INDEPENDENTLY-FILED PETITIONS DO NOT WEIGH AGAINST INSTITUTION OF GOOGLE'S PETITIONS

Under the Board's precedential *General Plastic* decision, the principal factor in deciding whether to deny institution of an IPR based on another IPR having challenged the same patent is "whether the ***same petitioner*** previously filed a petition directed to the same claims of the patent." *General Plastic Indus. Co. v. Canon Kabushiki Kaisha*, IPR2016-01357, Paper 19 at 15-16 (Sept. 6, 2017) (precedential). The "same petitioner" was extended to include a petitioner having "a significant relationship" with an earlier petitioner in *Valve Corp. v. Elec. Scripting Prods., Inc.*, IPR2019-00062, Paper 11 at 9-10 (Apr. 2, 2019) (precedential); *Videndum Prod. v. Rotolight*, IPR2023-01218, Paper 12 at 6 (Apr. 19, 2024) (Decision Granting Director Review) ("Under USPTO policy and precedent, *General Plastic* has not been extended to any cases in which the first and second petitioners do not have a significant relationship.").

Google and Amazon are different entities and do not have a significant relationship under *Valve*. VirtaMove presents no evidence of such a relationship because no such relationship exists. Google had no involvement in preparing

Amazon's IPRs, and vice versa.[9] *See Ford Motor Co. v. Neo Wireless, LLC*, IPR2023-00763, Paper 28 at 9 (Mar. 22, 2024) (holding that petitioners with "different allegedly infringing products and in different district court proceedings" who did not coordinate, as here, did not have a "significant relationship" under *Valve*).

In cases like this, where separate petitioners have challenged the same patent but "are neither the same party, nor possess a significant relationship under *Valve*, *General Plastic* **factor one necessarily outweighs the other General Plastics factors**" and weighs strongly against discretionary denial. *Videndum*, IPR2023-01218, Paper 12 at 5-6.

VirtaMove alleges that discretionary denial of at least three of the four '814 Petitions brought by Google and Amazon is warranted because "there appears to be a coordinated attempt by [these] technology giants" to challenge VirtaMove's '814 patent. DD-Brief, 18-19. VirtaMove does not even attempt to substantiate this baseless and irresponsible allegation of coordination. That Google and

---

[9] Google's and Amazon's '814 Petitions raise different grounds. *See Amazon.com, Inc. v. VirtaMove, Corp.*, IPR2025-00563, -00566, Paper 1 at 9 (Jan. 31, 2025) (both challenging claims based on Osman, Tucker, Bandhole, and Gélinas, none of which are named in any ground of Google's '814 Petitions).

Amazon filed separate petitions against the '814 patent around the same time is an unremarkable and highly predictable consequence of *VirtaMove's strategic decision* to sue Google and Amazon within one week of each other. Amazon and Google did not coordinate their IPRs in any way. VirtaMove's speculation to the contrary is baseless and simply wrong.

VirtaMove's protestation that it is a "relatively small" company being "overwhelm[ed]" by litigation expenses (DD-Brief, 18-19) is belied by VirtaMove's own strategic decision to assert its patents against six corporations in parallel across two districts. Within the span of two weeks last year, VirtaMove elected to sue four companies—Amazon, Google, IBM, and Hewlett Packard Enterprise—in two different jurisdictions (EDTX and WDTX), on two patents in different patent families. Several months later, VirtaMove elected to bring lawsuits in WDTX against two additional defendants—Microsoft and Oracle. Thus, in less than a year, VirtaMove chose to file *six* lawsuits in *two* separate districts against different companies, with the full knowledge that multiple IPR petitions by those separate defendants were not just possible but also easily foreseeable.[10]

---

[10] At the time of filing its suits against Microsoft and Oracle, the '814 patent was also involved in a declaratory-judgment suit brought by Red Hat in NDCA, which

But even if the expenses of the party that chose to initiate litigation could be a relevant consideration for discretionary denial, IPRs were specifically designed to be ***more efficient and streamlined*** than district-court actions, as VirtaMove itself concedes. DD-Brief, 5. Two additional defendants (Microsoft and Oracle) have sought to join Google's IPRs. *See supra* §II.D. Thus, if the Board grants either (or both) of those joinder motions, the overall efficiencies to be gained by (and potential litigation expenses to be saved because of) Google's IPRs will be more even pronounced here as compared to a typical one-defendant IPR. *See* EX1168, at 6-7 (joinder motion) (Oracle's joinder motion "accepting an 'understudy' role") (citing IPR2015-01353, Paper 11 at 6-7 (finding "joinder would increase efficiency by eliminating duplicative filings and discovery, and would reduce costs and burdens on the parties as well as the Board" because the petitioners agreed to an "understudy" role)); EX1169, at 5 (Microsoft's joinder motion agreeing to "tak[ing] an 'understudy' role").

Thus, to the extent VirtaMove's alleged concern for reducing its litigation expenses are at all relevant to the Director's consideration, the cost-saving benefit

was recently dismissed for lack of subject matter jurisdiction and is on appeal. *See Red Hat Inc. v. VirtaMove, Corp.*, 5-24-cv-04740 (N.D. Cal.).

– 29 –

over district-court actions is ***multiplied*** here where two additional defendants can be joined with Google's IPRs.

VirtaMove's suggestion that it was entitled to sue six companies across multiple jurisdictions but that "at most" only one IPR should be instituted (DD-Brief, 19) is plainly unreasonable. Google would be prejudiced if the Director were to discretionarily deny Google's Petition simply because Amazon filed its own. Google did not choose the prior art in Amazon's '814 petitions and has no control over how (or even whether) that IPR will proceed. Amazon's IPR petition is no substitute for Google being able to present its own challenge to the '814 patent.[11] Moreover, Google's and Amazon's petitions were filed at essentially the same time. There is no basis to favor Amazon's petition over Google's.

Under the Board's existing precedent (*General Plastic*, *Valve*, and *Videndum*) discussed above, Amazon's '814 petitions provide no basis for discretionarily denying this Petition. *See also* Interim Memo, 2 (interim

---

[11] At this point, it is unclear whether either of Amazon's '814 petitions will be instituted on its merits. VirtaMove's "one institution" argument provides no basis for denying Google's '814 Petition because it might be the only petition filed against the '814 patent that the Board finds meritorious enough to warrant institution.

procedures are designed to be "consistent with the discretionary considerations enumerated in existing Board precedent").

## IV. GOOGLE'S OTHER PETITION DOES NOT SUPPORT DISCRETIONARY DENIAL UNLESS AND UNTIL A TRIAL IS INSTITUTED ON THAT PETITION

### A. It Was Appropriate for Google to File Two Petitions Given the Priority Date Dispute

The Consolidated Trial Practice Guide ("CTPG") recognizes that "more than one petition may be necessary" "when there is a dispute about priority date requiring arguments under multiple prior art references." CTPG, 59.

Google's ranking paper ranks this Petition second behind the first-ranked petition in IPR2025-00487. *See* Paper 3 at 1. This second-ranked Petition was filed because of a potential priority-date dispute that could affect Google's first-ranked petition by VirtaMove attempting to antedate that petition's prior art. Grounds 1-2 of this Petition (which challenge all claims of the '814 patent) rely on references that are incontestable prior art regardless of any earlier priority date or invention date VirtaMove might ultimately allege. *Id*., 1-4. VirtaMove not only does not dispute that there is a potential priority-date dispute, VirtaMove acknowledges that there is one. DD-Brief, 17-18. Given that, Google respectfully submits that it was appropriate for Google to file two petitions under the guidance provided in the Trial Practice Guide. CTPG, 59.

– 31 –

### B. VirtaMove's Stipulation Provides No Basis to Discretionarily Deny This Petition Now

Despite acknowledging the potential priority-date dispute, VirtaMove seeks to have this Petition discretionarily denied based on a stipulation. But VirtaMove's stipulation is qualified. Specifically, VirtaMove says that "*if* the instant Petition is denied on discretionary grounds **_and IPR2025-00487 is instituted_**, Patent Owner stipulates that it will not contest the prior art status of the combination references relied on in IPR2025-00487 for purposes of that proceeding." DD-Brief, 17-18.

VirtaMove's stipulation is thus contingent on both Google's first-ranked petition in "IPR2025-00487 [being] **_instituted_**" and on this Petition being discretionarily denied. *Id*. Given that a condition precedent to VirtaMove's stipulation (*i.e.*, institution of IPR2025-00487) has not yet occurred, VirtaMove's stipulation provides no basis to discretionarily deny this Petition **_now_**.

### C. This Petition Being Second-Ranked Provides No Basis to Discretionarily Deny This Petition Now

The Consolidated Trial Practice Guide explains that "[t]o aid the Board in determining whether more than one petition is necessary," a petitioner may provide "a ranking of the petitions in the order in which it wishes the Board to consider the merits, *if* the Board uses its discretion **_to institute_** any of the petitions." CTPG, 59-60. Thus, the Trial Practice Guide contemplates that the Board will consider whether to discretionarily deny a lower-ranked petition *if* the Board decides to

"*institute*" a higher-ranked petition.  CTPG, 60; *see, e.g.*, *Google LLC v. Singular Computing LLC*, IPR2023-00397, Paper 8 at 11 (July 25, 2023) (instituting a second-ranked petition and finding it unnecessary to "decide the issue of discretion under" §314(a) because the first-ranked petition was denied institution on the merits).   Because the Board has not yet instituted IPR on Petitioner's first-ranked petition in IPR2025-00487, the present Petition being ranked second provides no basis to discretionarily deny this Petition *now*.

### D. Google Would Not Oppose Discretionary Denial of This Petition If and Only If a Trial on Google's First-Ranked Petition (IPR2025-00487) Is Instituted So That Discretionary Denial Here Would Trigger VirtaMove's Stipulation

If the Board were to institute a trial on Google's first-ranked Petition and then discretionarily deny this Petition, that would meet both conditions precedent for VirtaMove's stipulation.  Thus, ***if the Board were to institute*** a trial on Google's first-ranked Petition in IPR2025-00487, then in reliance on VirtaMove's stipulation[12] Google would not oppose the Office discretionarily denying this second-ranked Petition.

---

[12] Again, VirtaMove's stipulation is that "***if*** the instant Petition is denied on discretionary grounds ***and IPR2025-00487 is instituted***, Patent Owner will not contest the prior art status of the combination references relied on in IPR2025-00487 for purposes of that proceeding."  DD-Brief, 17-18.

The Director should decline to discretionarily deny institution of Google's first-ranked petition in IPR2025-00487 for the reasons discussed in Google's Opposition (filed June 10, 2025) to VirtaMove's discretionary-denial request in that case. Thus, the Director should send IPR2025-00487 to a panel for consideration on its merits.

With respect to VirtaMove's request for discretionary denial of the present Petition (IPR2025-00488), it is baseless for all the same reasons (*supra* §§II-III; *infra* §V), with the single exception of VirtaMove's qualified stipulation that seeks to obviate the need for this Petition by removing the priority-date dispute. Given that VirtaMove's stipulation is conditioned on a trial first being instituted in IPR2025-00487, Google respectfully requests that the Director send this case to a merits panel with an instruction to discretionarily deny institution of this Petition, because of VirtaMove's stipulation, ***if and only if*** the merits panel first institutes a trial in IPR2025-00487, and thereby ensures that a condition precedent to VirtaMove's stipulation is met.

**V. NONE OF THE OTHER CONSIDERATIONS LISTED IN THE DIRECTOR'S INTERIM MEMORANDUM SUPPORT DISCRETIONARY DENIAL**

The Director's Interim Memorandum has a list of other considerations that may be relevant for discretionary denial.[13] Interim Memo, 2-3. None of these considerations warrants discretionary denial here.

**A. The Petition Does Not Over-Rely on Expert Testimony**

Recognizing the weakness of its *Fintiv*-based arguments, VirtaMove leads its brief by arguing that discretionary denial is warranted "irrespective of any other factors" because of "Google's extraordinary over-reliance on expert testimony." DD-Brief, 3-5. Neither the Director nor the Board has ever discretionarily denied a petition on this basis. VirtaMove hopes that this case will be the first. It should not be for numerous reasons discussed below.

This Petition was filed before the Director's Interim Memo issued and is supported by an expert declaration that is similar to, and relied upon in the same

---

[13] Petitioner reserves the right to challenge the Interim Process for PTAB Workload Management announced in the Director's March 26, 2025 memorandum at least because it is legally invalid as (1) exceeding the Director's authority, (2) arbitrary and capricious, and (3) adopted without notice-and-comment rulemaking.

way, as numerous prior expert declarations that have been credited by the Board in instituting IPR trials and finding claims unpatentable at FWD.  *See infra* §§V.A.1-3.  There is nothing "extraordinary" about the Petition's reliance on Dr. Bhattacharjee's testimony.  DD-brief, 3.  The Petition demonstrates unpatentability based on patents and printed publications.  The Petition does not in any sense **over-**rely on expert testimony, let alone do so in a manner that would warrant discretionary denial of this Petition despite its strong merits and the fact that the *Fintiv* factors (*supra* §II) weigh strongly against denial.

### 1.    The Petition does not inappropriately rely on Dr. Bhattacharjee's testimony

The prior art's teachings themselves clearly meet the claims.  Most of the Petition's citations to Dr. Bhattacharjee's declaration simply confirm that Dr. Bhattacharjee agrees with the Petition's analysis of the prior-art teachings.  That is different from the Petition **over-relying** on expert testimony to make its unpatentability showing.  If there are any issues on which the Board might find it helpful to review expert testimony to "provide helpful context or to explain terms of art," Dr. Bhattacharjee's testimony corroborates everything he says with citation to a prior-art patent or printed publication.  *See* USPTO's "FAQs for Interim Processes for PTAB Workload Management" ("Interim-Processes FAQs"), FAQ

#21.[14]  While VirtaMove ***criticizes*** the corroborating references (pejoratively

labelling them as "shadow references," DD-Brief, 2-3), Board decisions have

"***applauded***" similar expert testimony that is corroborated by extensive citation to

published references.  *Tesla, Inc. v. Charge Fusion Techs., LLC*, IPR2025-00032,

Paper 11 at 39 (May 19, 2025); *see infra* §§V.A.2-3.

### 2. VirtaMove does not substantiate any alleged inappropriate reliance on Dr. Bhattacharjee's testimony

In its allegations of extensive reliance on expert testimony, VirtaMove

mainly criticizes the ***length*** of Dr. Bhattacharjee's declaration and the ***number*** of

corroborating references.  DD-Brief, 3-5.  As discussed below, both criticisms fail.

As to the declaration's length, VirtaMove alleges that the Petition's

submission of a "***335-page*** declaration spanning ***more than 64,000 words***" is

"exactly the type of over-reliance on expert testimony that the Director has

indicated is ill-suited for resolution at the PTAB, because the Board should base its

decision on patents and printed publications, not the written opinions of an expert

who will not even testify at the hearing."  DD-Brief, 3-4 (emphasis original).

VirtaMove cites no authority to support this assertion.

---

[14] https://www.uspto.gov/patents/ptab/faqs/interim-processes-workload-

management (last checked June 9, 2025).

VirtaMove acknowledges that a concern about overreliance on expert testimony is implicated if a petition relies on expert testimony **in place of** patents or printed publications.  *Id*. ("**<u>because the Board should base its decision on patents and printed publications</u>**, not the written opinions of an expert");[15] *see also* Interim Processes FAQs (FAQ #21: "The statute and our reviewing court require that petitions be based on prior art patents and printed publications.").  But the length of the expert declaration has no bearing on whether the Petition relies on expert testimony instead of patents or printed publications.  VirtaMove's focus on length exalts form over substance.  VirtaMove does not identify a single issue on which the Petition's arguments would require the Board to "base its decision on" on "the written opinions of an expert" instead of the teachings of the prior art that both the Petition and the expert discuss.  DD-Brief, 4.  That is because there is no such issue.  *See infra* §V.A.3.

The length of Dr. Bhattacharjee's declaration results primarily from the fact that most substantive paragraphs of the Petition cite Dr. Bhattacharjee's testimony.

---

[15] VirtaMove's assertion that Dr. Bhattacharjee "will not even testify at the hearing" is plainly wrong.  DD-Brief, 4.  His sworn declaration is "testimony" and VirtaMove will have the opportunity to cross-examine him and submit that testimony as well.  37 C.F.R. §42.53.

That is because, at least before the recent guidance in the Director's Interim Memo dated after this Petition was filed, it had been common practice for petitioners to cite expert testimony to support every argument—even those that the petitioner did not expect the patent owner to reasonably dispute.  It has been common for petitioners to do so because they could not anticipate what issue(s) a patent owner might dispute with expert testimony, and it was not uncommon for the Board to favor a party who submitted expert testimony on a disputed issue over one that relied simply on attorney argument.  *See, e.g.*, *Wasica Finance GmbH v. Continental Auto Sys.*, 853 F.3d 1272, 1284-85 (Fed. Cir. 2017) (finding it "reasonable for the Board to accept" one party's "expert testimony over" the other party's "bare attorney argument").  There is nothing "extraordinary" about the Petition being accompanied by a lengthy expert declaration.  DD-Brief, 3.  It is consistent with common practice since the AIA created IPRs.

The Director's Interim Memo refers to the extent to which the Petition ***relies on*** expert testimony, not the declaration's length.  The length of Dr. Bhattacharjee's declaration does not matter because the declaration does nothing but provide "appropriate supporting technical details and/or testimony as to the understanding of a" person of ordinary skill in the art without "offer[ing] wholly new arguments not found in the Petition."  *Nat'l Beef Packing Co., LLC v. Inst. For Envtl. Health, Inc.*, IPR2024-00186, Paper 8 at 50-51 (Jan. 13, 2025) (rejecting

patent owner's complaints about a 317-page expert declaration); *see also B/E Aerospace, Inc. v. Mag Aerospace Indus., LLC*, IPR2014-01510, Paper 24 at 13-14 (Mar. 26, 2015) ("[T]he length of the Declaration relative to the Petition is not the critical inquiry. The critical inquiry is whether an argument that is made in the Declaration is explained sufficiently in the Petition.").

VirtaMove's assertion that it cannot "practically respond" to every word in the expert declaration in a 14,000 word patent owner response is a red herring. DD-Brief, 4. VirtaMove need only respond to the arguments in the Petition, because the Petition cannot (and did not) incorporate by reference any argument from the expert declaration. 37 C.F.R. §42.6(a)(3); *see also B/E Aerospace*, IPR2014-01510, Paper 24 at 14 ("In our analysis of the grounds of unpatentability that follows, we address the declaration evidence commensurate in scope with the presentation and discussion of that evidence in the Petition.").

Just last month, the Director declined to discretionarily deny two related IPRs despite the patent owner arguing that the petition extensively relied on expert testimony because the petition "cite[d] its expert's ***269-page declaration at least 260 times***." *Twitch*, IPR2025-00307, Paper 11 at 18-19 (patent owner's request for discretionary denial); *id.*, Paper 18 at 3 (May 16, 2025) (decision denying request). That declaration's 269 pages was a comparable length to Dr. Bhattacharjee's declaration here, and the Director did not discuss the declaration's length as

relevant to her discretionary-denial consideration.  That decision is consistent with prior decisions instituting an IPR despite a patent owner's complaint about a declaration's length.  *See also Freewheel Media, Inc. v. Intent IQ, LLC*, IPR2024-00419, Paper 9 at 24 (Sept. 4, 2024) (instituting despite "[p]atent [o]wner complain[t]s about" "a 349-page declaration"); *Canon USA, Inc. v. Slingshot Printing LLC*, IPR2022-01541, Paper 7 at 21 (May. 22, 2023) (instituting where petitioner submitted a "232 pages long" declaration); *SNF SA v. Chevron USA Inc.*, IPR2022-01534, Paper 12 at 21 n.15 (Apr. 19, 2023) (instituting where petitioner submitted a "290 page[]" declaration).

There is no reason to treat this Petition differently.

VirtaMove's other primary complaint is that the Petition and Dr. Bhattacharjee cite a substantial number of corroborating references.  DD-Brief, 15-16 (referring to them derisively as "dozens upon dozens of additional 'shadow' references").  But once again, VirtaMove does not identify a single instance where the Petition relies only on Dr. Bhattacharjee's testimony to fill an alleged gap in the prior art's teachings, because no such examples exist.  *See supra* §II.F (discussing the Petition's strong merits); *infra* §V.A.3 (discussing VirtaMove's single example of the Petition allegedly mischaracterizing the prior art).

Citation to corroborating references does not demonstrate overreliance on Dr. Bhattacharjee's testimony—it demonstrates precisely the opposite.  The

substantial number of corroborating references reveals that the Petition relies on "prior art patents and printed publications" to make its case, rather than on Dr. Bhattacharjee's testimony. *See* Interim Processes FAQs (FAQ #21). The Board thus can decide any disputed issues of material fact from the corroborating references themselves, without relying on Dr. Bhattacharjee's testimony.

The Board's rules are clear that an expert must "disclose the underlying facts or data upon which the opinion is based" or the testimony may be given "little or no weight." 37 C.F.R. §42.65(a). That is all Dr. Bhattacharjee did here. Dr. Bhattacharjee's opinions are supported by multiple pieces of corroborating evidence. That does not render his testimony unfocused. It strengthens his testimony because he provides the underlying facts and data on which he based his opinions.

The Board recently instituted a petition and rejected discretionary-denial arguments by a patent owner that were nearly identical to VirtaMove's arguments here that criticize the length of the expert declaration and the number of corroborating references cited. *Tesla*, IPR2025-00032, Paper 11 at 39. In *Tesla*, the patent owner (much like VirtaMove here) complained about an expert declaration that was "twice as long as the Petition at 278 pages with a substantive portion containing 42,329 words." *Id.* at 39 (internal quotation marks omitted). Like VirtaMove here, the patent owner in *Tesla* also complained that it was unfair

to have "to wade through the 42,329 words" in the expert declaration to understand the petition's argument and complained that the expert "cit[ed] forty-three references that are not expressly identified as a basis for that challenge" (what VirtaMove calls "shadow" references, DD-Brief, 15).  The Board rejected those complaints because it did not find any improper incorporation by reference of arguments from the declaration into the petition, which is equally true here.  Indeed, *the Board "applaud[ed]" the expert* for "support[ing] his extensive explanations of his opinions with citations to dozens of pieces of objective evidence," which "is a feature, not a bug of his testimony" *because the expert "le[ft] virtually none of the substance of his testimony unsupported by objective evidence*."  *Tesla*, IPR2025-00032, Paper 11 at 39.  There is no reason to treat this Petition differently than the Board treated the *Tesla* petition.

### 3.    VirtaMove's single example fails to show extensive reliance on expert testimony rather than on the prior art

As explained below, despite using far fewer than the 14,000 words allowed, VirtaMove's Request for discretionary denial identified no claim limitation that the Petition meets via expert testimony alone, rather than via the teachings of a patent or printed publication.  VirtaMove also failed to identify any issue on which there could be a reasonable dispute between experts, let alone one that the Board could not resolve as well as an Article III court.

VirtaMove provides "one specific example" that purports to establish that the Petition is "weak and overly reliant on unreliable expert testimony to gap-fill holes in the prior art." DD-Brief, 15-16. Based on this "one" example, VirtaMove argues that the Petition extensively relies on Dr. Bhattacharjee's testimony because VirtaMove alleges that "the Petition proposes that the system" formed by the Petition's "Ground 1 combination" "would include 'several different operating systems' despite no teaching in any of the combination references that this would be the case." *Id.*, 16. VirtaMove argues the Petition cites "***fourteen*** paragraphs of expert testimony" and "***fifteen*** different non-combination references in support of a feature not disclosed in the combination art itself." *Id.* (VirtaMove's emphasis).

VirtaMove mischaracterizes both the prior art and the Petition's reliance on expert testimony. The Petition relies on the disclosures of the prior art, not merely Dr. Bhattacharjee's testimony.

The Petition demonstrates that Schmidt-479 (EX1008) explicitly discloses that its compute capsules can be "moved between the computers" in a system of computers (Petition, 12 quoting (Schmidt-479, [0005]), where each can be a "server computer" (Petition, 5-6 (quoting Schmidt-479, [0065] ("local server computer 1223")). The Petition also demonstrates that Schmidt-479 expressly discloses an example system having multiple servers respectively running, for example, "Microsoft Windows" or "X11/Unix," which are differing operating

systems.  Petition, 14 (quoting Schmidt-479, [0077] ("services include X11/Unix services…Windows NT service"), [0078] ("Each service is provided by a computing device optimized for its performance.  For example, an Enterprise class machine could be used to provide X11/Unix service,…[and] a Hydra based NT machine could provide applet program execution services")); *see* Schmidt-479, [0075] (the "system" has "[o]ne or more services communicat[ing] with one or more HIDs [human interface devices]").

Thus, VirtaMove has not identified a "feature" that is "not disclosed in the combination art itself."  DD-Brief, 16.  The feature VirtaMove complains about is expressly disclosed in (at least) the Petition's prior-art Schmidt-479 reference.

The Petition also argued obviousness in the alternative, demonstrating that a skilled person would have been "motivate[d to] implement" the Schmidt-Tormasov combination "in a system having multiple servers running different OSs."  Petition, 13-15.  The Petition established this motivation by citation to explicit disclosures in Schmidt-479, Tormasov (EX1010), and multiple pieces of independent, corroborating evidence.  Petition, 13-15 (citing, quoting, and explaining, *e.g.*, Schmidt-479, [0016]-[0018]; Tormasov, [0017], [0023]-[0025], [0035]; EX1083, [0002], [0014], [0011], [0061]-[0063]); EX1058, 1:14-21; EX1057, 1:10-14; EX1017, [0029]-[0030]; EX1016, [0002]; EX1053, 1:36-41; EX1049, 1:12-14, 1:41-58; EX1051, 2:25-37).

Appx0455

The Petition's obviousness arguments for Ground 1 rely on the plain teachings of Schmidt-479 and Tormasov (and other corroborating references), not just Dr. Bhattacharjee's testimony, to demonstrate unpatentability. Furthermore, the Petition's Ground 2 presents an alternative combination of Schmidt-479 and Tormasov with Calder (EX1006), which VirtaMove's brief does not dispute meets the claimed features.

To the extent VirtaMove's characterization of corroborating references as "shadow" "non-combination references" is intended to criticize them for not being "enumerated" in the Petition's "combination[s]" (DD-Brief, 15-16), that argument fails because "[t]here is nothing improper with using additional references as corroboration." *PLR Worldwide Sales Ltd., v. Flip Phone Games, Inc.*, IPR2024-00209, Paper 28 at 24 (Apr. 24, 2025) (finding a petition properly relied on evidence providing "corroboration of" the expert's "testimony as to how a person having ordinary skill in the art would have understood the teachings of" a reference in the prior-art combination) (citing *IXI IP, LLC v. Samsung Elec. Co.*, 903 F.3d 1257, 1262-63 (Fed. Cir. 2018)); *PLR*, IPR2024-00209, Paper 28 at 31 (explaining that "corroboration evidence" does not have to be "part of the ground[s]" and "there is no reason to identify it as such"); *Ariosa Diagnostics v. Verinata Health, Inc.*, 805 F.3d 1359, 1365 (Fed. Cir. 2015) ("Art can legitimately serve to

– 46 –

document the knowledge that skilled artisans would bring to bear in reading the prior art identified as producing obviousness.").

As discussed above (§§V.A.1-2), the Petition's extensive citation to corroborating evidence demonstrates the exact opposite of over-reliance on expert testimony.

## B. No Other Forum Has Already Adjudicated the Validity or Patentability of the Challenged Patent Claims, Which Weighs Against Discretionary Denial

Neither the PTAB nor any other forum has adjudicated the validity or patentability of the challenged patent claims. *See* Interim Memo, 2. Thus, this consideration weighs against discretionary denial.

## C. No Settled Expectation of the Parties Supports Discretionary Denial

The Director's Interim Memorandum says that an additional consideration is the "[s]ettled expectations of the ***parties***" (i.e., the settled expectations of the patent owner ***and*** petitioner). Interim Memo, 2. There were no settled expectations of the parties about the '814 patent that would warrant discretionary denial.

The '814 patent issued in 2009. VirtaMove did not sue Google until 15 years later. VirtaMove's complaint does not allege that VirtaMove ever called the '814 patent to Google's attention prior to suing Google.[16] After being sued,

---

[16] Around the same time VirtaMove also sued Amazon, IBM, and HPE.

Google filed this Petition because the '814 patent's claims are demonstrably unpatentable. The very "purpose and design" of IPRs—to "weed out bad patent claims"—would be fulfilled by the Board addressing the (strong) merits of the Petition, which demonstrates that VirtaMove's '814 patent should never have issued in the first place. *Thryv, Inc. v. Click-To-Call Techs., LP*, 590 U.S. 45, 54 (2020) ("By providing for inter partes review, Congress, concerned about overpatenting and its diminishment of competition, sought to weed out bad patent claims efficiently").

VirtaMove alleges that it had a "settled expectation[]" that it could "adjudicate its patent claims [only] before an Article III court" because the patent issued nearly fifteen years ago at a time before IPRs were available. DD-Brief, 17. VirtaMove has known for thirteen of those fifteen years (since 2012) that its patent was subject to IPR, and certainly knew that before it filed suit against Google and others. Any "expectation" VirtaMove allegedly had that the '814 patent was immune from IPR was baseless, unreasonable, and cannot warrant discretionary denial.

That the '814 patent has gone unchallenged for fifteen years also does not demonstrate that VirtaMove had a reasonable, settled expectation of patentability of the challenged claims. It is unsurprising that the '814 patent went unchallenged because it was never asserted before 2024. Once VirtaMove asserted its patent,

multiple independent parties challenged its patentability on a multitude of independent grounds. *Google LLC v. VirtaMove, Corp.*, IPR2025-00488 (Jan. 31, 2025); *Amazon.com, Inc. v. VirtaMove, Corp.*, IPR2025-00563, -00566 (Jan. 31, 2025); *IBM Corp. v. VirtaMove, Corp.*, IPR2025-00599 (Feb. 7, 2025). There was never any settled expectation of patentability of the '814 patent's claims that would warrant discretionary denial.

Instead, the public interest is best served by the Director not rewarding VirtaMove for having waited until nearly the end of its patent's life to file suit against Google (and others) by insulating VirtaMove from having to defend the patentability of its claims in this IPR on the merits. *Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 263 (2016) ("The purpose of inter partes review" includes "protect[ing] the public's paramount interest in seeing that patent monopolies are kept within their legitimate scope.") (internal quotation marks and citation omitted).

### D. Compelling Economic Interests Weigh Against Discretionary Denial

There are compelling economic interests in instituting this IPR, which weigh against discretionary denial. Interim Memo, 2. VirtaMove is asserting the '814 patent against several companies: Google, Amazon, HPE, IBM, Microsoft, and Oracle. EX1080, 2; Paper 2, xvi. Thus, there are compelling reasons to have the Board efficiently assess the patentability of the asserted claims. Conversely, there

stand to be substantial negative economic consequences if VirtaMove's

unpatentable claims remain in force and continue to be asserted in more expensive

and time-consuming litigations.  These considerations weigh against discretionary

denial.

**VI.     CONCLUSION: A HOLISTIC ASSESSMENT OF ALL DISCRETIONARY FACTORS WEIGHS STRONGLY AGAINST DENIAL**

It is highly likely that an FWD will issue well before a district-court trial,

which weighs heavily against discretionary denial under *Fintiv*.  *See supra* §II.B.

VirtaMove's other primary assertion is that the length of the Petition's

expert declaration "justifies denial of institution, irrespective of any other factors."

DD-Brief, 3-5.  That assertion is unsupported by any authority and has been

repeatedly rejected by the Director and the Board.  *See supra* §V.A; *see, e.g.*,

*Twitch*, IPR2025-00307, Paper 18 at 3.

The Interim Memo's other additional considerations are considered under a

"holistic assessment of all of the evidence and arguments presented" in

determining whether to "exercise discretion to deny institution."  *Twitch*, IPR2025-

00307, Paper 18 at 3; *Amazon.com, Inc. v. NL Giken Inc.*, IPR2025-00250, Paper

14 at 2 (May 16, 2025).  No other consideration warrants discretionary denial

unless and until IPR2025-00487 is instituted, as discussed above (§§III-V).

Discretionary denial under §314 is not warranted at this time.[17]

Respectfully submitted,

Date:  June 10, 2025

/Elisabeth Hunt/

Elisabeth Hunt, Reg. No. 67,336
WOLF, GREENFIELD & SACKS, P.C.

---

[17] As the Petition established and VirtaMove does not dispute, the prior-art references combined in the Petition's Grounds were not previously presented to the Office.  Petition, 96.  Thus, there is also no basis to deny the Petition under §325(d), and VirtaMove does not allege otherwise.

<u>**CERTIFICATE OF WORD COUNT**</u>

Pursuant to 37 C.F.R. §42.24, the undersigned certifies that the foregoing

**PETITIONER'S OPPOSITION TO PATENT OWNER'S REQUEST FOR**

**DISCRETIONARY DENIAL OF INSTITUTION** contains 10,736 words

excluding; a table of contents, a table of authorities, a certificate of service or word

count, or appendix of exhibits or claim listing. Petitioner has relied on the word

count feature of the word processing system used to create this paper in making

this certification.

Date: June 10, 2025

<u>/Dara Del Rosario/</u>
Dara Del Rosario
Paralegal
WOLF, GREENFIELD & SACKS, P.C.

# CERTIFICATE OF SERVICE UNDER 37 C.F.R. §42.6(E)(4)

I certify that on June 10, 2025, a copy of the foregoing document, including any exhibits or appendices filed therewith, is being served via electronic mail, as previously consented to by Patent Owner, upon the following:

| | |
|---|---|
| Reza Mirzaie | rmirzaie@raklaw.com |
| | rak_almondnet@raklaw.com |
| Marc A. Fenster | mfenster@raklaw.com |
| Neil Rubin | nrubin@raklaw.com |
| James A. Milkey | jmilkey@raklaw.com |
| Qi (Peter) Tong | ptong@raklaw.com |
| | rak_virtamove@raklaw.com |

Date: June 10, 2025

/Dara Del Rosario/
Dara Del Rosario
Paralegal
WOLF, GREENFIELD & SACKS, P.C.

# Data Undermines USPTO's 'Settled Expectations' Doctrine

By **Jonathan DeFosse, Samuel Smith and Kenzo Kasai** (August 29, 2025)

The acting director of the U.S. Patent and Trademark Office, Coke Morgan Stewart, has issued a series of decisions discretionarily denying institution of inter partes review based, at least in part, on the assertion that IPR is unwarranted because a patent owner develops so-called settled expectations once a patent has been in force for six or more years.

To test the premise of the settled expectations doctrine empirically, we collected data from IPR petitions filed since 2012 to determine the age of patents challenged in those proceedings.



Jonathan DeFosse

Our research indicates that a substantial volume of IPR proceedings — more than 8,000 petitions, representing more than 46% of IPR petitions filed since 2012 — challenged patents that were in force for six or more years.

Those petitions resulted in cancellation of at least one claim in over 80% of the proceedings that reached final written decisions. This data appears to refute the assertion that patent owners develop a strong settled expectation that their patents will not be challenged or invalidated once the patents are in force for six years.

Samuel Smith

### The Doctrine

On March 26, Stewart **issued** a memorandum to all Patent Trial and Appeal Board judges announcing that decisions on whether to institute inter partes review would be bifurcated into two phases: (1) discretionary considerations; and (2) merits and other nondiscretionary statutory considerations.

Kenzo Kasai

In the same memorandum, Stewart listed relevant discretionary considerations, including "[s]ettled expectations of the parties, such as the length of time the claims have been in force."

The memorandum did not provide any precedential basis for the settled expectations doctrine. The memorandum also did not elaborate on the nature of the settled expectations.

For example, it is unclear whether Stewart was referring to a settled expectation in the underlying validity of a patent or, alternatively, a settled expectation that the validity of the patent will not be challenged.

In June and July, Stewart and the acting deputy chief administrative patent judge, Kalyan Deshpande, issued 113 decisions referencing the settled expectations of the patent owners.

On June 18, Stewart stated in Dabico Airport Solutions Inc. v. AXA Power Aps that "there is no bright-line rule on when expectations become settled," but, in general, "the longer the patent has been in force, the more settled expectations should be."[1]

Despite the absence of a bright-line rule, Stewart has consistently found that patent owners developed strong settled expectations once their patents have been in force for six years.

Out of 113 discretionary denial decisions, 71 decisions addressed patents that had been in force for six or more years. In 90% of those cases — 64 out of 71 — Stewart discretionarily denied the petitions based, at least in part, on the patent owner's strong settled expectations.

She appears to have derived the de facto six-year period for developing strong settled expectations by way of analogy to the six-year statutory damages period.[2]

The de facto presumption of settled expectations after six years has been overcome in a few cases. Those cases offer several reasons why a patent owner may not have settled expectations.

- In Embody Inc. v. Lifenet Health, decided June 26, the patent is part of a family and there is a related patent that is less than 6 years old.[3]

- In Globus Medical Inc. v. Spinelogik Inc, decided June 12, the patent expired for nonpayment of maintenance fees.[4]

- In Eusung Global Corp. v. Hydrafacial LLC, decided July 10, the patent was issued after a material error during examination.[5]

- In Shenzen Tuozhu Technology Co. Ltd. v. Stratasys Inc., decided July 17, the patent owner did not invest in or seek to commercialize the patent.[6]

**Empirical Analysis**

To provide an empirical analysis for Stewart's reliance on a patent owner's strong settled expectations, we used Lex Machina to collect data from IPR petitions filed since 2012 to see whether those proceedings provide evidence of the settled expectations of patent owners.

Data collected from IPR proceedings indicates that it would have been unreasonable for patent owners to develop an expectation that their patents would not be challenged after six years.

Out of 17,515 IPR petitions filed since 2012, 8,166 of those petitions challenged patents that had been in force for six or more years.[7] The age of the patents challenged is reflected in the following chart.



**Number of IPR Petitions Filed**

As reflected above, 46.6% of patents challenged in IPR proceedings since 2012 have been in force for six or more years. Indeed, the average age of patents challenged in IPR proceedings is greater than 6.7 years.

The data also indicates that claims that were in force for more than six years were routinely invalidated. Out of 8,166 petitions challenging patents in force for more than six years, 2,269 petitions reached a final written decision.[8]

Out of the 2,269 final written decisions, 1,861 — or 82% — resulted in cancellation of at least one claim. The percentage of petitions resulting in the cancellation of at least one claim was also steady regardless of the age of the challenged patent, as shown in the following chart.



Thus, based on the history of IPR proceedings, patent owners would not appear to have any reasonable settled expectations either (1) that that patents will not be challenged after six years; or (2) that, if challenged, the claims will be found valid based on "the length of time the claims have been in force."

To the contrary, patent owners could reasonably expect their patents to be challenged, and the claims invalidated regardless of the age of the patents.

Under these circumstances — where the empirical data confirms that, historically, patents of all ages have been challenged and invalidated in IPR proceedings — a patent owner's hypothetical strong settled expectations counsel against discretionarily denying IPR petitions.

---

*Jonathan R. DeFosse is a partner at Sheppard Mullin Richter & Hampton LLP.*

*Samuel Smith is an associate at Sheppard Mullin.*

*Kenzo Kasai is an analyst at NGB Corp.*

*Sheppard Mullin counsel Timothy Cremen and NGB director Yuji Orita contributed to this article.*

*The opinions expressed are those of the author(s) and do not necessarily reflect the views of their employer, its clients, or Portfolio Media Inc., or any of its or their respective affiliates. This article is for general information purposes and is not intended to be and should not be taken as legal advice.*

[1] Dabico Airport Solutions Inc. v. AXA Power Aps, IPR2025-00408, Paper 21 at 3 (Acting Dir. Stewart June 18, 2025).

[2] See Dabico, IPR2025-00408 at 3 ("The approach aligns with other approaches to settled expectations and incentives, for example, for filing infringement lawsuits. Cf. 35 U.S.C. § 286 ('Except as otherwise provided by law, no recovery shall be had for any infringement committed more than six years prior to the filing of the complaint or counterclaim for infringement in the action.')").

[3] See Embody, Inc. v. Lifenet Health, IPR2025-00248, Paper 13 at 3 (Acting Dir. Stewart June 26, 2025).

[4] Globus Medical, Inc. v. Spinelogik, Inc., IPR2025-00225, Paper 8 at 2 (Acting Dir. Stewart June 12, 2025).

[5] See e.g., Eusung Global Corp. v. Hydrafacial LLC, IPR2025-00445, Paper 14 at 2 (Acting Dir. Stewart July 10, 2025).

[6] Shenzen Tuozhu Tech. Co., LTD v. Stratasys Inc., IPR2025-00531, Paper 10 at 3 (Acting Dir. Stewart July 17, 2025).

[7] We have collected data for IPRs filed between September 16, 2012 and July 23, 2025.

[8] Additionally, the data indicates that, historically, institution decisions have shown no bias against patents that have been in force for more than six years. Since 2012, 20.1% of petitions challenging patents that had been in force for less than six years were denied institution. In comparison, only 17.9% of petitions challenging patents that had been in force for more than six years were denied institution.

MEMORANDUM

To:  All PTAB Judges

From:  Coke Morgan Stewart
Acting Under Secretary of Commerce for Intellectual Property
and Acting Director of the United States Patent and Trademark Office

Subject:  Interim Processes for PTAB Workload Management

Date:  March 26, 2025

The Patent Trial and Appeal Board (PTAB) is tasked with several statutory duties under 35 U.S.C. § 6(b), including deciding *ex parte* appeals from adverse examiner decisions by patent applicants and conducting America Invents Act (AIA) trial proceedings, such as *inter partes* reviews (IPRs) and post-grant reviews (PGRs). To ensure that the PTAB continues to meet its statutory obligations as to *ex parte* appeals, while continuing to maintain its capacity to conduct AIA proceedings, the Director will exercise her discretion on institution of AIA proceedings under 35 U.S.C. §§ 314(a) and 324(a) as outlined below.

First, decisions on whether to institute an IPR or PGR will be bifurcated between (i) discretionary considerations and (ii) merits and other non-discretionary statutory considerations. Under this interim procedure, the Director, in consultation with at least three PTAB judges, will determine whether discretionary denial of institution is appropriate. If it is appropriate, the Director will issue a decision denying institution. If it is not appropriate, the Director will issue a decision regarding that determination and refer the petition to a three-member panel of the PTAB assigned according to Standard Operating Procedure (SOP) 1 (Rev. 16). The three-member panel will then handle the case in the normal course including by issuing a decision on institution addressing the merits and other non-discretionary statutory considerations.

Second, to facilitate this bifurcated approach, the USPTO will permit parties to file separate briefing on requests for discretionary denial of institution. The discretionary denial briefing shall proceed as follows: (1) within two months of the date on which the PTAB enters a Notice of Filing Date Accorded to a petition, a patent owner may file a brief explaining any applicable bases for discretionary denial of institution; and (2) a petitioner may file an opposition brief no later than one month after the patent owner files its brief. Leave to file further briefing may be permitted for good cause. Consistent with 37 C.F.R. § 42.24, discretionary denial briefing will be limited to 14,000 words. A reply brief, if any, will be limited to 5,600 words. The merits briefing schedule and the schedule for requesting rehearing or Director Review as to a decision on institution remain unchanged.

Third, consistent with the discretionary considerations enumerated in existing Board precedent (including *Fintiv*, *General Plastic*, and *Advanced Bionics*[*]) and the Consolidated Trial Practice Guide (Nov. 2019), the parties are permitted to address all relevant considerations, which may include:

- Whether the PTAB or another forum has already adjudicated the validity or patentability of the challenged patent claims;
- Whether there have been changes in the law or new judicial precedent issued since issuance of the claims that may affect patentability;
- The strength of the unpatentability challenge;
- The extent of the petition's reliance on expert testimony;
- Settled expectations of the parties, such as the length of time the claims have been in force;
- Compelling economic, public health, or national security interests; and

---

[*] *Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 11 (Mar. 20, 2020) (precedential); *Gen. Plastic Indus. Co. v. Canon Kabushiki Kaisha*, IPR2016-01357, Paper 19 (Sept. 6, 2027) (precedential as to § II.B.4.i); *Advanced Bionics, LLC v. MED-EL Elektromedizinische Geräte GmbH*, IPR2019-01469, Paper 6 (Feb. 13, 2020) (precedential).

2

- Any other considerations bearing on the Director's discretion.

The Director will also consider the ability of the PTAB to comply with pendency goals for *ex parte* appeals, its statutory deadlines for AIA proceedings, and other workload needs. *See* 35 U.S.C. § 316(b).

These processes aim to improve PTAB efficiency, maintain PTAB capacity to conduct AIA proceedings, reduce pendency in *ex parte* appeals, and promote consistent application of discretionary considerations in the institution of AIA proceedings. The processes described herein will be implemented in IPR and PGR proceedings where the deadline for the patent owner to file a preliminary response has not yet passed. In that situation, if the time for filing discretionary denial briefing as described herein has already elapsed, the patent owner may submit discretionary denial briefing within one month of the date of this memorandum.

The processes described herein are temporary in nature due, in part, to the current workload needs of the PTAB.

3



**An official website of the United States government**

Here's how you know ⌄



**UNITED STATES PATENT AND TRADEMARK OFFICE** ®

Home > Patents > PTAB > Interim Director Discretionary Process

ℹ️

On October 3, 2025, the following sections were updated:

- V.A.
- VI.

# Interim Director Discretionary Process

On March 26, 2025, the United States Patent and Trademark Office (USPTO or Office) issued a memorandum on interim processes for PTAB workload management (Process Memorandum). Under the Process Memorandum, decisions on whether to institute *inter partes* reviews (IPR) and post-grant reviews (PGR) are bifurcated between (i) discretionary considerations and (ii) merits and other non-discretionary considerations.

This webpage provides information on the discretionary considerations process and serves as a guide to parties on when and how to file discretionary briefing, and the process by which the Under Secretary of Commerce for Intellectual Property and Director of the USPTO (Director) will render decisions on discretion. All questions about the Director's Discretionary Process can be submitted to Director_Discretionary_Decision@uspto.gov.

This webpage supersedes the April 25, 2025 FAQs for Interim Processes for PTAB Workload Management, which are now archived.

Expand all | Collapse all

⌄ **I. Interim director discretionary process**

⌄ **A. Overview**

The Director has broad authority to determine whether to exercise discretion to institute a petition for IPR or PGR. When determining whether to exercise discretion to deny institution, the Director will consider existing precedent at the Patent Trial and Appeal Board (PTAB or Board), the Consolidated Trial Practice Guide, other considerations enumerated in the Process Memorandum, and any other fact or circumstance a party

believes bears on the Director's discretion. The Director's decision will be based on a holistic review of the facts and circumstances. While the Director ordinarily will rely on facts and circumstances that the parties raise in their briefs, the Director will consider additional facts and circumstances where appropriate, for example:

- To maintain consistency with Discretionary Decisions that the Director has already issued

- Where there are facts and circumstances within the purview of the Office or Office operations that the parties are not in a position to raise

- Where there are facts and circumstances in the record or in the public domain that are relevant to the determination

## ⌄ B. Discretionary considerations

The Process Memorandum includes a non-exhaustive list of considerations that may be raised in discretionary briefing, including *Fintiv*, *General Plastic*, *Advanced Bionics*, guidance from the Consolidated Trial Practice Guide (Nov. 2019), and the following exemplary circumstances:

- Whether the PTAB or another forum has already adjudicated the validity or patentability of the challenged patent claims

- Whether there have been changes in the law or new judicial precedent issued since issuance of the claims that may affect patentability

- The strength of the unpatentability challenge

- The extent of the petition's reliance on expert testimony

- Settled expectations of the parties, such as the length of time the claims have been in force

- Compelling economic, public health, or national security interests

- Any other considerations bearing on the Director's discretion

Parties are encouraged to address any fact or circumstance they believe bears on the Director's discretion to institute, including reasons not discussed in current Board precedent or in the Process Memorandum.

## ⌄ C. Briefing

The petitioner and the patent owner are permitted to file briefs addressing discretionary considerations. The patent owner may file a brief that explains the facts and circumstances that warrant discretionary denial of the petition. The petitioner may file a brief that opposes the patent owner's request and explains why the Office should review

the challenged patent in view of discretionary considerations. Each brief should provide a thorough explanation of the outcome that the party is advocating for, supported with facts and evidence. Additional details on party briefs are provided in Sections II–IV.

The petitioner and the patent owner should not present discretionary considerations in the petition or the Patent Owner Preliminary Response (POPR), respectively. Parties must make all their arguments (citing evidence, as needed) on the merits and other non-discretionary considerations in the petition, POPR, and any authorized reply or sur-reply. A Board panel will consider only arguments and evidence cited in those papers when determining whether to grant or deny institution.

## ⌄ D. Stipulations

If a petitioner chooses to file a stipulation, such as a *Sotera* stipulation, they should file it as soon as practicable, so that the patent owner may address the impact of the stipulation in its discretionary denial brief. The Director will take into account whether the stipulation materially reduces overlap between the proceedings. Where the petitioner is relying on corresponding system art in a co-pending proceeding and/or several other invalidity theories, a stipulation may not be particularly meaningful because the efficiency gained in an AIA proceeding will be limited.

## ⌄ E. Decisions

The Director will issue a decision in every case where a patent owner has filed a brief requesting discretionary denial. The Director's decision in each case will be based on a holistic review of the facts and circumstances and may highlight certain considerations. Each decision will either (1) deny the petition or (2) refer the petition to the Board to handle in case in normal course.

If the Director's decision refers the Petition to the Board, a Board panel will issue a decision on institution addressing the merits and other non-discretionary considerations the parties have raised in the petition, a POPR, and any additional briefing that the Board panel has authorized.

## ⌄ F. Merits, non-discretionary considerations, and motions

The "merits" considerations refer to whether there is a reasonable likelihood that a petitioner would prevail with respect to at least one of the claims challenged in an IPR petition, whether a patent is eligible for PGR, or whether it is more likely than not that at least one of the claims challenged in a PGR petition is unpatentable or the PGR petition raises a novel or unsettled legal question that is important to other patents or patent applications.

Appx0474

In addition to the considerations involving whether a petition presents a sufficient number of grounds/challenges of claims that meet the reasonable likelihood standard, (*see Chevron Oronite Co. LLC v. Infineum USA L.P.*, IPR2018-00923, Paper 9 (PTAB Nov. 7, 2018) (informative) and *Deeper, UAB v. Vexilar, Inc.*, IPR2018-01310, Paper 7 (PTAB Jan. 24, 2019) (informative)), non-discretionary considerations include those relevant to, for example, [35 U.S.C. §§ 311](#), [312](#), [315(a), (b), and (e)](#), [322](#), and [325(a) and (e)](#). Such considerations also may include, for example: (1) claim construction issues (*see, e.g., Cambridge Mobile Telematics, Inc. v. Sfara, Inc.*, IPR2024-00952, Paper 12 (PTAB Dec. 13, 2024) (informative)); or (2) whether a petition meets the requirements of [37 C.F.R. § 42.104(b)](#) (*see, e.g., Adaptics Ltd. v. Perfect Co.*, IPR2018-01596, Paper 20 (PTAB Mar. 6, 2019) (informative)).

The Board will decide procedural motions that do not relate to discretionary considerations regardless of when those motions are filed.

## ⌄ G. How to file

After the PTAB issues a Notice of Filing Date Accorded (or a Notice of Defective Petition) and the PTAB accepts a patent owner's Mandatory Notice, the new paper type "PO Discretionary Denial Brief" will be available. To select the new paper type, a patent owner should:

1. Log into P-TACTS.
2. Go to My Docket and select the AIA review case number to open Case Viewer.
3. Select the "+Add" button and File Other Document modal from the menu option.
4. Select "PO Discretionary Denial Brief" from the list of paper types.
5. Enter information into all required fields (marked by a red asterisk), beginning with paper type.
6. Select "PO Discretionary Denial Brief."
7. Click on "Add to List" and then "Submit."

After a patent owner files its discretionary denial brief, the new paper type "PET Opposition to Discretionary Denial Brief" will be available. To select the new paper type, a petitioner should:

1. Log into P-TACTS.
2. Go to My Docket and select the AIA review case number to open Case Viewer.
3. Select the "+Add" button and File Other Document modal from the menu option.
4. Select "PET Opposition to Discretionary Denial Brief" from the list of paper types.

5. Enter information into all required fields (marked by a red asterisk), beginning with paper type.

6. Select "PET Opposition to Discretionary Denial Brief."

7. Click on "Add to List" and then "Submit."

### H. Optional process

A patent owner is not required to file a discretionary denial brief. However, if a patent owner wishes to raise any applicable bases for discretionary denial, it must do so in a discretionary denial brief. If a patent owner chooses not to file a discretionary denial brief, the Director typically will not issue a decision on discretionary considerations and responsibility will pass to a Board panel the day after the due date for such a brief. In that situation, the Office will enter a notice into the docket indicating the case is now referred to a Board panel to consider the merits and non-discretionary issues.

After such a notice is entered, a Board panel will issue a decision on institution addressing the merits and other non-discretionary considerations that the parties have raised in the petition, a POPR, and any additional briefing that the Board panel has authorized.

### II. Patent owner's discretionary denial brief

### A. Availability

The bifurcated process for decisions on institution is available in all IPR and PGR proceedings in which the deadline for a patent owner to file a POPR is after March 26, 2025. In these proceedings, the patent owner may file a brief requesting discretionary denial of the petition.

### B. Timing

A patent owner must file a discretionary denial brief within two months of the date on which a Notice of Filing Date Accorded (NFDA) is entered into the record of the proceeding. To ensure statutory deadlines are met, the parties may not stipulate to a later due date for a patent owner discretionary denial brief.

### C. Content

In its brief, the patent owner should argue with particularity the circumstances that warrant discretionary denial. The patent owner may argue circumstances that warrant denial based on existing PTAB precedent, the Consolidated Trial Practice Guide, relevant considerations enumerated in the Process Memorandum, and any other consideration or circumstance that the patent owner believes bears on the Director's discretion.

#### ⌄ i. Arguments directed to the strength of the merits

Notwithstanding the prohibition on incorporation by reference in [37 C.F.R. § 42.6(a)(3)](), when filing a brief for discretionary denial, a patent owner may direct attention to an anticipated POPR and evidence for a discussion of the merits. Similarly, in arguing about the strengths or weaknesses of the merits, a patent owner may refer to arguments made in the petition and cite to record evidence. A patent owner should not repeat its merits arguments verbatim but should briefly explain why the merits are relevant. A patent owner should not treat a discretionary denial brief as an additional opportunity for merits briefing.

#### ⌄ ii. Evidence

A patent owner may submit evidence in support of its discretionary arguments. However, a patent owner should keep in mind that the Director will consider the petition, the POPR, and the evidence cited therein in determining whether discretionary denial is appropriate.

#### ⌄ iii. Page limit

**UPDATE** Effective for patent owners' discretionary denial requests due on or after September 1, 2025, a patent owner's discretionary denial brief is limited to 20 pages, regardless of when a patent owner files its brief. A patent owner may request additional pages and shall demonstrate good cause for the additionally requested pages. For discretionary denial requests due before September 1, 2025, a patent owner's discretionary denial brief is limited to 14,000 words as per the Process Memorandum.

### ⌄ III. Petitioner's brief opposing discretionary denial

#### ⌄ A. Availability

A petitioner should raise any discretionary issues in its opposition to a patent owner's discretionary denial brief, including issues relating to **35 U.S.C. § 325(d)**, parallel proceedings, parallel petitions, serial petitions, and any other matter bearing on the Director's discretion to institute. The petition should not address discretionary issues.

## ⌄ B. Timing

**UPDATE** A brief opposing a patent owner's discretionary denial request must be filed within three months of the date on which a Notice of Filing Date Accorded (NFDA) is entered into the record of the proceeding. To ensure statutory deadlines are met, the parties may not stipulate to a later due date for a petitioner's opposition brief.

## ⌄ C. Content

A petitioner's brief should be responsive to the arguments raised in patent owner's discretionary denial brief and should raise any discretionary issues, including issues relating to **35 U.S.C. § 325(d)**, parallel proceedings, parallel petitions, serial petitions, and any other matter bearing on the Director's discretion to institute. A petitioner's brief should also explain why, notwithstanding discretionary considerations, the Office should institute review of the challenged patent, including all facts or circumstances, such as those set forth in current Board precedent or the Process Memorandum.

### ⌄ i. Arguments directed to the strength of the merits

Notwithstanding the prohibition on incorporation by reference in **37 C.F.R. § 42.6(a)(3)**, when filing an opposition to a brief for discretionary denial, a petitioner may direct attention to its petition and evidence for a discussion of the merits. A petitioner should not repeat its merits arguments verbatim but should briefly explain why the merits are relevant. A petitioner should not treat an opposition as an additional opportunity for merits briefing.

### ⌄ ii. Evidence

A petitioner may submit evidence in support of its discretionary arguments. However, a petitioner should keep in mind that the Director will consider the petition, the POPR, and the evidence cited therein in determining whether discretionary denial is appropriate.

### ⌄ iii. Page limit

UPDATE   Effective for patent owners' discretionary denial requests due on or after September 1, 2025, a petitioner's opposition to the patent owner's discretionary denial brief is limited to 20 pages, regardless of when a patent owner files its brief. A petitioner may request additional pages and shall demonstrate good cause for the additionally requested pages. For discretionary denial requests due before September 1, 2025, a petitioner's opposition to the patent owner's discretionary denial brief is limited to 14,000 words as per the Process Memorandum.

## ⌄ IV. Additional briefing

### ⌄ A. General

A reply and a sur-reply to discretionary briefs are not authorized by default. A patent owner must demonstrate good cause for authorization to file a reply. Similarly, a petitioner must demonstrate good cause for authorization to file a sur-reply.

### ⌄ B. How to request

Parties should request authorization to file a reply or sur-reply as soon as practicable due to the time constraints on the discretionary considerations process. A party requesting briefing should send an email request, with a copy to counsel for all parties, to Director_Discretionary_Decision@USPTO.gov.

## ⌄ V. Director Discretionary Decisions

### ⌄ A. Process

The Director will receive each petition, discretionary denial brief, opposition brief, and POPR, as well as any evidence the parties have made of record in support of their papers. The Director retains responsibility for resolving whether the proceeding should be denied on discretionary grounds, unless the Director otherwise states. Similar to the Director Review process, once received, the Director will determine, in consultation with at least three senior PTAB judges who will be separate from judges addressing the merits, whether discretionary denial is appropriate, as set forth in the Process Memorandum. In deciding whether to exercise discretion to institute an IPR or a PGR, the Director may consult with other USPTO employees as needed, as long as those individuals do not have

a conflict of interest.

Absent good cause, the Director will issue a decision on discretionary considerations within one month of the due date of the last relevant paper filed. The Director's decision will explain why the Director has decided to exercise discretion to deny institution or why discretionary denial is not appropriate.

The Director has delegated his authority to the Deputy Director for discretionary decisions. When the Deputy Director has a conflict in a proceeding involving discretionary denial, the Director has further delegated his authority to Kalyan Deshpande. *See* Delegation of Authority.

## ˅ B. Strength of the merits arguments

When parties present arguments regarding the strength of the merits, the Director will consult with USPTO personnel with relevant technical expertise. A Board panel is not bound by the Director's assessment of the merits in a discretionary consideration decision but must explain in the decision on institution why the panel's findings and/or determination are different (citing the parties' evidence of record as relevant), if that occurs.

## ˅ C. Requests for rehearing or Director Review

If the Director exercises discretion to deny institution, then a party may file a request for rehearing or Director Review within 30 days of the Director's decision. If the party is requesting Director review, the party shall file its request under the procedures set forth in 37 C.F.R. § 42.75(c)　　and submit the fee as set forth in 37 C.F.R. § 42.15(f)　　.

If the Director issues a decision determining that discretionary denial is not appropriate, a party should file a single request for rehearing or Director Review after the Board panel issues its decision.

## ˅ D. Changes in circumstances

A party may raise changed circumstances, for example, a change in trial date, in a request for rehearing or a request for Director Review filed within the applicable time period.

## ˅ E. How to locate Director Discretionary Decisions

A Director Discretionary Decision will be entered into the record of a proceeding. To find Director Discretionary Decisions on the PTAB webpage:

1. Select "**All PTAB decision data**".

2. Select the "**Documents**" tab on the "**PTAB Decisions**" page.

3. Search for "Director Discretionary Decision" under "Document type."

4. Select both "Director Discretionary Decision: Refer" and "Director Discretionary Decision: Deny".

5. Choose "Apply."

## ⌄ VI. Conflicts of interest

If the Director, a consulting member of the PTAB, or any other USPTO employee has a conflict of interest, they shall recuse themselves from the case.

In determining whether a conflict of interest exists, the USPTO follows the guidance set forth in the Standards of Ethical Conduct for Employees of the Executive Branch at **5 C.F.R. Part 2635** and will consult with the Department of Commerce Ethics Law and Programs Office, as necessary, to resolve any questions pertaining to conflicts of interest. Conflicts may include, for example, involvement in the examination or prosecution of the underlying patent or a related patent at issue. Further information is available in the **U.S. Department of Commerce USPTO Summary of Ethics Rules**.

As a matter of policy, the PTAB judges who consult with the Director will additionally follow the guidance on conflicts of interest set forth in the PTAB's **SOP 1**.

The Director has delegated his authority to the Deputy Director for discretionary decisions. When the Deputy Director has a conflict in a proceeding involving discretionary denial, the Director has further delegated his authority to Kalyan Deshpande. *See* **Delegation of Authority**.

## ⌄ VII. Questions

All questions relating to the discretionary denial process should be submitted to **Director_Discretionary_Decision@uspto.gov**.

Was this page helpful?

Share this page  Print this page

Additional information  about this page

## Receive updates from the USPTO

Enter your email to subscribe or update your preferences

your@email.com    **Subscribe**

About the USPTO · Search for patents · Search for trademarks

US Department of Commerce

Accessibility

Privacy Policy

Terms of Use

Financial and Performance Data

Vulnerability Disclosure Policy

Freedom of Information Act

Inspector General

NoFEAR Act

USA.gov

Follow us

# PATENT TRIAL AND APPEAL BOARD

## STANDARD OPERATING PROCEDURE 2 (REVISION 11)[1]

## DESIGNATION OR DE-DESIGNATION OF DECISIONS AS PRECEDENTIAL OR INFORMATIVE

This Standard Operating Procedure (SOP) addresses the review procedure for designating Patent Trial and Appeal Board (Board or PTAB) decisions as precedential or informative authority for the Board. The review procedure includes a process by which an Advisory Committee and PTAB Executive Management evaluate decisions nominated for precedential or informative designation. As part of this process, PTAB Executive Management will, absent exceptional circumstances, solicit and evaluate comments from all members of the Board to determine whether to recommend a nominated decision for designation as precedential or informative.

This SOP also includes the process for de-designating previously designated precedential or informative decisions.

No decision will be designated or de-designated as precedential or informative without the approval of the Director. This SOP does not limit the authority of the Director to designate or de-designate decisions as precedential or informative. Nor does this SOP limit the Director's authority to issue, at any time and in any manner, policy directives that are binding on any and all USPTO employees, including Board judges, such as policy directives concerning the interpretation and implementation of statutory provisions. *See, e.g.*, 35 U.S.C. §3(a)(2)(A); *see also, e.g.*, 35 U.S.C. §§ 3(a)(1), 2(b)(2)(A), 316(a), 326(a).

This SOP sets forth internal processes and procedures for the administration of PTAB. It does not create any legally-enforceable rights. The actions described in this SOP are part of the USPTO's deliberative process.

## I.     PURPOSE

The Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office (Director), who is a statutory member of the Board (35 U.S.C. § 6(a)), is "responsible for providing policy

---

[1] Published July 24, 2023.

direction and management supervision for the Office" (35 U.S.C. § 3(b)(2)(A)), which has authority to "govern the conduct of proceedings in the Office" (35 U.S.C. § 2(b)(2)(A)). The Director has an interest in establishing binding authority for fair and efficient Board proceedings, and for ensuring consistent decisions within and across Board jurisdictions, including appeals from adverse patent examiner decisions, appeals from reexamination proceedings, derivation proceedings, and *inter partes* review and post-grant review proceedings. 35 U.S.C. § 6(b).

## A. <u>Publication of Decisions</u>

The Administrative Procedure Act requires that "[e]ach agency shall make available to the public . . . final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases." 5 U.S.C. § 552(a)(2)(A). Since August 1997, Board decisions have been made available to the public through the electronic posting of most[2] final Board decisions ([http://e-foia.uspto.gov/Foia/PTABReadingRoom.jsp](http://e-foia.uspto.gov/Foia/PTABReadingRoom.jsp); [https://ptab.uspto.gov](https://ptab.uspto.gov)). A decision, as used in this SOP, refers to any Board decision, opinion, or order, or the rehearing decision of any Board decision, opinion, or order.

The Board enters thousands of decisions every year. Every decision is, by default, a routine decision. A routine decision is binding in the case in which it is made, even if it is not designated as precedential or informative, but it is not otherwise binding authority. This SOP provides a mechanism for highlighting certain Board decisions by designating them as precedential or informative.

## B. <u>Designation of Decisions as Precedential or Informative</u>

This SOP set forth procedures for designating decisions as precedential or informative. These procedures are the typical procedures the Board and Office use to establish binding authority or set forth Board norms, but these procedures do not limit the Director's authority to issue, at any time and in any manner, policy directives, including issuing precedential decisions and guidance memorandums. These policy directives are binding on any and all USPTO employees, including Board judges, and may include directives concerning the interpretation and implementation of statutory provisions. *See, e.g.*, 35 U.S.C.

---

[2] Electronic publication of most decisions depends on whether the underlying application is entitled to confidentiality. 35 U.S.C. § 122. Since November 2000, only a relatively small number of decisions remain confidential.

§3(a)(2)(A); *see also, e.g.*, 35 U.S.C. §§ 3(a)(1), 2(b)(2)(A), 316(a), 326(a).

A precedential decision establishes binding authority concerning major policy or procedural issues, or other issues of exceptional importance, including constitutional questions, important issues regarding statutes, rules, and regulations, important issues regarding case law, or issues of broad applicability to the Board.

An informative decision provides Board norms on recurring issues, guidance on issues of first impression to the Board, guidance on Board rules and practices, and guidance on issues that may develop through analysis of recurring issues in many cases.

No case will be designated precedential or informative without the approval of the Director.

### C. Procedures for De-designation

This SOP also provides a procedure for de-designating decisions previously designated as precedential or informative when they should no longer be designated as such, for example, because they have been rendered obsolete by subsequent binding authority, are inconsistent with current policy, or are no longer relevant to Board jurisprudence. No decision will be de-designated without the approval of the Director.

## II. DESIGNATING AN ISSUED DECISION AS PRECEDENTIAL OR INFORMATIVE

Every Board decision is a routine decision unless it is designated as precedential or informative. A routine decision is binding in the case in which it is made, even if it is not designated as precedential or informative, but is not otherwise binding authority. The sections below set forth a procedure for nomination, review, and designation of issued decisions as precedential or informative.

### A. Nominating Process for Precedential or Informative Designation

Any person, including, for example, Board members and other USPTO employees, as well as members of the public, may nominate a routine decision of the Board for designation as precedential or informative. An informative decision may similarly be nominated for precedential designation.

Nominations for precedential or informative designation must set forth with particularity the reasons for the requested designation, and must also identify any other Board decisions of which the person nominating is aware that may conflict with the nominated decision. Nominations should be submitted by email to PTAB_Decision_Nomination@uspto.gov.

Nominated decisions may be considered for precedential designation to establish binding Board authority concerning major policy or procedural issues, or other issues of exceptional importance in the limited situations where it is appropriate to create such binding authority through adjudication before the Board. For example, such issues may include constitutional questions; important issues regarding statutes, rules, and regulations; important issues regarding binding or precedential case law; or issues of broad applicability to the Board. The precedential designation may also be used to resolve conflicts between Board decisions and to promote certainty and consistency among Board decisions.

Nominated decisions may be considered for informative designation for reasons including, for example: (1) providing Board norms on recurring issues; (2) providing non-binding guidance on issues of first impression to the Board; (3) providing non-binding guidance on Board rules and practices; and (4) providing non-binding guidance on issues that may develop through analysis of recurring issues in many cases.

B. Recommendations for Precedential or Informative Designation

1. Advisory Committee

An Advisory Committee will review the nominated decisions. The Advisory Committee has at least 11 members and includes representatives from various USPTO business units who serve at the discretion of the Director. The Advisory Committee typically comprises members from the following business units of the USPTO:

- Office of the Under Secretary (not including the Director or Deputy Director)
- Patent Trial Appeal Board (not including members of the original panel for each case under review)
- Office of the Commissioner for Patents (not including the Commissioner for Patents and any persons involved in the examination of the challenged patent)
- Office of the General Counsel

- Office of Policy and International Affairs

The Advisory Committee will make recommendations as to which decisions should be further reviewed for designation as precedential or informative. Advisory Committee meetings may proceed with less than all members in attendance. A quorum of seven members must be present for each meeting. Additional individuals, such as technical or subject matter experts, or others assisting in an administrative support capacity, may participate in Advisory Committee meetings but do not provide recommendations to the Director.

The Advisory Committee prepares an advisory recommendation for each nominated decision. The Advisory Committee provides its recommendations to the Director at regular intervals, promoting the timely consideration of nominated decisions. If the recommendation is not unanimous, dissenting views will be reported to the Director.

### 2. PTAB Executive Management

PTAB Executive Management also will provide a recommendation to the Director, either orally or in writing, on whether to designate a nominated decision, or a portion thereof, as precedential or informative. PTAB Executive Management will review the nominated decision and the recommendation provided by the Advisory Committee. PTAB Executive Management will, absent exceptional circumstances, solicit feedback from Board members, as discussed below. PTAB Executive Management will provide its recommendation to the Director as to whether to designate the decision, or a portion thereof, as precedential or informative.

### i. Composition of PTAB Executive Management

For purposes of this SOP, PTAB Executive Management consists of the Chief Judge, the Deputy Chief Judge, Vice Chief Judges, and Senior Lead Administrative Patent Judges.[3] A quorum of five members must be present in making each recommendation. If a quorum cannot be reached, PTAB Executive Management will not provide a recommendation to the Director.

---

[3] For purposes of this SOP, persons in an acting Chief Judge, Deputy Chief Judge, Vice Chief Judge, or Senior Lead Judge capacity are members of PTAB Executive Management.

### ii. PTAB Executive Management Review Process

As part of its evaluation, PTAB Executive Management will, absent exceptional circumstances, solicit and review comments from members of the Board that do not have a conflict of interest with the nominated decision. To that end, PTAB Executive Management will present the nominated decision to all members of the Board for comment during a Board review period. During the Board review period, which typically will be five business days, any member of the Board may submit written comments to PTAB Executive Management regarding whether the decision should be designated as precedential or informative. PTAB Executive Management may share the comments with all members of the Board. After the expiration of the Board review period, PTAB Executive Management will compile and evaluate the received comments, and shall determine by majority vote of PTAB Executive Management whether to recommend the decision for designation as precedential or informative. If the recommendation is not unanimous, dissenting views will be reported to the Director.

### C. <u>Designating a Decision as Precedential or Informative</u>

PTAB Executive Management shall submit its recommendation, along with the Advisory Committee recommendation and a summary of Board comments, to the Director, with an explanation for its recommendation. The Director may consult with others, including, for example, members of the Office of the General Counsel.[4] No decision or portion thereof may be designated as precedential or informative pursuant to these procedures without the Director's approval. If the Director determines that the decision or portion thereof should be designated as precedential or informative, the Director will notify the Chief Judge.[5]

The decision to be designated will then be published or otherwise disseminated following notice and opportunity for written objection afforded by 37 C.F.R. § 1.14, in those instances in which the decision would not otherwise be open to public inspection because a patent application is preserved in confidence

---

[4] The Director will not consult with anyone having a conflict of interest with the designated decision.

[5] This SOP does not limit the authority of the Director to designate or de-designate an issued decision or portion thereof as precedential or informative at any time, in his or her sole discretion.

pursuant to 35 U.S.C. § 122(a).

Decisions, or portions thereof, designated as precedential or informative shall be labeled "Precedential" or "Informative," respectively, and include the date on which the decision is so designated. If a portion of a decision is designated as precedential or informative, an indication of that portion shall be included in the label. Precedential and informative decisions shall be posted electronically on the Board's [Precedential and Informative Decisions Web page](#)[6] and may be sent to commercial reporters that routinely publish Board decisions.

### D. Effect of Precedential or Informative Designation

A precedential decision is binding Board authority in subsequent matters involving similar facts or issues.

Informative decisions set forth Board norms that should be followed in most cases, absent justification, although an informative decision is not binding authority on the Board.

A decision previously designated as precedential or informative under a prior version of SOP 2 (and not previously de-designated) shall remain precedential or informative unless de-designated under § III of this SOP.

### E. Conflicts of Interest

If the Director, a member of the Advisory Committee, or a member of PTAB Executive Management has a conflict of interest, they shall notify the other members and will recuse themselves from the designation or de-designation process for that decision.

In determining whether a conflict of interest exists, the USPTO follows the guidance set forth in the Standards of Ethical Conduct for Employees of the Executive Branch at 5 C.F.R. Part 2635 and will consult with the Department of Commerce Ethics Law and Programs Office, as necessary, to resolve any questions pertaining to conflicts of interest. Conflicts may include, for example, involvement in the examination or prosecution of the underlying patent or a related patent at issue.

---

[6] Available at www.uspto.gov/patents-application-process/patent-trial-and-appeal-board/precedential-informative-decisions.

Additionally, the Office has set forth procedures that the Office will follow in the event of an actual or potential conflict of interest by Director or Deputy Director of the USPTO. *See* "Director Recusal Procedures" at *Office of the Under Secretary and Director*.[7]

Finally, as a matter of policy, PTAB Executive Management judges will additionally follow the guidance on conflicts of interest set forth in the PTAB's Standard Operating Procedure 1 and will recuse themselves from any discussion or analysis involving cases or related cases on which they are paneled.

III.     DE-DESIGNATING A PRECEDENTIAL OR INFORMATIVE DECISION

Any person, including, for example, Board members and other USPTO employees, as well as members of the public, may suggest that a Board decision designated as "Precedential" or "Informative" should no longer be designated as such, for example because it has been rendered obsolete by subsequent binding authority, is inconsistent with current policy, or is no longer relevant to Board jurisprudence. Nominations for de-designation should be submitted by email to PTAB_Decision_Nomination@uspto.gov.

If the Director determines that a particular Board decision should no longer be designated as precedential or informative, that Board decision will be de-designated. The Chief Judge will notify the Board that the decision has been de-designated. The decision will be removed from the Board's Precedential and Informative Decisions Web page and the public will be notified that the decision has been de- designated.

---

[7] Available at www.uspto.gov/about-us/organizational-offices/office-under-secretary-and-director.

# PATENT TRIAL AND APPEAL BOARD

## ADDENDUM TO STANDARD OPERATING PROCEDURE 2 (REV. 11)
### (August 12, 2025)

Section II.B.1. is amended such that the Advisory Committee has five members consisting of one representative from each of the following business units of the USPTO:

- Office of the Under Secretary (not including the Director or Deputy Director)

- Patent Trial Appeal Board (not including members of the original panel for each case under review)

- Office of the Commissioner for Patents (not including the Commissioner for Patents and any persons involved in the examination of the challenged patent)

- Office of the General Counsel

- Office of Policy and International Affairs

Additional individuals, such as technical or subject matter experts, or others assisting in an administrative support capacity, may participate in the work of the Advisory Committee.

MEMORANDUM

To:        All PTAB Judges

From:      John A. Squires
Under Secretary of Commerce for Intellectual Property and
Director of the United States Patent and Trademark Office

Subject:    Director Institution of AIA Trial Proceedings

Date:      October 17, 2025

To improve efficiency, consistency, and adherence to the statutory requirements for institution of trial, effective October 20, 2025, the Director will determine whether to institute trial for *inter partes* review ("IPR") and post-grant review ("PGR") proceedings.[1] This process will maintain PTAB's capacity to conduct IPR and PGR trials and promote consistent application of considerations for institution of trial proceedings before the PTAB. This approach to institution flows from the processes outlined in the March 26, 2025 memorandum entitled "Interim Processes for PTAB Workload Management" ("Interim Processes"),[2] under which the Director determines whether or not to deny a petition based on discretionary considerations.

Similar to the discretionary considerations process, the Director, in consultation with at least three PTAB judges, will determine whether to institute trials in all IPR and PGR proceedings. Upon review of discretionary considerations, the merits, and non-discretionary

---

[1] Congress provided that the Director determines whether to institute trials under the America Invents Act. *See* 35 U.S.C. § 314(a) ("The Director may not authorize an inter partes review to be instituted unless the Director determines that the information presented in the petition filed under section 311 and any response filed under section 313 shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition."); *id.* § 314(b) ("The Director shall determine whether to institute an inter partes review under this chapter pursuant to a petition . . . ."); *id.* § 314(c) ("The Director shall notify the petitioner and patent owner, in writing, of the Director's determination under subsection (a), and shall make such notice available to the public as soon as is practicable."); *see also id.* § 324(a), (c), (d) (similar).

[2] Available at https://www.uspto.gov/sites/default/files/documents/InterimProcesses-PTABWorkloadMgmt-20250326.pdf.

considerations, if the Director determines that institution is appropriate on at least one ground for one challenged claim, the Director will issue a summary notice to the parties granting institution. *See* 35 U.S.C. §§ 314(c), 324(d). Similarly, if the Director determines that institution is not appropriate, whether based on discretionary considerations, the merits, or other non-discretionary considerations, the Director will issue a summary notice denying institution. In proceedings involving novel or important factual or legal issues, the Director may issue a decision on institution addressing those issues. Additionally, where the Director determines detailed treatment of issues raised in a petition is appropriate (e.g., complex claim construction issues, priority analysis, or real party in interest determination), the Director may refer the decision on institution to one or more members of the PTAB. The Office has issued more than 580 decisions under the Interim Processes, providing substantial guidance on how the Director will handle discretionary considerations. Any instituted IPR or PGR proceeding will be referred to a three-member panel of the PTAB to conduct the trial and that panel will be assigned according to PTAB Standard Operating Procedure (SOP) 1 (Rev. 16).[3]

This Memorandum supersedes the Interim Processes to the extent that (1) routine decisions on institution will be limited to summary notices, and (2) merit-based decisions on whether to institute petitions will not be referred to a three-member panel of the PTAB. The process for briefing discretionary considerations, as outlined in the Interim Processes and the Discretionary Decisions webpage,[4] and the process for briefing the merits and non-statutory considerations will remain the same. Further, all petitions referred to the PTAB for consideration of the merits and non-discretionary considerations under the Interim Processes prior to October 20, 2025 will remain with a three-member panel.

---

[3] Available at https://www.uspto.gov/sites/default/files/documents/sop1_r16_final.pdf.
[4] Available at https://www.uspto.gov/patents/ptab/interim-director-discretionary-process.

2

Testimony of

# John A. Squires

June 6, 2007

Testimony of. John A. Squires, Esq.
Goldman, Sachs & Co
On behalf of:
The American Bankers Association
The Financial Services Roundtable
And
The Securities Industry and Financial Markets Association
"Patent Reform: The Future of Innovation"
The Senate Committee on the Judiciary
Washington, D.C. 20510
June 6, 2007

Chairman Leahy, Senator Specter and members of the Committee, I am John Squires of Goldman Sachs and I appreciate the opportunity to testify today on the critical importance of S. 1145, "The Patent Reform Act of 2007," to the financial services sector.

I appear before you today as chairman of the Securities Industry and Financial Markets Association (SIFMA) Intellectual Property Subcommittee and am also representing the American Bankers Association (ABA) and The Financial Services Roundtable (FSR).

Our respective industry organizations support S. 1145, "The Patent Reform Act of 2007." The issues addressed in the bill, we believe, are precisely the issues that must be addressed to bring a system out of balance, back into balance. We are grateful for the substantial and thoughtful bipartisan, bicameral work already underway.

Patents are still generally new to our industry, but not for the reason most people think. While many people attribute patenting in the financial services sector to the State Street Bank decision in 1998, the truth of the matter is that the modern banking and technology needs and the advent of the Internet participants flattened our world almost overnight. Patents and intellectual property aside, we have had to rethink and re-engineer almost every aspect of how we deliver services, serve our clients and add value to stay competitive in a global marketplace. Be it technology push, or innovation pull, we would be here either way. 1

While patents in our industry do provide substantial benefits and incentives for financial service firms, particularly where open innovation is concerned or transparency desired the more common experience unfortunately has been that the patent system is a legal system in need of substantial reform.

Patent examination quality issues, predatory patent assertions and litigation abuse have precluded continued progress and efficiencies in bettering the U.S. financial system. A recent study by

Harvard Business School shows that the financial services industry is especially vulnerable to infringement suits and nuisance claims. The Harvard study found that financial patents are 27 times more likely to be asserted in a lawsuit than non-financial patents, and individuals and other non-practicing entities disproportionately own these litigated financial patents.2 And because patent suits carry the risk of injunction, the delivery of financial services in the U.S. economy is all too easily put at risk. We fear it is only the tip of the iceberg.

To be clear, our industry does not see itself as an "opponent" of sectors or industries who take divergent views on reform. Published accounts are quick to cast the patent debate as a schism between "tech" and drug and biotech companies, with the financial industry shaded towards the tech side of the debate. But the fact is that FSR, SIFMA and ABA-member organizations finance drug companies and biotech companies of all shapes and sizes. Member firms also provide seed and venture capital to independent inventors and start-ups that help bring their visions to fruition.

All industries do not experience the patent-granting and patent litigation system in the same way; we believe that our industry experiences are different from other sectors. So we have engaged and continue to engage on all fronts.

Over the last three years, we have jointly filed amicus briefs to both the Supreme Court and the Federal Circuit on issues of import to our members. In eBay v. MercExchange, we saw the automatic injunction rule create unacceptable operational risks to the financial system. Similarly, we have filed amicus briefs with the Federal Circuit in both Knorr-Bremse and in In re Seagate concerning willful infringement jurisprudence.

Analogous to an investment portfolio, we view the current patent system as underperforming because it is overweight with an "Industrial Revolution-era" view of the world, and underweight in terms of the robust and complex value drivers of the knowledge economy. The time has come for the patent law portfolio to be rebalanced and we believe the reform bills as introduced will accomplish much of the rebalancing when enacted. To finish my analogy, its time to enable patent law to generate the substantial returns for the U.S economy and American competitiveness that it should.

With respect to patent reform legislation, S. 1145 has several provisions that we strongly support as drafted, and there are others we can support with modifications. For instance, the provisions dealing with damages reform, postgrant review and interlocutory appeal are all necessary to accomplish meaningful patent reform and we support the language in the bill as introduced. However, the provisions clarifying the use of secret prior art, venue, prior user rights and the effective date could be strengthened or improved.

The focus of this hearing is post-grant review, interlocutory appeal and venue so our testimony addresses those issues in order before addressing other issues of equal importance.

Post-grant review (Section 6)
We support strongly the post-grant opposition proceeding in S.1145. The second window is essential to a meaningful, efficient and broadly available reevaluation of suspect patent claims before a firm is forced into prolonged and expensive litigation.

To date, there has been little if any way for industry - any industry for that matter - to practically engage in patent quality. And industry engagement is very important, particularly for the financial service sector; since the Patent and Trademark Office (PTO) has acknowledged that it lacks a suitable prior art database in the area of business methods. While potential troves of prior art may reside within our firms given our industry's historical lack of patenting, there has never been a balanced mechanism for firms to inject prior art into the system to improve patent quality. As a result, quality suffers.3

In today's information age, the "wisdom of the crowds" - and the prior art they may have - can and should be available to bolster patent quality. While available in theory, the current reexamination processes have generally proved ineffective and are not widely accessible or used. It is probably fair to say that the inter-partes reexamination process in particular, with its draconian estoppel provisions, has been a failure.

S. 1145 addresses these limitations by providing an opposition process where the challenger can fully participate and rely on any evidence of invalidity that would be available at trial. Equally important, the challenger need only prove invalidity under the more equitable preponderance of evidence standard without the presumption of validity that applies at trial.

More importantly, the bill creates an opportunity to utilize this improved opposition proceeding both during a one-year period after the patent is issued and immediately prior to litigation (the "second window"). Even if it were possible to review all of the relevant patents in the first window, it would be impossible to determine how a patentee might interpret and apply the patent, particularly to an expansive, undifferentiated business process.

A second window to oppose, triggered when notice is provided, may be the first and only opportunity for the industry to challenge a patent's validity before the agency best equipped to review the art it has marshaled. Indeed, the second window is the only proposal that addresses this issue and as a practical matter, is the first and only opportunity for financial services firms to ferret out invalid patents before being forced into expensive and prolonged litigation.

Interlocutory appeal (Section 10)
We strongly support language in Section 10 of S. 1145 to create an interlocutory appeal of Markman rulings. Although the proposed language applies the interlocutory appeal only to infringement actions, we favor extending the interlocutory appeal to apply to both infringement actions and declaratory judgments (under 28 U.S.C. 2201).

An interlocutory appeal would help to mitigate the judicial inefficiency that occurs when a full trial is conducted based on an incorrect interpretation of the patent at the district court proceeding and the Court of Appeals for the Federal Circuit (CAFC) modifies or reverses that interpretation and orders a new trial based on that modified interpretation or reversal. The purpose of the Markman ruling is essentially to tell the plaintiff and defendants what the patent means, and as such, the current system is failing litigants. Markman rulings by district courts are being overturned over 35% of the time. The practical effect is that many litigants effectively end up paying the attorney fees and expenses for two trials.

Markman decisions are neither elementary nor run-of-the-mill for most district courts. Many patent cases balance on the highly technical elements of science and patent law. Further, many district court judges see only a handful of patent cases over the course of their entire careers. Often, district court judges employ the assistance of Special Masters, and some Members of Congress have suggested that through the assistance of supplemental experts the complexity of patent cases can be conquered. While the Masters do help, they also add a great deal of cost to the case. Further, the Masters may be - and are - reversed just as the district courts are. The need for immediate CAFC intervention is demonstrated when litigants bend procedure like a pretzel to get a timely review of Markman, such as when litigants are willing to stipulate to infringement simply to get claims questions heard by the CAFC.

Three specific concerns have been raised about interlocutory appeal. First, a flood of appeals will result. Second, that the process will delay and unduly lengthen cases. Third and finally, that appeal will give litigants "two bites at the apple". It is important to address those concerns.

We are sensitive to the concerns raised by some that the proposal will increase the number of appeals filed to the Federal Circuit. While some experts have predicted a worst case scenario of a 50% increase, the math behind these predictions seems to indicate a more modest and - given the importance of the issue in deciding the entirety of the case - manageable increase.

The CAFC heard a total of 834 cases in 2006 of which 453 were patent cases.4 Of those, 259 were adjudicated (57%). A 50% increase would mean an additional 109 cases a year could be attributable to interlocutory appeal. The CAFC's current workload plus those cases is an increase of roughly 12%, and with four three-judge panels hearing cases, the net is an increase of 2 or 3 cases per month, per panel in addition to the roughly 17 cases per month the CAFC currently hears. These numbers do not account for any decrease in caseload resulting from cases that would no longer need an appeal at the end of trial due to IA resolving the issue earlier. Therefore, they are truly a worst case scenario.

Not only is this increase within the 14 percent increase in overall workload the CAFC saw last year, in the context of the other appeals courts, according to GAO, the average caseload per month of the other circuits (including the DC Circuit which hears the fewest) is 47.8 cases per month.

Regarding delay, we believe that the average duration of a district court proceeding is roughly 27 months. The average time to get a decision from the CAFC is 3-6 months (also an estimate), with time to appellate oral argument about 7 months from the final district court judgment. With these numbers in mind, it takes between 37-40 months to get a final determination of what the actually patent means. Allowing the appeal will greatly reduce the amount of time to define the scope of the patent. Once the appeal is ingrained, cases should take even less time. In fact, the mere presence of the interlocutory appeal will likely generate more reasonable settlement requests and an increased number of settlements.

Finally, we agree that provision should not provide litigants with two bites of the apple and agree that legislative language could readily address that threat.

Claims construction is arguably the most important factor in a patent case. It determines the scope of the invention, which relates to both infringement and validity. Under the current system, the CAFC is the final arbiter, and the only court that can provide litigants the certainty and clarity they need to have educated discussions around settlement. The interlocutory appeal proposed in the current bill will not only establish greater certainty, it will establish certainty based on the merits of the case and not by exploiting a district court's relative unfamiliarity with patent law or the subject matter.

Venue (Section 10)
A central component in reforming the litigation climate is curtailing forum shopping. Certain jurisdictions have apparently become a magnet for patent cases because of the disproportionately high number of cases decided in favor of patentees. One plaintiff alone filed over 50 infringement suits against financial service firms in the Eastern District of Texas, alleging infringement of patents it holds related to electronic check processing. Indeed, the manner in which commercial banks process checks is all but prescribed by the 2004 "Check 21" law that incentivizes electronic imaging. (Pub. L. No. 108-100, 117 Stat. 1177, codified at 12 U.S.C. sections 5001-5018.) As it stands, the cost of check imaging now includes the additional expense of patent infringement claims.

The proposed language in S. 1145 limits venue to locations where the defendant or plaintiff reside or where the defendant has committed acts of infringement and has a regular and established place of business. The redefinition of "resides" is generally consistent with the pre-1988 standard for patent venue and is limited to a firm's state of incorporation or location of principle place of business. While these changes preclude a patentee from suing a firm in a jurisdiction where neither party has a presence, they do not prevent a patentee from bringing suit in a desired jurisdiction once it has established and been incorporated in that jurisdiction.

The proposed language in S. 1145 is an important step forward. We would however, encourage efforts to strengthen the provision to ensure that financial institutions are not subject to litigation in venues where they have no significant business presence and that the incentive is removed for patent holders to "create" a principle place of business in a jurisdiction in order to sue in a particular judicial district.

It is appropriate to create a test whereby both parties have substantial business nexus in the judicial district or otherwise constrained by this statute. Financial firms do not want to be open to suit in any and all districts due simply to the presence of a branch or an ATM. It is unlikely that the provision, as it is currently constructed, will eliminate blatant forum shopping.

Prior user rights defense
We support the expansion of the prior user rights defense to remove "methods." However, the financial services industry continues to need additional language to ensure that a holding company may confer this defense on affiliates and extend protection to those who had reduced the subject matter to practice at least one year prior to the filing date of the patent.

The defense is a personal defense and applies only to "the person who performed the acts necessary to establish the defense..." Uncertainty about the scope of the term "person" should be remedied to ensure that regulatory requirements do not inadvertently constrain firms' use of the

defense. Financial services companies may include multiple lines of business and complex organizational structures imposed for legal/regulatory considerations, but leverage technological and financial infrastructure across the entire organization.

Therefore, we propose the following:

"The defense under this section may be asserted by a person who performed or caused the performance on its behalf of the acts necessary to establish the defense. Such person may license such defense only to (i) an entity that controls, is controlled by, or is under common control with that person so long as such entity became affiliated with such person in good faith for reasons other than receiving such license, or (ii) an entity providing services to such person or licensed affiliate, solely to the extent such services are provided on behalf of such person or licensed affiliate."

Importantly, the revised language keeps the same "good faith" requirements of the current provision thereby ensuring that one company cannot "buy the defense" by purchasing another company simply to gain access to the defense for itself.

The defense enables an earlier inventor to continue doing what it was doing before an asserted patent was filed, but problematically does not free the earlier inventor to make even obvious modifications to its business practices. In particular, the defense applies only to "subject matter that would otherwise infringe one or more claims... [of] a patent being asserted against a person, if such person had, acting in good faith, actually reduced the subject matter to practice at least one year before the effective filing date of such patent, and commercially used the subject matter before the effective filing date of such patent." The problem is that if the prior inventor had created and commercially used subject matter that was almost the same as that covered by the patent, but was not identical, then the earlier inventor would not be able to use the defense. This would be the case even where the patented invention was abundantly obvious given the subject matter created by the earlier inventor. Such a result technologically freezes the earlier inventor and prevents it from using obvious variations of its earlier business practices. This does not logically make sense.

We support revising section 273 to essentially incorporate the obviousness standard of 35 USC § 103 in determining the scope of an earlier inventor defense under section 273. In particular, the defense would be available to an earlier inventor if the patent claim "would be invalid under section 102 or 103 of this title if such subject matter is deemed to be prior art." We believe such an amendment reflects a balanced approach that protects patent owners and enables earlier inventors to continue to use both what they had previously commercially used (i.e., subject matter that has been "actually reduced to practice and commercially used, or substantial preparations for commercial use have been made, before the effective filing date of such patent") as well as all that would have been obvious there from.

Willfulness (Section 5)
We support the language in S. 1145 on willfulness because it provides a critical clarification to the damages rules related to the all-too-prevalent imposition of treble damages when willfulness is found. In our view, the bill strikes the right balance to punish copyists, but encourage good

faith due diligence and investigation - certainly a desirable practice for an industry new to patents.

In patent law, infringement can be found even if there is no intent on the part of the defendant to infringe. However, the current status of the law has set the bar so low for notice that claims of willful infringement are standard in infringement complaints and defendants can be heavily penalized for vague and non-specific knowledge of the patent.

Some patent holders take advantage of this uncertainty by blanketing an industry with vague letters that offer a license or make outright accusations of infringement. These letters often do not list which products or services that the patent may apply to and in some cases do not even list the patent numbers relevant to the situation. A recipient of this type of letter must scramble to try to determine not only which of the potentially hundreds of products, services and processes the letter implicates, but also every possible interpretation of the claims a patentee may have. Even if a recipient does the investigation and returns with a theory of non-infringement, the patent holder can just shift the focus of the inquiry, starting the process all over again. These investigations are time consuming and expensive, requiring outside counsel opinions, and escalate other business costs such as delayed product launches.

Aside from the high cost of investigation, the low notice requirements have encouraged a head in the sand attitude for many businesses. Instead of doing patent studies for new product launches, some businesses worry that mere inquiry to the existence of a patent will trigger a notice provision, and therefore do not study the existing patents in the relevant fields. Some worry whether reading articles about issued patents trigger the notice provision. None of these situations promotes a healthy patent system, and none were the intended consequences of the concept of willfulness that sought to single out the worst infringers.

A codified standard with fair and meaningful notice provisions would restore the balance to the system, reserving the treble penalty to those who were truly intentional in their willfulness and end the unfair treble damage windfalls for mere knowledge of a patent. As such, the financial services industry strongly supports the notice requirements set forth in (b)(2)(A).

Indeed, the FSR and SIFMA have jointly filed amicus briefs at the invitation of the Federal Circuit arguing that the current jurisprudence is out of balance and exactly backwards --imposing an affirmative duty on the defendant and creating liability risk for mere knowledge of another's patent. This chills the ability to even undertake an investigation of a competitor's or third party's patent position.

To combat the problem, SIFMA created and operates a clearinghouse (see, [http://www2.sia.com/IP_Warehouse/](http://www2.sia.com/IP_Warehouse/)) to connect interested parties on predatory patent assertions and licensing. Nevertheless, registered members face the additional risk of triggering notice and potentially an affirmative duty to obtain an opinion of counsel under the current rule

We look forward to continued discussion with the Committee and bill sponsors on (b)(2)(B), which allows willful infringement upon a finding of intentional copying. While blatant copying of a patented product with knowledge of the patent should be grounds for willfulness, further clarification is needed to ensure that mere notice of a patent, particularly by individuals not

involved in the development of the product at issue, does not constitute intentional copying. If it did, (b)(2)(B) would essentially reinstate the current low notice threshold.

Apportionment (Section 5)
Apportionment reform is needed to rationalize damages awards, which are being inflated by unreasonable calculation methodologies. Complex products in our industry, for example, often rely on numerous features or processes, many of which are unpatented. Even where the patented component is insignificant as compared to many unpatented features, patentees base their damage calculations on the value of an entire end product. This standard defies common sense, distorts incentives and encourages frivolous litigation.

Justice Kennedy gave voice to this concern in his eBay case concurrence:

"[i]n many cases now arising . . . the nature of the patent being enforced and the economic function of the patent holder present considerations quite unlike earlier cases. An industry has developed in which firms use patents not as a basis for producing and selling goods but, instead, primarily for obtaining licensing fees"

Section 5(a) of the bills addresses this problem by requiring that consideration be given to "the economic value that should be attributed to patent's specific contribution over the prior art," and the terms of non-exclusive marketplace licensing of the invention. We look forward to continued discussion with the Committee and the bill sponsors regarding the "entire market value" rule in (a)(3) to ensure the market value is based overwhelmingly on the patent's specific contribution over the prior art.

Effective Date
S. 1145 is currently drafted to "take effect 12 months after the date of enactment" and applies only to patents "issued on or after that effective date." We believe that Section 13(a) should be amended so that the provisions related to litigation take effect immediately upon enactment. The litigation provisions in Section 5 appropriately are effective immediately. The provisions in Section 10 should take effect immediately as well. Lower courts are able to handle changes in the law, whether by statute or judicial decision, quickly and seamlessly. Courts do not need 12 months to prepare for the proposed modifications Section 10. Perhaps more importantly, the litigation provisions in this Act and the postgrant review mechanism should apply to patents issued before or after the effective date of this Act. In many instances a plaintiff will assert multiple patents in a single case, some of which may have been issued before and some after the effective date of this Act. If this Act only applies to patents granted after the effective date, courts could be forced to apply different standards of venue, interlocutory appeal, prior user defenses and damages to different patents-in-suit in the same case. This will dramatically increase the complexity and cost of the cases.

In the chart below, I have provided our views as to how the effective dates should be modified. Again, whether effective immediately or after a grace period, the laws should apply to all non-expired patents and patent applications, not just those filed after the law is enacted.

Clarification of Secret Prior Art
S. 1145 departs from the previous refinements to the novelty provision (Section 102) that were

set forth in the bills of the 109th Congress. The former bills generally aligned U.S. novelty standards with international patent standards by requiring prior art to be "publicly known," and publicly accessible, whereas S. 1145 uses the language "in public use or on sale" in Section 102(a)(1). We are concerned that the proposed "in public use or on sale" language could be construed in a manner that penalizes or discourages research-and-development collaboration between companies. Courts could potentially hold that patents on prototypes, code or the like from inter-company collaboration are invalid or "on sale", despite an executed arms-length confidentiality agreement between separate companies.

In contrast, in Europe and the U.K. the existence of a confidentiality agreement provides a clear "safe harbor" for such collaboration. Under Article 54(2) of the EPC, "The state of the art shall be held to comprise everything made available to the public by means of a written description or oral description, by use, or in any other way, before the date of filing the European patent application." If we look to section 2(2) of the U.K. Patents Act of 2004, it recites that "[t]he state of the art in the case of an invention shall be taken to comprise all matter...which has at any time before the priority date of that invention been made available to the public... by written or oral description, by use or in any other way." The clear reference to "available to the public" is significant in that it supports the ability of organizations (in Europe) to protect against novelty destruction by entering into confidentiality agreements incidental to research and development activities. For example, in Europe, a secret sale of an invention (e.g., a prototype) that is subject to a non-disclosure agreement is simply not regarded as prior art. (See, e.g., 1992 O.J.E.P.O. 646, 652.)

Under the proposed bill language, the danger exists that when "company A" contracts or collaborates with "company B" for development, certain development activities such as building prototypes or design models resulting from that collaboration could work against the parties as to later-arising patent rights. An accused infringer under patent rights arising from the development work could argue that the development activities qualify as an invalidating secret offer for sale or sale. (M&R Marking Systems, Inc. v. Top Stamp, Inc., 926 F. Supp. 466, 470-471 (D.N.J. 1996); In Re Kollar, 286 F.3d 1326, 1334 (Fed. Cir. 2002)). Although the patent owner may ultimately prevail on technical arguments under a vague totality of circumstances test, the presence of a binding, air-tight confidentiality agreement is not decisive of the outcome under the totality of the circumstances test. (See, e.g., Netscape Communications Corporation v. Konrad, 295 F.3d 1315 (Fed. Cir. 2002).) This could be an expensive and time consuming loophole that infringement defendants could attack to require patent holders to successfully defend their patent validity, based on an activity- i.e. open innovation and research and development cooperation -- which should otherwise be encouraged. This problem, in our view, would place U.S.-based firms at a disadvantage vis-à-vis global competition.

For these reasons we recommend the following changes to the novelty provision: (1) in Section 102(1)(a), replace "public use or on sale" with "otherwise publicly known" or "otherwise available to the public." The above change to the H.R. 1908/S.1145 will allow organizations to contractually protect against unintentional invalidity of patents by executing a binding non-disclosure agreement with collaborating organizations.

Conclusion

It is time for Congress to act. The litigation around patents is too fervent and the awards and settlements too unbalanced. The Supreme Court of the United States has recognized and written eloquently against abuses, but the Court's recent decisions do not obviate the need for legislation. On the contrary, they suggest a clear need for legislative action.

We support S. 1145 as essential to increase patent quality and restore some balance and fairness to the litigation landscape. We encourage members of the Committee to work with the bill sponsors to report the bill to the full Senate this month so that the Senate can act during this session.

Thank you for the opportunity to testify.

1 John A. Squires and Thomas S. Biemer, Patent Law 101, Does a Grudging Lundgren Panel Decision
Mean the USPTO is Finally Getting the Statutory Subject Matter Question Right? 46 IDEA 561, 563-566
(2006).
2 "Trolls on State Street?: The Litigation of Financial Patents, 1976-2005." Mr. Josh Lerner. Harvard
Business Journal
3 See, Squires and Biemer, 46 IDEA at 581-85 (2006).
4 See http://www.fedcir.gov/pdf/ChartAdjudications06.pdf

**Nomination of John A. Squires**
**To be Under Secretary of Commerce for Intellectual Property and the Director of the**
**United States Patent and Trademark Office**
**Questions for the Record**
**May 28, 2025**

**QUESTIONS FROM SENATOR GRASSLEY**

1. What are your goals and priorities for the USPTO? What do you think will be your greatest challenges?

**RESPONSE:** My goals, if I am honored with confirmation to steward America's innovation agency, are to restore the USPTO to its rightful place atop the world as executor of our Nation's constitutional mandate and to boost America's ingenuity engine with the intellectual property that drives economic growth, technological progress, and global competitiveness. American intellectual property shall again set the standard for competing and winning in the marketplace of ideas.

My priorities are to pursue, promote and implement those policies that streamline our unitary patent system for all walks of inventors to ensure the intellectual property rights it issues are timely of high quality, and ensure it is aimed to foster continued innovation, opportunity and growth.

As Secretary Lutnick stated in his testimony to the Senate Commerce, Science, and Transportation Committee, USPTO's greatest challenge is to address the present "unacceptable "patent backlog and provide updated tools to ensure the issuance of market-timely intellectual property of demonstrable quality.

2. You previously testified before the Senate Judiciary Committee in favor of the creation of the PTAB.
   a. What is your present position regarding the PTAB? Do you have any concerns with the way it is functioning? Do you intend to make any changes to the PTAB's infrastructure, process or procedures? If so, what and why?

   **RESPONSE**: I believe that the creation of the PTAB was the right thing to do and testified before the Senate Judiciary Committee in 2007 regarding the creation of the PTAB, that an executive agency should have some form of ability to retake jurisdiction of its output. With the institution of the AIA, we now have the benefit of approximately 14 years' worth of data to examine.

   Overall, it is my belief that if we can analyze trends against the relevant issued patent marketplace data to better understand why IPRs have the types of numbers reported while PGRs seem less preferred; why prior art was missed in cases of invalidation and if that art is making it back to the art unit post disposition to address issues on the front end; and why industry appears to be under-utilizing third party submissions and what can be done to address this issue; among other issues. Some of the answers to those questions will

reveal themselves along the lines of the dual and differently directed functionality of Patent Trials and Appeal functions.

If confirmed, I will work avidly with the office's stakeholders, leadership, and Congress to provide that feedback and transparency to ensure that the PTAB is functioning in accordance with its creation and goals.

b. If confirmed, will you implement policies to alter the PTAB's authority or restrict access to IPRs? If so, how and why?

**RESPONSE**: If confirmed, I have no pre-disposition to alter the PTAB's authority or restrict IPR access. Ultimately, a balanced approach works best and is an indicator of ex parte and inter partes system that is in balance and functioning as intended in our robust, unitary system. Should I be confirmed, I will work to ensure that the Congressional intent and goals of the PTAB are met and in keeping with relevant decisional authority.

c. Will you commit that if you are confirmed, you will ensure that American companies that are sued on questionable patents will be allowed to seek review on the merits of those patents at the PTAB?

**RESPONSE**: Yes, if confirmed, I will work to ensure that American companies will have this important avenue of redress available to them.

d. Please explain your position on the PREVAIL bill currently being considered by the Senate. Do you agree with the changes it seeks to make to the PTAB process? Why or why not? Please be specific.

**RESPONSE**: As I testified at the hearing, I believe Congress is undertaking important work to strike the right balance for stakeholders since the creation of the PTAB. I have not had the opportunity to study the bill in great detail but if confirmed, I look forward to working with stakeholders, PTO management, and Congress to achieve these important aims.

3. Patent quality has been a major concern because poor quality patents can be easily weaponized to attack and inhibit U.S. manufacturers and other businesses due to the extremely high cost of patent litigation. Promoting patent quality is the most effective way to prevent those harms, while still ensuring that patents incentivize real innovations.

a. If confirmed, what will you do to improve the USPTO's examination process to promote patent quality, both at the front-end during examination and at the back end through effective post-issuance review and reexamination?

**RESPONSE**: I believe leaning-in to AI here can help at all stages insofar as patent quality. At the front end, best-in-class AI software should be evaluated as an adjunct to assist the Patent Examiners' evaluation of whether a patent application satisfies patentability standards. Indeed, the private sector increasingly uses AI software to find invalidating prior art. Our world-class Examining Corps should have access to and where helpful utilize these same tools. This would promote patent quality at the front end and,

in fact, discourage applicants from filing weak patent applications, thereby introducing an element of self-regulation and concomitant backlog reduction.

At the back end, these same tools can offer quality assistance. In addition, avenues should be explored to encourage third party submissions without later penalization for having injected art into the system at the earliest possible time. Incentives should be considered where relevant to utilize the PGR process to promote and improve patent quality nearer the time of issuance. If confirmed, I will work with the USPTO and stakeholders on these ideas and others to address examination areas and stages of examination where quality can be improved.

4. Management of the USPTO is not an easy task. In recent years, we have seen an increase in the backlog of patent applications pending review, which stands at more than 800,000 applications. On average, it takes more than two years from filing until final disposition. For many small businesses, two years is a lifetime to wait.

   a. Do you agree that the growing backlog of patent applications is a problem?

   **RESPONSE**: Yes. In private practice, reduction of patent application backlog was the subject of a seminal white paper I authored following my 2007 Senate Judiciary Testimony ("Peer to Patent" SJC submission 12D, No. 29). If confirmed, I am committed to working with Congress, USPTO staff, and stakeholders to implement effective, long-term solutions to ensure the USPTO can fulfill its mission and support American innovation.

   b. If confirmed, what steps will you take to decrease the backlog and application pendency?

   **RESPONSE**: USPTO should undertake a review and work in connection with the USTR to identify and eliminate from the system cases, especially foreign-filed cases, that are overburdening the system. Some applicants could self-elect with petitions to suspend examination for six months, especially with large portfolios of broad ranging patents and there may be incentives attendant to that. If confirmed, I will work with the USTPO and stakeholders on the best way to address the backlog and patent pendency including hiring additional examiners as well as using AI tools in examination.

   c. If confirmed, what technologies or approaches would you deploy to address this problem?

   **RESPONSE**: As I testified in my opening statement, I believe it is time for the USPTO to "lean-into" AI to provide tools to reduce backlog. Several areas should be investigated to provide immediate results in terms of utilizing generative AI, for example, on matters of written description, enablement and indefiniteness. I am aware of Examiner blogs reporting favorably on the exploration of such technology utilization.

   If confirmed, I would work with the USPTO and stakeholders to develop our own playbook to utilize generative AI tools to allow examiners to spend less time on tedious repetitive tasks that slow down review processes.

5. Recently the USPTO has lost a number of examiners and PTAB judges, which may increase the patent backlog and impact the ability of the USPTO to perform its duties.
    a. How do you intend to minimize further departures and ensure that the USPTO will carry out its statutory responsibilities?

    **RESPONSE**: If confirmed, I will work with others in the USPTO as well as PTAB leadership to ensure that the USPTO and the PTAB can continue to carry out their statutory responsibilities. Additionally, if confirmed, I will review the many areas I understand the USPTO currently has as to incentivization and retention in efforts to reenergize our professionals with the Office's important mission.

6. Patent examiners have expressed concerns that the subscriptions they utilize to research databases for their prior art reviews are being cancelled. They are concerned that without these resources, they will not be able to conduct their required prior art reviews in a comprehensive and complete manner, potentially resulting in the issuance of low-quality patents.
    a. Do you agree that it is critical for patent examiners to have access to all the literature they need to conduct in-depth and comprehensive prior art reviews in order to ensure high-quality patents?

    **RESPONSE**: Yes. In this day and age, search tools exist and can be deployed so that prior-art is knowable, accessible and applicable at the time of examination, including non-patent prior art, literature. This is where new AI applications can help and I believe should be made available so high quality patents are issued in the first instance. I believe this issue can be managed and applied correctly by the examiners, who after all are all of high skill in their respective areas.

    b. Will you commit to ensure that patent examiners have access to all the resources they need for their application reviews?

    **RESPONSE**: If confirmed, I commit to diligently explore all avenues of resources wherein the office provides both the tools and resources to do the job and execute on our mission. As I testified in my opening statement, our patent examiners are world class and we want inventors from all walks to come to our American patent system first, where we will help them "hone and hew" strong proprietary rights, expeditiously issued and of provable quality.

7. Please explain your position on USPTO fee diversion.
    a. Do you agree that the USPTO should have full access to its fee revenue to meet its operating needs?

    **RESPONSE**: Yes. As I testified, since the USPTO is a fee-based agency, I believe it should have full access to its fee revenue so it can be run efficiently like a business.

    b. Will you commit to safeguarding the fees that the USPTO collects, consistent with the USPTO's authorizing statutes?

**RESPONSE**: Yes. That is my understanding of the charge Congress provided for the Director and, if honored with confirmation, shall faithfully execute those duties, particularly because I believe that all Americans should benefit from the tremendous value of government-issued IP rights.

    c. Do you agree that we should end USPTO fee diversion? Will you work to stop this practice?

**RESPONSE**: Yes.

8. Many are concerned that litigation funding can lead to abusive filings and undermine legitimate small business activity.
    a. If confirmed, do you pledge to vigorously oppose abusive patent troll tactics and protect American businesses from frivolous patent litigation?

**RESPONSE**: Yes. As I testified to and have written about in co-authoring a 2015 Wharton Business Journal piece, "Why Investment Friendly Patents Spell Trouble for Trolls," "troll"     practices are based not upon notions of valuation of patents as self-standing assets (or investment parlance, "fundamentals") rather they are based upon " nuisance value" due to the extreme cost of defending litigation. They are predatory " arbitrage" plays, and the inventors are almost always the one who get hurt.

9. Some are concerned that foreign rival countries are bankrolling lawsuits in order to hobble the operations of U.S. companies and/or to gain access to sensitive technology, especially in the patent space.
    a. Do you support the mandatory disclosure of foreign litigation financing investors in the filing of a lawsuit or PTAB proceeding?

**RESPONSE**: Allowing foreign rivals to bankroll lawsuits against U.S. companies to gain access to our technology is unacceptable.  District court local rules require such disclosures and notification of the patent office of such parties in interest, the PTAB should have similar transparency requirements. If confirmed, I will work to ensure that the PTAB proceedings are used in accordance with statutory requirements.

10. You have been a strong proponent of business method patents, especially novel financial strategies.
    a. What is your position on the scope of patentability for business methods?

**RESPONSE**: My position and views on the patentability of business methods were formed as a result of patent filings expedited by the USPTO as "inventions" to combat terrorism for suspicious transactions, interdiction of illicit funds and disruptions of terrorist financing networks in their attempts to conduct their business in the shadows.  Based upon these patents, and the anti-terrorist financing technologies they spawned, I co-authored briefs to the Supreme Court that argued, ultimately successfully, that the courts cannot properly confine patentable inventions to some preexisting view about what innovation should look like. The U.S. patent system should be open to all

classes of innovation and affords tools, such as 102, 103 and 112 to weed out bad patents no matter the class of innovation.

    b.  Tax patents were a type of business method patent that Congress banned in the America Invents Act. Some of the concerns about tax patents are also applicable to business method patents in general. Will you ensure that the USPTO won't expand its policy relative to business methods patents to allow for tax patents? Will you ensure that the USPTO will follow the law and not issue tax patents?

    **RESPONSE**: If confirmed, I commit to following the law.  Tax patents are uniquely problematic because they are interposed between the taxpayer and the government's ability to collect revenue.

11. What is your position on patents and AI? What do you plan to do with respect to AI policy at the USPTO, and do you plan to introduce new policies regarding AI-assisted inventorship, the impact of AI on prior art-related determinations, subject matter eligibility, or other such areas?

**RESPONSE**: As I testified in my opening statement, if harnessed and smartly applied, AI tools can help deliver our finest hour.  The private sector has adopted such tools, the USPTO needs to keep pace to equip our world-class examining corp to grant patents tested by those same fires, expeditiously issued and of provable quality.  If confirmed, I would immediately explore new policies to meet those goals, within the appropriate constitutional confines, including areas of inventorship, eligibility, prior art,  eligibility, and other areas such as enablement, written description, and indefiniteness.

12. How do you intend to make enforcement of American intellectual property a priority in trade negotiations and in talks with international organizations?

**RESPONSE**: If confirmed, I commit to working closely with others in the Administration, including the USTR and the State Department, in ensuring that any future trade agreements include the availability of strong IP provisions as well as ensure that IP provisions in existing trade agreements are adequately enforced.

**Senator Dick Durbin**
**Ranking Member, Senate Judiciary Committee**
**Written Questions for John Squires**
**Nominee to be Under Secretary of Commerce for Intellectual Property and Director of the**
**United States Patent and Trademark Office**
**May 28, 2025**

1. At your hearing, you stated that you saw "no evidence of wrongdoing" in your areas of responsibility while employed by Perkins Coie LLP. You also said that you had seen President Trump's executive order entitled "Addressing Risks from Perkins Coie LLP."
   a. Do you agree with President Trump's characterizations of Perkins Coie in his March 6 executive order?

   **RESPONSE:** As I stated at the hearing, my practice was limited to intellectual property issues and in connection with my practice and client work, I was unaware of any evidence of wrongdoing during my time at Perkins Coie from 2012 to 2016.

   b. Do you agree with President Trump's decision to issue executive orders targeting Perkins Coie and other law firms?

   **RESPONSE:** As I stated at the hearing, my practice was limited to intellectual property issues and in connection with my practice and client work, I was unaware of any evidence of wrongdoing during my time at Perkins Coie from 2012 to 2016.

2. The U.S. Patent and Trademark Office (USPTO) has reportedly cut access to certain non-patent literature, particularly in the chemical arts, that examiners rely upon to properly examine biotech and pharmaceutical patent applications. I am concerned that this will lead to the issuance of low-quality patents that would allow Big Pharma to improperly extend their patent monopolies and maintain high drug prices in this country.
   a. What is your response to these reports?
   b. If you are confirmed as USPTO Director, what will you do to ensure examiners have the resources they need to properly examine patent applications and make sure the patents issued by the USPTO are of high quality?

   **RESPONSE:** Answers to 2 a and 2 b: If confirmed, I commit to reviewing the examination process at the USPTO, including which tools examiners may need to effectively examine patent applications. Implementing software and other AI-aided tools should allow examiners to be confident that access to necessary literature and other public information is sufficiently searched. In addition, the use of such tools, the increased efficiencies to follow should minimize any effects from the recent departures and should help foster a more productive and satisfying work environment.

3. Last month, the Judiciary Committee reported the Interagency Patent Coordination and Improvement Act—a bill I introduced with Senator Tillis—by voice vote. This bill would establish a task force between the USPTO and the Food and Drug Administration to enhance communication and coordination between the agencies in implementing their respective

activities related to patents. Coordination of this type would be particularly effective in addressing gamesmanship and abuses involving pharmaceutical patents that keep prescription drug prices too high for American patients.

    a. Do you support increased coordination between the USPTO and FDA to combat abuses of the patent system?

**RESPONSE:** The USPTO and FDA have begun coordinating their patent-related efforts pursuant to Executive Order (EO) 14036 on "Promoting Competition in the American Economy."

    b. Do you commit to continuing these efforts if you are confirmed as USPTO Director?

**RESPONSE:** I support proper information sharing between agencies to promote government efficiency. If confirmed, I commit to working with the FDA Commissioner on improving information sharing between the agencies.

4. I am concerned about potential harm to patent quality as a result of recent efforts to reduce the size of the federal workforce, including the ongoing hiring freeze. According to the data on the USPTO's website, the USPTO lost more than 350 examiners between January and March. That is a drop of more than four percent in just three months, and the attrition will almost certainly be much higher when the numbers for April are released. Further, the attrition has disproportionately affected technology centers in highly complex fields, such as TC1600 (Biotechnology) and TC1700 (Chemicals), where mentorship and institutional knowledge are critical for prior art analysis.

Even prior to this loss of examiners, the USPTO was already failing to keep up with the volume of patent applications it receives, with the USPTO's backlog increasing by nearly 30 percent over the last five years. Secretary Lutnick has pledged to reduce the backlog and make sure that "American inventors get taken care of quickly and effectively." In the short term, that will require the USPTO to examine significantly more applications with a smaller workforce, which raises serious concerns about whether examiners will have enough time to conduct adequate examinations.

    a. If confirmed, how will you address attrition rates in specialized technical centers, particularly in light of the learning curve for examiners in highly complex fields?

    b. If confirmed, how do you plan to reduce the application backlog without substantially impairing patent quality?

**RESPONSE:** Answers to 4 a and 4 b: If confirmed, I will work with others in the USPTO and in the Administration to determine the best way to address the backlog and patent pendency.

Specifically, in terms of backlog reduction, I believe AI tools deployed to repetitive and time-consuming tasks is the way forward. If confirmed, I would work with the USPTO and stakeholders to develop our own playbook to achieve similar results.

5.  Section 32 of the America Invents Act of 2011 required the Director of the USPTO to support the establishment of pro bono programs across the country to assist under-resourced independent inventors and small businesses. Within five years of the law's enactment, the USPTO helped to set up programs to serve patent applicants in every state. Many of those programs still exist to help applicants navigate the USPTO and submit applications to protect their inventions.

    a.  What role should the USPTO play to further support pro bono efforts and ensure resources exist to enable inventors to access the USPTO?
    b.  Do the USPTO's pro bono programs free up resources that could be used to reduce the patent backlog or pursue other priorities?

    **RESPONSE:** Answers for 5 a and 5 b: As I have dedicated my practice in the last 8 years to independent inventors, small business and startups, I know first-hand the value and importance of these programs. If confirmed, I will work with the USPTO senior leadership on continuing and providing support and resources to these efforts. I have seen the wonderful results they can bring, including ensuring appropriately expeditious tracks are available for examination and to help pro se applicants and small/micro entities successfully navigate the application to patent issuance.

**Nomination of John Squires to be Under Secretary of Commerce for Intellectual Property and Director of the U.S. Patent and Trademark Office**

**Questions for the Record**

**Submitted May 28, 2025**

**<u>QUESTIONS FROM SENATOR COONS</u>**

1. If President Trump asked you to do something you judged to be illegal or unethical, would you resign?  Please answer yes or no.
    a. If you would not resign, what would you do?  Please explain.

    **RESPONSE:** The President would not ask me to do something illegal or unethical. If confirmed, I will make every effort to faithfully discharge my duties, I will always follow the law and uphold my sacred oath to support and defend the Constitution.

2. Is there ever a circumstance when an executive branch agency may choose not to comply with a federal court order, until such time as that order is stayed or vacated by a higher court?

**RESPONSE:** In my career as a patent lawyer in private practice, I have neither encountered this question nor had occasion to study it. If confirmed and should such a situation manifest, I would consult the Office of Counsel for guidance and advice and be sure to follow the advice of counsel in the discharge of my Constitutional duties.

3. The Patent Trial and Appeal Board (PTAB) was designed to be a faster, cheaper alternative to federal district court litigation.  Unfortunately, that has not been the case.  What, if any, reforms do you think should be made to the PTAB so that it can actually function as the alternative to federal court it was meant to be?

**RESPONSE:** If confirmed, I will work with stakeholders, USPTO leadership and Congress to assess the almost 15 years of data since the PTAB creation to assess the effect of the differing standards between federal district court litigation proceedings and PTAB IPR proceedings.  From this data and analysis, I will work to ensure any legislation concerning the PTAB fulfills Congress's intent that the PTAB serve as a faster and cheaper alternative to district court litigation.

4. If confirmed, what steps would you take to tackle the U.S. Patent and Trademark Office's (USPTO) patent examination backlog?

**RESPONSE:** Several immediate steps should be explored for both their short term and long-term benefits.  With immediate effect, the Office should undertake a review and work in connection with the USTR to identify and eliminate from the system cases, especially foreign-filed cases that are overburdening the system. Some applicants could self-elect with petitions to suspend examination for six months, especially with large portfolios of broad ranging patents and there may be incentives attendant to that.  Above all, if confirmed, I will work with the

USTPO, stakeholders on the best way to address the backlog and patent pendency including hiring additional examiners as well as using AI tools in examination.

5. The USPTO's Office of Policy and International Affairs (OPIA) works to promote global intellectual property (IP) protections and prevent the theft of American IP around the world. If confirmed, what steps will you take to support OPIA and its mission?

**RESPONSE:** OPIA plays an important role in making sure U.S. IP interests are expressed and defended across the globe. If confirmed, I plan to work with OPIA, other stakeholders and USPTO leadership to provide resources to strengthen and improve policy for strengthening and balancing our system and its reach both at home and abroad.

6. The USPTO's IP Attaché Program serves as a vital asset for U.S. businesses, innovators, and creators striving to protect their IP rights in complex international markets. These attachés assist American rights holders in navigating foreign IP laws, advocating for stronger IP protections, and combating IP theft. Their efforts not only safeguard U.S. economic interests but also foster fair trade practices globally.
   a. If confirmed, how would you bolster and expand the IP Attaché Program to address current staffing vacancies and enhance its global reach?

   **RESPONSE:** If confirmed, I would look to bolster the program by ensuring IP Attachés meet the aims of safeguarding U.S. economic interests as well as fostering fair trade practices around the world.

   b. Are there specific regions or countries where you believe the deployment of additional IP attachés would significantly benefit U.S. stakeholders and promote robust IP enforcement?

   **RESPONSE:** I do not have any specific regions or countries in mind at present, but if confirmed I commit to working ardently with others within the USPTO, stakeholders, the executive branch and Congress to ensure strong IP protections and companion enforcement mechanisms exist and are available both domestically and internationally.

   c. In 2020, the Department of Homeland Security published a report to the President titled, Combating Trafficking in Counterfeit and Pirated Goods. Which recommendations, if any, do you think should be revisited from this report?

   **RESPONSE:** If confirmed, I will review this report and will work with Congress, others in the Trump Administration, and with IP stakeholders, on how best to stop counterfeit and pirated goods. I would note the Judiciary IP subcommittee's recent hearing on "Foreign Threats to American Innovation and Economic Leadership" elicited shocking testimony regarding the safety concerns of counterfeit parts, freely available from e-tails and the near impossible task of either consumers or e-tailers from discerning the authentic from counterfeit. Any recommendations from the 2020 report should fully take into account the deceitful and harmful to public safety practices that the hearing elicited.

7. Do you believe that the USPTO benefits from interagency coordination?  If so, in what contexts?
   a. How will you promote continued cross-agency collaboration?

   **RESPONSE:** I support proper information sharing and coordination between agencies as a means of promoting government agency effectiveness and harmonization. If I am confirmed, I would look for new opportunities to promote collaboration afforded by new technologies, such as blockchain.

8. If confirmed, how would you work with the Intellectual Property Enforcement Coordinator (IPEC)?
   a. Where do the objectives of the IPEC and the USPTO Director align and where do they diverge?

   **RESPONSE:** Effective and coordinated IP enforcement both at home and abroad is key to maintaining U.S. technological dominance.  If confirmed, I look forward to working with others in the Trump Administration in determining the most effective ways to ensure alignment on matters concerning the respect of IP rights both at home and abroad.

9. Acting USPTO Director Coke Stewart recently issued a memo outlining a new process for post-grant proceedings that clarifies the Director's discretion to deny petitions and expedite review.  Acting Director Stewart also rescinded a 2022 memo that constrained the Director's statutory discretion.  If confirmed, would you keep these policies in place?  Why or why not?

**RESPONSE:** I understand the AIA to confer rather broad-based discretion on the Director.  To understand the exercise of discretion, I would need to examine bases underlying policy changes as well as operational considerations that have gone into such.  If confirmed, I would look forward to working with Acting Director Stewart, PTO management and stakeholders to ensure that the PTAB meets Congress' intent of providing a faster, cheaper and agency-based alternative inter partes proceedings as an alternative to lengthy and expensive District Court litigation.

10. Some in the technology community have argued that the United States should "delete IP law."
    a. Do you think Congress should "delete" existing IP laws?

    **RESPONSE:** The U.S. Constitution charges Congress with the promotion of "the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries" in Article I, Sec. 8, Clause 8. If confirmed, I look forward to working with Congress as they exercise their Constitutional authority.

    b. Why are robust IP protections important to our country and to the American economy?

    **RESPONSE:** Our Founders understood the importance and value of IP by enshrining it in the U.S. Constitution.  IP laws are imperative to the United States' technological

leadership as it incentivizes innovation and protects the inspiration, perspiration and tenacity of innovators and creators from others stealing their work. As a key driver of economic development, growth and the source of millions of jobs each year, robust IP laws are fundamental to and an integral part of the U.S. economy.

**Nomination of John Squires to be the Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office**
**Questions for the Record**
**Submitted May 28, 2025**

### QUESTIONS FROM SENATOR CORY A. BOOKER

1. President Trump's recent Executive Order directs federal agencies to "optimize" intellectual property policies to make drugs more affordable. At the same time, Trump has systematically cut USPTO's staffing by implementing hiring freezes, terminating probationary employees, and incentivizing early retirement, which has reduced the patent examiner corps and exacerbated pre-existing staff shortages. In just one month, from February to March, the USPTO lost 5% of its patent examiners. Fewer examiners mean rushed patent reviews that can lead them to issue flawed patent applications. When the USPTO issues flawed drug patents it delays generic entry and increases drug prices for Americans.

    a. Do you agree that understaffing hinders USPTO's ability to review and issue patents, both slowing down the frequency with which new patents are issued and increasing the potential for hurried review?

    **RESPONSE:** I believe equipping Examiners with productivity tools, such as AI can alleviate staffing concerns.  If confirmed, I am committed to working with USPTO leadership and stakeholders to ensure patent applications are processed in a timely manner for shorter pendency for all applications, and to align production capacity with incoming workload. I am committed to introducing new initiatives aimed at reducing pendency.  If confirmed, I will also work with USPTO to align its examination capacity and productivity tools to attack the at-present unacceptable inventory of unexamined applications.

    b. How will you rebuild staffing to enhance the quality of patent reviews, especially for drug-related applications?

    **RESPONSE:** If confirmed, I will work with stakeholders, others in the Trump Administration, and USPTO leadership to determine staffing requirements and outfit staff with the productivity tools, such as AI, to find the best way to address the backlog and patent pendency, including in technology areas that deal with drug-related applications.

**Nomination of John Squires**
**To be Director of the United States Patent and Trademark Office**
**Questions for the Record**
**Submitted May 28, 2025**

<u>**QUESTIONS FROM SENATOR WHITEHOUSE**</u>

1.  If President Trump or anyone at the Department of Commerce asks you to engage in conduct that violates the law or your ethical obligations, what will you do?

**RESPONSE:** The President would never ask me to engage in unlaw conduct. I will follow the law and uphold my sacred oath to support and defend the Constitution.

2.  Has President Trump or any member of his team asked you to approve or deny a petition for inter partes review or post-grant review?  If yes, please describe.

**RESPONSE:** No one has made any such request of me, nor, if confirmed, do I anticipate any such request.

3.  Has President Trump or any member of his team asked you to take any official action that would advantage a specific person or entity?  If yes, please describe.

**RESPONSE:** No one has made any such request of me, nor, if confirmed, do I anticipate any such request.

4.  Have you had any discussions with any member of the Trump administration concerning personnel at the Office to which you've been nominated?  If yes, please describe with specificity.

**RESPONSE:** I have recommended names of qualified individuals to be considered for senior leadership positions at the Office.  The Secretary of Commerce and the Office of Presidential Personnel ultimately oversee all personnel decisions.

5.  Under what circumstances, if any, could a federal government official legally defy a court order issued in a case to which the official or the government was a party?

**RESPONSE:** In my career as a patent lawyer in private practice, I have neither encountered this question nor had occasion to study it. If confirmed, and should such a situation manifest, I would consult the Office of Counsel for guidance and advice and be sure to follow the advice of counsel in the discharge of my Constitutional duties.

6.  What would be the appropriate action for a court to take in the event that the government or a public official defied a court order?

**RESPONSE:** In my career as a patent lawyer in private practice, I have neither encountered this question nor had occasion to study it. If confirmed, and should such a situation manifest, I would consult the Office of Counsel for guidance and advice and be sure to follow the advice of counsel in the discharge of my Constitutional duties.

7. Was the U.S. Capitol attacked by a violent mob on January 6, 2021? Were violent rioters who were convicted of assaulting police officers on January 6 political prisoners?

**RESPONSE:** I am generally aware of the issue of "political prisoners" making its way to the Supreme Court, but do not recall the outcome of the issues litigated.

8. Did Joe Biden win the 2020 presidential election?

**RESPONSE:** President Biden was sworn in as 46th President of the United States of America on January 20, 2021.

9. Does the 22nd Amendment permit a president to be elected more than twice?

**RESPONSE:** In my career as a patent lawyer in private practice, I have neither encountered this question nor had occasion to study it. However, it is my understanding that a person may only be elected President of the United States for two terms.

**Senator Peter Welch**
**Senate Judiciary Committee**
**Written Questions for John Squires**
**Hearing on "Nominations"**
**Wednesday, May 21, 2025**

1. In 2007 you testified at a Senate Judiciary Committee patent hearing in support of the Patent Reform Act. The Patent Reform Act eventually became the Leahy-Smith America Invents Act (AIA), which was signed into law in 2011 and created new post-grant proceedings for invalidating patents at the Patent Trial and Appeal Board (PTAB).
   a. What is the current role of the PTAB?

   **RESPONSE:** The "PTAB" is actually a concatenation of two important functions created by the AIA one being "Patent Trails" and the other "Appeals" Boards. The "Patent Trials" function comprises IPRs, PGRs and Derivation proceedings. The Appeals Board function is different as it affords a direct appeal to the Director from an examiner impasse, providing an important point of redress for applicants.

   The PTAB's role is to administer these post-grant, inter-partes programs and appeal processes in a fair way to keep our unitary patent system in balance for all stakeholders and the American public.

   b. Are inter partes reviews (IPR) and post-grant reviews (PGR) effective ways to invalidate bad patents?

   **RESPONSE:** It seems that both forms of redress have served their function as a faster and cheaper alternative to district court litigation.

   c. If confirmed, do you commit to ensuring the PTAB has the resources and personnel to be able to fulfill their current mandate and continue to administer IPRs and PGRs?

   **RESPONSE:** Yes. If confirmed, I will work avidly with the office's stakeholders, leadership and to ensure the PTAB functioning in accordance with its creation and goals and fulfilling Congressional intent, including ensuring the PTO continues to have the necessary personnel – and tools – to fulfill its statutory mission.

2. Since publication of a new rule by the U.S. Patent and Trademark Office regarding discretionary denials of IPRs, the PTAB institution rate has dropped from 68% to 43%.
   a. How do you plan to address the decrease in PTAB institution rates?

   **RESPONSE:** We have nearly 15 years of important data on the PTAB. I testified that this data seems "skewed" to me as between the Patent Trial functions of IPRs, PGRs and Derivation proceedings as one might expect a more "normal" distribution, or at least as between IPRs and PGRs. As to the drop in the rate, I would want to explore the avenues of redress where that is headed, whether it be district court or elsewhere. If confirmed, I look forward to working with stakeholders the USPTO and Congress to ensure that the PTAB fulfills Congressional intent as to all aspects.

3. If confirmed, do you plan to hire more USPTO staff to ensure the USPTO is able to function effectively?

**RESPONSE:** If confirmed, I will work with the USPTO and stakeholders to ensure that the USPTO is able to fulfill its statutory missions in all aspects of its ex parte and inter partes functions.

4. Do you believe there should be a standing requirement at the PTAB?

**RESPONSE:** I have seen certain proposed legislation over the years that has sought to establish new standing requirements for filing petitions at the PTAB. If confirmed, I commit to working with Congress and stakeholders on this issue, including any harmonization proposals that may be attendant to companion federal district court litigation.

5. Is the PTAB an effective way to challenge bad pharmaceutical patents?

**RESPONSE:** Yes. The PTAB plays an important role in the U.S. patent system to provide redress in terms of a faster and cheaper alternative venue to challenge the validity of a patent in our unitary system, including pharmaceutical patents.

6. If confirmed, are there any reforms you plan to implement that would assist in more generic drugs being able to enter the market?
   a. Please describe your views on patent thickets in relation to the cost of prescription drugs.

   **RESPONSE:** Historically, "hard technology" innovation has been generally viewed as "incremental" whereas pharmaceutical patents have generally correlated to molecules, compounds, and the efficacy of such. These technologies have now converged, creating the prospect of incremental invention in the pharmaceutical sector. While there is no specific "quantum" of invention per se in either field, if confirmed, I am committed to ensuring the USPTO issues patents that meet the statutory requirements for patentability in every technological art area, including pharmaceuticals, and ensuring patents are not abused.

7. Do you believe that patent examiners currently have enough time to review patent applications? If not, do you have any plans to address this problem?

**RESPONSE:** In a unitary system housing all types of art units, some areas may require more time, some less. If confirmed, I will work with stakeholders and USPTO to evaluate the relative amount of time granted to examiners and what changes, if any, are necessary, including the provision of appropriate productivity tools, including AI.

8. Please describe any plans you may have to integrate artificial intelligence (AI) into the USPTO.
   a. What guardrails should be put in place prior to using AI at the USPTO?

**RESPONSE:** Non-public USPTO data and applicant data should be walled off, for one, so as to not allow training off from this pool. Any software tools contemplated for modernizing the examination process should include appropriate cyber security measures to better manage the complicated and onerous task of searching for and identifying the most relevant prior art. Enacting efficiencies will help speed the entire examination process. If confirmed, I will work with others in the USPTO on what AI tools are currently being used and how best to integrate additional AI into the USPTO's examination process.

9. Please describe your views on the issue of third-party funding of patent litigation and how you would address this issue at the USPTO.

**RESPONSE:** As to foreign countries, allowing funding of lawsuits against U.S. companies to gain access to our technology is unacceptable. As to domestic funding, if confirmed, I will work to ensure that the USPTO and the PTAB proceedings are used as intended by Congress, including working to make the PTAB disclosure requirements concerning funders congruent with federal district court local rules concerning the real-party in interest and notification to the USPTO of such.

**Questions from Senator Tillis**
**for John Squires**
**Senate Judiciary Committee**
**Nomination Hearing**

1. What are your thoughts regarding the need for patent eligibility reform? Do you agree that such reform is needed now, more than ever, and that it is not just a threat to innovation but that it is also a threat to our national security not to do something about it?

**RESPONSE:** As I testified, the area of patent eligibility suffers from clarity of precedent and sews confusion and uncertainty into our patent system. This uncertainty clouds patents, erodes confidence in our system, and is leading to a lack of American competitiveness particularly in AI and critical emerging technologies. I agree that clarity is needed and the lack of clarity is compromising our world standing and threatens our national security. If confirmed, I look forward to working with Congress and this Committee to ensure our patent laws meet the moment and serve both inventors and the Nation at large.

2. What are your thoughts regarding the need for reform of the U.S. Patent and Trademark Office (USPTO) Patent Trial and Appeal Board (PTAB)? Do you agree that for far too long the PTAB has been an arena for gamesmanship by bad actors that that such practice needs to be reined in?

**RESPONSE:** We have nearly 15 years of important data on the PTAB. I testified that this data seems "skewed" to me as between the Patent Trial functions of IPRs, PGRs and Derivation proceedings as one might expect a more "normal" distribution, or at least as between IPRs and PGRs. Whether this "skewing" is a result of gamesmanship by bad actors or other factors is not clear. If confirmed, I look forward to working with others at the USPTO and with Congress on ensuring that the PTAB fulfills its mission.

3. Given that the USPTO is fully funded by user fees from inventors and entrepreneurs – not taxpayers – do you believe that these fees should remain at the USPTO and that they should not be redirected to unrelated federal programs?

**RESPONSE:** Yes, as I testified, it is important for the PTO to retain its fees so it can be efficiently run as a business because I also believe that all Americans should benefit from the tremendous value of government-issued IP rights.

4. What specific measures will you take to ensure that the patent backlog – now at a historic high – does not continue to grow and that pendency does not increase?

**RESPONSE:** Several immediate steps should be explored for both their short-term and long-term benefits. With immediate effect, the Office should undertake a review and work in connection with the USTR to identify and eliminate from the system cases, especially foreign-filed that are overburdening the system. Some applicants could self-elect with petitions to suspend examination for six months, especially with large portfolios of broad ranging patents and there may be incentives attendant to that.

As I testified in my opening statement, I believe it is time for the USPTO to "lean-into" AI to provide tools to reduce backlog. Several areas should be investigated to provide immediate results in terms of utilizing generative AI, for example, on matters of written description, enablement and indefiniteness. I am aware in fact of Examiner blogs reporting favorably on the exploration of such technology utilization.

If confirmed, I will work with the USTPO and stakeholders on the best way to address the backlog and patent pendency including hiring additional examiners as well as using AI tools in examination.

5.  Fundamental to the patent examination process is the prior art search. Thorough and complete and prior art searches, at every stage of examination, are key to ensuring high quality and efficient examination.

    Do you agree with this and what are your general thoughts on this topic?

**RESPONSE:** A thorough and comprehensive prior art search is the foundation of every patent examination and the foundation of quality and confidence in the patent system. The earlier prior art can be injected into the system, the better for all stakeholders to improve quality and confidence and I believe AI tools can help further these aims.

6.  The USPTO maintains both unpublished and published data which is ripe for use for training AI models. This could be of great use to patent examiners for performing prior art searches, which I outlined in a May 20, 2025 letter to the USPTO asking the agency to explore this topic in earnest.

    Assuming that proper security and privacy measures are taken, do you agree with this and what are your general thoughts on this topic?

**RESPONSE:** Yes. Any software tools contemplated for modernizing the examination process should include appropriate cyber security measures concerning the use of LLMs and other AI-assisted tools to better manage the complicated and onerous task of searching for and identifying the most relevant prior art. Making this and other steps more efficient will help speed the entire examination process. If confirmed, I will work with others in the USPTO on what AI tools are currently being used and how best to integrate additional AI into the USPTO's examination process.

**Questions for the Record**
**Sen. Adam Schiff (CA)**

**John Arthur Squires, Nominee to be Under Secretary of Commerce for Intellectual**
**Property and Director of the United States Patent and Trademark Office (USPTO)**

1. Will you be an advocate for the employees at USPTO, many of whom have already been forced to move to keep their jobs, and work with the Secretary of Commerce to exempt the agency's workforce from any reductions in force?

**RESPONSE:** I commit to ensuring the USPTO has the workforce necessary to carry out its statutory functions and responsibilities, including providing productivity tools with which employees can excel at their jobs.

2. You have ties to the private equity fund Fortress Investment Group. According to public reporting, you helped them get into the patent litigation business by advising them on the creation of a multimillion-dollar fund. Fortress has rapidly become a major patent litigant, bringing cases against dozens of US companies.
   a. Can you describe your involvement with Fortress IP and whether that will impact your work as USPTO Director?

   **RESPONSE:** I have no present ties or connection to Fortress investment group. My prior work for them was around the 2013-2017 time frame. My work and advice for them was not related to litigation funding. Specifically, my work for them centered on my written scholarship and modeling of patents as derivatives for valuation and as self-standing assets per se. My solution was a "patent mortgage" wherein operating companies pledge their patents as collateral and use their loan proceeds as working capital to fund operations, expansion or the like.

   At the time this work helped emerging companies in distress with valuable patents stave-off bankruptcy and avoid the dilemma of having to sell or license their portfolio at unfavorable valuations and divesting themselves of their prized assets. And, as I testified at my hearing, in 2020, Marshall Phelps reported in Forbes of several companies surviving the economic downturn brought on by Covid-19 using my very patent mortgage solution. If confirmed, I will abide by my Ethics Agreement concerning former client work for Fortress or any other former client.

3. Do you believe that approximately 68 out of 100 U.S. patents that are currently in force are defective?
   a. If so, what should Congress be doing to improve patent quality on the front end during the patent examination process?

   **RESPONSE:** No. The statistics I mentioned are those published by the USPTO concerning claim cancellation upon challenge at the PTAB which are a small subset of all issued patents, not a measure of quality at the front end. I also testified in response to Senator Coon's questions that this data seems "skewed" to me as between the Patent Trial

functions of IPRs, PGRs and Derivation proceedings as one might expect a more "normal" distribution, or at least as between IPRs and PGRs (and even a higher incidence than current numbers concerning Derivation proceedings).

In general, errors of all types should be avoided, including errors in not granting patent claims that should rightly issue. I believe it is to the benefit of all stakeholders if prior art is identified and applied at the earliest stage of examination or post issuance, as we benefit as a society from patents "born strong," beginning with the original patent grant. I further believe the third party submission provisions provided in the AIA should be incentivized and better utilized to inject art as early as possible into the system. If confirmed, I am committed to working with stakeholders, the USPTO and Congress to improve patent quality on the front end and mechanisms for achieving such.

    b.   What can Congress do to ensure that PTAB is effectively catching any defects that examiners miss?

**RESPONSE:** Quality has a place at every aspect of the examination and PTAB process and I look forward to working with stakeholders, the USPTO and Congress to make sure the tools provided are being effectively deployed and any new tools under consideration help meet Congressional intent for the PTAB and its important function.

4.   Whistleblowers play a critical role in calling out waste, fraud, and abuse across government. If confirmed, do you commit to protecting and in no way adversely affecting, or retaliating against, the employment of any employees who report internal waste, fraud and abuse of authority by the Trump Administration, including any activity that may involve you, through the proper channels to agency management, to the appropriate agency Inspector General, and to Congress?

**RESPONSE:** Yes.

**Senate Judiciary Committee**
**Hearing on the Nomination of John Arthur Squires**
**to be Under Secretary of Commerce for Intellectual Property**
**and Director of the U.S. Patent and Trademark Office**
**May 21, 2025**
**Questions for the Record**
**Senator Amy Klobuchar**

In April, the Senate Judiciary Committee advanced a number of bills to stop branded pharmaceutical companies from abusing their patents to box out cheaper generic alternatives. Senator Grassley and I have led legislation, the Preserve Access to Affordable Generics and Biosimilars Act, to help put a stop to these anti-consumer deals.

1.  As Director of the United States Patent and Trademark Office, what steps can you take to ensure that patents are not abused to drive up the cost of prescription drugs?

**RESPONSE:** I am aware of concerns of so-called patent thickets being abused in relation to the cost of prescription drugs. I believe this is a relatively new phenomenon. Historically, "hard technology" innovation has been generally viewed as "incremental" whereas pharmaceutical patents have generally correlated to molecules, compounds and the efficacy of such. These technologies have now converged, creating the prospect of incremental invention in the pharmaceutical sector. While there is no specific "quantum" of invention per se in either field, if confirmed, I am committed to ensuring the USPTO issues patents that meet the statutory requirements for patentability in every technological art area, including pharmaceuticals, and ensuring patents are not abused, including as thickets.

**Nomination of John Squires**
**To be Under Secretary of Commerce for Intellectual Property and**
**Director of the United States Patent and Trademark Office Questions**
**for the Record**
**Submitted May 28, 2025**

**QUESTIONS FROM SENATOR CORNYN**

1. Please explain your view of the role of third-party litigation finance in the context of patent litigation. Specifically:

   a. Do you believe third-party litigation finance has enabled "patent trolls" to weaponize improperly-issued patents against United States small businesses by threatening lawsuits for infringement and then offering to settle for less than the cost of litigation?

   **RESPONSE:** Third party litigation financing may have played a part in the "troll" practice where patents are aggregated around certain sectors and asserted as "nuisance suits" I have written in opposition to such practices in the Wharton Business review, "Why Investment friendly Patents Spell Trouble for Trolls" (Knowledge@Wharton, September 24, 2015.

   b. Do you view a strong Patent Trial and Appeal Board (PTAB) as a partial remedy against this "patent troll" behavior as described above?

   **RESPONSE:** As to poor quality patents being asserted for nuisance value, yes. Congress established the PTAB to serve as a faster and cheaper alternative to district court litigation specifically as a remedy for patent validity issues.  We have nearly 15 years of important data on the PTAB.  If confirmed, I look forward to working with others at the USPTO and with Congress on ensuring that the PTAB fulfills its mission.

   c. Does the United States Patent and Trademark Office (USPTO) have all the information it needs regarding the funding behind the challenges brought before the PTAB?

   **RESPONSE:** The answer to this question is not clear.  In federal district court litigation, local rules require identification of real parties in interest and notification of the USPTO of such. In general, it seems to me that these transparency vehicles as between the federal court system and the USPTO should be congruent.  If confirmed, I commit to working with others within the USPTO and IP stakeholders to ensure the USPTO has sufficient information to address misuse of PTAB proceedings.

2. In 2024, foreign companies earned a majority of issued patents. What protections do you plan to put in place to ensure that foreign competitors like China cannot use U.S. IP to harm domestic industry?

**RESPONSE:** Congress has already enshrined review provisions in the United States Code when national security concerns are implicated.  If confirmed, I commit to exploring the use of existing

regulatory obligations promulgated to effectuate these laws directed to the issuance of IP rights that implicate national security concerns to ensure that foreign competitors cannot use U.S. IP to harm domestic industry.

3. What will you do to ensure foreign adversaries do not impede American innovation through the funding of frivolous patent litigation?

**RESPONSE:** Allowing foreign rivals to bankroll lawsuits against U.S. companies to gain access to our technology is unacceptable. If confirmed, I plan to bring the full weight of the office to require transparency with respect to such and review any such situations for national security implications. I will work ardently to ensure that the PTAB proceedings are used as intended by Congress.

4. Two years ago, CIA Director John Ratcliffe wrote in the Dallas Morning News about "the burgeoning threat of patent trolls serving as puppets for adversaries that participate in U.S. litigation as an undisclosed third party." The USPTO has the tools through inter partes review at the PTAB to deter these adversaries. Will you commit to requiring the agency you lead to operate the PTAB as Congress articulated in the America Invents Act and not exceed the authority granted to discretionarily deny petitions for review as previous Directors have done?

**RESPONSE:** Yes.

5. Would you support taxing foreign entities that finance frivolous patent litigation against United States companies?

**RESPONSE:** Yes.

6. During your career in private practice, you helped found Fortress Investment Group's IP funding arm, which last year committed $6.6 billion to litigation finance, as well as $2.9 billion specifically to intellectual property litigation. What steps will you take to recuse yourself from decisions that would benefit Fortress?

**RESPONSE:** I have not represented Fortress since 2017 and have no arrangements with them, legally or otherwise.

My prior work for them was around the 2013-2017 time frame and stemmed from my scholarship and modeling of patents as derivatives for valuation and as self-standing assets per se. My solution was a "patent mortgage" wherein operating companies pledge their patents as collateral and use their loan proceeds as working capital to fund operations, expansion or the like.

At the time this work helped emerging companies in distress with valuable patents stave-off bankruptcy and avoid the dilemma of having to sell or license their portfolio at unfavorable valuations and divesting themselves of their prized assets. And, as I testified at my hearing, in 2020, Marshall Phelps reported in Forbes of several companies surviving the economic downturn brought on by Covid-19 using my very 'patent mortgage' solution.

I will always follow applicable government ethics laws and regulations based on guidance from the Ethics Office of the Department of Commerce to avoid actual or perceived conflicts of interest.